UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
  PLAINTIFF,           )     CASE NO. 2:14-CR-127
                             )
      vs.            )     APRIL 14, 2016
                             )
ROBERT B. LEDBETTER, ET AL.,  )     9:00 A.M.
                             )
  DEFENDANTS.         )     VOLUME 8

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:

BENJAMIN C. GLASSMAN
United States Attorney
By:  DAVID M. DEVILLERS
      KEVIN W. KELLEY
      BRIAN J. MARTINEZ
Assistant United States Attorneys
303 Marconi Boulevard
Columbus, Ohio  43215

FOR THE DEFENDANT ROBERT B. LEDBETTER:

JEFFREY A. BERNDT, ESQ.
575 South High Street
Columbus, Ohio  43215

AARON G. DURDEN, ESQ.
10 West Monument Avenue
Dayton, Ohio  45402

- - -

Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
APPEARANCES CONTINUED:



FOR THE DEFENDANT CHRISTOPHER A. HARRIS:

Carpenter, Lipps & Leland, LLP
By:  KORT W. GATTERDAM, ESQ.
280 North High Street
Columbus, Ohio  43215

KEVIN P. DURKIN, ESQ.
367 East Broad Street
Columbus, Ohio  43215


FOR THE DEFENDANT RASHAD A. LISTON:

ISABELLA DIXON, ESQ.
98 Hamilton Park
Columbus, Ohio  43203

Kegler, Brown, Hill & Ritter
By:  S. MICHAEL MILLER, ESQ.
65 East State Street
Columbus, Ohio  43215


FOR THE DEFENDANT DEOUNTE USSURY:

Office of the Ohio Public Defender
By:  GREGORY W. MEYERS, ESQ.
     KIRK A. MCVAY, ESQ.
250 East Broad Street
Columbus, Ohio  43215



FOR THE DEFENDANT CLIFFORD L. ROBINSON:

Scott & Nolder Law Firm
By:  STEVEN S. NOLDER, ESQ.
35 East Livingston Avenue
Columbus, Ohio  43215


                        -  -  -
```

TRIAL ONE – VOL. 8 –  759

1               THURSDAY MORNING SESSION

2               APRIL 14, 2016

3                       – – –

4       Thereupon, the following proceeding was held in chambers

5   with all counsel present:

6           THE COURT:  Go ahead, Mr. Kelley.

7           MR. KELLEY:  Thank you, Your Honor.  This witness kind

8   of triggered for us –– we wanted to have a discussion, put

9   something on the record regarding this idea of relocation.

10  This witness, along with a number of others, have had threat

11  assessments done by the FBI.  The FBI, for some of these

12  people, is making potential relocation –– some could be before

13  they testify, but a majority are post-testifying –– available

14  for them.

15      Obviously, we don't plan on getting into a lot of the

16  particulars, but I wanted counsel to know that that program

17  exists; that a lot of these people have not chosen to take

18  advantage of it though it's been available.  But it's also

19  something that's supposed to be available for them at any

20  point.  If things change and circumstances change, they could

21  invoke this and receive financial assistance.  We AUSAs are not

22  a part of the process other than we're obviously aware of the

23  program.

24      Eligibility, what they're given, how it is done, is all

25  handled by the FBI and their victim witness people –– victim

TRIAL ONE - VOL. 8 -  760

1    assistance people.  That's kind of the gist of it.  I think

2    most of us will be flagging it with our witnesses who at least

3    expressed interest so that counsel will know that this is one

4    of the people that's potential.  And ultimately, if counsel

5    wants someone, I guess, designated as a potential witness for

6    the defense to go into it, I'll find someone at the FBI that

7    can answer for what the program is.

8         But this is a little bit unchartered territory for us.

9    And it is something, though, that I think is fair for counsel

10   to know about, but it likely isn't going to come out in our

11   direct examination.

12        MR. MEYERS:  "It" being the details thereof?

13        MR. KELLEY:  The details and/or -- this is not the

14   Witness Protection Program.  That almost would be easier to

15   explain because that's a fairly finite program.  This is more

16   an offers of assistance including moving expenses possibly, or

17   getting them out of town.

18        THE COURT:  Does it have a witness protection

19   component, Mr. Kelley?

20        MR. KELLEY:  Absolutely.

21        THE COURT:  So it will be a Witness Protection Program

22   plus.

23        MR. KELLEY:  Yes.  Though witness protection, we call

24   it a more informal witness protection plan because this is a

25   lesser standard.

1      THE COURT:  I see.  I'm glad you clarified it because

2  I thought it was more significant.

3      MR. KELLEY:  For some people, it could be no more than

4  they're giving a lump sum to get out of town.  It could come

5  down to something like that.

6      THE COURT:  And the FBI determines whether they are

7  put in the witness program like we're familiar with that sparks

8  the Jencks Act, that kind of witness protection, or whether

9  it's kind of the step-down program?

10      MR. KELLEY:  Yes, Your Honor.

11      MR. DEVILLERS:  If I may add, there's some beforehand

12  too.  So we have some people out of town now that will be

13  brought back and kept at an undisclosed location and brought

14  in.  Once they're done testifying, it could be -- not just this

15  trial, but the second trial as well, then they'll be getting

16  the same relocation package.  Some may get the Witness

17  Protection Program, which is the marshal's program; some might

18  get the FBI program.

19      MR. KELLEY:  The only other category that could be

20  eligible besides witnesses is families of cooperating

21  defendants.  Almost all our cooperating defendants are in the

22  system already, but their immediate family members are given

23  the opportunity.  If they can meet these assessment

24  requirements, they have the potential to get that benefit.

25      THE COURT:  All right.  Okay.

TRIAL ONE – VOL. 8 – 762

1      MR. DURKIN:  Your Honor, can I ask one question?

2      THE COURT:  Go ahead, Mr. Durkin.

3      MR. DURKIN:  And finally, understanding this is the

4  marshal and the FBI, does BOP have some other program?

5      MR. DEVILLERS:  Yes.  Within the Bureau of Prisons,

6  for people like Allen Wright and others, there is a WITSEC

7  program within BOP which they'll be screened for which means it

8  can be name changes, particular locations where they won't be

9  within the general population.

10      MR. KELLEY:  And we do have a paragraph addressing

11  that in each of those plea agreements, I think.

12      THE COURT:  Mr. Berndt.

13      MR. BERNDT:  I certainly appreciate the disclosure.  I

14  would at least like to have access to somebody who can explain

15  it to me.  And I'll tell you why.  For instance, if somebody

16  gets $10,000 just to leave town, I'd like to know whether or

17  not there are any confines on the money, whether there's any

18  accountability for it, things like that.  I mean, again, it may

19  not ever come up, but do they have -- do they know now -- say,

20  for instance, Michael Boyd was on the witness stand.  He said

21  he was going to try to avail himself to relocation.  Does he

22  know now what the --

23      MR. KELLEY:  No.

24      MR. BERNDT:  So they don't know if they're going to

25  get in; if they get in, what it's going to entail?

1          MR. KELLEY:  As of literally this morning, it still

2    has not been decided how -- it's a case by case.  It is the

3    federal government.  They don't just hand out checks.  But I

4    completely understand the concern.  And we can carry back that

5    the defense might want someone to be that sounding post for

6    that.

7          MR. BERNDT:  But if it's going to be something that's

8    consummated -- or these people know before they testify, then I

9    would never need it, so we don't have to add work to the pile.

10   If that's the case, I withdraw the request.

11         MR. DEVILLERS:  Some might.  Once by the time the

12   three months is over, they may know.

13         MR. BERNDT:  Will we know?

14         MR. DEVILLERS:  Yeah.

15         MR. GATTERDAM:  I guess from my perspective, I

16   wouldn't withdraw the request to talk to somebody because we

17   may feel that the possible money that may be given to them, all

18   the other things that Jeff brought out, I think might be

19   important for the jurors to understand from one of us on the

20   defense side.  I don't know.  And even if Mr. Boyd doesn't know

21   for sure, I'm sure that's accurate.  I'm sure he knows

22   something, and his knowledge may be something somebody may want

23   to ask him, that he may be seeking a paycheck down the road.  I

24   don't know.

25         THE COURT:  Maybe it's something as simple as you,

TRIAL ONE - VOL. 8 - 764

1  Mr. Kelley, or you, Mr. Devillers, advising defense counsel of

2  who in the FBI they can talk to, or whoever runs the program in

3  the FBI. Just give the defense counsel a name. Defense

4  counsel can talk to that person who can give them whatever

5  information they need on the program, if there's written

6  information or whatever. You think that would be satisfactory

7  to defense counsel?

8              MR. GATTERDAM: Yes.

9              THE COURT: Mr. Berndt, would that meet your --

10             MR. BERNDT: That's fine.

11             MR. NOLDER: Plus, if anything has been given, we're

12  entitled to that.

13             THE COURT: Of course you are. But I'm talking

14  about -- and that's what I assume was the purpose of Mr. Kelley

15  and Mr. Devillers' disclosure. But I thought that Mr. Berndt

16  was asking something slightly different, that is, we want to

17  know more about the program itself, because what you know about

18  the program now is what the United States Attorney has told you

19  about the program. So, if you want to know more of the

20  details, maybe you can talk to someone within the FBI.

21         Do you have a name, Mr. Kelley?

22             MR. KELLEY: I don't, but I will get one.

23             THE COURT: Okay.

24         Get Agent Lauber in here. Maybe he knows something

25  about it. Maybe he can tell us.

1          MR. DURDEN:  Your Honor, if I can ask Mr. Devillers,

2     as the witnesses come forward, will we know whether or not they

3     have been in, at what stage they may be.

4          MR. DEVILLERS:  Literally, this morning, we're trying

5     to get more details so we can tell you exactly.  It's still in

6     the air.  What we've learned this morning is the goal is to get

7     them to pay for what would be costs for moving expenses, place

8     to live for about six months, and then they're kind of on their

9     own.  That's kind of what we're looking at.

10          Will that be through receipts?  Will it be through lump

11     sum money?  Will it be through -- how else they're going to

12     verify them leaving?  We don't know.  We do know for some of

13     the people that are coming in that we've removed from the city

14     of Columbus, we have them at Extended Stays throughout the

15     country, quite frankly.  We'll fly them back and it will be at

16     a location that the FBI is paying for here, a secret location

17     for the few days they're going to testify, and back out.  We'll

18     keep them at those Extended Stays until they're done completely

19     testifying in all the trials, and they'll be given some sort of

20     six months relocation package.  But that's still in the air

21     what that is.

22          (Erick Lauber enters chambers.)

23          THE COURT:  Agent Lauber, I apologize to you.  But

24     what frequently happens in litigation is whomever is out of the

25     room is designated for some awful task, or they're blamed for

TRIAL ONE – VOL. 8 – 766

1    something that's happened.  And this was no exception.

2            MR. LAUBER:  I'm very used to that.

3            THE COURT:  A question was raised about the mechanics

4    or the core and the details of the kind of step-down program

5    about which Mr. Boyd testified, which is not as significant as

6    the Witness Protection Program that we're all familiar that

7    sparks the Jencks Act, but the lesser program.  It might

8    involve the payment of a sum of money to leave town, et cetera.

9    And could you get us the name -- could you get for defense

10   counsel the name of someone probably in the FBI who can discuss

11   with defense counsel the details of the program just to give

12   them a primer on this is how the program works.  Because

13   Mr. Kelley already disclosed that there is such a program, that

14   some of the witnesses may be involved or included in the

15   program, and so counsel just wants to know more about how it

16   works.

17           MR. LAUBER:  I understand, Your Honor.  What I'll try

18   to do -- it's probably easiest to explain a little bit -- is

19   get one coordinating name.  This person is not going to know --

20   there's the financial aspect versus how to get them out of town

21   aspect versus -- that's run by probably separate units.  You

22   know how our government likes to separate things.  I'll try to

23   get one name they can go to --

24           THE COURT:  Kind of a clearinghouse.  If that one

25   person could just give an understanding of the program well

TRIAL ONE - VOL. 8 -  767

1    enough to provide an overview of this is how the program works,

2    you know, these are the criteria for admission into the

3    program, whatever the case may be.  I don't know what questions

4    defense counsel might have, but -- or that person may be able

5    to tell them where they can go to find out all of the details

6    about the program.  It's probably codified in a CFR someplace.

7              MR. LAUBER:  I don't believe it's that structured.

8    Every time we ask questions, we get

9    this-hasn't-been-done-before-type answers.  So I think it's --

10   we're all learning at this point, but I can probably find you

11   somebody that can help you out with that.

12             THE COURT:  Agent, thank you very much.  Is that

13   something that you can get to counsel by close of business

14   today?

15             MR. LAUBER:  Certainly.

16             THE COURT:  Is that ample time?

17             MR. GATTERDAM:  Absolutely.

18             THE COURT:  Is there anything else we need to take up,

19   Mr. Meyers?

20             MR. MEYERS:  Just a quick point following Mr. Nolder's

21   comment.  With respect to upcoming witnesses for whom these

22   issues are relatively settled, the Broomfields of the world

23   perhaps who have already been relocated, maybe given financial

24   aid already, will we, on the brink of their arrival, if not

25   sooner, get the final details of what benefits, quote/unquote,

TRIAL ONE - VOL. 8 - 768

1   benefit package they were given thus far?

2           MR. DEVILLERS:  Thus far, sure.

3           THE COURT:  Is that all?

4           MR. BERNDT:  Your Honor, I want to talk about Mr. Boyd

5   and the issues that came up there towards the end of the day

6   yesterday.

7           THE COURT:  Okay.

8           MR. BERNDT:  First of all, I'd like to apologize for

9   getting a little bit excited.  I -- it's something that I'll

10  try to rein in.  I took a look at Mr. Boyd's background to the

11  extent that I could last night.  I found his case in Virginia,

12  a Southampton case.  I don't have certified records or things

13  like that, but he did get five years of probation.  He also had

14  a capias, an arrest warrant, issued for him for revocation of

15  that probation, and that was consistent with the timing of the

16  fugitive of justice warrant which he was arrested on and had to

17  post a bond to get out of jail.

18          The capias was, in fact, dismissed after he was brought

19  back to Virginia.  And in the paperwork that I had, it said

20  that he would be on five years probation after his release.

21          I won't kid anybody.  I don't know the mechanics of it.

22  I know he got out of jail.  It's possible that his probation

23  issue could have been handled by telephone, whether there was a

24  personal appearance, that type of thing.  But based upon the

25  fact that I haven't had a lot of time to look at it, it does

TRIAL ONE – VOL. 8 – 769

1    appear, as if to me, that he was in error in terms of stating

2    it was five years probation.

3           THE COURT:  You mean six months?

4           MR. BERNDT:  He said six months.  And I think that

5    with him being arrested on the fugitive of justice warrant, I

6    think it's probably more than a mistake.

7           The other end of it is that in running his record again

8    this morning, he has a drunk driving case, which is very

9    recent, in municipal court here.  I know that the OVI isn't

10   something that's going to be relevant in terms of 609, but in

11   that case he gave a different birth date than the one that he

12   has.  And again, I don't know if that's because he's not

13   supposed to get in trouble when he's cooperating with the

14   government, or that he's got a prior OVI and is trying to avoid

15   a second offense, or that he's just that kind of guy.

16          I also don't know whether or not it's a scrivener's

17   error by the police.  A lot of the times in these instances,

18   this happens when people say they don't have a driver's license

19   on them, they give information.  And I do want the Court to be

20   aware that the information is slightly different.  His birth

21   date being 11-8 of '78 on most of the documents went down as

22   11-3 of '73.  But there's also a criminal case attached to it,

23   which is an obstruction of justice.  So something went on.  I

24   haven't had time to verify what that was, and I don't want

25   to -- I talked to Kevin.

TRIAL ONE - VOL. 8 -  770

1          THE COURT:  If ever you wanted to make a case for a

2    scrivener's error, you probably just did, at least the

3    scrivener either makes his eights like threes, or -- eights

4    like threes it would have to be, or he lied about saying I was

5    born in -- but he would be one of these guys who wants all of

6    his eights to be threes.  I wonder where I've heard that

7    before.  But go ahead.

8          MR. BERNDT:  That went right past me.  But lots of

9    things go right past me, Judge.

10          THE COURT:  It's like the whole C-K, C-C thing.  I'm

11    learning a whole other language.

12          MR. BERNDT:  I'm right there with you.

13          With his background, I have a little bit more pause and

14    concern in terms of whether or not this was misrepresenting

15    something to law enforcement.  Also I don't know if he feels

16    like if he discloses it that he has a problem over on this side

17    of the desk.  So I put this out there.  I actually don't want

18    to continue his cross-examination because I think it loses some

19    impact in doing that.

20          THE COURT:  I agree.  And I think, quite frankly, in

21    light of my ruling based on *Petros* and *Gaines*, you're going to

22    be able to question him about the convictions anyway.  There's

23    certainly enough there.  I don't know that we need to go into

24    the arrest or anything like that because we can't prove it.  We

25    don't have enough evidence to indicate that it was either a

TRIAL ONE - VOL. 8 - 771

1   scrivener's error or intentional deception.  We just don't.

2   And I don't want to try that case through this witness.  You've

3   got a treasure trove of stuff, it seems.

4          MR. BERNDT:  Could I simply ask the Court to do this?

5          THE COURT:  Sure.

6          MR. BERNDT:  If I determine in the future -- if I talk

7   to this police officer and he tells me something along the

8   lines of the guy didn't have his driver's license, he gave me

9   this information, he -- if I can show that I have some type of

10  legitimate information that he misled the police in terms of

11  his identity, I'd like to reserve the right to recall that

12  gentleman.  And again, I recognize that would be months down

13  the road.  But I think it's --

14         THE COURT:  Yeah.  And I'll take that under

15  consideration.  Let me look at that question, because basically

16  you would be calling a witness back just to impeach him on

17  whether he lied to the police about a traffic stop.

18      And at some point it becomes a balancing process.  But

19  instead of going down that road, let me just say I will take it

20  into consideration.

21         MR. BERNDT:  Thank you.  I appreciate it.

22         MR. KELLEY:  Your Honor, just briefly.

23         THE COURT:  Go ahead, Mr. Kelley.

24         MR. KELLEY:  I think Mr. Berndt has a good-faith basis

25  to address whether it was a six-month probation or a five-year

1  probation.  I don't have a problem with that.  He's got a

2  good-faith basis.  But getting into potential revocations that

3  were not convictions is not fair to him.

4      THE COURT:  I agree.

5      MR. KELLEY:  And then the OMVI -- for the record,

6  Mr. Boyd made us aware of this OVI, which is not him hiding it.

7  It's not a conviction.

8      THE COURT:  That answers your question, Mr. Berndt.

9  He told Mr. Kelley and the rest of the prosecution team about

10  the OVI.

11      MR. KELLEY:  And he knows we're talking to his

12  prosecutor to make sure he shows up and notifies the prosecutor

13  what's going on.  He is clearly not trying to hide it from the

14  prosecutor who has his current probation.  I think that

15  probably would be the limited extent to which this needs to be

16  looked into.

17      THE COURT:  I don't want to mislead, but I'm going to

18  look at the question seriously.  But unless I find something

19  that would be awfully compelling, I would be hard-pressed to

20  call a witness back just for you to impeach him on that

21  narrow -- that's a very narrow issue.  But I'm not going to

22  tell you that I won't do it.  I'll look at the question.

23      MR. BERNDT:  Could I ask the Court something?

24      THE COURT:  Sure.

25      MR. BERNDT:  Could I ask him today whether he told his

TRIAL ONE – VOL. 8 –  773

1  probation officer about the OVI?  A lot of times what happens

2  is when you get a new offense, you get a holder.  The reason

3  isn't because I just want to ask him that, but --

4       THE COURT:  Does that circumvent 609, though?  What it

5  does, it creates in the jury's impression that this guy has

6  caught another case.  And 609 could have included arrests in

7  the text, but it didn't.  It says convictions.

8       And so I've just talked myself into my answer.  The

9  answer is no.

10      MR. BERNDT:  The reason why I would ask it is because

11  if he got a pass on the holder, then that's an inducement that

12  he's getting to testify here.  It's not whether he simply

13  reported it.  But if he says, yes, I did, but the prosecutors

14  took care of that for me, then that's another inducement.

15      THE COURT:  I will tell you what I would do.  If there

16  is a basis for that, then I will allow that examination outside

17  the presence of the jury.  And if you can satisfy the Court

18  that there was some kind of inducement associated with it, I'll

19  rethink it.  But I think that as postured now, it undermines

20  609 because 609 deals with convictions.  And I think it would

21  be -- it would leave the impression, especially with this guy's

22  record, that this is another conviction when it's not; it's

23  just an arrest.

24      MR. BERNDT:  I understand.

25      THE COURT:  So I'm not going to undermine 609.  I'll

TRIAL ONE – VOL. 8 –  774

1    tell you what.  At the point you decide in your outline that

2    you are going to get into those questions, then I want you to

3    advise the Court.  I will excuse the jury so that you can voir

4    dire the witness on this.  If you can satisfy me by a

5    preponderance of the evidence that he was -- that this served

6    as an inducement, that is, he told his probation officer, the

7    probation officer indicated -- if I understand what you're

8    saying correctly -- that he would talk to the government about

9    maybe giving him a pass on a violation of his probation, or

10   whatever, as a result of this OVI, then I will consider letting

11   the jury hear it under the theory it was an inducement for him

12   to testify, and it may be an inducement for him to testify

13   wrongly.

14        But see here is the other part of that.  There is

15   nothing in his agreement that says that he has to -- that there

16   has to be a conviction for him to get the benefit of the deal.

17   The only thing is that he has to tell the truth.  And I don't

18   know that that establishes that he hasn't told the truth.  In

19   fact, it might establish the reverse, that he did tell the

20   truth because he told his probation officer and he told the

21   government about the OVI.  So he's acting in a manner

22   consistent with this.

23        MR. BERNDT:  Your Honor, I'd be satisfied with Kevin's

24   answer in terms of whether or not there was any type of contact

25   with you after the OVI about the probation, or the government

TRIAL ONE - VOL. 8 -    775

1    period.

2         MR. DEVILLERS:  I talked to -- Warren Edwards is his

3    prosecutor on the -- on the case he's on -- actually parole or

4    shock probation.

5         MR. BERNDT:  Judicial release.

6         MR. DEVILLERS:  I talked to him.  He had a hearing

7    scheduled I think in relation to that at one point.  I said,

8    Look, he has -- I think it's -- is it this week?

9         MR. BERNDT:  The 18th.

10        MR. DEVILLERS:  It was something where we thought he

11   might be testifying.  I said, Look, one, we needed to get this

12   guy out of town temporarily; two, we may need to get him out of

13   town permanently.  We will bring him to whatever hearing you

14   have, but he may be testifying.  That's what we told him.  He

15   said that was fine, let us know when he's done testifying and

16   we'll make sure he's at whatever probation, parole violation

17   hearing there may or may not be.  We'll make sure that's done.

18   That's what I talked to Warren about.

19        MR. DURDEN:  I haven't asked Jeff this question.  The

20   judicial release that he touched on, I wonder if we can address

21   the issue whether or not Mr. Berndt will be able to ask the

22   question, because he retained counsel and he worked toward an

23   early release.  He was really scheduled to do seven to ten

24   years.  So that issue may be one --

25        THE COURT:  He testified to that during the direct.

TRIAL ONE – VOL. 8 – 776

1  So I think that Mr. Berndt can ask about that.  I'm just saying

2  those things that are arrests and not convictions, no, not in

3  the presence of the jury because that would otherwise undermine

4  609.

5       Mr. Gatterdam?

6       MR. GATTERDAM:  I have one very easy matter.  We gave

7  the prosecutors a witness list.  I put Pamela Harris, my

8  client's mother, on that list.  I let Mr. Devillers know we do

9  not intend to call her.  He's agreed I don't need to do

10  anything more formal.  The problem is the marshals need your

11  blessing to allow Ms. Harris to come into the courtroom.

12  That's all.

13       THE COURT:  We will take care of that.  That's an easy

14  fix.

15       The other thing is, Juror No. 1's son I believe has

16  surgery today, and so she needs to leave at four.  That's why I

17  announced yesterday -- and I apologize for not telling you all

18  that we were going to end at four.  But just as long as --

19  since it's in your case, you can tell your witnesses that we're

20  going to break camp at four so that she can get to her son's

21  surgery.

22       Go ahead, Mr. Martinez.

23       MR. MARTINEZ:  One final thing, this has not come up

24  yet, I don't think, in the trial.  Prior to trial, the parties

25  entered into a number of stipulations.  And some of those

TRIAL ONE - VOL. 8 -   777

1  stipulations have to do with prior convictions of some of the

2  defendants.  We're going to present evidence about one of those

3  cases today.

4          THE COURT:  Do you want me to read the stipulation?

5          MR. MARTINEZ:  At the appropriate time.

6          MR. MEYERS:  We understand that.

7          THE COURT:  Okay.

8          MR. MCVAY:  Ever so briefly, I know we've addressed

9  this before.  But Juror No. 7, there was a problem with him

10  falling asleep.  I can't see him from where I'm sitting, but my

11  client is telling me he is continuing to fall asleep.

12          THE COURT:  Yesterday there were times when he was

13  either examining the underside of his eyelids -- that's always

14  a possibility.  He was doing that or he was concentrating or he

15  was asleep.

16          MR. DURDEN:  And wrapping his arm around Juror No. 6.

17          THE COURT:  I'm not going to touch that one,

18  Mr. Durden.  I'm not going to touch it because I didn't see it.

19          MR. DURDEN:  Okay, Judge.

20          THE COURT:  But I always hate to call a juror out, and

21  I wouldn't do it in front of his fellow jurors.  But I can

22  always bring him in with a representative of each defendant and

23  one representative of the government and say, you know, you

24  might be examining the underside of your eyelids or

25  concentrating or asleep.  But we want to make sure that you're

TRIAL ONE – VOL. 8 –  778

1  paying attention.  And I will do that if it's a consensus of

2  the group.  We can do that today at the beginning of the lunch

3  hour.

4       MR. KELLEY:  He had a good day on Tuesday.  I was

5  watching.  That's my job.

6       THE COURT:  Yesterday was one of those days where you

7  had a lot of technical stuff going on, foundation for a lot of

8  the exhibits.  It was not nearly as compelling as Mr. Wright's

9  testimony the day before.  Well, I won't say it wasn't as

10  compelling.

11       MR. MARTINEZ:  I take great offense to that.

12       THE COURT:  Mr. Wright's testimony was kind of

13  interesting.  I think it had enough colorful language and

14  colorful facts, episodes, stories that most people were pretty

15  much engaged.

16       MR. MEYERS:  To my great credit, I think I heard him

17  snoring softly when I was on my --

18       MR. DEVILLERS:  That was me.

19       MR. MEYERS:  Maybe that's just me.

20       THE COURT:  That could have been just you.  He didn't

21  snore on anybody else.

22       MR. MEYERS:  I've written that down in the annals of

23  my trial legacy in my own mind.  I would be inclined -- we

24  don't have to decide it I suppose here, but to ask the Court to

25  follow what you suggested.  Initially, while I appreciate

TRIAL ONE – VOL. 8 –   779

1   Mr. Kelley's willingness to stand guard, it's an odd role for

2   any lawyer.  I think it's so early in this trial --

3          THE COURT:  It's too early in the trial to start

4   sleeping.  That much is true.

5          MR. MEYERS:  I really think -- we've all seen it and

6   we've got to do something about it.

7          THE COURT:  I'm not in disagreement with that.

8       And usually once you kind of make a shot across the bow,

9   then everybody kind of reorients himself or herself.

10          MR. MCVAY:  If my recollection is correct, I think he

11  may be making a longer drive in the morning than most of the

12  jurors.  I think he's from southeastern Ohio somewhere.  Is he

13  the one that works in Ross Correctional?

14          MR. MEYERS:  He drives to the different prisons.

15          MR. MCVAY:  He may be rising a little earlier in the

16  morning than some of the others, for what that's worth.

17          THE COURT:  It seems like that's the consensus of the

18  group.  I'll bring him in at the beginning of the lunch hour

19  and say something very soft.  We just want to make sure that

20  he's engaged.

21          MR. MEYERS:  We may all wonder whether counsel for all

22  parties even needs to be there.  I don't want to intimidate the

23  guy.

24          MR. NOLDER:  I think you should just do it yourself.

25          THE COURT:  As long as I have the consent of the

TRIAL ONE – VOL. 8 –   780

1  jury -- because I did that.  I had the consent of all parties

2  once.  I went back.  I advised the jury.  I took my court

3  reporter.  And the Sixth Circuit said I shouldn't have done

4  that because it was a critical stage in the proceeding.

5        MR. MEYERS:  Can you have all individual defendants --

6  maybe at the -- towards the end of the lunch break, the clients

7  are all in here, you can get each one of them to tell you

8  direct, I give it up.  And then that might protect your record.

9  Then you talk to the juror after the lunch break.

10        THE COURT:  Because if everyone agrees with it, it

11  won't be an issue on appeal.  The Sixth Circuit is not going to

12  consider a matter that's not raised as an issue.  I doubt if

13  they'll *sua sponte* raise that.  If I have everyone's agreement,

14  I'll bring him in briefly with the court reporter and so advise

15  him.

16        Mr. Berndt?

17        MR. BERNDT:  Agreed, Your Honor, on behalf of

18  Mr. Ledbetter.

19        THE COURT:  Mr. Gatterdam?

20        MR. GATTERDAM:  Agreed on behalf of Mr. Harris.

21        THE COURT:  Ms. Dixon?

22        MS. DIXON:  Agreed on behalf of Mr. Liston.

23        MR. MCVAY:  Agreed on behalf of Mr. Ussury.

24        THE COURT:  Mr. Nolder?

25        MR. NOLDER:  Agreed.

TRIAL ONE — VOL. 8 —   781

1          THE COURT:  Mr. Kelley?

2          MR. KELLEY:  Yes.  We would agree, Your Honor.

3          THE COURT:  Anything else we need to take up?

4          MR. KELLEY:  Thank you for making the time, Your

5   Honor.

6      (End of chambers discussion.)

7      (Thereupon, the following proceeding was held in open court

8   with all counsel and defendants present.)

9          THE COURT:  Good morning, ladies and gentlemen, and

10  welcome back to the United States District Court.  A couple of

11  housekeeping matters.  We are going to break today at four for

12  reasons that you all understand.  And we had an evidentiary

13  matter that took a little longer this morning to resolve than

14  we thought.  So I like to explain to you why it is that we

15  don't begin at nine o'clock when we don't begin at nine

16  o'clock.  So I don't want you to think we were having coffee

17  and bonbons.

18      Mr. Boyd -- let's recall Mr. Boyd to the stand so that

19  we can begin with the cross-examination of Mr. Berndt.

20          MR. BERNDT:  Thank you, sir.

21          THE COURT:  While we're waiting, ladies and gentlemen,

22  we have a -- our newest judge to the federal court, Judge

23  Kimberly Jolson.  Judge Jolson, would you please stand so that

24  the jurors can see you.  Judge Jolson came on to the court two

25  months ago.

TRIAL ONE – VOL. 8 –   782

1           MAGISTRATE JUDGE JOLSON:  Yes, Your Honor.

2           THE COURT:  She clerked for the chief judge of the

3    Sixth Circuit and worked at a major law firm and then the

4    attorney general's office, and now she is a magistrate judge on

5    this court.  So we're very happy to have someone of her immense

6    talent and skills as a new member of the judiciary.  You should

7    rest assured your judiciary continues to be in good hands and

8    to get better.

9           Mr. Boyd, please come forward.  Resume the stand.

10   Remember you're still under oath.  Please have a seat.  You're

11   still under oath.  Mr. Berndt, on behalf of Mr. Ledbetter, are

12   you ready to proceed?

13          MR. BERNDT:  I am, Your Honor.

14          THE COURT:  Please proceed.

15                           -  -  -

16                      CROSS-EXAMINATION

17   BY MR. BERNDT:

18   Q    Mr. Boyd, good morning.

19   A    Good morning.

20   Q    Can you speak up a little bit?  Can you hear me okay?

21   A    Yes, I can.

22   Q    If you can't hear me, I want you to tell me, okay?

23   A    No problem.

24   Q    Very important here today, correct?

25   A    I assume so.

TRIAL ONE – VOL. 8 – 783

1    Q    Mr. Boyd, I want to talk to you about who you are, okay?

2         THE COURT:  Mr. Berndt, could I ask you to move your

3    mic so it sort of follows you?

4         MR. BERNDT:  Thank you.

5    BY MR. BERNDT:

6    Q    Okay.  Mr. Boyd, you testified yesterday that you had a

7    conviction in Virginia, correct?

8    A    Correct.

9    Q    You testified that that was for obtaining money by false

10   pretenses, correct?

11   A    Correct.

12   Q    Would you consider that a crime of dishonesty and

13   deceit?

14   A    I'm not a judge, Your Honor.  I'm not sure.

15   Q    I'm asking you your opinion.

16   A    No.

17   Q    You do not believe that obtaining money by false

18   pretenses is a crime of dishonesty or deceit, correct?

19   A    That's not what I said.  I said think that's the way it

20   happened.

21   Q    You were convicted though, correct?

22   A    Yes, I was.

23   Q    You testified yesterday you got six months probation,

24   correct?

25   A    I believe so.  I think it happened 16 years ago.

TRIAL ONE – VOL. 8 – 784

1    Q    If I said that you got five years of probation, would

2  that refresh your recollection, sir?

3    A    No, it wouldn't.

4    Q    Okay.  Do you remember having a situation where you were

5  arrested in Franklin County for violating that probation?

6          MR. KELLEY:  Objection, Your Honor.

7          THE COURT:  Sustained.

8  BY MR. BERNDT:

9    Q    So it's your testimony here today under oath that you

10  got six months probation from the Virginia court.  Yes or no?

11    A    Sir, I made a guess yesterday on what I received.

12    Q    Mr. Boyd, you're under oath in a federal courtroom.  I

13  don't think you should be guessing.

14    A    I don't want to mislead you either.  So that was my

15  honest answer.

16    Q    So you don't know how long your probationary term was,

17  correct?

18    A    No, because once the case was settled, I moved back to

19  Columbus, Ohio.

20    Q    And you never heard about it again, correct?

21    A    Not till I was detained.

22    Q    Okay.  And when were you detained?

23    A    Sir, I'm sure you have the dates.  I don't remember.

24    Q    But you were detained?

25    A    Actually, no.  I was –– someone got into a car accident

TRIAL ONE – VOL. 8 – 785

1   in one of my vehicles, and they came to my place of employment

2   and arrested me.  So that's exactly how it happened.  I wasn't

3   the person that got into the car accident, but it was

4   registered in my cellular company name.

5   Q    But you got arrested?

6   A    Nevertheless, yes.

7   Q    Okay.  For something related to that Virginia case?

8   A    Yes.

9   Q    Thank you.  And that arrest was well after six months

10  from the disposition of that case?

11  A    I'm not sure.

12       MR. KELLEY:  Objection, Your Honor.

13       THE COURT:  Sustained.  The jury is instructed to

14  disregard the question and answer.

15  BY MR. BERNDT:

16  Q    You've also been convicted of aggravated arson, correct?

17  A    Yes.

18  Q    And that was in 2012, correct?

19  A    Yes.

20  Q    So 2004 you had the false pretenses case, correct?

21  A    No.

22  Q    2003?

23  A    I think it might have been before that.

24  Q    Well, I have a document here that shows you being

25  convicted on February 24th -- I'm sorry, on August 17th of 2004

TRIAL ONE – VOL. 8 – 786

1  for obtaining money by false pretenses in Southampton,

2  Virginia.  Would you like to see that document?

3  A    If that's what it says, that's correct.

4  Q    Then it would be 2004, correct?

5  A    Okay.

6  Q    And in 2012, you picked up the subsequent conviction,

7  correct?

8  A    Right.

9  Q    You also stated that you owned a strip bar, correct?

10  A    I said I was one of the managing owners.  I think that's

11  exactly what I said.

12  Q    And you bought into that bar, correct?  That was your

13  testimony?

14  A    Correct.

15  Q    So how does a convicted felon buy into a business that

16  has a liquor license attached to it?

17  A    Because I managed it, as I said yesterday.

18  Q    So again, you deceived the liquor commission in regard

19  to your ownership interest in that bar by hiding the fact that

20  a convicted felon was managing that bar, correct?

21  A    No, I didn't.

22         MR. KELLEY:  Objection, Your Honor.

23         THE COURT:  Side-bar.

24

25

TRIAL ONE – VOL. 8 –  787

1                            – – –

2          (The following proceeding was held at side-bar.)

3              THE COURT:  Go ahead, Mr. Kelley.

4              MR. KELLEY:  Your Honor, he specifically indicated

5     that he was a manager and that he did use the term managing

6     owner.  And if the question is something he can answer --

7     Mr. Berndt's question assumes facts that certainly are not in

8     evidence.  I don't doubt that there's some good faith basis,

9     but at least this witness has to be given an opportunity to

10    respond to individual questions.  Did he apply for a liquor

11    license?  Was he a part of a liquor license?  That hasn't been

12    done.

13             THE COURT:  Mr. Berndt.

14             MR. BERNDT:  Your Honor, he testified yesterday that

15    he owned the business.  He testified yesterday that he had a

16    financial interest in the business, and he testified that the

17    business had a liquor license.  My understanding of the

18    application process for a liquor license is that you have to

19    disclose all employees, as well as their prior histories.  And

20    any type of substantial employee who has a felony conviction,

21    that establishment is going to be denied that liquor license.

22    This gentleman started it with the strip club in terms of how

23    he presented to the jury his interest in that bar.

24             THE COURT:  I understand your point.  But there's a

25    great leap.  And the leap almost assumes that he would have

TRIAL ONE – VOL. 8 –   788

1    knowledge of the law.  And as a result of him having knowledge

2    of the law, knowing that as a convicted felon he couldn't get

3    that, he made some material misrepresentations.  And that may

4    be correct; I just don't know that.  But the question does

5    assume maybe facts not in evidence.  But it certainly assumes

6    that he has some working knowledge of the law, that he

7    intentionally deceived the law.  And that's not established on

8    the record.  I'm going to sustain Mr. Kelley's objection.  I'm

9    going to ask you to rephrase.  It is a proper area of inquiry,

10   but just not --

11        MR. BERNDT:  Your Honor, I'll walk him through it

12   slowly.  Just in anticipation, when he tells me he can't even

13   name the people who he is in partnership with, because we know

14   that's what is going to happen -- I'll ask the question.

15        THE COURT:  Understand you have a jury who will ferret

16   out fact from fiction.

17        MR. BERNDT:  Thank you.  Appreciate it.

18     (The following proceeding was held in open court.)

19        THE COURT:  Mr. Berndt, please continue.

20        MR. BERNDT:  Thank you, Your Honor.  I appreciate

21   that.

22    BY MR. BERNDT:

23    Q    Mr. Boyd, who were you in business with at the Allure

24   Strip Club?

25    A    A gentleman by the name of Jerry Black.

TRIAL ONE – VOL. 8 – 789

1    Q    And who applied for the liquor license for the Allure

2    Strip Club?

3    A    If I'm correct, it was kept in escrow, and there was a

4    management agreement that was used.

5    Q    Who is Kevin Escrow?

6    A    Kept in escrow.

7    Q    Oh, kept in escrow.

8    A    Correct.

9    Q    So my question still remains.  Who applied for the

10   liquor license?

11   A    I'm not sure.

12   Q    You said that it was kept in escrow.  Is that a yes?

13   A    Correct.  Yes.

14   Q    And it was kept in escrow for what reason?

15   A    That's just the way that the management wanted it to

16   happen.

17   Q    And are you aware of the fact that a convicted felon

18   can't hold a liquor license?

19   A    I had no intentions of holding it.

20   Q    Sir, answer my question.  Are you aware of the fact that

21   a convicted felon cannot hold a liquor license?

22   A    I am now.

23   Q    Are you also aware of the fact that a convicted --

24        THE COURT:  Wait a minute, Mr. Berndt.  When you say

25   you are now, Mr. Boyd, is that to say that you are at this

TRIAL ONE – VOL. 8 –   790

1   moment?

2           THE WITNESS:  Yes, Your Honor.  I am at this moment.

3           THE COURT:  When did you become aware of that fact?

4           THE WITNESS:  Sir, I never asked.

5           THE COURT:  So you just became aware during

6   Mr. Berndt's cross-examination?

7           THE WITNESS:  Correct.

8           THE COURT:  Go ahead, Mr. Berndt.

9           MR. BERNDT:  Thank you, Your Honor.

10   BY MR. BERNDT:

11   Q    How long were you in business at the strip club?

12   A    I don't recall.

13   Q    You have no idea?

14   A    I mean, I have a guess, maybe.  I don't recall.

15   Q    I'm not asking you to guess.  Do you remember when it

16   started?

17   A    That was a blur because there was a lot of drinking

18   going on.  So '07 maybe to '08.

19   Q    So are you saying that you're an alcoholic?

20   A    That's not what I said.  I said there was a lot of

21   drinking going on then.

22   Q    You're saying during that time period you were drinking

23   so much that you have no memory?

24   A    No, that's not what I said.  What I'm saying is that I

25   believe it to be about nine years ago.  I don't recall the

TRIAL ONE – VOL. 8 –   791

1    exact dates when we opened up and when we closed.

2    Q    Okay.  You think it was in 2007 or 2008?

3    A    Sir, I'm not sure.

4    Q    Okay.  When did you start your cell phone business?

5    A    I had that in Virginia.  I transferred it from Virginia

6    to Ohio.

7    Q    When did you start your cell phone business?

8    A    '99.

9    Q    So that was before your conviction in Virginia?

10   A    Correct.

11   Q    And so your testimony to this jury is that you were in

12   the cell phone business from 1999 until when?

13   A    '08, '09.

14   Q    And why did you get out of the cell phone business?

15   A    Nextel went out of business.

16   Q    Okay.  No other companies available?

17   A    Well, I mean, that didn't pay the same way Nextel paid,

18   no.

19   Q    So there was no other reason?

20   A    Nextel went out of business.

21   Q    That was it?

22   A    Sir, Nextel went out of business.

23   Q    Did you -- have you ever held a real estate license?

24   A    Yeah, I had a real estate license I believe 2011 to

25   2012.  And I lost it from my conviction.

TRIAL ONE – VOL. 8 – 792

1    Q    How does a convicted felon obtain a real estate license?

2    A    By applying for one.

3    Q    And then you held that license for about a year?

4    A    I held it until I was convicted in 2012.

5    Q    You got it in 2011, correct?

6    A    I believe that's correct.

7    Q    You were convicted in 2012, correct?

8    A    Correct.

9    Q    You held it for one year, correct?

10   A    Correct.

11   Q    And you lost your license because you engaged in

12   criminal felonious conduct while you held that license,

13   correct?

14   A    No.  Actually, I don't believe that is correct.

15   Q    And why did you lose your real estate license?

16   A    I think I lost my real estate license because I was

17   convicted of a crime.  The criminal activity that I committed

18   was before I applied for my real estate license.

19   Q    Okay.  Mr. Boyd, when did you first talk to the police

20   about anything that has to do with Rodriccos Williams and/or

21   his untimely demise?

22   A    Maybe 2009.

23   Q    And where was that?

24   A    Where did I speak to them?

25   Q    Yes.

TRIAL ONE – VOL. 8 – 793

1    A    I actually spoke to them in front of my rental

2    properties.  They called me on the phone.

3    Q    And was there any type of report made or any statement

4    taken?

5    A    Sir, I can't recall what the police did.  I did speak to

6    them.

7    Q    Okay.  And when was the second time you spoke to them?

8    A    They may have called me.  We might have spoke a couple

9    of times.

10   Q    Okay.  When did you speak to them when you were locked

11   up in prison?

12   A    When I was locked up in prison.  August.

13   Q    August of 2014?

14   A    No, I don't believe that.  It was August 2012.

15   Q    So it's your testimony under oath here today that your

16   statement to David Kessler, Pickerington Police Department,

17   occurred in August of 2012?

18   A    I believe that's when it occurred, whenever they came to

19   interview me at FCI prison.

20   Q    Correct.  You don't believe that that was 2014, two

21   years ago?

22        MR. KELLEY:  Objection, Your Honor.  May we approach?

23        THE COURT:  Yes.

24

25

TRIAL ONE – VOL. 8 – 794

1              – – –

2         (The following proceeding was held at side-bar.)

3              THE COURT:  Go ahead, Mr. Kelley.

4              MR. KELLEY:  Your Honor, my concern is, my

5    understanding is that video is from August 2012.  There is not

6    an intro to the video.  That is not Mr. Berndt's fault.  It

7    doesn't give a date and time.  But the file itself is created,

8    it says, August 2012.  That's what I've gone from.  It is

9    consistent with when he was in jail.  We were already a part of

10   the case in August 2014.  So it's very consistent with

11   everything I know.  I'm sure Mr. Berndt didn't know that.  But

12   I also don't want us to go too far with this.

13             MR. BERNDT:  That's fine.  I'll rein it in.  For the

14   record, my tape doesn't have any indications as to when that

15   statement occurred.

16             THE COURT:  All right.  Good enough.

17        (The following proceeding was held in open court.)

18             THE COURT:  Mr. Berndt, please continue.

19             MR. BERNDT:  Thank you, Your Honor.

20        BY MR. BERNDT:

21        Q    You testified previously that Mr. Ledbetter came to your

22   strip club, correct?

23        A    Yes.

24        Q    And that he told you, in round figures, that he had big

25   problems with Rodriccos Williams, correct?

TRIAL ONE – VOL. 8 –   795

1    A    Correct.

2    Q    You also said that you then called Mr. Williams and

3  warned him of that, correct?

4    A    I don't know if warn is the right word.  But I called

5  him, communicated that it was a bad idea for him to come up

6  there, yes.

7    Q    Okay.  You informed him of that, correct?

8    A    Yes.

9    Q    You also informed LaTonya Boyce of that, correct?

10    A    Correct.

11    Q    Now, you just testified that you first talked to the

12  police in 2009, correct?

13    A    Okay.

14    Q    Correct?  Yes?

15    A    Correct.

16    Q    And Rodriccos Williams died on November 3rd, 2007,

17  correct?

18    A    Correct.

19    Q    So what you're telling this jury is is that you knew of

20  a threat 30 days before Rodriccos Williams died, and you took

21  two years to tell the police about that threat even though you

22  knew immediately about Mr. Williams' murder.  Yes or no?

23    A    I communicated to the parties that I thought needed the

24  information.

25    Q    Sir, my question is, you waited two years to tell the

TRIAL ONE - VOL. 8 - 796

1  police, correct?

2  A    Correct.

3  Q    You also testified that Mr. Williams would come to your

4  strip club, correct?

5  A    Correct.

6  Q    You testified that you knew he was conducting drug

7  activity in your strip club, correct?

8  A    Correct.

9  Q    You testified that you knew that his supplier would meet

10 him at your strip club, correct?

11 A    Correct.

12 Q    And you testified that you tolerated this because he

13 spent a lot of money in your strip club, correct?

14 A    I believe so, correct.

15 Q    So you tolerated criminal activity in your place of

16 employment as a convicted felon so that you could make some

17 money, correct?  Yes or no?

18 A    Correct.

19 Q    Thank you.  Now, you testified yesterday that you

20 weren't looking for anything for your testimony, correct?

21 A    Correct.

22 Q    But then you said you were looking for an expungement of

23 your record, correct?  Yes or no?

24 A    Correct.

25 Q    Then you said you were hoping to get off probation.  Yes

TRIAL ONE – VOL. 8 –   797

1    or no?

2      A    Correct.

3      Q    Then you said you were hoping to get relocated, correct?

4      A    Correct.

5      Q    Did you also ask the Pickerington police to help you get

6    your real estate license back?  Yes or no?

7      A    I can't recall that.

8      Q    Okay.  But you did testify that you weren't looking for

9    anything initially, correct?

10     A    Yesterday?

11     Q    Yes.

12     A    Actually, the federal government found me.  I didn't

13   find them.

14     Q    My question was, you testified initially yesterday that

15   you weren't looking for anything for your testimony?

16     A    Correct.

17     Q    And you were telling something that wasn't true,

18   correct?

19     A    No, that wasn't the case.

20     Q    Yet you are looking for something, correct?

21     A    No.  I'm being -- I'm being forced to testify.  So with

22   that being said, I was hoping something could happen.

23     Q    Who is forcing you to testify?

24     A    Just because of whatever I said in the past, I needed to

25   testify.  I don't know if force is the right word.

TRIAL ONE – VOL. 8 –  798

1    Q    It's the word you used, wasn't it?

2    A    That was a bad choice of words.

3    Q    Now, you testified yesterday that Rodriccos Williams was

4    the victim of an attempted kidnapping at your Livingston Avenue

5    cellular phone store, correct?

6    A    That's not what I said.  I said there was an attempted

7    kidnapping at one of my cellular stores.  I made an assumption

8    that it had something to do with him.  That's exactly what I

9    said.

10    Q    When you testified about this attempted kidnapping, you

11    weren't relating that to Rodriccos Williams?

12    A    I made an assumption it had something to do with him,

13    yes.

14    Q    But you have no idea?

15    A    I don't have an idea, no.

16    Q    You also talked about some type of ransom issue with

17    Rodriccos Williams, correct?

18    A    I think that had something to do with the attempted

19    kidnapping.

20    Q    And it had something to do with Mr. Williams's family,

21    correct?

22    A    I believe so.  I'm not sure.

23    Q    And certainly it didn't have anything to do with

24    Mr. Ledbetter, correct?

25    A    Then again, I am not sure.

TRIAL ONE – VOL. 8 –  799

1   Q    So basically you're just not sure about any of those

2   things, correct?

3   A    I'm just not sure about the last couple of questions you

4   asked me.

5   Q    So, when you testified yesterday about an attempted

6   kidnapping, you were testifying about something that you didn't

7   have anything to really offer on, because you don't know

8   anything about it because you were assuming those things?

9   A    No.  I testified against something that happened that

10  was criminal into my nature, my business.

11  Q    Tell me what happened.

12  A    I wasn't there.  I was contacted.  Someone said that

13  someone came in at gunpoint and tried to take one of the

14  employees.  I wasn't at the location.  So that's what I was --

15  was explained to me.

16  Q    Was that reported to the police?

17  A    I'm not sure.

18  Q    It was at your business, correct?

19  A    Correct.

20  Q    So what you're saying is is that somebody came in at

21  gunpoint in your business and attempted to kidnap somebody, and

22  you didn't call the police?

23  A    I wasn't there to call the police.

24  Q    Sir, you didn't call the police that day or ever,

25  correct?

TRIAL ONE – VOL. 8 –  800

1    A    I wasn't there to call the police.

2    Q    Yes or no?  Did you ever call the police?

3    A    No.

4    Q    Thank you.  You also testified yesterday that Crystal

5  Fyffe was a dancer at the Allure nightclub, yes or no?

6    A    I didn't testify to that yesterday.

7         MR. KELLEY:  Objection.

8         THE COURT:  Sustained.

9  BY MR. BERNDT:

10   Q    You testified yesterday that you can take more with a

11 pen than a gun.  Do you remember that?

12   A    I didn't testify to that yesterday.

13        His dates are worse off than mine.

14        MR. KELLEY:  Objection, Your Honor.

15        THE COURT:  Sustained.

16 BY MR. BERNDT:

17   Q    Didn't you testify yesterday about *American Greed*?

18   A    Once again, I didn't testify --

19        MR. KELLEY:  Objection, Your Honor.

20        THE COURT:  Sustained.

21 BY MR. BERNDT:

22   Q    Now, you don't know Mr. Ledbetter well, do you?

23   A    Better than I want to, but no.

24   Q    And it's your testimony that he came into your liquor

25 establishment and gave you information that is clearly, if

TRIAL ONE – VOL. 8 –   801

1    true, very damning to him, correct?

2    A    Correct.

3    Q    And he just did this, correct?

4    A    Whatever year -- yeah, years ago, yes.

5    Q    And there was nobody else there except you and him,

6    correct?

7    A    Maybe some bartenders and waitresses.

8    Q    But nobody else heard this, correct?

9    A    Correct.

10   Q    So we just have you to rely on for the veracity, for the

11   truthfulness, of those statements, correct?

12   A    I would assume so, yes.

13   Q    We don't have anything except your word, correct?

14   A    Correct.

15   Q    And your word is also something that you weren't willing

16   to share with the Pickerington Police Department until at least

17   two years after Rodriccos Williams was killed, correct?

18   A    That's not correct, no.  That's when the police

19   department decided to contact me.

20   Q    You hadn't contacted them previously, correct?

21   A    No, I didn't.

22   Q    Thank you.

23       MR. BERNDT:  I have nothing further, Your Honor.

24       THE COURT:  Thank you, Mr. Berndt.

25       Mr. Durkin?

TRIAL ONE – VOL. 8 – 802

1          MR. DURKIN:  No questions, Your Honor.

2          THE COURT:  Ms. Dixon?

3          MS. DIXON:  No questions, Your Honor.

4          THE COURT:  Mr. McVay?

5          MR. MCVAY:  No questions, Your Honor.

6          THE COURT:  Mr. Nolder?

7          MR. NOLDER:  No questions, Your Honor.

8          THE COURT:  Mr. Kelley, any redirect?

9          MR. KELLEY:  Yes, Your Honor.

10                          - - -

11                  REDIRECT EXAMINATION

12    BY MR. KELLEY:

13    Q    Mr. Boyd, you were asked about being here testifying.

14    Do you feel forced to testify?

15    A    I feel as if I have limited options.

16    Q    Did you suggest to the government whether you wanted to

17    testify or not testify?

18    A    I made it kind of clear that I did not want to testify.

19    Q    Why did you not want to testify?

20    A    Because I didn't want nothing to do with all this drama,

21    the same reason I didn't contact the Pickerington Police

22    Department.  You can't put toothpaste back in the tube.

23    There's nothing to come from this other than justice, I

24    believe.

25          MR. KELLEY:  No further questions, Your Honor.

TRIAL ONE – VOL. 8 – 803

1        THE COURT:  Anything further, Mr. Berndt?

2        MR. BERNDT:  One question.

3                        – – –

4                 RECROSS-EXAMINATION

5   BY MR. BERNDT:

6   Q    Did you just say that you didn't report what you called

7   to be critical information about a murder in order to avoid

8   drama?  Yes or no?  Did you just testify to that, sir?

9   A    What I just said was, if I'm correct, that I was not

10  willing to answer questions for the federal government because

11  I didn't see what was to come of this.  Lives were lost.

12  Answering questions is not going to bring anyone back.

13        MR. BERNDT:  Thank you, Your Honor.

14        MR. KELLEY:  No, Your Honor.

15        THE COURT:  Mr. Boyd, thank you very much, sir.  You

16  may be excused.

17        Your next witness, Mr. Martinez?

18        MR. MARTINEZ:  Thank you, Your Honor.  The United

19  States calls Samantha Murphy.

20        MR. KELLEY:  Your Honor, if I may.

21        THE COURT:  Yes.

22        MR. KELLEY:  We know the witness is here, but let

23  me --

24        THE COURT:  All right.

25        THE DEPUTY CLERK:  Ma'am, come forward and be sworn,

TRIAL ONE – VOL. 8 –   804

1   please.

2       (Witness sworn.)

3         THE COURT:  Ma'am, bend the microphone toward you and

4   speak clearly into it, all right?  Thank you.

5                           – – –

6                     SAMANTHA MURPHY

7     Called as a witness on behalf of the Plaintiff, being first

8   duly sworn, testified as follows:

9                     DIRECT EXAMINATION

10   BY MR. MARTINEZ:

11   Q     Good morning, Ms. Murphy.

12   A     Good morning.

13   Q     Make sure you speak up, okay?  Can you state your name

14   for the record and spell your last name?

15   A     Samantha Murphy, M-U-R-P-H-Y.

16   Q     Are you nervous?

17   A     I'm scared.

18   Q     Ms. Murphy, where did you grow up?

19   A     Short North.

20   Q     Here in Columbus?

21   A     Yes.

22   Q     Where did you live?

23   A     Fourth and Eighth, Ninth and Eleventh or Summit and

24   Eleventh, Mount Vernon.

25   Q     You moved around different places?

TRIAL ONE – VOL. 8 – 805

1    A    Yes.

2    Q    How long did you live in the Short North?

3    A    Since I've been eight.

4    Q    When did you leave?

5    A    Probably just about three years ago, four years ago.

6         MR. DURKIN:  Your Honor, I'm struggling --

7         THE COURT:  I'm sorry.

8         MR. DURKIN:  I'm sorry, Your Honor.  I just can't hear

9    the witness.

10        MR. MARTINEZ:  May I please have the Exhibit 153-188?

11   BY MR. MARTINEZ:

12   Q    Who is that person, Samantha?

13   A    My kids's father.

14   Q    What's his name?

15   A    Keith Maye.

16        MR. MARTINEZ:  Can we move into evidence

17   Exhibit 153-188?

18        THE COURT:  Yes.  Any objections?

19        MR. BERNDT:  No objection.

20        MR. GATTERDAM:  No objection.

21        MS. DIXON:  No objection.

22        MR. MCVAY:  No objection.

23        MR. NOLDER:  No objection.

24        THE COURT:  153-188 will be received.

25

TRIAL ONE – VOL. 8 –  806

1    BY MR. MARTINEZ:

2    Q    Did you say you have kids with Mr. Maye?

3    A    Yes.  I have three.

4    Q    And how long did you and Mr. Maye date?

5    A    About six years.

6    Q    What were the approximate years?

7    A    From 2001 to 2006, 2007.

8    Q    Did you stay in contact with him even after you were

9    formally dating?

10   A    Yes.

11        MR. MARTINEZ:  May I please have Exhibit 154-1-033?

12   BY MR. MARTINEZ:

13   Q    Do you recognize that person?

14   A    Yeah.

15   Q    Who is that?

16   A    Ricco Maye, my kids's cousin.

17   Q    What is --

18   A    Ricco is my kids's father's cousin.

19   Q    So Ricco Maye and Keith Maye are cousins?

20   A    Yes.

21        MR. MARTINEZ:  Can we move into admission Exhibit

22   154-1-033?

23        THE COURT:  Yes.

24        MR. BERNDT:  No objection.

25        MR. GATTERDAM:  No objection.

TRIAL ONE – VOL. 8 – 807

1          MS. DIXON:  No objection.

2          MR. MCVAY:  No objection.

3          MR. NOLDER:  No, Your Honor.

4          THE COURT:  And you may publish it.

5          MR. MARTINEZ:  May I have Exhibit 155-1, please?

6     BY MR. MARTINEZ:

7     Q    Ms. Murphy, who is that?

8     A    Brandon.

9     Q    Brandon what?

10    A    Ledbetter.

11         MR. MARTINEZ:  Your Honor, we move the admission of

12    Exhibit 155-1.

13         THE COURT:  Yes.

14         MR. BERNDT:  No objection, Your Honor.

15         MR. GATTERDAM:  No objection.

16         MS. DIXON:  No objection.

17         MR. MCVAY:  No objection.

18         MR. NOLDER:  None, Your Honor.

19    BY MR. MARTINEZ:

20    Q    So you know Brandon Ledbetter?

21    A    Yes.

22    Q    How do you know Brandon Ledbetter?

23    A    He's my kids's father cousin.

24    Q    So he's related to Keith Maye?

25    A    Yes.

TRIAL ONE – VOL. 8 – 808

1    Q    Did you spend time with Brandon Ledbetter?

2    A    Yeah, through with my kids's father, you know, being

3    around.

4    Q    So over a period of years, you spent time with

5    Mr. Ledbetter?

6    A    Yes.

7    Q    How often would you see Mr. Ledbetter?

8    A    I don't know.  Off and on.  You know, whenever my kids's

9    father was around or he was around my kids's father.

10   Q    You hung with him sometimes?

11   A    Yeah, we like -- all together.

12   Q    All together.

13        MR. MARTINEZ:  Can we see Exhibit 154-1-085, please?

14   And Your Honor, this is already in evidence so I ask it be

15   published.

16        THE COURT:  Yes, you may.

17   BY MR. MARTINEZ:

18   Q    Do you recognize that person?

19   A    Uh-huh.

20   Q    Who is that?

21   A    Elijah Ledbetter.

22   Q    How is Elijah Ledbetter related to Brandon Ledbetter?

23   A    His brother.

24   Q    Where is Elijah Ledbetter today?

25   A    Deceased.

TRIAL ONE - VOL. 8 -  809

1  Q    Did you used to spend time with Elijah Ledbetter?

2  A    Yeah.  We was together all the time.  He basically

3  stayed at my house and I fed him, you know.

4  Q    Were there times where you and Elijah and Brandon were

5  all together?

6  A    Uh-huh.

7  Q    Were there times when Ricco or Keith Maye were with you?

8  A    Yeah.

9       MR. MARTINEZ:  Can I see Exhibit 155-5, please?

10  BY MR. MARTINEZ:

11  Q.   Who is that?

12  A    Christopher.

13  Q    Okay.  Christopher.  Do you recall his last name?

14  A    Harris.

15       MR. MARTINEZ:  Your Honor, may I move admission of

16  Exhibit 155-5?

17       THE COURT:  Yes.  Any objection?

18       MR. BERNDT:  No objection.

19       MR. GATTERDAM:  No objection.

20       MS. DIXON:  No.

21       MR. MCVAY:  None, your Honor.

22       MR. NOLDER:  No, Your Honor.

23  BY MR. MARTINEZ:

24  Q    How do you know Chris Harris?

25  A    Just being around Keith and Tony.

TRIAL ONE – VOL. 8 – 810

1    Q    Did he also hang around Brandon?

2         MR. GATTERDAM:  Objection.  Leading.

3         THE COURT:  Sustained.

4    BY MR. MARTINEZ:

5    Q    Were there times when you were together with Chris

6    Harris and Brandon Ledbetter?

7    A    A couple.

8    Q    Did you see Chris Harris and Brandon Ledbetter together?

9    A    Uh-huh.

10        THE COURT:  That means yes, ma'am?

11        THE WITNESS:  Yes.  I'm sorry.

12        MR. MARTINEZ:  May I please see Exhibit 155-7?

13   BY MR. MARTINEZ:

14   Q    Who is that person?

15   A    They used to call him Buckwheat.  I can't remember his

16   real name.

17   Q    So you knew him as Buckwheat?

18   A    Yes.

19        MR. MARTINEZ:  Your Honor, we move for the admission

20   of Exhibit 155-7.

21        THE COURT:  Any objection?

22        MR. BERNDT:  No, Your Honor.  Thank you.

23        MR. GATTERDAM:  No, Your Honor.

24        MS. DIXON:  No, Your Honor.

25        MR. MCVAY:  No, Your Honor.

TRIAL ONE - VOL. 8 - 811

1          MR. NOLDER:  No objection.

2          THE COURT:  155-7 will be received and it may be

3     published.

4     BY MR. MARTINEZ:

5     Q    How did you know Buckwheat?

6     A    Being around Tony a lot, mostly.

7     Q    I want to make sure we all understand.  When you say

8     Tony, who are you talking about?

9     A    Elijah.  I'm sorry.

10    Q    People called him Tony?

11    A    Yeah, I call him Tony.

12    Q    Please continue.  How did you know Buckwheat?

13    A    Being around Tony, you know.  Like we would be together,

14    you know, me being with them doing stuff we shouldn't be doing.

15    Q    What kind of stuff was Buckwheat doing that he shouldn't

16    have been doing?

17    A    Robbing, stealing, you know, things like that.

18          MR. MARTINEZ:  May I see Exhibit 155-3, please?

19    BY MR. MARTINEZ:

20    Q    Do you recognize that person?

21    A    Uh-huh, yes.

22    Q    Who is that person?

23    A    Allen.

24    Q    Do you remember his last name?

25    A    I call him Al-Nuts.  I can't remember.

TRIAL ONE – VOL. 8 – 812

1    Q    You call him Al-Nuts?

2    A    Yeah.

3        MR. MARTINEZ:  Your Honor, we move for the admission

4    of Exhibit 155-3.

5        THE COURT:  It will be received.  Any objection?

6        MR. BERNDT:  No objection.

7        MR. GATTERDAM:  No objection.

8        MS. DIXON:  None, Your Honor.

9        MR. MCVAY:  No, Your Honor.

10       MR. NOLDER:  No objection, Your Honor.

11       THE COURT:  You may publish it, Mr. Martinez.

12   BY MR. MARTINEZ:

13   Q    Ms. Murphy, how do you know Allen Wright, or Al-Nuts, as

14   you called him?

15   A    The same way, being around my kids's father and robbing

16   me.

17   Q    He what?

18   A    He robbed me.

19   Q    We'll get to that later.  Okay.  Can I see Exhibit

20   155-16, please?

21       Do you recognize that person?

22   A    Yeah.  I can't remember his -- I don't like know his

23   name.  I wasn't really around him a lot.  I just seen him.

24   Q    Have you seen him before?

25   A    Yes.

TRIAL ONE – VOL. 8 – 813

1    Q    Describe the circumstances in which you saw him.

2    A    Like drugs and guns exchange.

3    Q    Who was he exchanging drugs and guns with?

4    A    My kids's father, Brandon.  It was like somewhere out

5  east like off Mount Vernon.

6    Q    I want to be clear about this.  You saw this man in

7  Exhibit 155-16 exchanging guns with Brandon Ledbetter?

8    A    Yes.

9         MR. MARTINEZ:  Your Honor, can we publish Exhibit

10  155-16, please?

11         THE COURT:  Yes, you may.  Any objection?

12         MR. BERNDT:  No, Your Honor.

13         MR. GATTERDAM:  No, Your Honor.

14         MS. DIXON:  No, Your Honor.

15         MR. MCVAY:  No, Your Honor.

16         MR. NOLDER:  No, Your Honor.

17         THE COURT:  You may publish it.  It will be received.

18  BY MR. MARTINEZ:

19    Q    But you said you can't remember that person's name; is

20  that right?

21    A    Yes.

22    Q    That's fine.  That's fine.

23         MR. MARTINEZ:  Can I see Exhibit 1-1-112 [sic],

24  please?

25         MR. GATTERDAM:  Brian, do you mind saying that again?

TRIAL ONE – VOL. 8 –   814

1              MR. MARTINEZ:  1-2-112.

2         Special Agent Lauber, if we could just blow up the

3    bottom picture there, please.

4      BY MR. MARTINEZ:

5      Q    Can you see that, Ms. Murphy?

6      A    Yes.

7      Q    All right.  Who's in this picture?

8      A    My kids's father Keith Maye, his brother Jeffrey

9    Holbert, Robert, Elijah and Ricco.

10             MR. MARTINEZ:  Your Honor, can we please move for the

11   admission of 1-2-112?

12             THE COURT:  Yes.  But it may be helpful before you --

13   once it is admitted into evidence, to have the witness either

14   go left to right or right to left so that we can --

15             MR. MARTINEZ:  That's my intention, Your Honor.  Thank

16   you very much.

17             THE COURT:  Any objection, Mr. Berndt?

18             MR. BERNDT:  No, Your Honor.

19             MR. GATTERDAM:  Not to the bottom picture, Your Honor.

20             MS. DIXON:  No, Your Honor.

21             MR. MCVAY:  No, Your Honor.

22             MR. NOLDER:  No, Your Honor.

23             THE COURT:  The bottom picture will be admitted, and

24   you may have the bottom picture displayed to the jury.

25             MR. MARTINEZ:  Thank you.

TRIAL ONE – VOL. 8 – 815

1    BY MR. MARTINEZ:

2    Q    Ms. Murphy, do you see that, the picture?

3    A    Yes.

4    Q    Starting with the individual on the left -- let's go

5    left to right.  Please identify the folks in that photograph.

6    A    Ricco.

7    Q    Ricco Maye?

8    A    Yes, Ricco Maye, Elijah Ledbetter, Robert.

9    Q    Robert what?

10   A    Ledbetter, Jeffrey Holbert and Keith Maye.

11   Q    You mentioned Robert Ledbetter.  What did you know

12   Robert Ledbetter as?

13   A    Brandon.

14   Q    Brandon?  Okay.

15        MR. MARTINEZ:  Can we minimize that, please, Special

16   Agent?  Can we pull up the photo on the top right?  Now it's in

17   the bottom right.

18   BY MR. MARTINEZ:

19   Q    Do you recognize any of the individuals in that

20   photograph, ma'am?

21   A    At the bottom is Robert.  And then the woman, I believe

22   that's his mother.  I've only met her a few times.

23   Q    How about the other person?

24   A    I can't really tell.  I don't know if that's like one of

25   his little brothers or something.  I don't know.

TRIAL ONE – VOL. 8 –   816

1    Q    You said the person on the bottom is definitely Robert

2    Ledbetter?

3    A    Yes.

4         MR. MARTINEZ:  Your Honor, we move for the admission

5    of this portion of Exhibit 1-2-112.

6         THE COURT:  All right.  Any objection?

7         MR. BERNDT:  No, Your Honor.

8         MR. GATTERDAM:  No objection.

9         MS. DIXON:  No objection.

10        MR. MCVAY:  No.

11        MR. NOLDER:  No objection.

12        THE COURT:  You may publish it.

13   BY MR. MARTINEZ:

14   Q    Ms. Murphy, I think you testified a moment ago -- and

15   now the ladies and gentlemen of the jury can see the photo.  I

16   think you testified a moment ago the person on the bottom is

17   Brandon Ledbetter, correct?

18   A    Yes.

19   Q    What is he doing with his hands?

20   A    I don't know.  That's what they do, where they're from

21   or their hood.

22   Q    The four?

23   A    Probably Fourth Street.

24   Q    And you said that's what they do.  That's what who did?

25   A    I mean, the people from the neighborhood or gangbangers,

TRIAL ONE – VOL. 8 – 817

1  you know, whatever --

2      Q     So Brandon did that?

3      A     I mean, yeah.

4      Q     Okay.  Have you seen Elijah do that?

5      A     Uh-huh.

6      Q     Have you seen Chris do that?

7      A     Yes.

8      Q     Have you seen Buckwheat do that?

9      A     Yes.

10     Q     Have you seen Al-Nuts do that?

11     A     Yes.

12     Q     Okay.

13         MR. MARTINEZ:  161-29.02.  Your Honor, this is going

14  to take a moment to load.  But if I could advise the Court

15  about what we're going to see.

16         THE COURT:  Yes.  Why don't you advise me out of the

17  presence --

18         MR. MARTINEZ:  Side-bar?

19                              - - -

20     (The following proceeding was held at side-bar.)

21         MR. MARTINEZ:  Thank you, Your Honor.

22         THE COURT:  Go ahead, Mr. Martinez.

23         MR. MARTINEZ:  Your Honor, the exhibit that I just

24  named out is actually a fairly lengthy video clip of Keith

25  Maye, the woman with whom this witness had children.  And he's

TRIAL ONE - VOL. 8 - 818

1    in custody.

2           THE COURT:  Okay.

3           MR. MARTINEZ:  I'm going to -- he's speaking to some

4    law enforcement agents.  I'm going to mute the audit so no one

5    can hear it.  You can't really see the officers very well.

6    They're not wearing uniforms.  I'm going to play about three

7    seconds of the video just so the ladies and gentlemen of the

8    jury and the witness can see the clothes Mr. Maye is wearing.

9    That's all I'm going to do, if it goes well.

10          THE COURT:  While we have everybody, any objection?

11          MR. BERNDT:  No, Your Honor.

12          MR. GATTERDAM:  No, Your Honor.

13          MR. MCVAY:  No, Your Honor.

14          MS. DIXON:  No.  I just do want to say -- and I didn't

15   object.  If you could, when you said have you seen Buckwheat do

16   that, if you could put a time period on that.

17          MR. MARTINEZ:  In the future, I'll do that.

18          MS. DIXON:  I appreciate that.

19          MR. NOLDER:  No objection.

20          MR. MARTINEZ:  I was relying on the fact when she said

21   she was around these guys from --

22          MS. DIXON:  But still.

23          MR. BERNDT:  I do have a question, and it's for Brian.

24   When I get to these things in the discovery, it's a trial --

25   it's like that placeholder thing.  Can I start it?

TRIAL ONE – VOL. 8 –  819

1          MR. MARTINEZ:  We have to show you how to do it.

2    There's a trick to doing it.

3          MR. BERNDT:  That's fine.  I'll talk to you at lunch.

4          MR. MARTINEZ:  And Eric is the one that can show you.

5    We'll talk at lunch.

6       (The following proceeding was held in open court.)

7    BY MR. MARTINEZ:

8    Q    Ms. Murphy, in just a moment, we're going to play just a

9    couple seconds of a video.  There's not going to be any sound.

10   Just watch the video and tell me if you recognize a person.

11   Okay?

12      (Videotape played for witness only.)

13         MR. MARTINEZ:  Stop it there.

14   BY MR. MARTINEZ:

15   Q    Ms. Murphy, do you recognize the person in that video?

16   A    Yes.  Keith Maye, my kids's father.

17         MR. MARTINEZ:  Your Honor, we'd like to move for the

18   admission of those few seconds and replay it for the jury.

19         THE COURT:  Counsel have already indicated they have

20   no objection -- counsel for the defense.  So you may play it.

21      (Videotape played in open court.)

22   BY MR. MARTINEZ:

23   Q    Who is that person, Ms. Murphy?

24   A    My kids's father, Keith Maye.

25   Q    Can you see the shirt he's wearing in that picture?

TRIAL ONE – VOL. 8 –  820

1    A    Yes, a little bit.

2    Q    Just tell me what you can see.

3    A    I mean, that's -- I think it's the same picture you guys

4    showed just a second ago with Ricco, Elijah, Brandon, Jeffrey

5    and Keith.

6    Q    Can you read the writing at the top of the shirt?

7    A    It looks like something short.  Life or something.  I

8    don't know.

9    Q    Ms. Murphy, I'd like to talk a bit about the individuals

10   that we just went through in all the various photographs.  So

11   that would be Brandon Ledbetter, Elijah Ledbetter, Keith Maye,

12   Ricco Maye, Al-Nuts, Buckwheat, Chris Harris.  Did you ever

13   know any of those individuals to carry guns?

14   A    Yeah.

15   Q    Have you ever seen Brandon Ledbetter with a gun?

16   A    Yes.

17   Q    How often?

18   A    I mean, he usually always carried a gun.  I mean,

19   that's --

20   Q    How about Elijah Ledbetter?

21   A    Yeah, most of the time.  I mean, sometimes he'd have it;

22   sometimes he wouldn't.

23        THE COURT:  Ma'am, you're going to have to keep up

24   your voice because I didn't hear the last answer.  So would you

25   repeat it and speak into the mic.  Could you repeat your last

TRIAL ONE – VOL. 8 – 821

1    answer?

2          THE WITNESS:  Tony would have them sometimes, when

3    he'd get the money.

4    BY MR. MARTINEZ:

5    Q    By Tony, you mean Elijah?

6    A    Elijah.

7    Q    That's okay.  Was there ever a time when Elijah

8    Ledbetter had a gun in your home and you got upset about it?

9    A    Yes.

10   Q    Tell us about that.

11   A    I went upstairs for something, and I come back down and

12   he like has these two 9s.  My son was only like two years old

13   at the time.  And he was sitting there basically like putting

14   them in his hand and thinking it was all cute and funny.  It

15   really made me --

16   Q    How did you react?

17   A    It pissed me off.  You don't do that.

18   Q    Have you ever heard Brandon Ledbetter refer to Roscoe?

19   A    Uh-huh.

20   Q    Who is Roscoe?

21   A    That's a gun.

22   Q    He called his gun Roscoe?

23   A    Uh-huh.

24          MR. MARTINEZ:  May I have Exhibit 150-65, please?

25   This is a taped call, Your Honor.  I think we had one of those

TRIAL ONE – VOL. 8 – 822

1    before.

2         THE COURT:  All right.

3         MR. MARTINEZ:  We're going to play from 9 minutes and

4    27 seconds to 9 minutes and 55 seconds.

5    BY MR. MARTINEZ:

6    Q    Ms. Murphy, we're going to play this tape.  I'm going to

7    ask you to listen to it and I'll ask you some questions.

8       (Audiotape played in open court.)

9    BY MR. MARTINEZ:

10   Q    Whose voice is that?

11   A    Brandon's.

12        MR. MARTINEZ:  Can we start from the beginning?

13      (Audiotape played in open court.)

14   BY MR. MARTINEZ:

15   Q    Did you hear what Mr. Ledbetter said about Roscoe in

16   that tape?

17   A    Uh-huh.

18   Q    What did you hear him say?

19   A    That he'd put the Roscoe to her dome.

20   Q    What does that mean to you?

21   A    A gun to somebody's head.

22   Q    How about Buckwheat?  Have you ever seen Buckwheat with

23   a gun?

24        MS. DIXON:  Objection.

25        THE COURT:  Basis?  Legal basis.

TRIAL ONE – VOL. 8 – 823

1          MS. DIXON:  Time period.

2          MR. MARTINEZ:  Ever is the time period.

3    BY MR. MARTINEZ:

4    Q    Have you ever --

5          THE COURT:  Overruled.  You may answer.

6    BY MR. MARTINEZ:

7    Q    Have you ever --

8    A    Yes.

9    Q    You have seen Buckwheat with a gun?

10   A    Yeah.

11   Q    Have you ever seen Allen Wright, Al-Nuts, with a gun?

12   A    Yes.

13   Q    I'd like to talk about drugs.  Did Brandon Ledbetter

14   ever sell drugs?

15   A    Yes.

16   Q    What did he sell?

17   A    Crack cocaine, marijuana.

18   Q    Anything else?

19   A    I mean, cocaine, crack; same thing.

20   Q    How about Elijah Ledbetter?  Did he ever sell drugs?

21   A    Yeah.  I mean, off and on.

22   Q    How about Buckwheat?  He ever sell drugs?

23   A    I've seen him like a little bit of crack cocaine.  But

24   he was more into like robbing and stealing and all that kind of

25   stuff.

1    Q    How about Al-Nuts?  Did he ever sell drugs?

2    A    Yes.

3    Q    What did he sell?

4    A    Crack cocaine.

5    Q    Keith Maye?

6    A    Yes.

7    Q    Your baby's --

8    A    My kids's father.

9    Q    -- father?

10   A    Yes.

11   Q    What did he sell?

12   A    Crack cocaine.

13   Q    How about Ricco Maye?

14   A    Yes.

15   Q    What did he sell?

16   A    Cocaine, crack cocaine.

17   Q    Did you ever hear any of these gentlemen talk about

18   snitches?

19   A    Yes.

20   Q    What did they say about snitches?

21        MR. GATTERDAM:  Objection as to who.

22        THE COURT:  Sustained.

23        MR. MARTINEZ:  Okay.  Thank you, Counsel.

24   BY MR. MARTINEZ:

25   Q    Did you ever hear Brandon Ledbetter talk about snitches?

TRIAL ONE – VOL. 8 –   825

1    A     Uh-huh.

2    Q     What would he say about snitches?

3    A     They get dealt with.  I mean, you're in that game --

4    you're in that kind of game, snitching, they want you dead.

5    Q     They want you dead.  Is that what you said?

6    A     Uh-huh, or messed up.

7    Q     Have you ever heard any of these individuals -- have you

8    ever heard any of these individuals talk about Homicide Squad

9    or Homo?

10   A     I've heard them like a couple times, you know, just

11   screaming out, you know, like --

12   Q     And who did you hear scream that out?  Give me some

13   examples.

14   A     Buckwheat used to say it all the time.

15         THE COURT:  Ma'am, you said you don't remember

16   Buckwheat's given name?

17         THE WITNESS:  No.  I wasn't around him every day.  I

18   just knew him through my kids's father and stuff.

19         THE COURT:  All right.

20   BY MR. MARTINEZ:

21   Q     Have you ever known any of these individuals to use

22   violence or intimidation?

23   A     Yeah.

24   Q     Okay.  I'd like to get into some examples of that.

25   Let's start with Chris Harris.  Have you ever been around Chris

TRIAL ONE – VOL. 8 –  826

1   Harris when he did anything that you considered violent?

2   A    We was -- I'm not sure what year it was.  Probably like

3   2004 or five when they had the -- somebody had owed them money,

4   and they put the guy in the trunk.

5   Q    What did they do next?

6   A    They're just like riding around with him.

7   Q    Chris Harris did that?

8   A    Yeah.

9   Q    How long was this man in the trunk?

10  A    I don't know, probably some hours.

11  Q    Hours.  Did they stop the car at any point?

12  A    I don't know.  I just seen them on -- like the

13  neighborhood we was in, so I don't know.

14  Q    What did you see Chris Harris do with the man in the

15  trunk?

16  A    Just like banging on the trunk, you know, and opened it,

17  and...

18  Q    Who banged on the trunk?

19  A    Chris.

20  Q    And he opened the trunk?

21  A    Yes.

22  Q    Did you see the man in the trunk?

23  A    Yeah.  It ain't funny, but yeah.

24  Q    Let's talk about Buckwheat.  Do you recall a time when

25  you were with Buckwheat and Elijah Ledbetter?

TRIAL ONE – VOL. 8 – 827

1     MS. DIXON:  Objection.  Leading.

2     THE COURT:  You may reimpose your objection,

3  Ms. Dixon, when Mr. Martinez finishes his question.

4     Complete your question, Mr. Martinez.  Ma'am, just pause

5  for a moment before you answer.

6     Ms. Dixon, you may object but we don't know what the

7  question is yet.  Mr. Martinez, please complete your question.

8  BY MR. MARTINEZ:

9  Q     Have you ever walked to a grocery store with Buckwheat

10  and Elijah Ledbetter?

11  A     Yes.

12  Q     Anything unusual happen?

13  A     Yeah.  It was real late at night.  I'm not sure what

14  time.  But we was walking, and Elijah kind of just like goes

15  off.  I don't know if they seen this woman like getting out of

16  her car.  And they just go up and rob her.  I heard the woman

17  like scream and they take off.  I'm like stuck there not

18  knowing if the police was going to run up on me because I was

19  with them.  I think they got a purse with some money in it.

20  Q     And that was Elijah Ledbetter and Buckwheat, right?

21  A     Yeah.

22  Q     Have you ever been around Brandon Ledbetter, Keith Maye,

23  Ricco Maye, when they shot anybody?

24  A     I was with my kids's father and a guy named Marc.  And

25  somebody owed Ricco money.

TRIAL ONE – VOL. 8 – 828

1    Q    Was Brandon Ledbetter there?

2    A    Yes.  He was with Ricco -- in the car with Ricco.

3    Q    Go on.

4    A    Somebody owed Ricco money.  And the people that I was

5    with, they got out of the car and went around the corner.  And

6    I heard like gunshots.  Then later on we went back, and they

7    was -- it was like in front of like a store, and they was

8    spraying blood off the concrete.

9    Q    Did Brandon and Elijah Ledbetter ever commit robberies?

10    A    Yeah.

11    Q    What kind of stuff would they steal?

12    A    I mean, it probably depends on the situation.  Like, I

13    mean, if it was other drug dealers, you know, or people that

14    owed them money, you know.  It depends on --

15    MR. BERNDT:  Your Honor, foundation.

16    THE COURT:  I'm going to allow that answer to stand,

17    but I'm going to ask Mr. Martinez to give me some context:

18    time, dates.  The witness gave a general answer that was

19    peripherally responsive.  So I want you to go back and

20    establish context: time, date.

21    MR. MARTINEZ:  Okay.

22    MR. BERNDT:  Thank you, Your Honor.

23    BY MR. MARTINEZ:

24    Q    Ms. Murphy, during what period of time were you spending

25    time with Brandon and Elijah Ledbetter?

TRIAL ONE – VOL. 8 –   829

1   A    Let me see.  Elijah got killed April, so maybe like --

2   this stuff was happening like when everything was getting to

3   the boiling point, like maybe 2003, four, five somewhere.

4   Q    Into six?

5   A    Yeah.

6   Q    How do you know that Brandon Ledbetter was robbing

7   people?

8   A    I mean, people would brag about it.

9   Q    Would Brandon brag about it?

10  A    Yeah.

11  Q    Did you ever see any of the things he stole?

12  A    I mean, not really.  You just like hear them talk about

13  the -- talk about stuff.

14  Q    Did you ever help Brandon and Elijah with laptops?

15  A    Yes, especially Tony.  I knew how to like -- I'd buy

16  them for cheap and they'd be locked, and I knew how to unlock

17  them and clear them out and resell them.

18  Q    Where did they get the laptops?

19  A    Campus, steal them.

20       MR. BERNDT:  Objection, Your Honor.

21       THE COURT:  Sustained.  Rephrase your question,

22  Mr. Martinez.

23  BY MR. MARTINEZ:

24  Q    Do you know where they got those laptops, Brandon and

25  Elijah?

TRIAL ONE – VOL. 8 – 830

1    A    Out of cars, probably, like --

2            MR. BERNDT:  Your Honor, object, unless she has

3    personal knowledge.

4            THE COURT:  I just want to establish how she knows.

5            MR. MARTINEZ:  I'm sorry, Your Honor.  I thought we

6    covered that.

7    BY MR. MARTINEZ:

8    Q    Let me ask you this.  How do you know that Brandon and

9    Elijah were stealing laptops out of cars?

10   A    I've been with Tony, you know, before --

11   Q    You've seen it?

12   A    Yes.  I was doing that kind of stuff too sometimes.

13           MR. BERNDT:  Your Honor, move to strike in regard to

14   Robert Ledbetter, because that answer was with regard to

15   Elijah.

16           THE COURT:  I'm going to sustain your objection with

17   regard to Robert Ledbetter unless you can establish a time

18   period and circumstance with respect to the laptops.

19           MR. MARTINEZ:  I'm going to move on from the laptops,

20   Your Honor.

21   BY MR. MARTINEZ:

22   Q    Just a second ago, Ms. Murphy, I think you said you used

23   to do this kind of thing?

24   A    Uh-huh.

25   Q    Did you ever engage in burglaries with any of the

TRIAL ONE – VOL. 8 –  831

1  individuals we talked about this morning?

2  A    Yeah.

3  Q    Tell us what you did.

4  A    I would knock on doors like campus area.  If they

5  answered, I would, you know, ask for somebody.

6         MR. BERNDT:  Your Honor --

7         THE COURT:  Yes.  Do you have an objection?

8         MR. BERNDT:  I do.

9         THE COURT:  What's the legal basis?

10        MR. BERNDT:  The legal basis is foundation.  I don't

11  know who she's speaking of.

12        THE COURT:  Overruled at this point because she

13  hasn't -- her answer is incomplete.  So it could be with the

14  completion of her answer, the basis will divine itself; perhaps

15  not.  You may reimpose your objection should that be the case.

16        MR. BERNDT:  Thank you.

17        THE COURT:  Please continue, Ms. Murphy.

18        THE WITNESS:  I would do this with Elijah, Marc – I

19  believe he's deceased now – Chris.  It was different people

20  like all the time.  But we'd go to houses.  I would knock.  If

21  they answered, I would ask for somebody I knew didn't live

22  there.  If they didn't answer, then I would pop the door.

23  BY MR. MARTINEZ:

24  Q    What's the last part?  They might have popped the door?

25  A    I would pop the door if nobody answered, if I knew

TRIAL ONE – VOL. 8 – 832

1    nobody was there.

2        Q    You were good at getting in doors?

3        A    Yes.

4            THE COURT:  When you say pop the door, what do you

5    mean?

6            THE WITNESS:  Like break in.

7        BY MR. MARTINEZ:

8        Q    Did you ever get caught?

9        A    Yeah.

10       Q    What happened?

11       A    I went to prison.

12       Q    For burglary?

13       A    Yes.

14       Q    What year was that?

15       A    2006, I believe.

16       Q    How long did you spend in prison?

17       A    That time it was about a year and a half.

18       Q    That time?

19       A    Yeah.

20       Q    Was there another time?

21       A    2010.

22       Q    What happened in 2010?

23       A    Felonious assault and burglary.  And I did

24   two-and-a-half years.

25       Q    Describe the circumstances of that felonious assault and

TRIAL ONE – VOL. 8 –  833

1   burglary.

2   A    The woman, she had stole all my son's birthday presents

3   out the car.  The police wasn't trying to do anything, so I

4   took the matter in my own hand.  The fight started on the

5   porch.  And she locked me out, and I kicked in her door and

6   went into the house.

7   Q    What did you do when you got in?

8   A    I beat her up.

9   Q    Did you ever sell drugs?

10  A    Yes.

11  Q    What did you sell?

12  A    Pills, crack cocaine sometimes.

13  Q    Why did you sell drugs?

14  A    To take care of my kids.  I mean, their dad wasn't doing

15  nothing, so...

16  Q    Did you ever have a habit of your own?

17  A    Yeah.

18  Q    Tell us about that.

19  A    I had back surgery and they started giving me

20  medication.  So, you know, I started abusing the Percocets.

21  Q    Did you move -- was there a time when you could no

22  longer get the prescriptions?

23  A    Yes.

24  Q    What did you do then?

25  A    Steal, you know, to get them, you know, for money or buy

TRIAL ONE – VOL. 8 – 834

1    it from other people.

2        Q    Who did you buy it from?

3        A    Whoever had them.  Tony.

4        Q    So you bought drugs from Elijah Ledbetter?

5        A    Yeah.

6        Q    Did you ever buy drugs from Ricco Maye?

7        A    Yes.

8        Q    How about Marcus?

9        A    Yes.

10       Q    Did you ever buy drugs from Chris Harris?

11       A    Yes.

12       Q    Did you live at Mount Vernon at one point, Mount Vernon

13   and Miami, maybe?

14       A    Yeah.

15       Q    Did there ever come a time when you woke up to a

16   surprise in your house?

17       A    Yeah.  They was out doing burglaries, and I woke up and

18   there was like rims and table saws and everything you could

19   imagine downstairs in my apartment.

20       Q    Who was there?

21       A    Marc, Elijah, Ricco, Keith.

22       Q    Brandon show up at some point?

23       A    Yeah.  I think it was later on, because I wanted it all

24   out of my house.  And Keith was like selling it, selling the

25   stuff.

TRIAL ONE – VOL. 8 – 835

1    Q    Have you ever been robbed by any of these individuals?

2    A    Yes.

3    Q    How many times?

4    A    Two different times.

5    Q    Tell us about the first time you were robbed.

6    A    The first time it was Al-Nuts -- Allen.  I believe my

7    kids's father sent him in there because we had broke up, and he

8    said the reason was to come check on my son.  I don't know how

9    that's checking on my son, more like putting him in danger to

10   me.  Pretty stupid.

11        He just came in like more or less trying to intimidate

12   me, like take over my house.

13   Q    Was anyone with him?

14   A    Not that time.  There was a couple people out on the

15   porch.

16   Q    Who was on the porch?

17   A    I don't know.  Who was on the porch that time?  I think

18   it was Elijah that was on the porch and somebody else.  I don't

19   know who the person that was on the porch.

20   Q    So this incident you're talking about with Al-Nuts, did

21   he or his colleagues steal anything from your house?

22   A    Yeah, just like picking up DVDs, like trying to take

23   whatever, you know, they seen.

24   Q    Let's talk about the second time you were robbed.

25   Describe that incident.

TRIAL ONE - VOL. 8 - 836

1    A    That incident, Elijah had knocked on my door, and I

2  thought it was just him.  And I opened the door, and it was

3  probably like 30 people just like rushed in.

4    Q    What did they do?

5    A    They beat up my dad.

6    Q    Who beat up your dad?

7    A    Buckwheat.  My dad would try to get up and punch him.

8  There was somebody else.  I'm not sure who the other person

9  was.

10   Q    This large number of people came in your house and what

11  happened?

12   A    Beat up my dad.

13   Q    They steal anything?

14   A    Like my DVD player, TV.  They even took my son's little

15  Jordon's that was sitting by the door, just whatever they could

16  grab.

17   Q    I'd like to go back to Elijah Ledbetter for a moment.

18  You said he's deceased?

19   A    Yes.

20   Q    Were you familiar with a man named Alan Johnson, or AV?

21   A    Yes.

22   Q    Who was AV?

23   A    He was Elijah's friend.  That's who shot Elijah.

24   Q    Let's -- we're going to get to that.

25   A    Okay.

TRIAL ONE – VOL. 8 – 837

1    Q    Let's talk about what led up to that.

2    A    What Elijah told me was AV was getting robbed and that

3    AV thought that he was robbing him.  But Elijah said that he

4    was just in there to stop it.  So I don't know.

5    Q    So AV thought Elijah robbed him?

6    A    Yeah.

7    Q    What happened next?

8    A    Tony called me, and he was coming home from a bar and he

9    asked me to come pick him up.  But I was like kind of far away,

10   and I didn't feel like dealing with him that night.  So I

11   didn't go pick him up.  Like six -- four, five o'clock, six

12   o'clock in the morning I got a call saying he had got shot.

13   Q    Saying that Elijah had been shot?

14   A    Elijah had been shot, yeah.

15   Q    Did he die?

16   A    Yes.

17   Q    What was the belief about who shot Elijah?

18   A    That AV shot him.

19   Q    And why would he shoot him?

20   A    Because he thought he robbed him.

21   Q    Now, Elijah was Brandon Ledbetter's brother, right?

22   A    Yes.

23   Q    Were they close?

24   A    Yeah, I guess.

25   Q    Was Brandon upset when Elijah died?

TRIAL ONE – VOL. 8 –  838

1    A    Yeah.  I mean, it's his brother.

2    Q    Did you ever hear Brandon talk about what he wanted to

3  do?

4    A    Yes.

5    Q    What did he say?

6    A    You know, basically, he wants to take care of who killed

7  his brother.

8    Q    Where is AV today?

9    A    He's deceased.

10    Q    Let's talk about the night that AV died.  Where were you

11  the night that AV, or Alan Johnson, was killed?

12    A    I believe at home.

13    Q    Was anyone with you?

14    A    I'm not sure if it was the night or a couple -- like the

15  day before.  It was like Keith -- Keith, Marc, Robert.  We was

16  just all -- everybody was like in and out.

17    Q    Of your house?

18    A    Yes.

19    Q    So it's Keith Maye?

20    A    Uh-huh.  They're all cousins.

21    Q    Robert --

22    A    Ricco.

23    Q    And Ricco was there, and Brandon Ledbetter and a person

24  named Marc?

25    A    Yes.

TRIAL ONE – VOL. 8 – 839

1    Q    Okay.

2         MR. GATTERDAM:  Objection, Your Honor.  I don't

3    believe that's what the testimony is.

4         THE COURT:  Side-bar.

5                        – – –

6    (The following proceeding was held at side-bar.)

7         MR. BERNDT:  Your Honor, could I ask for Brian to seek

8    clarification as to which day she was talking about.  She said

9    she didn't know if it was the day or the day before AV Johnson

10   was murdered when she was talking about these people being in

11   and out of the house.

12        THE COURT:  The reason I asked for a side-bar.  I have

13   it on my screen.  She did say, "I'm not sure if it was the

14   night or a couple —— like the day before.  It was like Keith ——

15   Keith, Marc, Robert.  We was just all —— everybody was like in

16   and out."

17        MR. MARTINEZ:  I thought I heard her say Ricco.  I can

18   ask her again if Ricco was there.

19        THE COURT:  Now, you had an issue, Mr. Berndt.

20        MR. BERNDT:  Yes, Your Honor.  The question right

21   before that, she was asked what day these people were at her

22   house.  She said the day of Alan Johnson's murder or the day

23   before.  She didn't specify.  I think we should be clear on

24   that.

25        MR. MARTINEZ:  The answer is the answer.

TRIAL ONE – VOL. 8 – 840

1    THE COURT:  The answer is the answer.  That's your

2   territory for cross.

3        Ms. Dixon.

4        MS. DIXON:  I was just looking at the clock for break.

5   That's all.  I don't have anything to say.

6        THE COURT:  How much more -- do you need to break now?

7        MS. DIXON:  I'm okay.

8        THE COURT:  I thought we would break at around 11

9   since we got started around 9:20.

10       MR. MARTINEZ:  Ten minutes would be fine.

11     (The following proceeding was held in open court.)

12       THE COURT:  Mr. Martinez, please continue.

13       MR. MARTINEZ:  Thank you, Your Honor.

14   BY MR. MARTINEZ:

15   Q    Ms. Murphy, I just want to clarify who was at your house

16   that evening.  Was Brandon Ledbetter there?

17   A    Yes.

18   Q    Was Marc there?

19   A    Yes.

20   Q    Was Keith Maye there?

21   A    Yes.

22   Q    Was Ricco Maye there?

23   A    Yes.

24   Q    Is that a yes?

25   A    Yes.

TRIAL ONE – VOL. 8 – 841

1    Q    Okay.  Tell the ladies and gentlemen of the jury what

2  happened.

3    A    I can remember -- I don't know if it was like the day

4  before or the day of when AV got killed.  I just know that

5  Brandon was supposed to get a phone call.  And I'm not sure if

6  it was China, the girl that -- where AV was staying, but

7  somebody let him know where AV was at.

8    Q    What was Brandon Ledbetter's reaction to getting that

9  telephone call?

10   A    I mean, happy, you know.  He just -- the dude that

11  killed his brother, I mean, he's about to retaliate.

12   Q    What did Brandon and the other men in your house do

13  after that phone call?

14   A    I just remember my kids's father getting like Marc and

15  them like hoodies.

16   Q    What color were the hoodies?

17   A    Black.

18   Q    Go on.

19   A    I just remember them leaving -- my kids's father had

20  came back.  So I don't know if it was that night, that day or

21  the next day.

22   Q    Let's take it one step at a time.

23   A    Okay.

24   Q    This night when Brandon Ledbetter got the phone call,

25  did any of the men in the house have guns?

TRIAL ONE - VOL. 8 - 842

1   A   Yeah.  I mean, they always carried guns.

2   Q   Now, at some point after the phone call, did they leave?

3   A   Yes.  It was like a little bit -- little bit later.  It

4   wasn't like right away.

5   Q   And I think you testified a moment ago someone came

6   back.  Who came back?

7   A   My kids's father.

8   Q   Is that Keith?

9   A   Yes.

10  Q   All right.  Was there a time when you were together with

11  Brandon Ledbetter after -- shortly after AV was killed?

12  A   I was with my kids's father.  And I don't know if -- I

13  think we was over on like Fourth Street or somewhere like that.

14  And it was just like a group of them.  And they was just

15  talking about, you know, they took care of him, you know, took

16  care of AV.

17  Q   Was Brandon there?

18  A   Yeah.

19  Q   What was Brandon saying?

20  A   That he was talking about he took care of AV.

21  Q   Did he say how they, quote, took care of AV, end quote?

22  A   I believe they went to China's house or apartment, and

23  went in there and shot him, killed him.

24  Q   How did they get in the apartment?

25  A   Through the door.

TRIAL ONE - VOL. 8 - 843

1    Q    Did Brandon say how he got in the door?

2    A    I don't know if -- somebody said they kicked it in, you

3    know, to make it look like it wasn't -- that China didn't say

4    here he is, you know.

5    Q    Describe, if you can, what Brandon Ledbetter's demeanor

6    was as he's saying these things.

7    A    I mean, like proud, like happy, like he's...

8    Q    Did Brandon Ledbetter say anything about China Hester?

9    A    Just like -- I know her son was there and they wasn't

10   supposed to do it in front of the son or something, and there

11   was supposed to be some money to keep quiet.

12   Q    Money to who to keep quiet?

13   A    To China.

14   Q    The information that you just gave, Ms. Murphy, about

15   AV's murder, did you provide that information to law

16   enforcement?  Did you talk to the police about this?

17   A    After they came and got me for it.

18   Q    Okay.

19   A    I mean, like --

20   Q    What year was that?  When you talked to the police the

21   first time, what year was that?

22   A    2006.

23   Q    And why were you with the police?

24   A    Because of a burglary, because they got me for burglary.

25   Q    The burglary we talked about before?

TRIAL ONE – VOL. 8 – 844

1   A    Uh-huh.

2        THE COURT:  Your answer is "yes," ma'am?

3        THE WITNESS:  Yes.

4   BY MR. MARTINEZ:

5   Q    Just so we're clear, at that point when you were

6   detained on the burglary, you provided this information to law

7   enforcement?

8   A    Yes.

9   Q    Did there ever come a time when Ricco Maye contacted you

10  about speaking to law enforcement?

11  A    Yes.

12  Q    Tell us about that.

13  A    We was on Facebook -- actually, my boyfriend was on

14  Facebook.  And Ricco sent a message, like what's your number.

15  My boyfriend set it all up.  I think he thought we was trying

16  to talk.  We give the number.  When he called, you put it on

17  speaker phone.  And Ricco was on there saying like Ledbetter

18  call his attorney.

19  Q    Call whose attorney?

20  A    His attorney.

21  Q    Who is him?

22  A    Ricco.  Ricco's attorney and Brandon's attorney, and

23  tell them that, you know, they didn't do it and stuff like

24  that.

25       MR. MARTINEZ:  This might be a good time for our break

TRIAL ONE – VOL. 8 –  845

1   that we talked about, Your Honor.

2        THE COURT:  Ladies and gentlemen, it's eleven o'clock.

3   We'll break now for our morning recess.  We'll stand in recess

4   until 11:15.  Remember the Court's admonition.

5      (Recess taken from 11:00 a.m. to 11:15 a.m.)

6      (Thereupon, the following proceeding was held in open court

7   with all defendants and counsel present.)

8      (Jury in at 11:15 a.m.)

9        THE COURT:  Mr. Martinez, please proceed.

10       MR. MARTINEZ:  Thank you, Your Honor.

11   BY MR. MARTINEZ:

12   Q.  Ms. Murphy, I just want to clarify one thing before we

13   move on.  There have been a number of references in your

14   testimony to Marcus, or Marc.  Do you remember saying that

15   name?

16   A.  Uh-huh.

17   Q.  Do you know his last name?

18   A.  Uhm -- oh, I do.  I just --

19   Q.  Let me ask you this question:  Is he alive now?

20   A.  No.  He's deceased.

21   Q.  Okay.

22       MR. MARTINEZ:  May I see Exhibit 154-1-089, please?

23       COURTROOM DEPUTY CLERK:  Could you repeat that?  154

24   --

25       MR. MARTINEZ:  154-1-089.

TRIAL ONE – VOL. 8 – 846

1        COURTROOM DEPUTY CLERK:  Thank you.

2        MR. MARTINEZ:  You're welcome.

3  BY MR. MARTINEZ:

4  Q.  Ms. Murphy, do you recognize the person in that picture?

5  A.  That was Brandon's girlfriend.

6  Q.  What's her name?

7  A.  Crystal.

8        MR. MARTINEZ:  Your Honor, the government moves for

9 the admission of Exhibit 154-1-089.

10       THE COURT:  It will be received.

11     Any objection?

12       MR. GATTERDAM:  No objection.

13       MS. DIXON:  No objection.

14       MR. BERNDT:  No, Your Honor.

15       MR. McVAY:  No, Your Honor.

16       MR. NOLDER:  No objection.

17       THE COURT:  All right.  Thank you.

18  BY MR. MARTINEZ:

19  Q.  Ms. Murphy, did you ever meet Crystal Fyffe?

20  A.  Uh-huh, yes.

21  Q.  Okay.  And -- I'm sorry.  You know her -- you know her

22 as related to Brandon how?

23  A.  As his girlfriend.

24       MR. MARTINEZ:  May I have Exhibit 150-92?

25  BY MR. MARTINEZ:

TRIAL ONE - VOL. 8 - 847

1    Q.   This is a taped call we're going to play.  We're going

2    to start at 11:24 and go to 12:12.  And, Ms. Murphy, I'll just

3    ask you to listen to the audio.  And I'll ask you some

4    questions.  Okay?

5         (Audiotape played in open court.)

6    BY MR. MARTINEZ:

7    Q.   Do you recognize the voices on that tape?

8    A.   It sounds like his aunt, Paulette, is who it sounds

9    like.

10   Q.   When you say "his aunt," who do you mean?

11   A.   Brandon.

12   Q.   Who was the other voice on the tape?

13   A.   Paulette.

14   Q.   And who was the other voice?

15   A.   Brandon.

16   Q.   Okay.  Paulette and Brandon, all right.

17        Did you hear the reference about what happened to

18   Crystal on the tape?

19   A.   What do you mean?  Oh, about her getting --

20   Q.   Did you hear the people on the tape talking about

21   Crystal --

22   A.   Yes.

23   Q.   -- and what happened to Crystal?

24   A.   Yes.

25   Q.   Do you know what happened to Crystal?

TRIAL ONE – VOL. 8 – 848

1    A.    She got killed.

2    Q.    Did you ever talk to anyone about the circumstances of

3    her death?

4    A.    Yes.

5    Q.    Who did you talk to?

6    A.    My kids' father.

7    Q.    What did he say?

8    A.    That -- the rumor was going around that Brandon --

9             MR. BERNDT:  Objection, Your Honor.

10            THE WITNESS:  -- had got her killed.

11            THE COURT:  Just a second.

12            MR. MARTINEZ:  Your Honor, co-conspirator statement.

13            THE COURT:  Side-bar, Counsel.

14                              - - -

15     (Thereupon, the following proceeding was held at side-bar.)

16            THE COURT:  I just wanted to make sure that I was

17    following the conversation trail.

18            MR. MARTINEZ:  Yes.

19            THE COURT:  So, tell me what you expect her to say.

20            MR. MARTINEZ:  What I expect her to say is that Keith

21    Maye told her that Brandon killed Crystal.

22            THE COURT:  Okay.  So, the co-conspirator statement is

23    what Brandon said.  Is Mr. Maye an unindicted co-conspirator?

24            MR. MARTINEZ:  Yeah, that's what we consider him.

25    Yes, Your Honor.  That's why we laid some of the foundation

1   today about what he was doing with this group, the illegal

2   activities he was engaged in with them.

3          THE COURT:  All right.

4       Go ahead, Mr. Berndt.

5          MR. BERNDT:  I'm going to have a question for Mr.

6   Martinez before I state my objection.

7       Do you intend on calling Keith Maye?

8          MR. MARTINEZ:  I don't know.

9          MR. BERNDT:  Okay.  Then, I would object to the

10  testimony.  They have a witness.  He is a government informant.

11  He is somebody who the statement was supposedly said to, and he

12  can come in and testify to that.  This is a -- This is an

13  alleged co-conspirator statement.  And I'm not so sure that we

14  have Keith Maye in here -- well, we don't have Keith Maye in

15  the conspiracy; but, assuming Mr. Ledbetter is in the

16  conspiracy, that statement was made to somebody who's not in

17  the conspiracy and then made to this witness.  So --

18         MR. GATTERDAM:  Can I add something?

19         THE COURT:  Yes.  Go ahead, Mr. Gatterdam.

20         MR. GATTERDAM:  The other objection that I was about

21  to make is, she is saying "rumor."  I don't think she's saying

22  what Keith Maye said --

23         MR. MARTINEZ:  I'll clarify that.

24         MR. GATTERDAM:  Okay.

25         THE COURT:  Okay.  I'm going to overrule your

TRIAL ONE – VOL. 8 –  850

1    objection because it's a statement made in furtherance of the

2    conspiracy by –– and those statements can also be made by

3    unindicted co-conspirators.  And there has been sufficient

4    evidence, at least by a preponderance of the evidence, that Mr.

5    Maye was involved in this alleged conspiracy.

6              MR. BERNDT:  Could I ask one question of the Court?

7              THE COURT:  Uh-huh.

8              MR. BERNDT:  Assuming that the statement was made, how

9    does the Court view this as being in furtherance of the

10   conspiracy?

11             THE COURT:  Because one of the acts of the

12   conspiracy –– one of the acts of the conspiracy was the murder

13   of Crystal Fyffe.  And, so, it's all a part of the conspiracy.

14       But I don't want –– I want to make one thing really

15   clear to you.  I don't do this as a general proposition.  I

16   make my rulings.  I state the legal basis for it, but this

17   is –– this, almost, is kind of like a motion for

18   reconsideration.

19             MR. BERNDT:  I apologize, Your Honor.

20             THE COURT:  No, no.  No apology is necessary.  I

21   understand the basis of your question, which is why I answered

22   it.  But, you know, we would never get out of here if I made a

23   ruling, stated the basis for it, and then engaged in spirited

24   debate about it.  So ––

25       (The following proceedings were had in open court.)

TRIAL ONE – VOL. 8 – 851

1      THE COURT:  Please continue, Mr. Martinez.

2    BY MR. MARTINEZ:

3    Q.  Ms. Murphy, I'm going to reask the question, but I'm

4    going to try to be very clear with you about what the question

5    is.  Okay.  I'm not asking about rumor.  I just want to know

6    what Keith Maye told you about how Crystal Fyffe died.

7    A.  Okay.  He just said that Brandon had got her killed

8    because she knew too much.

9    Q.  Ms. Murphy, do you think that you would be able to

10   recognize Brandon Ledbetter today?

11   A.  Yeah.

12   Q.  Is that a "yes"?

13   A.  (Nodding affirmatively.)

14   Q.  Okay.  I want you to look around the courtroom and tell

15   me if you see Brandon Ledbetter.

16   A.  Over there (pointing).

17   Q.  Okay.  Describe what he's wearing.

18   A.  I don't know.  Black suit and -- I can't see -- a tie.

19   Q.  What kind of tie?

20   A.  I can't -- maybe blue and purple, black.  I don't know.

21   Q.  What color shirt?

22   A.  White.

23      MR. MARTINEZ:  Your Honor, let the record reflect that

24   Ms. Murphy has identified the defendant, Mr. Ledbetter.

25      THE COURT:  The record will so reflect.  And just so

TRIAL ONE – VOL. 8 – 852

1    that the record is clear, she pointed in the direction of

2    Mr. Ledbetter, because the tie is not blue and purple.

3            MR. MARTINEZ:  Thank you, Your Honor.

4            THE WITNESS:  I need glasses.

5    BY MR. MARTINEZ:

6    Q.   Ms. Murphy, do you think you'd recognize Christopher

7    Harris if you saw him in the courtroom?

8    A.   Uh-huh.

9    Q.   Is that a "yes"?

10   A.   Yes.

11   Q.   Okay.  Look around the courtroom, please, and tell me if

12   you see Christopher Harris.

13   A.   Like, behind you.

14   Q.   What's he wearing?  I'll get out of the way.

15   A.   Like, a vest and white shirt.

16           MR. MARTINEZ:  Your Honor, let the record reflect that

17   Ms. Murphy has identified the defendant, Christopher Harris.

18           THE COURT:  The record will so reflect.

19   BY MR. MARTINEZ:

20   Q.   Do you think you'd recognize Buckwheat if you saw him in

21   the courtroom today?

22   A.   Uh-huh.

23   Q.   Okay.  I'd ask you to look around the courtroom and tell

24   me if you see Buckwheat.

25   A.   He don't look the same no more.  He's over there

TRIAL ONE – VOL. 8 –  853

1   (pointing).

2      Q.   All right.  What's he wearing?

3      A.   A vest.  White shirt.

4      Q.   Okay.

5           MR. MARTINEZ:  Your Honor, I'd like the record to

6   reflect that Ms. Murphy has identified Buckwheat as Mr. Liston,

7   the defendant.

8           THE COURT:  The record will so reflect.

9      BY MR. MARTINEZ:

10     Q.   Ms. Murphy, do you want to be in court today?

11     A.   No.

12     Q.   Why are you here?

13     A.   Because you had made me, basically.

14     Q.   Has the United States Government promised you anything

15  for being in court today?

16     A.   No.

17     Q.   Have we made any offers to help you do certain things?

18     A.   I'm just moving.

19     Q.   Moving?

20     A.   Yeah.

21     Q.   Okay.  And did we help you move recently?

22     A.   Yeah.

23     Q.   Okay.  And you expect to move again?

24     A.   Yeah.

25     Q.   All right.

TRIAL ONE – VOL. 8 – 854

1          MR. MARTINEZ:  May I have Exhibit 150-20, please?

2      Another phone call, Your Honor.

3          THE COURT:  All right.

4          MR. MARTINEZ:  We're going to start at thirteen

5  minutes and four seconds, and we're going to go to thirteen

6  minutes and forty-four seconds.  Can you go back just a little

7  bit, please?

8          AGENT:  Okay.

9      (Audiotape played in open court.)

10  BY MR. MARTINEZ:

11  Q.   Who's the male voice there?

12  A.   Brandon Ledbetter.

13  Q.   Did you hear him on the tape say that he can, quote, run

14  shit over the phone, end quote?

15  A.   Yeah.

16  Q.   Are you scared of Brandon Ledbetter?

17  A.   Uh-huh.

18  Q.   Why?

19  A.   I mean, look what he's done to other people.  I mean, I

20  ain't nobody to him.  So, I mean --

21          MR. MARTINEZ:  No further questions, Your Honor.

22          THE COURT:  Thank you, Mr. Martinez.

23      Mr. Berndt?

24          MR. BERNDT:  Thank you.

25          MR. MARTINEZ:  Your Honor, can we approach before

TRIAL ONE – VOL. 8 –   855

1    cross?

2            THE COURT:  Yes.

3                            – – –

4        (Thereupon, the following proceeding was held at side-bar.)

5            MR. MARTINEZ:  Your Honor, I'm sorry.  I didn't mean

6    to interrupt.

7            This goes to what we talked about in chambers this

8    morning.  I just want Mr. Berndt and everyone to know that when

9    I asked Ms. Murphy if we've helped her move recently, she's

10   been in a hotel, out where she used to live, for about two

11   weeks.

12           THE COURT:  Okay.

13           MR. BERNDT:  Your Honor, I have a second issue to talk

14   to the Court about.

15           Last night, when I was looking through Ms. Murphy's

16   situation, I found that, in December of 2015, she had a warrant

17   issued for her in the Franklin County Court of Common Pleas

18   under Case Number 15-Criminal-6198.

19           THE COURT:  Uh-huh.

20           MR. BERNDT:  The documents that I have show that the

21   warrant was issued on December 17th, 2015.  It's a felony two

22   burglary.  It allegedly occurred on September 22, 2015.  She

23   has no attorney of record.  No assigned prosecutor.  Yet,

24   yesterday, on the 13th of April, the warrant was magically set

25   aside.  I have to believe that this was with the assistance of

TRIAL ONE – VOL. 8 –  856

1  law enforcement.  It was never disclosed by Ms. Murphy, and I

2  need to make certain that I understand what the state of this

3  is when I cross-examine her.

4           MR. MARTINEZ:  Issued the hearing and -- It's Franklin

5  County, right?  Yes?

6           MR. BERNDT:  Uh-huh.

7           MR. MARTINEZ:  Franklin County, on May the 12th, I

8  want to say.

9           MR. BERNDT:  How did it get set aside?

10          MR. MARTINEZ:  Franklin County set it aside.

11          MR. BERNDT:  How did that happen?

12          MR. MARTINEZ:  We talked to them about it.

13          MR. BERNDT:  She didn't mention it.

14          MR. MARTINEZ:  No.  I should have mentioned it.  I'm

15  sorry.

16          MR. BERNDT:  Well, she didn't mention it.  So, is this

17  something I can inquire about?

18          THE COURT:  So it's about an arrest.  On what

19  authority would you cross-examine her about an arrest?

20          MR. BERNDT:  Because it's an inducement to have her

21  testify.

22          THE COURT:  The arrest was an inducement to have her

23  testify?

24          MR. BERNDT:  She wasn't arrested.  The warrant was set

25  aside by the government so she wouldn't be arrested, and it was

TRIAL ONE - VOL. 8 - 857

1    set aside yesterday.  The warrant had been out for four months.

2    She has three or four burglaries on her record.  She is

3    probably looking at a hundred-thousand-dollar bond in Common

4    Pleas Court.  It is a significant benefit to her.

5         Your Honor, I don't stop there.  She also has the same

6    situation in Municipal Court under Case Number 2015-CRB-2609,

7    where she had a warrant for failing to appear to do a 30-day

8    sentence.

9         THE COURT:  And that was set aside, also?

10        MR. BERNDT:  That was set aside March 15th of 2016.

11        THE COURT:  Did you all have that set aside?

12        MR. MARTINEZ:  Someone from my office talked to

13   someone in the Municipal --

14        THE COURT:  Under those circumstances, you may inquire

15   --

16        MR. BERNDT:  Thank you.

17        THE COURT:  -- about them having them set aside.

18        MR. MARTINEZ:  But how far can Mr. Berndt inquire

19   about the facts?

20        THE COURT:  I don't think that the facts of the

21   case -- I don't think you need to go into the underlying facts.

22   And the Federal Rules are clear that you don't need to go into

23   the underlying facts, but you may inquire about those warrants,

24   the circumstances under which they were set aside and by whom,

25   you know, they had been set aside.

TRIAL ONE – VOL. 8 – 858

1    MR. BERNDT:  Okay.

2    (The following proceedings were had in open court.)

3    THE COURT:  Mr. Berndt, please proceed.

4    MR. BERNDT:  Thank you, Your Honor.

5                        - - -

6                   CROSS-EXAMINATION

7    BY MR. BERNDT:

8    Q.   Ms. Murphy, I'm Jeff Berndt.  How are you today?

9    A.   I'm good.

10   Q.   Okay.  I represent Robert Ledbetter.  Can you hear me

11   okay?

12   A.   Yes.

13   Q.   Okay.  I've got some questions for you.  If I ask you a

14   question that you don't understand, please ask me to rephrase

15   it.  Okay?

16   A.   Okay.

17   Q.   It's very important, what we're doing here today.

18        You said that you were afraid of Brandon Ledbetter,

19   correct?

20   A.   Yes.

21   Q.   You also said that you started giving information to the

22   police about Brandon Ledbetter in 2006, correct?

23   A.   Yeah, 2006.

24   Q.   And Brandon Ledbetter has not harmed you in any way

25   whatsoever over the past ten years, correct?

1    A.    Hu-uh, no.

2    Q.    Okay.  So, you've had this fear for ten years, and this

3  fear is something that has never come to fruition, correct?

4    A.    Yeah.

5    Q.    Okay.  Now, how old are you?

6    A.    Thirty.

7    Q.    Okay.  And do you have children?

8    A.    Yeah.  I have four and a newborn.

9    Q.    You have a newborn?

10    A.    Uh-huh.

11    Q.    Okay.  And where are you employed?

12    A.    Nowhere right now.  I just recently quit my job.

13    Q.    Where was your prior job?

14    A.    At a care center.

15    Q.    I'm sorry?

16    A.    The Alzheimers Care Center.

17    Q.    Okay.  Where was that?

18    A.    Up north.

19    Q.    Do you know the street name?

20    A.    Henderson Road.

21    Q.    Do you know the name of the entity, the place that you

22  worked, the name?

23    A.    The Columbus Alzheimers Care Center.

24    Q.    Okay.  I'm sorry.  How long did you work there?

25    A.    I don't know.  Four -- four years --

1    Q.   Okay.

2    A.   -- off and on.

3    Q.   What kind of work did you do there?

4    A.   The kitchen, housekeeping, stuff like that.

5    Q.   Okay.  Now, you have been convicted of crimes, correct?

6    A.   Uh-huh.

7    Q.   Okay.

8         THE COURT:  Yes?

9         THE WITNESS:  Yes.  Yes.

10   BY MR. BERNDT:

11   Q.   And I'd like to go through those with you.

12       Two Thousand Eight, misdemeanor theft?

13   A.   Uh-huh.

14   Q.   Do you remember that?

15   A.   Yep.

16   Q.   Do you consider that an act of dishonesty or deceit?

17   A.   Yeah.  I've done a lot of that.

18   Q.   Okay.

19   A.   I mean -- I'm changed now.  So that -- all that stuff

20  shouldn't even matter.

21   Q.   Two Thousand Ten, misdemeanor theft?

22   A.   Uh-huh.  Yes.

23   Q.   Consider that an act of dishonesty or deceit?

24   A.   Yeah, yeah, yeah, yeah.

25   Q.   Two Thousand Thirteen, misdemeanor theft?

1      A.   Uh-huh.

2      Q.   Is that a "yes"?

3      A.   Yes.

4      Q.   Is this funny?

5      A.   No, but I don't understand why all this -- I mean, I

6   done told you guys what I did.  Why you -- I'm not being tried

7   here.  So why does all that matter?

8      Q.   Do you consider that an act of dishonesty or deceit?

9      A.   Yes.

10      Q.   Two Thousand Fifteen, theft?

11      A.   Yes.

12      Q.   Consider that an act of dishonesty or deceit?

13      A.   Yes.

14      Q.   Correct?

15      A.   Yes.

16      Q.   Two Thousand Six, felony receiving stolen property.

17      A.   Yep.

18      Q.   Consider that an act of dishonesty or deceit?

19      A.   Yep.

20      Q.   Two Thousand Six, theft, felony; tampering with

21   evidence, felony?

22      A.   Yep.

23      Q.   Two Thousand Five, receiving stolen property?

24      A.   Yep.

25      Q.   Two Thousand Six, felony burglary?

TRIAL ONE – VOL. 8 – 862

1    A.    Yep.

2    Q.    Two Thousand Ten, felonious assault?

3    A.    Yep.

4    Q.    All acts of dishonesty or deceit; would you agree?

5    A.    Uh-huh.  Uh-huh.

6          THE COURT:  Does that mean "yes," Ms. Murphy?

7          THE WITNESS:  Yes.

8    BY MR. BERNDT:

9    Q.    So you have at least ten criminal convictions --

10   A.    Uh-huh.

11   Q.    -- since 2005 --

12   A.    Uh-huh.

13   Q.    -- both misdemeanors and felonies, all involving cases

14   of dishonesty or deceit, correct?

15   A.    Uh-huh.  Yep.  Trying to take care of my son.  So do

16   what I had to do.

17   Q.    Ma'am, have you used any drugs that were not prescribed

18   to you?

19   A.    It's been about six years I've been clean.

20   Q.    What kind of drugs?

21   A.    Percocet.  Vicodin.

22   Q.    Okay.  And you told the jury that that was because you

23   had some type of surgery that you ended up addicted?

24   A.    Yeah.  I had back surgery.

25   Q.    Back surgery?

TRIAL ONE – VOL. 8 –  863

1   A.   (Nodding affirmatively.)

2   Q.   Where did you have the back surgery?

3   A.   OSU East.

4   Q.   When was that?

5   A.   In '97.

6   Q.   Okay.  Now, you have a relationship with law

7   enforcement; do you not?

8   A.   Not a good one.

9   Q.   I'm sorry?

10   A.   Not a good one.

11   Q.   Not a good one?

12   A.   Yeah.

13   Q.   Well, you stated that you were forced to be here,

14   correct?

15   A.   Yes.

16   Q.   Okay.  Who forced you to be here?

17   A.   Prosecutors.  Whoever subpoenaed me.

18   Q.   Okay.  And you have received some benefits from the

19   prosecutors; have you not?

20   A.   No, not really.

21   Q.   Okay.

22   A.   I mean, just helped me relocate.  But that ain't no --

23   Q.   That's all?

24   A.   Yeah.

25   Q.   Okay.  Did you have a warrant for your arrest, as of

TRIAL ONE – VOL. 8 –  864

1  yesterday, for a felony burglary that occurred in September of

2  2015?

3  A.  Uh-huh.

4  Q.  And the government, these gentlemen right at this table,

5  got that warrant set aside for you; did they not?

6  A.  I still got to deal with it.  I'm still going to be

7  charged with it.

8  Q.  Ma'am, did they get the warrant set aside for you?

9  A.  Yes.

10  Q.  And you're somebody who has several criminal

11  convictions, correct?

12  A.  Yes.

13  Q.  This warrant had been out since December of 2015,

14  correct?

15  A.  Yes.

16  Q.  Is this bothering you?

17  A.  You're kind of aggravating.  Yeah.

18  Q.  And they got that warrant set aside, correct?

19  A.  Yes.

20  Q.  No longer subject to arrest, correct?

21  A.  Yes.

22  Q.  No longer have to post a bond, correct?

23  A.  Yeah.

24  Q.  Didn't even need your own lawyer to do it, correct?

25  A.  Nope.

TRIAL ONE – VOL. 8 –  865

1    Q.    You didn't even have to go down to the courthouse to do

2    it, correct?

3    A.    No.  No.

4    Q.    And you are a three-time convicted felon, correct?

5    A.    Yep.

6    Q.    Okay.  And you also have a case in Municipal Court,

7    correct?

8    A.    Yes.

9    Q.    That was for theft, correct?

10   A.    Yeah.  That was further back.  I didn't turn myself in

11   because I had another warrant.  So, I didn't turn myself in for

12   that.  So that's why that came back up.  That was, like, 2013.

13   But I was supposed to turn myself in, do 30 days.  But the

14   other warrant popped up.  So I didn't do that.  I didn't turn

15   myself in.  So that's why that warrant was issued.

16   Q.    And that warrant was also set aside, correct?

17   A.    Yes.

18   Q.    In May -- I'm sorry.  In March, March 15th of this year,

19   correct?

20   A.    Yeah, I think.

21   Q.    And that was also set aside with the assistance of the

22   government, correct?

23   A.    It's not set aside.  I still got to deal with it.  I'm

24   still going to get sentenced.  So --

25   Q.    You're not subject to arrest, correct?

1   A.   No.

2   Q.   You got the warrant set aside, correct?

3   A.   Uh-huh.

4   Q.   Without a lawyer, correct?  Didn't even have to appear,

5   correct?

6   A.   No.

7   Q.   Okay.  So, you've been treated pretty well, correct?

8   A.   I mean, I would have got them set aside myself.  I mean,

9   it ain't like -- I could get a lawyer.  It wasn't something I

10  couldn't do myself.  It's not like it was that special.  Shit.

11  Could have turned myself in and bonded out.

12  Q.   When was the last time you went through a session with

13  the government lawyers preparing you for today's testimony?

14  A.   When was the last time --

15  Q.   -- that you sat down with the agent --

16  A.   Yesterday.

17  Q.   Yesterday?

18  A.   Uh-huh.

19  Q.   Okay.  When was that yesterday?

20  A.   I don't know.  Probably like six, seven o'clock.

21  Q.   How long did you stay?

22  A.   About an hour.

23  Q.   Okay.  And you went over everything that you discussed

24  today, correct?

25  A.   Not everything.  I mean, they didn't --

1    Q.   Most things, correct?

2    A.   Some.

3    Q.   You knew what was going to be asked of you today,

4    correct?

5    A.   Yeah.

6    Q.   You knew what exhibits were going to be presented,

7    correct?

8    A.   No.

9    Q.   You knew what areas of inquiry were going to be

10   discussed, correct?

11   A.   Yeah.

12   Q.   Your answers were given to the government yesterday,

13   correct --

14   A.   Yeah.

15   Q.   -- so that they had a chance to hear those in advance of

16   today, correct?

17   A.   Uh-huh.

18   Q.   So you, basically, had a dry-run?

19   A.   Yeah.

20   Q.   Okay.  Who was present for that dry-run?

21   A.   I can't remember his name, him (pointing).

22        MR. MARTINEZ:  I was present.

23   BY MR. BERNDT:

24   Q.   Mr. Martinez?

25   A.   Yes, Martinez.

TRIAL ONE - VOL. 8 - 868

1    Q.    Now, you identified a picture of Robert Ledbetter.

2         MR. BERNDT:  And can we bring that up?  I think it was

3    1-2-112.  And I think it was the bottom picture, Eric.

4         Actually, could I see all three of them on here?

5    Actually, I want the one with the house in the background.

6    BY MR. BERNDT:

7    Q.    Ma'am, I'm going to show you a portion of what's been

8    marked and previously admitted as Exhibit -- Government's

9    Exhibit 1-2-112.  Can you see that okay?

10   A.    Yeah.

11   Q.    Okay.

12        MR. BERNDT:  Now, Your Honor, could the jury see this

13   while I'm asking the questions?

14        THE COURT:  Yes.

15        MR. BERNDT:  Thank you.

16   BY MR. BERNDT:

17   Q.    Do you know when this picture was taken?

18   A.    No.

19   Q.    And do you know who the people are who are behind

20   Mr. Ledbetter?

21   A.    I think that is his mom.  I've only seen his mom a

22   couple of times.  I'm not sure.

23   Q.    Okay.  That's his mom.  If I suggested that this was his

24   little brother, next to his mom --

25   A.    I don't know him.

TRIAL ONE - VOL. 8 - 869

1  Q.   Okay.  And the sign that Mr. Ledbetter is giving is for

2  the North -- Short North?

3  A.   Fourth Street, I guess, yeah.

4  Q.   Okay.  And does Mr. Ledbetter appear in any type of gang

5  clothing there?

6  A.   No.

7  Q.   Are you aware as to whether or not Mr. Ledbetter's mom

8  is involved in any type of criminal conduct?

9  A.   No.

10  Q.   Or his little sister, or, his little brother?

11  A.   No.

12  Q.   Okay.  If I told you that this picture was taken in

13  2003, would that refresh your recollection?

14  A.   I mean, I don't know.  I don't know when it was tooken.

15  Q.   You stated that you saw Mr. Ledbetter off and on.

16       I'm sorry?

17  A.   Yes.

18  Q.   Okay.  Is there somebody back there you want to talk to?

19  A.   No.

20  Q.   Okay.  You said that you saw Mr. Ledbetter, Robert

21  Ledbetter, off and on; is that right?

22  A.   Yes.

23  Q.   Okay.  You saw his brother, Elijah, a lot more than you

24  saw Robert, correct?

25  A.   Uh-huh.  Yes.

TRIAL ONE – VOL. 8 –  870

1   Q.   And you saw Ricco Maye a lot more than you saw Robert,

2   correct?

3   A.   Yeah.

4   Q.   And you saw Keith Maye a lot more than you saw Robert,

5   correct?

6   A.   Yes.

7   Q.   Okay.  You stated that -- Well, let me ask you this:

8   Where did Robert live in the Short North?

9   A.   I don't know.  I don't know where he lived.

10  Q.   Do you know if he lived in the Short North?

11  A.   No.  He always kept those kinds of things quiet.

12  Q.   So, your relationship with him did not include you even

13  knowing where he lived, correct?

14  A.   I mean, we was always at other people's houses.

15  Q.   I understand, but you don't know where he lived?

16  A.   No.

17  Q.   Okay.  You said that Robert always carried a gun; is

18  that correct?

19  A.   Yes.

20  Q.   Okay.  And how do you know that?

21  A.   Because I've seen him.  I mean --

22  Q.   Okay.

23  A.   That's how I know.

24  Q.   Okay.  What kind of gun?

25  A.   I've seen him with twelve gauges; just little handguns.

1      My kids' father was in some kind of trouble one time,

2  and he showed up in a van and had twelve gauges.

3   Q.   When was that?

4   A.   Maybe, like, 2003 or '04.

5   Q.   Okay.  Did you report that to the police?

6   A.   No.

7   Q.   Why not?

8   A.   Because I didn't.

9   Q.   Did you report --

10  A.   I was doing my own little stuff back then.  I mean --

11  Q.   Did you report any of these incidents that you claim to

12  be true to the police?

13  A.   No.

14     MR. BERNDT:  Eric, could we play 150-92, 11:24 through

15  12:12?

16  BY MR. BERNDT:

17  Q.   Ms. Murphy, I'm going to ask that the phone call that

18  you claimed was between Robert Ledbetter and Paulette Maye be

19  replayed to you.  I want you to listen to that.  It's about --

20     (Audiotape played in open court.)

21     MR. BERNDT:  Stop right there.

22  BY MR. BERNDT:

23  Q.   Did you hear that?

24  A.   Uh-huh.

25  Q.   Was that Mr. Ledbetter?

TRIAL ONE – VOL. 8 –  872

1    A.    Yeah.

2    Q.    And did he say:  How do I know what's going on with

3   Crystal?  I'm in jail?

4    A.    Okay.  Of course.  That's a coverup.  You're going to

5   say that.

6    Q.    Ma'am, did he say that?

7    A.    Yes.

8    Q.    Thank you.

9          Now, you testified that, after the death of Alan

10   Johnson --

11    A.    Uh-huh.

12    Q.    -- that you were with Keith Maye at the Golden 8

13   Ball --

14    A.    No, I didn't say that.

15          MR. MARTINEZ:  Objection, Your Honor.  That was not

16   part of this witness' testimony.

17          THE COURT:  I'm going to sustain the objection.

18          You can rephrase your question.

19          I'm going to caution -- I'm going to remind counsel, the

20   narrative nature of the objection.  And I'm going to instruct

21   the jury to disregard Mr. Martinez's narrative about what the

22   witness' testimony was or was not, because you've heard the

23   testimony.  You are to rely on your own recollections as to

24   what the witness said.

25          MR. BERNDT:  Thank you, Your Honor.

TRIAL ONE – VOL. 8 – 873

1    THE COURT: You may inquire further.

2    MR. BERNDT: Thank you.

3  BY MR. BERNDT:

4  Q. Ma'am, do you remember testifying about allegedly

5 hearing Robert Ledbetter say that he took care of Alan Johnson?

6  A. Okay. This -- It was after -- We was at somebody's

7 house, and they was talking about it.

8  Q. Okay. And whose house?

9  A. I believe it was Ricco's. We was outside. Fourth

10 Street.

11  Q. Okay. And when was it?

12  A. It was right after AV got killed.

13  Q. Okay. And who else was there?

14  A. Like, Keith Maye, my kids' father; Ricco; just like a

15 bunch of people standing outside.

16  Q. Okay. So those gentlemen could corroborate that.

17   Anybody else?

18  A. Nope.

19  Q. And, of course, you called the police immediately?

20  A. Nope.

21  Q. Okay. You also testified that you were told that China

22 Hester was in on it, correct?

23  A. Yep.

24  Q. And who told you that?

25  A. Keith. I heard Brandon talk about it. Ricco. I mean,

TRIAL ONE – VOL. 8 – 874

1    it wasn't no secret.

2    Q.    And was that at the same time that you allegedly heard

3    the other statements by Mr. Ledbetter in regard to Mr. Johnson?

4    A.    No.  I've heard that before, before AV even got killed,

5    and then after.

6    Q.    You heard before AV got killed that Robert Ledbetter had

7    him killed?

8    A.    No, that China –– about China.

9    Q.    What did you hear about China before?

10   A.    Oh, her setting it up with Brandon.

11   Q.    So you're saying that –– how long before?

12   A.    I don't know.  Like maybe a day or two.

13   Q.    Okay.  So it's your testimony that China Hester

14   contacted Mr. Robert Ledbetter two days before Alan Johnson was

15   killed?

16   A.    I'm not sure if it was China.  I know that somebody

17   contacted him.  I'm not –– I don't know if it was China, but

18   they blamed it on –– it was at, you know, at China's house.

19   Q.    Two days before he was killed?

20   A.    A day or two, yeah.

21   Q.    But certainly at least one day before he was killed?

22   A.    A day or two, yeah.

23   Q.    A day or two?

24   A.    Uh-huh.

25   Q.    Do you know China Hester?

TRIAL ONE – VOL. 8 – 875

1    A.    Yeah.  I've been in jail with her a few times.

2    Q.    Talk to her about this while you were in jail?

3    A.    I didn't really talk to her about it.  She was telling

4    me about it.

5    Q.    You said that Robert Ledbetter sold drugs, correct?

6    A.    Uh-huh.

7    Q.    Made a lot of money selling drugs?

8    A.    Yes.

9    Q.    Okay.  You didn't see Robert Ledbetter hanging around

10   the corner of Fourth and Eighth Street very often, did you?

11   A.    Well, he was usually -- he had a spot over there on

12   Grant.

13   Q.    Okay.

14   A.    Where did you say?  Where?  Fourth and Eighth?

15   Q.    Uh-huh.

16   A.    Yeah.  He'd be at Fourth and Eighth, Grant, wherever he

17   could sell drugs.  He didn't just sit in one spot.

18   Q.    You're saying that he sold drugs on the street?

19   A.    Usually had, like, spots, people selling for him.

20   Q.    Okay.  And he would sell -- sell small amounts of drugs

21   on the street?

22   A.    No, I wouldn't say small amounts.  If you're having

23   other people sell for you, that's not small amount.

24   Q.    Did you actually witness Mr. Ledbetter sell drugs?

25   A.    Yes.

1    Q.    Okay.  Where?

2    A.    He had a place right there on Grant that he would be all

3    the time.

4    Q.    Right where on Grant?

5    A.    Like Grant and Fifth, right up the street.

6    Q.    And this was a place that he allegedly sold drugs from?

7    A.    Uh-huh.  SWAT hit it.

8    Q.    And you were allowed there?

9    A.    Yeah.

10   Q.    What were you doing there?

11   A.    My kids' father was there, so I was -- pop in on my

12   kids' father.  My aunt lived two houses down.  So --

13   Q.    My question still remains.  What did you do there?

14   A.    Just hung out.  My kids' father would be there.  So I

15   would go there with him or be next door at my aunt's house.  So

16   --

17   Q.    So --

18   A.    If you're asking me if I bought drugs, no.  I did not

19   smoke crack cocaine.

20   Q.    But it's your testimony that what you did was, you hung

21   out at a house where drugs were sold all day?

22   A.    I didn't hang out in there.  I was around because of my

23   kids' father.

24   Q.    That would be Keith Maye?

25   A.    Yes.

TRIAL ONE – VOL. 8 – 877

1    Q.    And that would be where you've received a lot of your

2    information, correct?

3    A.    No.

4    Q.    Some of your information?

5    A.    Some of it, and some of it comes from the horse's mouth.

6    I mean, it just --

7    Q.    You also said that Mr. Ledbetter was stealing laptops,

8    correct?

9    A.    Tony.

10   Q.    Not Robert?

11   A.    Yeah.  I mean, they all have them.

12   Q.    Did you ever see Mr. Ledbetter steal a laptop?

13   A.    I've seen him do crimes, but not like a laptop laptop.

14   Other stuff.  It doesn't mean --

15   Q.    We're talking about laptops now.  We'll get to the other

16   stuff.  Did you ever see him steal a laptop?

17   A.    No.

18   Q.    Okay.  You also talked about how you, yourself,

19   committed burglaries with Elijah --

20   A.    Yeah.

21   Q.    I'm sorry?

22   A.    Uh-huh.

23   Q.    -- with Elijah --

24   A.    Yeah.

25   Q.    -- Marc and Chris, correct?

TRIAL ONE - VOL. 8 - 878

1    A.   Uh-huh.

2    Q.   Okay.  Not with Robert Ledbetter, correct?

3    A.   No.

4    Q.   And that you went to prison in 2006, correct?

5    A.   Yep.

6    Q.   When was that in 2006?

7    A.   Maybe, like, July.  I don't know.  I'm not sure of the

8    month.

9    Q.   Uh-huh.  That was when you were arrested for a burglary

10   charge, correct?

11   A.   Yes.

12   Q.   Okay.  And that was on June 13th or 14th of 2006?

13   A.   Yeah.  It might have been in June.

14   Q.   Okay.  And by the information that's been given to me,

15   you were talking to law enforcement from the Franklin County

16   Corrections Center II, I believe the workhouse, on June 14th,

17   2006, at 2:39 in the morning, correct?

18   A.   Yep.

19   Q.   So you got arrested for your burglary charge, correct?

20   A.   Yep.

21   Q.   And the first thing you did --

22   A.   Not what I did.  They knew I was there, and they came to

23   me.

24   Q.   Okay.

25   A.   So, it wasn't what I did.

TRIAL ONE – VOL. 8 –  879

1    Q.   It wasn't what you did?

2    A.   Shit.

3    Q.   What time were you arrested before the police came down

4    to talk to you?

5    A.   I'm not sure.  It was -- it was some hours.

6    Q.   I'm sorry?

7    A.   It was some hours.

8    Q.   Okay.

9    A.   I don't know -- I'm not sure of the exact how many

10   minutes or hours.

11   Q.   Law enforcement came down very quickly; did they not?

12   A.   Probably about a half a day.

13   Q.   Okay.  Do you know how they knew you were arrested?

14   A.   No.

15   Q.   And, under oath, it's your testimony to this jury that

16   you didn't call them?

17   A.   I really don't remember.  I was really intoxicated.

18   Q.   Ma'am, this is very important.  Did you call law

19   enforcement to come down and talk to you after you got arrested

20   for that burglary in June of 2006?

21   A.   I really don't remember if I called them or not.

22   Q.   So, when you testified that you didn't call them, they

23   came down to see you, that was inaccurate, correct?

24   A.   I don't know -- like I said, I was intoxicated.  I don't

25   remember if I contacted them or not.  I might have, because I

TRIAL ONE – VOL. 8 – 880

1   was probably scared, but I don't -- I don't really, like,

2   remember if I did or not.

3   Q.   So, as soon as you were in trouble --

4   A.   Why does it matter if I contacted them or they contacted

5   me?  I told them what I told them.  So what does it matter?

6   Q.   Ma'am, with all due respect, it's up to me to ask the

7   questions right now.  Okay.

8        As soon as you were in trouble, you called the police,

9   correct?

10  A.   Yes.  I called the police.

11  Q.   And you made a statement, correct?

12  A.   Uh-huh.

13  Q.   And you made a statement to curry favor with the police,

14  correct?

15  A.   No.  They didn't do anything for me back then.  I went

16  to prison, did my time.  So it wasn't nothing to do with that.

17  Q.   The warrant getting set aside yesterday is directly akin

18  to what happened in 2006.

19  A.   Okay.  You were just talking about 2006.  We're talking

20  -- now you're talking about yesterday.

21       MR. BERNDT:  Your Honor, could you instruct the

22  witness to let me finish my question before she starts to

23  answer it?

24       THE COURT:  Ms. Murphy, let Mr. Berndt finish his

25  questions before you begin to answer.

1      Mr. Berndt, allow Ms. Murphy to complete her answer

2  before you pose your next question.

3      MR. BERNDT:  I will, Your Honor.  I appreciate it.

4  Thank you.

5  BY MR. BERNDT:

6  Q.   Getting your warrant set aside yesterday is directly

7  akin to what happened in June of 2006 when you got into trouble

8  and called the police?

9  A.   I did not know they set my warrant aside.  I thought I

10  still had the warrant until today.  So, I didn't ask them to do

11  anything.

12  Q.   Correct.  They did it for you?

13  A.   Yeah.

14  Q.   And you're glad they did it for you?

15  A.   I mean, yeah, but I'm still going to have to deal with

16  it.  I'm probably still going to go to prison.

17  Q.   And do you expect law enforcement to speak to your

18  prosecutor?

19  A.   I don't expect them to do nothin' for me.

20      THE COURT:  Ms. Murphy, you have to allow Mr. Berndt

21  to complete his question.  And then you may answer.

22      Mr. Berndt, restate your question.

23      MR. BERNDT:  Okay.

24  BY MR. BERNDT:

25  Q.   Do you expect law enforcement to help you with your new

TRIAL ONE – VOL. 8 – 882

1    burglary case, like they did when the warrant was set aside?

2    A.   No.

3    Q.   So you're willing to have them not help you, correct?

4    A.   Well, this wasn't a burglary.  So I'm fighting this

5    because -- I'm not going to get charged with burglary, one.  So

6    I'm not worried about it.

7    Q.   Okay.  You made a statement to the police.  Do you

8    remember that?

9    A.   Which?  When?  What statement?

10    Q.   Well, you made a statement in 2006, and you made a

11    statement in 2014.

12    A.   Okay.  Yeah.

13    Q.   Okay.  Were those the only two statements that you'd

14    made to the police in regard to Robert Ledbetter?

15    A.   Yeah.

16    Q.   Okay.  In the -- In the statement that you made in 2014,

17    you stated that, on the night of Johnson's murder, there was a

18    birthday party at your house.

19    A.   I didn't say the night of his murder.  The

20    night -- there was -- there was -- the night that they'd found

21    out where he was, not the night he was murdered.

22    Q.   Okay.  So that must be a scrivener's error in terms of

23    the report that I'm reading from?

24    A.   I didn't say the night of his murder.

25    Q.   Okay.

TRIAL ONE - VOL. 8 -   883

1    A.   The night that we found out where he was, we was all

2    drinking and stuff.  Not the night of his murder.  That

3    happened -- I don't know -- that night or the next day.  I

4    don't know when it happened.  I didn't go with them.

5    Q.   Okay.  So you're positive that there was a time period

6    before when Mr. Ledbetter allegedly found out where Alan

7    Johnson was and when Alan Johnson was killed?

8    A.   Hmm?

9    Q.   At least a day, maybe two?

10   A.   Yeah.

11   Q.   Okay.  This report, though, goes on that, after

12   Mr. Ledbetter received the phone call in which an unknown

13   caller told Johnson -- told Ledbetter where Johnson was

14   located, that the group then began to gear up, putting on

15   jackets, masks and hats?

16   A.   Uh-huh.

17   Q.   Now, that would be unusual for that to happen?

18   A.   They wasn't all putting it on.  My -- My kids' father

19   was getting stuff out that belonged to him and giving it to

20   certain people.

21   Q.   But Alan Johnson --

22   A.   They left.  I don't know if they put it on or what they

23   did.

24   Q.   So --

25   A.   Shit.

TRIAL ONE – VOL. 8 – 884

1   Q.   -- this report that says they began to gear up, putting

2   on jackets, masks, and hats, is also inaccurate?

3   A.   No, because a couple of them did put the jackets and

4   stuff on.

5   Q.   But Alan Johnson wasn't killed until at least one, maybe

6   two, days?

7   A.   I don't know if it happened that night or the next day.

8   I don't know when it happened.  I didn't go.  It could have

9   happened that night.  I don't know.

10   Q.   Okay.

11   A.   Shit.

12   Q.   You testified previously that it happened at least a day

13   or two later, correct?

14   A.   I don't know when it happened.  I said I don't know when

15   it happened.  It could have happened that night or the next day

16   or the day after that.  I don't know.

17   Q.   And is that pretty much --

18   A.   Shit.

19   Q.   -- relevant to all of your testimony --

20   A.   Yeah.

21   Q.   -- that you're really not sure?

22   A.   No, I'm sure.  I know what I said.

23        MR. BERNDT:  Your Honor, may we approach?

24        THE COURT:  Yes.

25

TRIAL ONE – VOL. 8 – 885

1                              – – –

2      (Thereupon, the following proceeding was held at side-bar.)

3           THE COURT:  Mr. Berndt, go ahead.

4           MR. BERNDT:  I'm going to move to strike this witness'

5      testimony and ask the Court to advise the jury to disregard it.

6      She has now stated that she isn't sure of all of her testimony.

7           THE COURT:  That's not what she said.  What she said

8      was she was not sure whether it was the night or a day or two

9      after, because you followed up and said:  Does that relate to

10     all of your testimony?  She said:  No, that -- something to the

11     effect that it didn't relate to all of her testimony.

12          So your motion is well taken but denied.  The jury has

13     heard the testimony.  The jury knows what was said.  They know

14     what was not said.  They will divine the evidence from -- They

15     will divine the facts from the evidence that has been adduced,

16     including direct and cross, both which, in this case, was quite

17     good.

18          Now, is there anything further, Mr. Berndt?

19          MR. BERNDT:  No, Your Honor.  Thank you very much.

20          THE COURT:  Are you done?

21          MR. BERNDT:  I am not quite -- I need just a minute

22     to --

23          THE COURT:  Go ahead.  Go ahead and finish.  What I

24     want to do is finish your cross before we break for lunch.

25          MR. BERNDT:  That's fine.

1      THE COURT:  Then we can come back with yours, Mr.

2   Gatterdam.

3      MR. BERNDT:  I just need a couple of minutes, Your

4   Honor.

5     (The following proceedings were had in open court.)

6      THE COURT:  Mr. Berndt, please continue.

7      MR. BERNDT:  Thank you, Your Honor.

8   BY MR. BERNDT:

9   Q.   You talked about when you lived at Mount Vernon and

10  Miami, correct?

11  A.   Uh-huh.

12  Q.   Is that a "yes"?

13  A.   Yes.

14  Q.   And you talked about how you woke up, and there was a

15  surprise in your house:  Rims, tables, saws, things like that.

16  Correct?

17  A.   Yes.

18  Q.   You then testified that Marc, Tone, Ricco, and Keith

19  were there, correct?

20  A.   Yep.

21  Q.   And then you said that Robert showed up later, correct?

22  A.   Yep.

23  Q.   Now, you don't know what involvement, if any, that

24  Robert Ledbetter had in regard to what you found in your house,

25  correct?

TRIAL ONE – VOL. 8 – 887

1    A.    No.  I never said that.  I figured he was coming to buy

2    some stuff.

3    Q.    You also said that you were robbed by Al-Nuts and

4    Elijah, correct?

5    A.    Uh-huh.

6    Q.    That had nothing to do with Robert Ledbetter, correct?

7    A.    No.

8    Q.    You also said that you were robbed a second time by

9    Elijah when he had 30 people rush into your house?

10   A.    Uh-huh.

11   Q.    Do you remember that?

12   A.    Uh-huh.

13   Q.    Where did you live then?

14   A.    Fourth and Say Avenue.

15   Q.    An apartment?

16   A.    No, house.

17   Q.    Okay.  And that, also, had nothing to do with Robert

18   Ledbetter, correct?

19   A.    No.

20   Q.    You said that Robert Ledbetter was upset about his

21   brother being murdered, correct?

22   A.    Yeah.  He's supposed to be.

23   Q.    Reasonably so, right?

24   A.    Uh-huh.

25   Q.    Okay.  Now, have you talked to Keith Maye about his

TRIAL ONE – VOL. 8 – 888

1   version as to how Alan Johnson was murdered?

2   A.   I don't talk to him.  I haven't talked to him probably

3   in -- it's been years.

4   Q.   But did you ever talk to him about his version as to how

5   Alan Johnson was murdered?

6   A.   It's about the same.  I mean, that's where I got

7   information from, too.  So, I mean --

8   Q.   That's where you got the information from, too?

9   A.   Like, I've heard him talk about it.  I've heard Robert

10  talk about it.  So, I mean, it's all the same.

11  Q.   So you believe that, if Mr. Maye was here, he would

12  testify consistently with what you said?

13  A.   Yeah.

14  Q.   Okay.  Now, you mentioned before that Ricco asked you to

15  call me.

16  A.   Uh-huh.

17  Q.   Correct?

18  A.   (Nodding affirmatively.)

19  Q.   And did -- did I call you?

20  A.   Did you --

21  Q.   Yeah.  Did you call me?

22  A.   No.

23  Q.   I didn't set an appointment with you that you didn't

24  show up at?

25  A.   Oh, yeah.

1    Q.    Okay.  So, I did call you?

2    A.    I don't know who it was.  I don't know if it was you.  I

3    don't know who it was.

4    Q.    Well, it was -- it was a lawyer saying that he

5    represented Robert Ledbetter, correct?

6    A.    Okay.  Yeah.  And I had Ricco on the other line, and I

7    was doing it to make him happy.

8    Q.    Okay.  But you received a call from me, correct?

9    A.    Okay.  But did I show up?  No.

10    Q.    And did I reschedule you?

11    A.    Okay.  Did I show up for that one?  No.

12    Q.    Okay.  Why not?

13    A.    Because I wasn't going to come in there and say that

14    they didn't do it, like they wanted me to.

15    Q.    Now, I never asked you to say that, correct?

16    A.    No.

17    Q.    Okay.  As a matter of fact, you've never even spoken to

18    me except to set up that appointment, correct?

19    A.    Uh-huh.

20    Q.    So, Ricco may have asked you that.

21    A.    Uh-huh.

22    Q.    I didn't, correct?

23    A.    Yep.

24    Q.    And Robert didn't, correct?

25    A.    No.

TRIAL ONE – VOL. 8 – 890

1          MR. BERNDT:  Your Honor, thank you very much.

2       Thank you, young lady.

3          THE WITNESS:  Uh-huh.

4          THE COURT:  Thank you, Mr. Berndt.

5       Ladies and gentlemen, it's a few minutes past 12:00,

6    about 12:13, actually.  We will break now for our lunch recess.

7       I'm told it's a nice day outside.  Actually, it's as

8    warm as it is sunshiny.  So I hope that you are able to get out

9    to enjoy your lunch.

10       We will resume at 1:15, at which time we'll begin with

11   the cross-examination by Mr. Gatterdam.

12       So, ladies and gentlemen, remember the Court's

13   admonition, and enjoy your lunch.

14     (Jury out at 12:13 p.m.)

15          THE COURT:  Please be seated.

16       Ms. Murphy, you may be excused.  I'm sorry.

17          THE WITNESS:  Okay.

18       (Thereupon, the witness exits the courtroom.)

19          THE COURT:  Mr. Martinez, is there anything further

20   from the government before we adjourn for lunch?

21          MR. MARTINEZ:  Not at this time, Your Honor.  Thank

22   you.

23          THE COURT:  Mr. Berndt?

24          MR. BERNDT:  No, Your Honor.  Thank you.

25          THE COURT:  Mr. Gatterdam?

TRIAL ONE – VOL. 8 –  891

1        MR. GATTERDAM:  No, Your Honor.

2        THE COURT:  Ms. Dixon?

3        MS. DIXON:  No, Your Honor.

4        THE COURT:  Mr. McVay?

5        MR. McVAY:  No, Your Honor.

6        THE COURT:  Mr. Nolder?

7        MR. NOLDER:  No, Your Honor.  Thank you.

8        THE COURT:  Thank you very much, everyone.  I will see

9   you at 1:15.

10       (Lunch recess taken from 12:14 p.m. to 1:15 p.m.)

11                        –  –  –

12                        THURSDAY AFTERNOON SESSION

13                        APRIL 14, 2016

14                        –  –  –

15   Thereupon, the following proceeding was held in chambers

16   with the Court and Juror No. 7 present:

17       THE COURT:  I brought you in because there was some

18   concern voiced by the various counsel for both parties that you

19   at points during the week since we had opening statements were

20   either examining the underside of your eyelids, concentrating

21   fiercely with eyes closed or, perhaps, asleep.

22       Now, what I wanted to tell you was that, you know, I

23   wanted to remind you, as I instructed the jury earlier, that

24   it's important that you pay very careful attention because you

25   are going to have to rely upon your combined collective

TRIAL ONE – VOL. 8 –   892

1   memories when you go back to determine from the evidence

2   presented what the facts of the case are.  So if at some points

3   during the day, as happens to all of us from time to time, you

4   get sleepy, just signal to me that you need a break and we'll

5   take one.

6        And I say that without finding, which I specifically do

7   not, that you were asleep.

8        As I said, it could have been, you know, a multitude of

9   reasons why you appeared to have your eyes closed.  I will add

10  that nobody heard you snore so that would add to the reasons

11  other than your being asleep.

12       But in response to the concerns, I just wanted to give

13  you that admonition and give you that tool just in case, you

14  know, you did feel that you were getting drowsy or sleepy, you

15  could just let the Court know that you need a minute or two and

16  we'll take a break at the first opportunity.

17       All right?

18          THE JUROR:  Yes, sir.

19          THE COURT:  Thank you very much, sir.  You may return

20  to the jury.  I would request that you not discuss with the

21  jury what I've discussed with you.

22          THE JUROR:  Thank you, sir.

23          THE COURT:  All right.

24     (The following proceedings were had in open court.)

25     (Jury in at 1:20 p.m.)

1     THE COURT:  Ladies and gentlemen, I hope that everyone

2     had time to do more than to inhale your lunch and that you had

3     a chance to get into some of that very pleasant sunshine.

4          We're going to continue with the government's case in

5     chief with the cross-examination of Ms. Murphy as soon as

6     Ms. Murphy arrives.

7          Ms. Murphy, please come forward.

8          Mr. Gatterdam, on behalf of Mr. Harris, please proceed.

9          MR. GATTERDAM:  Thank you, Your Honor.

10                                - - -

11                          CROSS-EXAMINATION

12    BY MR. GATTERDAM:

13    Q.   Ms. Murphy, my name is Kort Gatterdam.  I represent

14    Christopher Harris.  If there's anything you don't understand

15    that I'm asking you, please let me know.  Okay?

16    A.   Okay.

17    Q.   All right.  I want to clarify a couple things you said

18    either on direct or cross-examination.

19         First of all, you were explaining two charges or

20    convictions of yours from 2010.  Do you remember that?

21    A.   Yes.

22    Q.   A felonious assault and a burglary, correct?

23    A.   Yes.

24    Q.   And do you recall indicating -- you talked a little bit

25    about the offenses, you going into somebody's home and having a

TRIAL ONE – VOL. 8 – 894

1    fight with her.  Do I have that right?

2    A.    Yeah, that was one of them.

3    Q.    And that all happened the same time?

4    A.    Around, like, the same day.

5    Q.    Well, help me with this because I'm looking at the

6    docket sheets for those two offenses, and it looks to me like

7    the date of the felonious assault was July 7, and the date of

8    the burglary was July 19 of 2010.

9    A.    Yeah, but they was both over the same thing.  It was

10   with the same -- it was the same person.

11   Q.    Okay.  So if I'm -- so you would agree then that it

12   didn't happen the same day.

13   A.    The fight didn't.  I mean, we got in a fight that day,

14   too, but the felonious assault was from another day.  They

15   charged me, like, separate with them.

16   Q.    Correct.  Is it the same -- is it the same house?

17        MR. MARTINEZ:  Objection, Your Honor.

18        MR. GATTERDAM:  I'm just trying to clarify.

19        THE COURT:  Basis?

20        MR. MARTINEZ:  Beyond the scope.

21        THE COURT:  Overruled.

22        You may answer, Ms. Murphy.

23     BY MR. GATTERDAM:

24   Q.    The felonious assault happened July 7, 2010, according

25   to the docket.  That's the woman you were fighting with,

TRIAL ONE – VOL. 8 –  895

1  correct?

2    A.    Yeah, but at the same house.  It's the same -- she lived

3  at the house where the burglary happened, but the fight

4  happened -- the felonious assault that I got charged with

5  happened that day.  And then the house thing happened, but they

6  didn't charge me with felonious assault, they only charged me

7  with burglary.

8          THE COURT:  Which happened first, ma'am --

9          THE WITNESS:  The felonious assault and then the

10  burglary.

11          THE COURT:  -- the fight or the burglary?

12          THE WITNESS:  Yeah.

13          THE COURT:  The fight happened and then the burglary?

14          THE WITNESS:  Yeah, and then the burglary.  They was

15  trying to give me the felonious assault, but they dropped it

16  with the burglary and charged me with the other one.

17    BY MR. GATTERDAM:

18    Q.    So you had the felonious assault and then the burglary

19  of the same victim?

20    A.    Yeah.

21    Q.    Okay.  Nine days later, if the docket sheet reflects

22  that?

23    A.    Yeah.

24    Q.    Okay.  You mentioned when you were talking about on

25  direct examination things that were going on, things that

TRIAL ONE – VOL. 8 – 896

1    happened in your past and people you dealt with.

2        Do you remember those questions?

3    A.    Uh-huh.

4    Q.    Okay.  And I think, and correct me if I'm wrong, you

5    indicated you were using drugs back during that time period.

6    A.    Yeah, just Percocet.

7    Q.    Just Percocet?

8    A.    Yeah.

9    Q.    How many would you typically take?

10   A.    About maybe three, four a day.

11   Q.    Okay.  And how did that make you feel?  How did it make

12   you act?

13   A.    I felt like I act the same.  I mean, it was just for the

14   pain.  I mean, it made me feel normal after a while because, I

15   mean, when I first started taking them, they give me, like, a

16   buzz, but after my body was used to them, it just made me feel

17   normal, like, I would -- you know, I needed them so I wouldn't

18   be sick.

19   Q.    And is that why you ended up committing the crimes you

20   committed, to pay for these Percocets?

21   A.    Sometimes.  Sometimes because I needed the money to take

22   care of my kids and bills.

23   Q.    Okay.  So if you needed the money to take care of your

24   kids or bills, you resorted to committing crimes, correct?

25   A.    Uh-huh.

TRIAL ONE - VOL. 8 -   897

1    Q.   And how many kids do you have?

2    A.   I have four now.

3    Q.   Did the taking of the pills ever cause you to have

4    memory loss?

5    A.   No, not that I'm aware of.

6    Q.   Now, you were asked some questions about statements that

7    you gave to the police about the Alan Johnson case.

8         Do you recall that?

9    A.   Uh-huh.

10   Q.   And you indicated that the first time you spoke to the

11   police was approximately June 14, 2006, correct?

12   A.   Yeah, I guess.

13   Q.   And that was --

14   A.   I don't know what day it was.

15   Q.   And let me try to clarify because Mr. Berndt asked you

16   this question, and I'm not sure I understood your answer.

17        You don't know as of this day whether or not you

18   contacted the police to come talk to you or whether they just

19   showed up.

20   A.   No.  That night when I got arrested I was, like, really

21   intoxicated.  We had been drinking all night and, I mean, I

22   might have asked for the police.  I don't know.  I really don't

23   remember.

24   Q.   Okay.  And in asking for the police --

25   A.   I don't know.

TRIAL ONE – VOL. 8 –  898

1    Q.    I'm sorry?

2    A.    No.

3    Q.    And in asking for the police, it would be for them to

4    help you, correct?

5    A.    No.

6    Q.    You just asked for the police for no reason?

7    A.    I don't know even know if I asked for them.

8    Q.    But if you did ask for them, what would be the purpose

9    in asking for them?

10   A.    Probably for help?  I don't know.

11   Q.    And you knew the way -- you know, you had been in

12   trouble before.  You knew how the game works, right?  You got

13   to help them --

14   A.    No, I was never in trouble, I don't think, before that.

15   I think 2006 was around the time, like, I first --

16   Q.    You had a receiving stolen property before that,

17   correct?

18   A.    Yeah, but that wasn't -- I mean.

19   Q.    No big deal?

20   A.    Yeah.

21   Q.    So you gave a statement to the police, and I don't know

22   if you know -- well, actually you do know it was recorded

23   because you've listened to that statement, correct?

24   A.    Uh-huh.

25   Q.    In fact, prior to coming in here today, you listened to

1    that statement, correct?

2    A.   It's been a few months, something like that.

3    Q.   All right.  Would you agree with me that at no point in

4    time during that statement, never, not once did you ever

5    mention the name Chris Harris?

6    A.   No.

7    Q.   And they were -- obviously, they were asking you

8    questions about the Alan Johnson murder, correct?

9    A.   Uh-huh.

10   Q.   Now, you indicated that you then also spoke to the

11   police a second time, I believe it would be December 2, 2014,

12   with Agent Bajus; is that correct?

13   A.   Yes, I believe so.

14   Q.   And you indicated to having some additional memory about

15   a birthday party.  And are you saying today that that birthday

16   party was either the night Mr. Johnson was killed or the next

17   night?  You don't recall?

18   A.   No, it was the night that we was all at my house.  We

19   was all drinking.

20   Q.   Okay.  Were you taking Percocets that night, too?

21   A.   No, I think I wasn't taking pills then.

22   Q.   What years do you think you were taking pills?

23   A.   From, like, around 2000 to, like, 2005.  In 2005, 2006.

24   Q.   Okay.  And would you agree the second interview there

25   was additional -- there was discussion about the Alan Johnson

TRIAL ONE – VOL. 8 – 900

1  murder, correct?

2    A.    Uh-huh.

3    Q.    And there was also more general discussion about other

4  things that you witnessed or observed, correct?

5    A.    Yeah.

6    Q.    And would you agree with me that at no point in time

7  during that interview did you ever mention the name Christopher

8  Harris?

9    A.    Huh-uh.

10        THE COURT:  Is that a yes or a no, Ms. Murphy?

11        THE WITNESS:  No.  No, no.

12     BY MR. GATTERDAM:

13    Q.    You never mentioned him being involved in any of the

14  things that you just talked about here today, correct?

15    A.    No.

16        THE COURT:  You have to give a verbal response.  I'm

17  sorry.

18        THE WITNESS:  No.

19        THE COURT:  Okay.

20     BY MR. GATTERDAM:

21    Q.    And so I take it then –– well, let me ask you this:

22        How many times would you say that you saw Chris Harris

23  in the course of your lifetime?

24    A.    I don't know.  Couple times a week, you know, just

25  through other people.

TRIAL ONE - VOL. 8 - 901

1   Q.   From when to when?

2   A.   I mean, I don't know when.  Every couple days.  I don't

3   know.

4   Q.   I mean, do you know the years?

5   A.   No.

6   Q.   Do you know when you last saw him?

7   A.   Probably 2006.  2005, 2006.

8   Q.   And you testified to some things on your direct

9   examination about drugs and about a burglary and those kinds of

10  things involving Mr. Harris, correct?

11  A.   Uh-huh.

12  Q.   You never told the police -- you never went to the

13  police to say Chris Harris did this or Chris Harris did that,

14  correct?

15  A.   Nope.

16  Q.   And you were talking about this incident with somebody

17  who was in the trunk of a car.  Do you remember talking about

18  that?

19  A.   Uh-huh.

20  Q.   Okay.  And, again, the two interviews you had with the

21  police, you never mentioned that once to them, correct?

22  A.   Nope.

23  Q.   When is the first time you ever even brought that up?

24  Was it here today?

25  A.   No.  I seen a picture a while ago and just recognized

TRIAL ONE – VOL. 8 –   902

1   him.

2      Q.    And this incident that you were talking about with

3   somebody in the trunk, where were you when this was going on?

4      A.    I was with a friend over by the apartment complex.

5      Q.    And you saw what was going on?

6      A.    Uh-huh.

7      Q.    And didn't call the police.

8      A.    No.

9      Q.    Isn't it true that two individuals named Hokie and T

10  were the ones that were involved in this, not Chris Harris?

11     A.    I don't know who Hokie is.

12     Q.    You don't know Allen Moore?

13     A.    If I seen the face.  I don't know people by their real

14  names.

15     Q.    What's -- you mentioned an individual named Mark --

16     A.    Uh-huh.  He's deceased.

17     Q.    And that's Taron Colvin, correct?

18     A.    No.

19     Q.    It's not Taron Colvin?

20     A.    Huh-uh.

21     Q.    Isn't it true that those two individuals were prosecuted

22  for this offense, and Chris Harris had nothing at all to do

23  with it?

24     A.    I have no idea.  I don't know anything about none of

25  that.

TRIAL ONE – VOL. 8 –   903

1    Q.    Okay.  You don't have any idea who was arrested or

2   charged with this?

3    A.    Huh-uh.

4    Q.    Did you stick around to see what happened?

5    A.    Huh-uh.

6    Q.    How much time did you actually see?

7    A.    Couple minutes, maybe.

8    Q.    And who's the friend that supposedly saw it with you?

9    A.    Elizabeth.

10   Q.    What's Elizabeth's last name?

11   A.    Moppin.

12   Q.    Moppin?

13   A.    Uh-huh.

14   Q.    You spoke on direct examination about the possibility of

15  being moved or the fact that you're hoping to move or being

16  able to be moved, correct?

17   A.    Uh-huh.

18   Q.    Is there any possibility that you know of about getting

19  money to move?

20   A.    No.  They've been driving me, helping me find just

21  another city.

22   Q.    Now, when you talked about the crimes that you've

23  committed and you indicated you did it for your kids, you kept

24  the money or whatever it was when you did these things, right?

25   A.    Uh-huh.

TRIAL ONE – VOL. 8 –  904

1    Q.    And if you did them with other people, you split it

2  up --

3            THE COURT:  When you say uh-huh, you mean yes?

4            THE WITNESS:  Yes.

5      BY MR. GATTERDAM:

6    Q.    And if you did them -- like, you mentioned you did a,

7  what, a burglary with Allen Wright?

8    A.    Yeah, we split it.  Like, whatever we got, we split.

9    Q.    And that's how it worked --

10   A.    Uh-huh.

11   Q.    -- just you get your share, he gets his share, that's

12  it.  It doesn't go anywhere else but to you guys.

13   A.    Yep.

14   Q.    Now, I may have mistaken what you said, but you

15  indicated that you had this burglary charge and a warrant got

16  set aside.

17          And did you ask for the warrant to be set aside?

18   A.    No.

19   Q.    Did you raise the issue with the government that you had

20  a warrant --

21   A.    No.  They already knew when they approached me that I

22  had these warrants.  Because I didn't contact them for months.

23  They had been looking for me, and I didn't contact them.

24   Q.    Because you had a warrant?

25   A.    Yeah.

1    Q.   You actually had two warrants, correct, a misdemeanor

2   and a felony?

3    A.   Uh-huh.

4    Q.   Okay.  And so your condition was to make sure that

5   warrant got set aside before you walked in this courtroom,

6   correct?

7    A.   No.  I've been dealing with them while I had the

8   warrant.  The warrant just got lifted yesterday so, I mean, I

9   talked to them plenty of times with the warrant still there.

10   Q.   And what do you think you have to do in return for that

11  warrant just getting set aside?

12   A.   I didn't know they was going to set it aside.

13   Q.   How did you find out?

14   A.   I just found out today.

15   Q.   When Mr. Berndt was asking you is the first time you

16  knew?

17   A.   Just right before I came into the courtroom, I knew it

18  was set aside.

19   Q.   And how did you feel about that?

20   A.   I mean, I feel the same because I'm still going to get

21  to pay for it.  I'm still going to probably go to prison --

22   Q.   Don't you think --

23   A.   -- so it don't matter.

24   Q.   I'm sorry.  I'm sorry to interrupt you.  Are you done?

25   A.   Uh-huh.

TRIAL ONE – VOL. 8 –  906

1   Q.   Don't you think the people that got your warrant set

2   aside can help you make the case go away?

3   A.   No.

4   Q.   But you said you didn't do it.  Don't you think they can

5   help with you that?

6   A.   I don't know.

7   Q.   All the times you talked to the police and them helping

8   you with this warrant now, you're going to get something in

9   return --

10  A.   This is insane.

11  Q.   -- aren't you?

12  A.   Probably not.  I'm still going to go to prison.  I mean,

13  I've been in trouble a lot.  They're not going to just let it

14  go away.

15  Q.   Well, but I think you indicated, too, you did what you

16  had to do to take care of your kids, correct?

17  A.   Uh-huh.

18       THE COURT:  Yes?

19       THE WITNESS:  Yes.

20    BY MR. GATTERDAM:

21  Q.   And that's what you're doing now, isn't it, by

22  testifying here because you're going to get relocated and you

23  hope --

24  A.   I mean, I can do that myself.

25  Q.   You hope you're not going to go to prison, right?

TRIAL ONE – VOL. 8 –  907

1     A.   Well, yeah.  I want to be home with my kids.

2     Q.   Who can help you not go to prison?

3     A.   I mean, why does this stuff even matter?

4          MR. GATTERDAM:  Your Honor, can you direct the witness

5     to answer?

6          THE WITNESS:  Shit.

7          THE COURT:  Ms. Murphy, you have to answer

8     Mr. Gatterdam's question.

9          THE WITNESS:  If they're going to help me, they're

10    going to help me.  I mean, if that's what I want, if I ask them

11    that, it's my business.

12      BY MR. GATTERDAM:

13    Q.   You hope that they will help you deal with this felony

14    burglary, correct?

15    A.   It really don't matter to me if they do or not.

16    Q.   It doesn't matter if you --

17    A.   No.

18    Q.   -- go to prison or not with the four kids you have?

19    A.   No.  I'll get my own lawyer.

20    Q.   How much -- how much time do you face?

21    A.   I don't know.

22    Q.   You don't know?  You've not been charged --

23    A.   Because it wasn't even a burglary so I don't know how

24    they're charging me a burglary so I'm going to fight it.

25    Q.   Okay.  Wouldn't it be easier if it just went away?

TRIAL ONE – VOL. 8 – 908

1    A.    Uh-huh.  Oh, yeah.

2    Q.    Just like your warrant.

3    A.    Yep.  Sure would.

4    Q.    But you know how the game works now.  You've been

5    around, you have a number of convictions.  To get something,

6    you got to do something in return, correct?

7    A.    Yeah, if you say so.

8    Q.    And that's why you're here today, to get what you need.

9    A.    Nope, that ain't.

10           MR. GATTERDAM:  Nothing further.

11           THE WITNESS:  Dumbass.

12           THE COURT:  Ms. Dixon?

13           MS. DIXON:  Thank you.

14                            - - -

15                      CROSS-EXAMINATION

16     BY MS. DIXON:

17    Q.    Ms. Murphy, good afternoon.

18    A.    Good afternoon.

19    Q.    I'm Isabella Dixon.  I represent Rashad Liston and,

20    guess what, we're going to talk about that record again.  All

21    right?

22    A.    Uh-huh.

23    Q.    And just so we are clear and so that the ladies and

24    gentlemen of this jury are clear, you pled guilty to a

25    felonious assault, correct --

1    A.   Yep.

2    Q.   –– back in 2010?

3    A.   Yep.

4    Q.   Right?

5    A.   Uh–huh.

6    Q.   Originally you got put on community control or

7    probation, correct?

8    A.   Yep.

9    Q.   And you got out on judicial release, correct?

10   A.   Yep.

11   Q.   And you messed up and got sent to prison, right?

12   A.   No.  I went to CBCF.

13   Q.   You went to CBCF.  Okay.

14        Now, let's go a little bit further back.  For your first

15   case in '05, all right ––

16        THE COURT:  Before you do that, Ms. Dixon, do you want

17   to inform the jury through this witness as to what CBCF is?

18        MS. DIXON:  Oh, I'm sorry.  I'll let her tell them.

19   Tell them what CBCF is.

20        THE WITNESS:  It's community based.  It's, like, an

21   anger modification program.

22     BY MS. DIXON:

23   Q.   Okay.  You said it's an anger modification program?

24   A.   Uh–huh.

25   Q.   Pardon me?

TRIAL ONE – VOL. 8 –   910

1    A.   Yes.

2    Q.   So you have anger issues?

3    A.   No.  It's just, like, a rehabilitation to help you get

4  jobs, deal with anger issues, past issues with family.  It's

5  just like a rehabilitation.

6    Q.   Okay.  They help you with drug issues, too, don't they?

7    A.   Yeah.  They have -- like, you can go up to the meetings

8  and stuff if you want to.

9    Q.   Did you do any of that when you were at CBCF?

10   A.   They had, like, Alcoholics Anonymous.  I didn't -- no.

11   Q.   Were you aware that your mother wrote a letter for you

12  to get judicial release in regards to CBCF?

13   A.   It wasn't my mother.

14   Q.   Who was it?

15   A.   It was my kids' father's grandmother.

16   Q.   Okay.  But you know she identified herself as your

17  mother.

18   A.   Well, my mom might have.  I don't know.  But I know

19  Keith's grandmother did, too.

20   Q.   Okay.  Because there was an individual who identified

21  herself as your mother.

22   A.   I don't know.

23   Q.   Who had your kids when you were in prison?

24   A.   My mother, my boyfriend at the time, my grandmother.

25   Q.   Okay.  And did they actually have custody or did you

1   just give them guardianship?

2   A.   Yeah, guardianship.  Like, my mom has custody of the

3   youngest one because I was in prison when I had him.

4   Q.   Okay.

5   A.   So it was easier for her to get everything through

6   courts and stuff that way.

7   Q.   Okay.  And what about the other -- is it other three or

8   other two?

9   A.   It was other two then.

10  Q.   Okay.  Is it three now?

11  A.   I have four kids now.

12  Q.   You have four kids --

13  A.   Yeah.

14  Q.   Okay.  And so do you have custody of all of them now?

15  A.   Not the youngest one.

16  Q.   Not the youngest one.

17  A.   My mother had, what do you call it, like, when you get,

18  like, written permission?

19  Q.   Guardianship.

20  A.   Yeah.

21  Q.   Okay.  And so just, again, going back, you caught your

22  first felony in '05, right --

23  A.   Yeah.

24  Q.   -- that you pled guilty to, right?

25  A.   Yes.  A felony, yes.

TRIAL ONE – VOL. 8 – 912

1    Q.   Okay.  And then you had a couple more in '06, right,
2    that you pled guilty to, right?
3    A.   Yes.
4    Q.   And then you had a couple more in 2010 that you pled
5    guilty to, right?
6    A.   Yes.
7    Q.   And then you had the one where you keep talking about
8    the warrant got set aside yesterday.
9    A.   Uh-huh.
10   Q.   But you didn't ask them to do it.  They just did it,
11   right?
12   A.   (Witness nods head.)
13   Q.   Well, shouldn't they do something for you when you're
14   coming in risking your life?  I mean, you're not a police
15   officer, are you?
16   A.   I mean, they did it apparently.  They set my warrant
17   aside so they did something for me.
18   Q.   Right.  I'm saying that you're not a police officer, are
19   you?
20   A.   No.
21   Q.   It's not your job to solve crimes, is it?
22   A.   No.
23   Q.   It's not your job to help anybody do anything except you
24   and your kids, right?
25   A.   Right.

TRIAL ONE – VOL. 8 – 913

1    Q.   But you have come in here risking your life, right?

2    A.   Because I got subpoenaed, too --

3    Q.   Pardon me?

4    A.   -- that's why.  Because I got subpoenaed, too.  Because

5    I wanted to.

6    Q.   So you're doing your civic duty.

7    A.   Shit.

8    Q.   I'm sorry.  I didn't hear you.

9    A.   I didn't say nothing.  Go ahead.

10   Q.   Oh, I'm sorry.  I thought I heard something.

11   A.   I did.  I said shit.

12   Q.   Okay.  Now, when you -- and the reason I'm going over

13   this is it's a time thing.  When was the last time you saw

14   Rashad prior to coming in this courtroom?

15   A.   Years.  10 years, maybe.

16   Q.   10 years?

17   A.   Uh-huh.

18   Q.   '06?

19   A.   Maybe somewhere around there.

20   Q.   Would it surprise -- now, you indicated that you went to

21   prison in '06, right?

22   A.   Yep.

23   Q.   You were there for a year-and-a-half.

24   A.   Yep.

25   Q.   What month in '06 did you go to prison?

TRIAL ONE – VOL. 8 – 914

1    A.   I don't know.  June, July.  I don't know.  I know it was

2  summer.

3    Q.   So if –– did you visit Rashad ever when he was locked

4  up?

5    A.   No.

6    Q.   So if he was locked up in '06, you couldn't have seen

7  him in '06, right?

8    A.   It was probably before that because I know it was cold

9  out.  It might have been, like, four or five.

10   Q.   '04, or '05?

11   A.   He was real young, like, super young.

12   Q.   Super young.  The last time you saw him, he was super

13  young.

14   A.   Yeah.

15   Q.   '04 or '05.

16   A.   Uh-huh.

17   Q.   Now, you indicated that I think you heard him say, oh,

18  I'm in Homicide Squad?

19   A.   Yeah.

20   Q.   When was that?

21   A.   I don't know the years.  I don't know when it was.

22  Shit.

23   Q.   Well, you hadn't seen him in 12 years, right?

24   A.   Okay.  It was back then.  If I said it's been 12 years,

25  it's been 12 years ago ––

TRIAL ONE – VOL. 8 – 915

1    Q.   Okay.  So --

2    A.   -- that I seen him then.  Shit.

3    Q.   -- it would have been '04 or '03 or '05?

4    A.   Yeah.

5    Q.   That's when you heard him say that?

6    A.   Uh-huh.

7    Q.   All right.  Now, you also indicated that you and him and

8    Elijah Ledbetter were walking to the store, and him and

9    Elijah --

10   A.   Uh-huh.

11   Q.   -- I guess, stole somebody's purse?

12   A.   Yeah.

13   Q.   Did you get charged with that?

14   A.   No.  Nobody got charged with that.

15   Q.   Okay.  But you thought you were going to get charged

16   because they left you there, right?

17   A.   We all -- yeah, we all took off.

18   Q.   Oh, you took off?

19   A.   We all took off.

20   Q.   Oh, okay.  I'm sorry.  I thought I heard you say they

21   left you there.

22   A.   When they did it, they went their separate way, I went

23   my separate way.

24   Q.   Okay.  So you ran, too?

25   A.   Yeah.

TRIAL ONE – VOL. 8 –  916

1    Q.   Even though you didn't do anything?

2    A.   Yeah.

3    Q.   Okay.  Now, you indicated that you have a substance

4  abuse issue.

5    A.   No, not -- I don't have one no more.

6    Q.   Okay.  When did that end?

7    A.   Like, early 2006.

8    Q.   Okay.  And that was just with Percocets, I think you

9  said?

10    A.   Uh-huh.

11    Q.   So you've never used heroin?

12    A.   No.

13        MS. DIXON:  Okay.  I have nothing further, Your Honor.

14        THE COURT:  And, Ms. Murphy, when you said uh-huh, you

15  meant yes?

16        THE WITNESS:  Yes.  Yes.  Yes.

17        THE COURT:  All right.  Mr. McVay?

18        MR. MCVAY:  No questions, Your Honor.

19        THE COURT:  Mr. Nolder?

20        MR. NOLDER:  No questions.

21        THE COURT:  Mr. Martinez, do you have any redirect?

22        MR. MARTINEZ:  I do have some redirect, Your Honor.

23        THE COURT:  Please proceed.

24

25

1                           – – –

2                    REDIRECT EXAMINATION

3      BY MR. MARTINEZ:

4    Q.    I'm going to try to be quick, Ms. Murphy.

5    A.    Okay.

6    Q.    There have been a lot of questions from a lot of defense

7  attorneys today about why you were in court today.

8    A.    Yeah.

9    Q.    Did you receive a subpoena in this case?

10   A.    Yeah.

11   Q.    Did that subpoena force you to be here?

12   A.    Yeah.

13   Q.    Do you want to be here?

14   A.    No.

15   Q.    There have been a lot of questions about the warrants

16  you had recently.  Did you ask the United States to do anything

17  with those warrants?

18   A.    No.

19   Q.    Okay.  Have you ever asked the United States to talk to

20  any of the prosecutors to help you in your cases?

21   A.    No.

22   Q.    Have I ever offered to help you with your other cases?

23   A.    No.

24   Q.    Has anyone at that table ever offered to help you with

25  your other cases?

TRIAL ONE – VOL. 8 –   918

1    A.    No.  I don't even know who took care of the warrants.  I

2    don't even know.

3    Q.    That's okay.

4          And those two cases that so many defense attorneys have

5    asked you about today, the misdemeanor and the felony, they're

6    still out there.

7    A.    Uh-huh.

8              THE COURT:  You mean yes?

9              THE WITNESS:  Yes.  Yes.  Yes.  Yes.

10     BY MR. MARTINEZ:

11   Q.    They haven't gone away.

12   A.    No.

13   Q.    All right.  I think you had at least three defense

14   attorneys just ask you whether over the years you reported the

15   crimes that you saw.  Do you remember those questions?

16   A.    Yeah.

17   Q.    What happens to snitches?

18   A.    I mean, we get hurt, we get killed.  I mean, family gets

19   hurt.

20   Q.    Mr. Gatterdam asked you about conversations you had with

21   law enforcement in the past.  Do you remember those questions?

22   A.    Yes.

23   Q.    And he asked you if you talked about Chris Harris during

24   those interviews.

25   A.    Uh-huh.

TRIAL ONE – VOL. 8 –  919

1    Q.    Did anyone ever ask you about Chris Harris?

2    A.    No.

3    Q.    Did anyone ask you about Chris Harris before yesterday

4    when I met with you?

5    A.    No.

6    Q.    Mr. Berndt right over here (indicating) asked you about

7    your conversations with the police in 2006 about the Alan

8    Johnson murder.  Do you remember those questions?

9    A.    Yes.

10   Q.    And he asked you whether Brandon Ledbetter had done

11   anything to you since 2006.  Do you remember that question?

12   A.    Yes.

13   Q.    And what did you say?

14   A.    No.

15   Q.    Was Brandon Ledbetter in the room when you were talking

16   to those police officers?

17   A.    No.

18   Q.    Did you ever tell Brandon Ledbetter, hey, Brandon, guess

19   what, I just told the police you killed Alan Johnson?

20   A.    No.

21   Q.    No.

22         There has also been -- and, frankly, I'm confused at

23   this point.  There have been a lot of questions about that

24   interview in 2006 and whether you initiated the interview or

25   whether the police came and found you.

TRIAL ONE – VOL. 8 –   920

1          Do you remember all those questions?

2      A.   Yes.

3          MR. MARTINEZ:  Okay.  Will you pull up Exhibit

4    165-16.01?  And if you could just blow up that first paragraph,

5    Agent Lauber.

6      BY MR. MARTINEZ:

7      Q.   Now, Ms. Murphy, I just want you to read the first

8    sentence to yourself.

9          MR. NOLDER:  Your Honor, I don't think the form of the

10   question is proper.  If she needs to refresh your recollection,

11   that's a different question but she hasn't determined that yet.

12         THE COURT:  Sustained.  Rephrase your question,

13   Mr. Martinez.

14     BY MR. MARTINEZ:

15     Q.   Okay.  Ms. Murphy, let me ask you this question before

16   you read that first sentence.  Were you confused at all about

17   the questions that were being asked about who initiated this

18   interview?

19     A.   No.

20     Q.   All right.  But are you having a hard time remembering

21   who initiated the interview?

22     A.   Yeah.

23     Q.   Okay.  And if I showed you a document, do you think

24   maybe that would help you remember?

25     A.   Is this the document right here?

TRIAL ONE – VOL. 8 – 921

1    Q.    Answer the question first.  If I showed you a

2    document -- Ms. Murphy, right here.

3    A.    Okay.

4    Q.    If I showed you a document, do you think that might help

5    you remember?

6    A.    Yeah.

7    Q.    All right.  So I want you to please just read the first

8    sentence of that --

9          MR. NOLDER:  Your Honor, it's not her statement.

10         THE COURT:  I understand.  Sustained.

11         Sidebar.

12                              – – –

13   Thereupon, the following proceeding was held at sidebar out

14   of hearing of open court:

15         THE COURT:  Okay.  Just as a reminder, the witness has

16   to indicate that she doesn't recall.  You can ask her if

17   there's anything that would refresh her recollection, and she

18   will tell you yes.  Then you must ask her what.  And she might

19   tell you anything from a document to, as Faust Rossi --

20   Professor Faust Rossi used to say, it could be a plate of

21   pasta.  And then you'll have to provide it to her and she will

22   look at it, and then you will ask her if her memory is

23   refreshed, and she will say yes.  And you would take away the

24   document or the fresh plate of pasta and then she would answer

25   your a question; the theory being that something that she saw

TRIAL ONE – VOL. 8 – 922

1   in that document or in that plate of pasta jarred her memory,

2   not that she's reading from the document.

3       So that's the problem that you're having.

4       MR. MARTINEZ:  Oh, the reading of the document part?

5       THE COURT:  No.  No.  Because she didn't say which

6   document would refresh her recollection so you can't volunteer

7   the document that will refresh her recollection unless she says

8   to you, well, you know, that document that we were looking at,

9   you know, last night.  So she has to identify the document, and

10  it will refresh her recollection.

11      MR. MARTINEZ:  Instead of me pointing it out to her.

12      MR. NOLDER:  Cornell University.

13      THE COURT:  Yes, he was.

14      MR. BERNDT:  And, Your Honor, I would ask that the

15  document be taken down from the screen.

16      MR. MARTINEZ:  I don't plan to show it to the jury.

17      MR. BERNDT:  Well, I'm talking about to the witness.

18      MR. MARTINEZ:  Oh, yeah, that's fine.

19      MR. MCVAY:  Your Honor, to the extent that she would

20  repeat a statement that's made in that document, that would be

21  the introduction of the police report by the government which

22  would be precluded by 803(8).

23      Now, if all she says is this refreshes my recollection,

24  now I remember who initiated, that's one thing.

25      THE COURT:  And that's what we were talking about.

TRIAL ONE – VOL. 8 –  923

1          MR. NOLDER:  And it's not her statement.  She didn't

2    prepare it.

3          THE COURT:  It doesn't matter whether it's her

4    statement.  It doesn't matter what it is.  If there is a

5    document that will refresh her recollection, she's entitled to

6    see it.  What she's not entitled to do is to read from that

7    document or testify from that document.  But she -- whatever

8    the document is, it does not have to be her statement.  It can

9    be anything.  So --

10          MS. DIXON:  I just think kind of we're beating a dead

11    horse in the sense that -- you know, and I read that initially,

12    that they initiated that interview, and I get the point

13    everybody is trying to make.  But the reality of it is she

14    reached out to them, and we all know it.  Whether it's a big

15    difference or not, you know.

16          THE COURT:  I understand.  But that's not the point

17    because the point simply is that, you know, they went into it

18    on cross.  If he wants to repair whatever damage he perceives

19    has been done, he may.

20          MR. MARTINEZ:  Thank you, Your Honor.

21       (The following proceedings were had in open court.)

22          THE COURT:  Mr. Lauber -- Agent Lauber, you may take

23    that down.  Thank you.

24       Mr. Martinez, please continue.

25          MR. MARTINEZ:  Thank you, Your Honor.

TRIAL ONE - VOL. 8 - 924

1    BY MR. MARTINEZ:

2    Q.   So let's go back to where we left off there, Ms. Murphy,

3    and the various questions that were asked about whether you

4    initiated the interview or whether the police came to you.

5    A.   Uh-huh.

6    Q.   And I think you testified before we went over there that

7    you weren't sure.

8         Okay.  Did you and I meet last night?

9    A.   Yes.

10   Q.   Did you review any documents, any interviews that you

11   gave when you and I met last night?

12   A.   I just read the little thing that was on there.

13   Q.   But last night --

14   A.   Yes.

15   Q.   -- did you and I -- you read some things?

16   A.   Yes.

17   Q.   Okay.  And do you remember reading a summary of the

18   statement you gave to the police in 2006?

19   A.   Yes.

20   Q.   Okay.  Is there any document that you can think of that

21   might refresh your recollection, help you remember whether you

22   initiated that interview --

23   A.   I just read that and it said I initiated so I guess I

24   did.  I was drunk.

25   Q.   It said you initiated?

TRIAL ONE – VOL. 8 –  925

1    A.    Yeah.

2    Q.    Okay.  We'll move on from that then.

3              MR. NOLDER:  Your Honor, she's answered the question.

4              MR. MARTINEZ:  Yeah.  We'll move on.

5              THE COURT:  Well, let me see counsel at sidebar.

6                               - - -

7         Thereupon, the following proceeding was held at sidebar out

8    of hearing of open court:

9              THE COURT:  I think what I'm going to have to do is

10   strike that -- her answer because Mr. Martinez didn't solicit

11   that response.  It was an unsolicited response.  It was

12   testimony that at sidebar I indicated wouldn't be permitted

13   because she hasn't established that her memory was refreshed.

14        What she just said was that she testified from that

15   document, which would be inappropriate, so I'm going to strike

16   that portion of her answer.

17             MR. MARTINEZ:  That's fine, Your Honor.  Thank you.

18        (The following proceedings were had in open court.)

19             THE COURT:  Ladies and gentlemen, the Court is going

20   to direct you to disregard Ms. Murphy's last statement.  I

21   won't read it back to you to reinforce it further.  It is

22   stricken.  You are to disregard it.

23        Mr. Martinez, please continue.

24             MR. MARTINEZ:  Thank you, Your Honor.

25        BY MR. MARTINEZ:

TRIAL ONE – VOL. 8 – 926

1    Q.   Let me ask a slightly different question, Ms. Murphy.

2         When you met with police in 2006 and talked about the

3    Alan Johnson homicide, were you telling the truth?

4    A.   Yes.

5    Q.   And when you met with law enforcement in 2014 and talked

6    about the Alan Johnson homicide, were you telling the truth?

7    A.   Yes.

8    Q.   And when you testified under oath today --

9         MR. NOLDER:  Your Honor, I object.  That's not for her

10   determination.  That's for a jury determination.

11        THE COURT:  Overruled.

12     BY MR. MARTINEZ:

13   Q.   And as you've testified today in this courtroom under

14   oath about the Alan Johnson homicide, have you done your best

15   to tell the truth?

16   A.   Yes.

17        MR. MARTINEZ:  No further questions, Your Honor.

18        THE COURT:  Mr. Berndt, do you have anything?  Any

19   recross?

20        MR. BERNDT:  Just briefly, Your Honor.

21        THE WITNESS:  Oh, God.  Him again?

22                        - - -

23                   RECROSS-EXAMINATION

24     BY MR. BERNDT:

25   Q.   Ms. Murphy, I just have a couple of questions for you.

TRIAL ONE – VOL. 8 –  927

1        I heard you testify that you met with law enforcement

2   while the warrant was still pending, correct?

3     A.   Yes.

4     Q.   And that law enforcement knew about that warrant,

5   correct?

6     A.   Yes, I guess.  I didn't tell them.

7     Q.   And they didn't arrest you, did they?

8     A.   No.

9     Q.   So you are –– have a felony –– a second degree felony

10  warrant sitting with law enforcement.  You're not being made

11  any promises, yet you're not being arrested on an active

12  warrant when you're sitting in a room full of police officers;

13  is that ––

14    A.   Yep.

15    Q.   –– accurate?

16        Okay.  You also testified that you're subpoenaed down

17  here, that's why you're here.  Correct?

18    A.   Uh-huh.

19    Q.   Were you subpoenaed ––

20        THE COURT:  Is that yes?

21        THE WITNESS:  Yes.

22    BY MR. BERNDT:

23    Q.   Were you subpoenaed to the meeting last night with Brian

24  Martinez?

25    A.   No.

TRIAL ONE - VOL. 8 -   928

1    Q.   Okay.  So you voluntarily did that, correct?

2    A.   I mean, I figured that I'm subpoenaed here so I'd have

3    to go to that.  I mean --

4    Q.   You were aware that the subpoena is to have you appear

5    in court, correct?

6    A.   Yeah.

7    Q.   Okay.  And you voluntarily appeared last night for that

8    meeting, correct?

9    A.   Yeah.

10   Q.   Much like you did with Agent Bajus in 2014, correct?

11   A.   Yep, if you say so.

12   Q.   It's not for me to say.  It's for you to say.

13   A.   Idiot.

14        MR. BERNDT:  Your Honor, I have nothing further.

15   Thank you very much.

16        THE COURT:  Thank you, Mr. Berndt.

17        Mr. Gatterdam, any recross?

18        MR. GATTERDAM:  Yes, Your Honor.

19                          - - -

20                   RECROSS-EXAMINATION

21     BY MR. GATTERDAM:

22   Q.   Ms. Murphy, you testified on redirect that you didn't

23   say certain things about crimes because of snitches and what

24   happens to snitches, correct?

25   A.   Uh-huh, yep.

TRIAL ONE – VOL. 8 –  929

1   Q.   Well, you certainly talked to the police in 2006 and

2   told them what you knew, didn't you?

3   A.   Yeah.

4   Q.   And you certainly talked to them in 2014 and told them

5   what you knew, didn't you?

6   A.   Yeah.

7   Q.   And when they asked you questions in 2006 and 2014, they

8   asked you to tell everything you knew about the Alan Johnson

9   murder or anybody that was involved, correct?

10  A.   Yes.

11  Q.   And you never mentioned Chris Harris' name.

12  A.   No.

13  Q.   And, in fact, you never mentioned Chris Harris ever

14  until last night when they started showing you pictures,

15  correct?

16  A.   I don't know if it was last night or the time before

17  that.  I don't know, but --

18  Q.   Okay.  Another time before when you were prepared for

19  today?

20  A.   Uh-huh.

21  Q.   Okay.  And, again, you would do anything you had to do

22  to stay out of prison and be with your kids, correct?

23  A.   No.

24  Q.   You wouldn't do anything?

25  A.   (Witness shakes head.)

TRIAL ONE – VOL. 8 – 930

1 Q. You would not do anything?

2 A. What do you mean by anything?  Like, you talking about

3 coming in and doing this today to stay out of prison?  That

4 ain't why I did this to stay out of the prison.

5   THE COURT:  Just a moment, Ms. Murphy.

6  Go ahead, Mr. Martinez.

7   MR. MARTINEZ:  I said, objection; asked and answered,

8 Your Honor.

9   THE COURT:  It has been answered fairly exhaustively.

10  Sustained.

11   MR. GATTERDAM:  Thank you, Your Honor.  Nothing

12 further.

13   THE COURT:  All right.  Thank you, Mr. Gatterdam.

14  Ms. Dixon, anything further?  Any recross?

15   MS. DIXON:  No, Your Honor.

16   THE COURT:  All right.  Mr. McVay, any recross?

17   MR. MCVAY:  No, Your Honor.

18   THE COURT:  Mr. Nolder?

19   MR. NOLDER:  No.

20   THE COURT:  Any sur-redirect?

21   MR. MARTINEZ:  No, Your Honor.  Thank you.

22   THE COURT:  Ms. Murphy, thank you very much, ma'am.

23 You may be excused.

24   THE WITNESS:  Okay.  Thanks.

25   THE COURT:  Mr. Martinez, your next witness?

TRIAL ONE – VOL. 8 –  931

1      MR. MARTINEZ:  Thank you, Your Honor.  The

2  government's next witness is Detective John Kifer.

3      THE CLERK:  Sir, come forward and be sworn, please.

4    (Witness sworn.)

5      THE COURT:  Sir, please bend the microphone towards

6  you and speak clearly into it.

7      Mr. Martinez, please proceed.

8      MR. MARTINEZ:  Thank you, Your Honor.

9                          – – –

10                   DIRECT EXAMINATION

11    BY MR. MARTINEZ:

12  Q.   Good afternoon, sir.

13  A.   Good afternoon.

14  Q.   Will you please state your name for the record and spell

15  your last name.

16  A.   John Kifer, K-I-F-E-R.

17  Q.   Thank you, sir.

18      Where are you currently employed?

19  A.   I work for the Columbus Division of Police.

20  Q.   What is your current title and position with the

21  Columbus Division of Police?

22  A.   I'm a detective in the Narcotics Bureau INTAC Unit.

23  Q.   What is INTAC?

24  A.   It's investigative tactical.

25  Q.   All right.  When did you join the Columbus police

TRIAL ONE – VOL. 8 – 932

1   department?

2   A.   December of 1989.

3   Q.   So that's, what, 27 years?

4   A.   26.

5   Q.   26.  Okay.

6        And how long have you worked in INTAC?

7   A.   16 years.

8   Q.   And, INTAC, that's narcotics investigations --

9   A.   Correct.

10  Q.   -- is that correct?

11       THE COURT:  Could you spell INTAC?  Is it I-N-T-A-C-T?

12       THE WITNESS:  No.  Just I-N-T-A-C.

13       THE COURT:  I-N-T-A-C.

14    BY MR. MARTINEZ:

15  Q.   Okay.  Detective Kifer, I want to ask you about an

16  investigation that you did in the summer of 2006 regarding

17  activity at 1439 North Sixth Street in Columbus, Ohio.

18       Are you familiar with that investigation?

19  A.   Yes.

20  Q.   But before we talk about that particular place, can you

21  just sort of provide some background about your typical

22  investigation and sort of the techniques that you use in

23  narcotics cases?

24  A.   Normally we get complaints come in on the telephone,

25  through the mayor's office, other police officers, neighbors

1    calling about a house in their –– or apartment in their

2    neighborhood that they think are dealing drugs.

3         We then go out, we pick up a confidential informant.  We

4    go out, and we attempt to make buys.

5         If we do get a buy, we turn the property into the

6    property room.  We go back to the office, we write a search

7    warrant.  We go down in front of a judge the next day and get

8    the search warrant signed.  And then we go out, and the rest of

9    the week we attempt to execute the warrant.

10   Q.   And is that the sort of procedure that you and your

11   colleagues used in the particular case that I mentioned a

12   moment ago?

13   A.   That is correct.

14   Q.   All right.  So were you able to find a confidential

15   informant to do some buys for you?

16   A.   Yes.

17   Q.   Please describe for the ladies and gentlemen of the jury

18   how that went.

19   A.   We would pick up our confidential informant, we would

20   search them.  We would tell them that we have a complaint house

21   that we need to go run.  We give them all the information that

22   we know, if we know any at all.  We give them marked money.  We

23   give them buy money, obviously, marked money.  We search them

24   before they go into the house.  If they bring us product back,

25   we search them afterwards to make sure they have no product on

TRIAL ONE - VOL. 8 - 934

1   them or any other money.  And then we put that into a bag, it

2   goes down to the property room, and then we move on to our next

3   complaint.

4   Q.   Okay.  So in this case with respect to the

5   July/August 2006 time period and suspected activity at 1439

6   North Sixth Street, were you and your colleagues able to find a

7   confidential informant to make buys?

8   A.   That is correct.

9   Q.   How many buys did that confidential informant make from

10  that residence?

11  A.   At least one.

12  Q.   And what did that confidential informant buy from the

13  occupants of that residence?

14  A.   Crack cocaine.

15  Q.   What did you and your colleagues do with the information

16  that you obtained during that part of the investigation?

17  A.   Like I said, we got a description of the seller, you

18  know, what type of stuff's inside the house.  We call it the

19  big four, guns, dogs, kids and barricades.

20       Then we go back to the office and then we write out what

21  we call a pre-raid which basically tells us everything that we,

22  you know, got from the informant that day.  It goes to a scout

23  team, we scout the place.  We go down and get a search warrant

24  signed for that place with all that information, and then we

25  execute the warrants afterwards.

TRIAL ONE – VOL. 8 – 935

1    Q.   Were you able to get a search warrant for 1439 North

2    Sixth Street?

3    A.   Yes, sir.

4    Q.   Do you recall approximately when that was?

5    A.   I believe it was on the 15th of August.

6    Q.   Of what year?

7    A.   2006.

8    Q.   2006.

9         All right.  And did you and your team execute that

10   search warrant?

11   A.   Yes, we did.

12   Q.   And do you recall about when you executed the warrant?

13   A.   I think it was, like, 7 o'clock at night-ish.

14   Q.   On the same day, August 15, 2006?

15   A.   That's correct.

16   Q.   All right.  Before we get to the specifics, let's talk

17   just for a little bit about your practice for when you're

18   executing a warrant.

19        Tell me what your normal protocol is for executing a

20   search warrant in a house suspected of narcotics activity?

21   A.   We get our whole team together, we have a mission

22   planner that plans the mission.  He tells everybody what their

23   jobs are for the day from the person hitting the door to a

24   person carrying a rifle to a utility person, who's going to be

25   throwing flash bangs possibly.

1    Q.   What's a flash bang?

2    A.   A flash bang is a distraction device that has a 1.1 to

3  1.2 million candle-powered flash followed by a 175-decibel

4  sonic boom.

5    Q.   All right.  Go on.  I interrupted you.

6    A.   Also who is shooting knee knockers that night and who

7  the supervisor is that night.

8    Q.   On this particular warrant which officer was in charge?

9    A.   It was probably Kevin Tilson back then.

10    Q.   But were you involved in the execution of the warrant?

11    A.   Yes.

12    Q.   And, as a matter of fact, who signed the search warrant?

13    A.   I did.

14    Q.   Okay.  If incriminating evidence is found during a

15  search warrant like this, what do you and your team do with it?

16    A.   Once we find the evidence, we call for the photo person.

17  They come in, they photograph the evidence.  Then whoever found

18  it, collects it, puts it into a bag and then turns it over to

19  an inventory officer who fills out an inventory sheet which we

20  leave at the scene after we collect all evidence.

21    Q.   All right.  So photographs and then collection?

22    A.   Correct.

23    Q.   Do I have that right?

24    Okay.  With respect to this particular search warrant,

25  do you recall if photos were taken?

TRIAL ONE – VOL. 8 –   937

1    A.    Yes, sir.

2    Q.    And is it the practice of you and your team to create

3  some sort of document memorializing what photographs were

4  taken?

5    A.    Yes.

6    Q.    Tell me about that.  What is that document?

7    A.    It's just a photo array that we have that we put in all

8  of our packets what they go to court or when we arrest somebody

9  out of the incident.

10    Q.    So those are the actual photographs you're talking

11  about?

12    A.    Yes.

13    Q.    Is there also a log created of what photos were taken?

14    A.    Yeah, the description of what photo was taken and what

15  it was.

16          MR. MARTINEZ:  Okay.  May I have Exhibit 28-2, please?

17      BY MR. MARTINEZ:

18    Q.    Detective Kifer, do you recognize the document on this

19  screen marked 28-2?

20    A.    Yes, I do.

21    Q.    And what is that document, sir?

22    A.    That is a narcotics bureau photo log.

23    Q.    And is this the log for the incident that we've been

24  discussing?

25    A.    That is correct.

TRIAL ONE – VOL. 8 – 938

1    Q.   All right.  Is this document created by you or members

2    of your team?

3    A.   Yes.  This one is made by Matt Montenay.

4    Q.   And is this document created at or around the time that

5    the search warrant is executed?

6    A.   It's after the fact after we're all done back at the

7    office either that night or maybe even the next day.

8    Q.   All right.  And is this sort of document kept in the

9    normal course of your business of your --

10   A.   Yes, sir.

11        MR. MARTINEZ:  All right.  Your Honor, at this point

12   the government would move for the admission of Exhibit 28-2?

13        THE COURT:  Exhibit 28-2 will be received.

14        Is there an objection?

15        MR. DURDEN:  No objection.

16        MR. GATTERDAM:  No objection.

17        MS. DIXON:  No objection.

18        MR. MCVAY:  No objection.

19        MR. NOLDER:  None, Your Honor.

20        MR. MARTINEZ:  Your Honor, may I approach the witness

21   please?

22        THE COURT:  Yes, you may.

23     BY MR. MARTINEZ:

24   Q.   Detective Kifer, I'm just going to hand you a hard copy

25   of that document so you can refer to it throughout the

TRIAL ONE – VOL. 8 –  939

1    testimony.

2         Detective Kifer, do you recall if any incriminating

3    evidence was found during this search warrant?

4    A.   Yes, there was.

5    Q.   In summary, what was found?

6    A.   Basically, we found crack cocaine, we found handguns, we

7    found cash and a bullet proof vest.

8         MR. MARTINEZ:  May I have Exhibit 28-2#, please?

9         Your Honor, may I approach the witness?

10        THE COURT:  Yes, you may.

11     BY MR. MARTINEZ:

12   Q.   Detective Kifer, I'm going to hand you a set of

13   photographs that have been marked Exhibit 28-2# through

14   28-2#-014.  I'd ask you to take a look, and I'll also give a

15   copy to opposing counsel.

16        Have you looked over those photographs, Detective Kifer?

17   A.   Yes, I have.

18   Q.   Do you recognize those photographs?

19   A.   Yes, I do.

20   Q.   What are they?

21   A.   They are pictures of evidence that we collected in place

22   when the person who was searching for it found it.

23   Q.   And do those photos truly and accurately depict the

24   scene as it existed on August 15, 2006?

25   A.   Yes, sir.

1      MR. MARTINEZ:  Your Honor, at this time the United

2  States would move for the admission of Exhibits 28-2# through

3  28-2#-014.

4          THE COURT:  Any objection?

5          MR. DURDEN:  No objection, Your Honor.

6          MR. GATTERDAM:  No objection.

7          THE COURT:  Ms. Dixon?

8          MS. DIXON:  No objection.

9          MR. MCVAY:  Your Honor, I haven't had an opportunity

10  to review this just yet.  Can I have a minute?

11          THE COURT:  Yes.

12      Have you had a chance to review it, Mr. Nolder?

13          MR. NOLDER:  I have not, Your Honor.

14          THE COURT:  All right.

15          MR. NOLDER:  I won't object.

16          THE COURT:  All right.

17          MR. NOLDER:  Consistency.

18      MR. MARTINEZ:  And, Your Honor, for what it's worth,

19  these were all provided.

20          THE COURT:  I understand.  I mean, I'm going to admit

21  them.  I'm going to allow counsel to object for the record to

22  preserve their record.

23          MR. MCVAY:  No objection.

24          THE COURT:  Mr. McVay has no objections.  They will be

25  admitted.  You may publish them, Mr. Martinez.

TRIAL ONE – VOL. 8 –   941

1          MR. MARTINEZ:  Thank you, Your Honor.

2          We're going to go through select photos.

3          Agent Lauber, if I can have Exhibit 28-2#-006, please.

4      BY MR. MARTINEZ:

5      Q.   Okay.  So, Detective Kifer, could you please tell us

6   what's depicted in that exhibit which is number 6 on your list?

7      A.   It would be a handgun that is sitting on the mantle in

8   the living room.

9          MR. MARTINEZ:  All right.  May I please have exhibit

10   28-2#-009?

11      BY MR. MARTINEZ:

12      Q.   Do you recognize that photograph, sir?

13      A.   Yes, sir.

14      Q.   What's depicted in that photograph?

15      A.   It is a handgun laying in a couch or chair.

16          MR. MARTINEZ:  Okay.  Also, may I please have Exhibit

17   28-2#-003?

18      BY MR. MARTINEZ:

19      Q.   This is item number 3, Detective Kifer.  Do you

20   recognize what's in that photograph?

21      A.   Yes, sir.

22      Q.   And what is that, sir?

23      A.   It's a handgun sitting on the kitchen table.

24      Q.   All right.

25      A.   Along with a set of digital scales.

1      Q.    Thank you.

2            MR. MARTINEZ:  May I please have Exhibit 28-2#-012?

3        BY MR. MARTINEZ:

4      Q.    This is -- can you tell us what's depicted in that

5   exhibit, sir?

6      A.    It is a bullet proof vest that was found in the

7   northwest corner of the living room.

8            MR. MARTINEZ:  May I please have Exhibit 28-2#-005?

9        BY MR. MARTINEZ:

10     Q.    What's depicted in that exhibit, Detective Kifer?

11     A.    It is a plate with crack cocaine on it.

12           MR. MARTINEZ:  May I please have Exhibit 28-2#-013?

13       BY MR. MARTINEZ:

14     Q.    Now, this might take a little bit more explanation.

15  What are we looking at in that photograph sir?

16     A.    What we're looking at here is a floor grate for the

17  heating and cooling system of the house.

18     Q.    Okay.  Was something found in that floor grate?

19     A.    Yes.  A small baggie of crack cocaine was hidden

20  underneath it.

21           MR. MARTINEZ:  All right.  Can I please have

22  28-2#-014?

23       BY MR. MARTINEZ:

24     Q.    What are we looking at in that photograph, sir?

25     A.    That is the same picture as before with the grate lifted

TRIAL ONE – VOL. 8 –   943

1   off and the baggie of crack cocaine that was underneath the

2   grate.

3     Q.   If you would do me the favor, sir, and actually touch

4   the screen with your finger and just circle where the crack

5   cocaine is.

6     A.   (Indicating).

7     Q.   Thank you.

8          I think you mentioned digital scales a moment ago.

9     A.   Yes, sir.

10    Q.   Was there any other drug paraphernalia found in the

11   house?

12    A.   Not that's listed on the photo log, sir.

13    Q.   We'll come back to that in a minute.

14         I think you mentioned cash was found in the house?

15    A.   Yes.

16    Q.   Do you recall approximately how much?

17    A.   I believe it was over $800.

18    Q.   All right.  Sir, I believe you testified a moment ago

19   that when physical evidence is seized, you create some sort of

20   inventory.

21    A.   Yes, sir.

22    Q.   Tell us about that inventory.  What's on the inventory?

23    A.   When evidence is found inside the house, they usually

24   call the affiant over, which would have been me, and they say,

25   yeah, we found this handgun here.  It was loaded, it was

TRIAL ONE – VOL. 8 –   944

1    unloaded, it was just sitting there; any sort of drugs, money

2    or anything like that, and I decide whether or not I want it

3    collected or not.  We take a photograph of if, the person that

4    found it collects it and then turns it over to an inventory

5    officer.

6      Q.   And what does that inventory officer do?

7      A.   He puts it on a separate sheet that is much similar to

8    the photo log and everything is listed in it as 1, 2, 3, 4 and

9    the number of items that's found inside the structure and

10   collected.

11     Q.   All right.  Thank you.

12          MR. MARTINEZ:  May I please have Exhibit 28-7?  And I

13   would like page 5 of that exhibit, please.

14     BY MR. MARTINEZ:

15     Q.   All right.  Detective Kifer, if you would take a look at

16   your screen and let me know if you recognize that document.

17     A.   I do.

18          THE CLERK:  I'm sorry, is this part of the same

19   exhibit you were --

20          MR. MARTINEZ:  This is Exhibit 28-7, page 5.  And for

21   the record, the inventory list is pages 5 and 6.

22     BY MR. MARTINEZ:

23     Q.   Sorry.  Go ahead, Detective Kifer.  What is this

24   document?

25     A.   This is our inventory sheet.  It lists on there the

TRIAL ONE – VOL. 8 – 945

1    address, the date, the time and even a suspect.  It's listed in

2    chronological order of the order that the stuff was turned over

3    to the collection officer.  It describes what the property is,

4    where it was found and who found it.

5      Q.    And this document, is it created at or around the time

6    the search is executed?

7      A.    It is created at the time we are there.

8      Q.    Is this sort of document one that you keep in the

9    regular course of your police activity?

10     A.    Yes, sir.

11           MR. MARTINEZ:  Your Honor, at this time the government

12   would move for the admission of Exhibit 28-7, just pages 5 and

13   6.

14           THE COURT:  It will admitted.

15        Any objection, Mr. Durden?

16           MR. DURDEN:  No objection, Your Honor.

17           MR. GATTERDAM:  No objection.

18           THE COURT:  Ms. Dixon?

19           MS. DIXON:  No objection.

20           THE COURT:  Mr. McVay?

21           MR. MCVAY:  No, Your Honor.

22           THE COURT:  Mr. Nolder.

23           MR. NOLDER:  No objection.

24           THE COURT:  You may publish it, Mr. Martinez.

25           MR. MARTINEZ:  Thank you, Your Honor.

1          May I approach the witness?

2               THE COURT:  Yes, you may.

3               MR. MARTINEZ:  I'm going to hand you a hard copy of

4     this so you will have it.

5               THE WITNESS:  Thank you.

6          BY MR. MARTINEZ:

7     Q.    Detective Kifer, I'm going to hand you what's been

8     marked as Exhibit 28-8, and I believe it's item number 1 on

9     your log.

10              Do you recognize that, sir?

11    A.    Yes, I do.

12    Q.    What is that item?

13    A.    It is item number 1, which is a Smith & Wesson Model 60

14    with a three-inch barrel and a .357 Magnum caliber.

15    Q.    Where was that found in the house?

16    A.    It was found in the living room on the mantle.

17    Q.    Does that exhibit appear to be in substantially the same

18    condition as it was the day it was seized?

19    A.    Yes, sir.

20              MR. MARTINEZ:  Your Honor, at this point the

21    government would move for the introduction and admission of

22    Exhibit 28-8.

23              THE COURT:  It will be admitted.

24         Any objection, Mr. Durden?

25              MR. DURDEN:  No objection, Your Honor.

1          THE COURT:  Mr. Gatterdam?

2          MR. GATTERDAM:  No objection.

3          MS. DIXON:  No objection.

4          THE COURT:  Mr. McVay?

5          MR. MCVAY:  No objection.

6          THE COURT:  Mr. Nolder?

7          MR. NOLDER:  No objection.

8          THE COURT:  You may publish it, Mr. Martinez.

9          MR. MARTINEZ:  Thank you, Your Honor.

10         MR. MARTINEZ:  May I approach the witness?

11         THE COURT:  Yes, you may.

12         MR. MARTINEZ:  Exhibit 28-8.

13     May I approach, Your Honor?

14         THE COURT:  Yes.

15   BY MR. MARTINEZ:

16   Q.   Detective Kifer, I'm going to hand you what has been

17   marked as Exhibit 28-9 which is item number 7 on your list.

18        Do you recognize that item, sir?

19   A.   Yes, I do.

20   Q.   What is that?

21   A.   This is a Smith & Wesson Model 27 .357 Magnum.

22   Q.   And I should have asked you this before but let me ask

23   you now, is there a property number written on the envelope

24   there of that exhibit?

25   A.   Yes, there is.

TRIAL ONE – VOL. 8 – 948

1    Q.   What is that property number?

2    A.   It is 06-19890.

3    Q.   And is there also a property number that's written on

4    the top of your inventory sheet?

5    A.   That is correct.

6    Q.   What is that property number?

7    A.   06-19890.

8    Q.   Are those property numbers the same?

9    A.   They are.

10   Q.   And does Exhibit Number 28-9 appear to be in the same

11   condition it was on the day it was seized?

12   A.   Yes, sir.

13        MR. MARTINEZ:  Your Honor, at this time the government

14   would move for the admission of the Exhibit 28-9.

15        THE COURT:  28-9 will be received.

16        Any objection Mr. Durden?

17        MR. DURDEN:  No objection.

18        MR. GATTERDAM:  No objection.

19        MS. DIXON:  No objection.

20        MR. MCVAY:  None.

21        MR. NOLDER:  None, Your Honor.

22        THE COURT:  Thank you.

23        You may publish it, Mr. Martinez.

24        MR. MARTINEZ:  Thank you, Your Honor.  I will

25   approach, if that's okay.

TRIAL ONE – VOL. 8 –  949

1          THE COURT:  Yes.

2          MR. MARTINEZ:  Exhibit 28-9.

3       May I approach, Your Honor?

4          THE COURT:  Yes.

5     BY MR. MARTINEZ:

6    Q.   Detective Kifer, I'm now going to hand you what's been

7    marked as Exhibit 28-10 which is item number 15 on your sheet.

8          Do you recognize that item, sir?

9    A.   Yes, I do.

10   Q.   What is Exhibit 28-10?

11   A.   It is a Springfield Armory Model 1911 .45 automatic.

12   Q.   Where was that item found in the house, item 15?

13   A.   It was found on the kitchen table.

14   Q.   Does Exhibit 28-10 appear to be in substantially the

15   same condition as it was the day it was seized?

16   A.   Yes, sir.

17          MR. MARTINEZ:  Your Honor, at this point I would move

18   for the admission of Exhibit 28-10.

19          THE COURT:  It will be received.

20       Any objection, Mr. Durden?

21          MR. DURDEN:  No, Your Honor.

22          THE COURT:  Mr. Gatterdam?

23          MR. GATTERDAM:  No, Your Honor.

24          THE COURT:  Ms. Dixon?

25          MS. DIXON:  No, Your Honor.

TRIAL ONE – VOL. 8 –  950

1          THE COURT:  Mr. McVay?

2          MR. MCVAY:  No, Your Honor.

3          MR. NOLDER:  No objection.

4          THE COURT:  You may publish it, Mr. Martinez.  You may

5    retrieve it from the witness.

6          MR. MARTINEZ:  Thank you, Your Honor.

7          Exhibit 28-10.

8          May I approach the witness, Your Honor?

9          THE COURT:  Yes, you may.

10     BY MR. MARTINEZ:

11   Q.   Detective Kifer, I'm going to hand you what has been

12   marked Exhibit 28-15 which is item number 10 on your sheet.

13          Do you recognize that exhibit, sir?

14   A.   Yes, sir.

15   Q.   And please tell me what is in Exhibit 28-15.

16   A.   It is a magazine that was supposed to be in a gun, which

17   it wasn't, and it had live ammo in it.

18   Q.   Is there anything special about that particular

19   magazine?

20   A.   It's a 30-round magazine.

21   Q.   Where was Exhibit 28-10 found, sir?

22          I'm sorry, 28-15, item number 10.

23   A.   It was found on the kitchen table.

24   Q.   And does it appear to be in substantially the same

25   condition as it was the day it was seized?

TRIAL ONE – VOL. 8 – 951

1    A.   Yes, sir.

2         MR. MARTINEZ:  Your Honor, at this time I would move

3    for the admission of Exhibit 28-15.

4         THE COURT:  28-15 will be received.

5         Any objection, Mr. Durden?

6         MR. DURDEN:  No, Your Honor.

7         MR. GATTERDAM:  No, Your Honor.

8         MS. DIXON:  No, Your Honor.

9         THE COURT:  Mr. McVay?

10        MR. MCVAY:  No, Your Honor.

11        THE COURT:  Mr. Nolder?

12        MR. NOLDER:  No, Your Honor.

13        THE COURT:  You may publish it after you retrieve it,

14   Mr. Martinez.

15        MR. MARTINEZ:  Thank you, Your Honor.

16        MR. MARTINEZ:  Exhibit 28-15.

17        May I approach the witness, Your Honor?

18        THE COURT:  Yes, you may.

19     BY MR. MARTINEZ:

20    Q.   Sir, I'm going to hand you what's been marked Exhibit

21   28-16 which I believe is item number 16 on your list.  And if

22   you need to peek in there or take it out, that's fine.

23        Do you recognize that exhibit, sir?

24    A.   Yes, I do.

25    Q.   What is Exhibit 28-16?

TRIAL ONE – VOL. 8 – 952

1    A.    It's body armor found in the living room behind the

2    couch.

3    Q.    Body armor?

4    A.    Yes.

5    Q.    In your experience is it common to find body armor in

6    the search of a home?

7    A.    No.

8    Q.    Does Exhibit 28-16 appear to be in substantially the

9    same condition as it was the day it was seized?

10   A.    Yes, sir.

11        MR. MARTINEZ:  Your Honor, at this point the

12   government would move for the admission of the Exhibit 28-16.

13        THE COURT:  It will be admitted.

14        Any objection?

15        MR. DURDEN:  No, Your Honor.  But can we display page

16   2 of this exhibit?

17        MR. MARTINEZ:  Oh, sure.

18        MR. GATTERDAM:  No, Your Honor.

19        MS. DIXON:  No, Your Honor.

20        MR. MCVAY:  No, Your Honor.  Thank you.

21        THE COURT:  Mr. Nolder?

22        MR. NOLDER:  No, sir.

23        THE COURT:  Thank you.

24        MR. MARTINEZ:  May I approach the witness, Your Honor?

25        THE COURT:  And you may publish 28-16.

TRIAL ONE – VOL. 8 – 953

1    MR. MARTINEZ:  Your Honor, may I pass this around?  Do

2  you have any objection to it?

3    THE COURT:  No.  You may pass it around if the jury

4  wishes to see it.

5    MR. MARTINEZ:  Can I retrieve the exhibit, Your Honor?

6   BY MR. MARTINEZ:

7  Q.   Detective Kifer, I believe you testified there was some

8  money found in the home; is that right?

9  A.   Yes, sir.

10  Q.   All right.  I'm going to hand you what's been marked --

11    MR. MARTINEZ:  May I approach, Your Honor?

12    THE COURT:  Yes.

13   BY MR. MARTINEZ:

14  Q.   I'm going to hand you what's been marked Exhibit 28-13

15  which is item number 2 on your sheet.  Do you recognize that

16  exhibit, sir?

17  A.   Yes, sir.

18  Q.   Okay.  What is that?

19  A.   It's a baggie that contained $375 cash.

20  Q.   And if you could refer to your sheet and just please

21  tell me, from what person was that $375 in cash seized?

22  A.   From Deounte Ussury.

23  Q.   And there's no cash in the bag, right?

24  A.   That is correct.

25  Q.   So tell me, why is that?

TRIAL ONE – VOL. 8 – 954

1    A.   When we turn it into the property room, they take it out

2   and they put it someplace secure so it's not all down at the

3   property room.

4    Q.   And the little tag on the front, is that a receipt?

5    A.   It's just a break down of what the individual bills were

6   inside.

7         MR. MARTINEZ:  Your Honor, I would move for the

8   admission of Exhibit 28-13.

9         THE COURT:  28-13 will be received.

10        Any objection, Mr. Durden?

11        MR. DURDEN:  No objection.

12        MR. GATTERDAM:  No, Your Honor.

13        MS. DIXON:  No, Your Honor.

14        MR. MCVAY:  No, Your Honor.

15        THE COURT:  Mr. Nolder?

16        MR. NOLDER:  No, Your Honor.

17        THE COURT:  You may retrieve it and publish it.

18        MR. MARTINEZ:  Thank you, Your Honor.

19     BY MR. MARTINEZ:

20    Q.   And while I'm here, Detective, I'm going to hand you

21   Exhibits 28-11 and 28-12.

22        Let's start with 28-11 which is item number 5 on your

23   sheet, sir.

24    A.   Okay.

25    Q.   Please tell me what that exhibit is.

TRIAL ONE – VOL. 8 – 955

1    A.    $173 cash that was found on Terrel Patterson.

2    Q.    And Exhibit 28-12 which is item number 12?

3    A.    $273 cash that was found on Howard Goddie or Godie.

4          MR. MARTINEZ:  Your Honor, at this time the government

5    would move for the admission of Exhibits 28-11 and 28-12.

6          THE COURT:  28-11 and 28-12 will be received.

7          Any objection?

8          MR. DURDEN:  No objection, Your Honor.

9          MR. GATTERDAM:  No objection.

10         MS. DIXON:  No objection.

11         MR. MCVAY:  No objection.

12         THE COURT:  Mr. Nolder?

13         MR. NOLDER:  No objection.

14         THE COURT:  You may retrieve them, and you may publish

15   them.

16         MR. MARTINEZ:  Thank you, Your Honor.

17      BY MR. MARTINEZ:

18   Q.    Detective Kifer, were any arrests made the day the

19   warrant was executed?

20   A.    Yes, there were.

21         MR. MARTINEZ:  May I please see Exhibit 28-2#-011?

22      BY MR. MARTINEZ:

23   Q.    We've displayed on the screen there, Detective Kifer,

24   what's been marked as Exhibit 28-2#-011 which corresponds to

25   item number 13 on your log.

TRIAL ONE – VOL. 8 – 956

1      Can you please tell me who is depicted in that

2   photograph?

3    A.    That would be Deounte Ussury.

4    Q.    Okay.  Can I please have -- oh, sorry.

5         And does that photograph accurately depict the condition

6   of Mr. Ussury on the day it was taken?

7    A.    That is correct.

8         MR. MARTINEZ:  Your Honor, at this time I would move

9   for the admission of Exhibit 28-2#-011.

10        THE COURT:  28-2#-011 will be received.

11        Any objection, Mr. Durden?

12        MR. DURDEN:  No objection.

13        MR. GATTERDAM:  No, Your Honor.

14        MS. DIXON:  No, Your Honor.

15        MR. MCVAY:  No, Your Honor.

16        MR. NOLDER:  No, Your Honor.

17        MR. MARTINEZ:  May we publish, Your Honor?

18        THE COURT:  You may publish.

19        MR. MARTINEZ:  Thank you.

20        And, finally, may I please have Exhibit 28-2#-010?

21     BY MR. MARTINEZ:

22    Q.   Detective Kifer, if you could just take a look at the

23   exhibit on the screen which I believe corresponds to item

24   number 12 on your list.  Please tell me who is depicted in that

25   photograph.

TRIAL ONE – VOL. 8 – 957

1    A.    That would be Terrel Patterson.

2    Q.    Does that photograph fairly and accurately depict

3    Mr. Patterson on the day of this search warrant execution?

4    A.    Yes, sir.

5          MR. MARTINEZ:  Your Honor, at this time the government

6    would move for the admission of Exhibit 28-2#-010.

7          THE COURT:  Exhibit 28-2#-010 will be received.

8          Any objection, Mr. Durden?

9          MR. DURDEN:  No objection, Your Honor.

10         MR. GATTERDAM:  No, Your Honor.

11         MS. DIXON:  No, Your Honor.

12         THE COURT:  Mr. McVay?

13         MR. MCVAY:  No, Your Honor.

14         THE COURT:  Mr. Nolder?

15         MR. NOLDER:  No, Your Honor.

16         THE COURT:  You may publish it.

17         MR. MARTINEZ:  Thank you, Your Honor.

18       BY MR. MARTINEZ:

19    Q.    Detective Kifer, was Mr. Ussury placed under arrest?

20    A.    Yes, he was.

21    Q.    And was Mr. Patterson placed under arrest?

22    A.    Yes, he was.

23         MR. MARTINEZ:  Your Honor, I have no further questions

24    of this witness at this time.

25         THE COURT:  All right.  Mr. Durden, any cross?

TRIAL ONE – VOL. 8 – 958

1      MR. DURDEN:  No, Your Honor.

2      THE COURT:  Mr. Gatterdam, any cross?

3      MR. GATTERDAM:  No, Your Honor.

4      THE COURT:  Ms. Dixon, any cross?

5      MS. DIXON:  No, Your Honor.

6      THE COURT:  Mr. McVay, any cross?

7      MR. MCVAY:  Yes, Your Honor.

8      THE COURT:  All right.

9                        - - -

10              CROSS-EXAMINATION

11    BY MR. MCVAY:

12    Q.   Good afternoon, Detective Kifer.  How are you?

13    A.   I'm good.  Yourself?

14    Q.   Very good.  My name is Kirk McVay.  Greg Meyers and I

15    are representing Mr. Ussury.  I just have a few questions I

16    want to ask you concerning the execution of your search

17    warrant.

18          Now, you described what your procedures are as you

19    prepare to execute a search warrant in a situation like this,

20    and I believe you said that you meet and you kind of discuss

21    what the roles are going to be of the individuals involved,

22    correct?

23    A.   That is correct.

24    Q.   One of the things you do is you do some planning as to

25    who has what weaponry?

1    A.    Correct.

2    Q.    Who's going to do what in terms of, I think you

3    mentioned, whether or not there had been the use of flash

4    bangs?

5    A.    Correct.

6    Q.    And for the jury's sake, will you explain what a flash

7    bang is?

8    A.    Again, it's a distraction device that has a 1.1 to

9    1.2 million candle-powered flash, as well as a 175 decibel

10    sonic boom.

11    Q.    And how would that be employed if you were to use one?

12    A.    It would be deployed just inside the front door as a

13    distraction device if anything is coming at us and to keep

14    everybody away from the front door so we can enter safely.

15    Q.    And that's assuming that you have to do a forced entry?

16    A.    Correct.

17    Q.    And then you also mentioned a device called knee

18    knockers.

19    A.    That is correct.

20    Q.    Could you explain what those are?

21    A.    Those are also a distractionary device that is used.

22    It's five wooden pellets that are 37 millimeters in diameter.

23    They are fired through the windows.  They're designed to bounce

24    off the ceiling and walls.  They're -- like I said, there's

25    five of them.  They go in and they get people down on the

TRIAL ONE - VOL. 8 -  960

1   ground and keeps them from going for a weapon.

2   Q.   Okay.  And if I understand things correctly, then you

3   would discuss whether or not those were going to be used in a

4   particular situation --

5   A.   That is correct.

6   Q.   -- correct?

7        And in this particular situation, were either one of

8   those used?

9   A.   I do not think so.

10  Q.   If they were, your report would indicate that they were

11  used, right?

12  A.   That's correct.

13  Q.   The report does not indicate they were used; is that

14  fair to say?

15  A.   Yes, sir.

16  Q.   And how was entry gained into this particular residence?

17  A.   I believe it was through the front door.

18  Q.   Was that through forced entry?  Was it a knock and

19  announce?

20  A.   We always knock and announce unless it's a no-knock

21  warrant.  I believe we did knock and forced the door open.

22  Q.   Okay.  And you met no resistance from anyone inside; is

23  that fair to say?

24  A.   Yes, sir.

25  Q.   Okay.  Now, you also indicated one of the things you

TRIAL ONE – VOL. 8 –  961

1    discuss is whether or not you should expect to find guns, dogs,

2    kids or barricades.

3      A.   Yes, sir.

4      Q.   And the only things that you've talked about or

5    testified to today is that you found guns --

6      A.   Yes.

7      Q.   -- correct?

8           There were no kids.

9      A.   No, sir.

10     Q.   There were no dogs.

11     A.   No, sir.

12     Q.   And there were no barricades.

13     A.   No, sir.

14     Q.   And I believe you testified that this search warrant was

15   executed at 7:00 p.m.?

16     A.   Yes, sir.

17     Q.   On August 15, 2006?

18     A.   Yes, sir.

19     Q.   So unless my recollection of daylight savings time is

20   amiss, it would have been evening -- early evening, but it

21   still would have been daylight; is that fair to say?

22     A.   Yes, sir.

23     Q.   Now, one of the things that you do, is it not, once --

24   when you enter and you're trying to find evidence or determine

25   what evidence exists as you do your search, you are not only

TRIAL ONE – VOL. 8 – 962

1   looking for contraband, being drugs or guns or money related to

2   either one of those, but also something to indicate to you or

3   prove to you or give some indication, at least, as to who

4   occupies that residence, who's the tenant or the homeowner; is

5   that fair to say?

6   A.   Yes, sir.

7   Q.   And you look for documentation of that in the form of

8   utility bills or something along those lines, maybe a bank

9   statement that gives a name and an address on that?

10  A.   Anything we can find with a name on it, yes, sir.

11  Q.   Okay.  And, to the best of your recollection, was there

12  anything found which would indicate occupancy of this

13  particular property?

14  A.   Not to my recollection.

15       MR. MCVAY:  Okay.  Could we see the photo of series --

16  what is that, 28-2#-003?  And I believe this has been publish

17  to the jury; is that correct?

18       THE COURT:  Yes, it may be published.

19   BY MR. MCVAY:

20  Q.   Okay.  Detective Kifer, you described in talking about

21  this photo before about this firearm -- I forget which one that

22  was, a Smith & Wesson, if I'm not mistaken -- and other items

23  on what I believe you had said was the kitchen table.  Is that

24  fair to say?

25  A.   Yes, sir.

TRIAL ONE – VOL. 8 –  963

1    Q.    Okay.  And is there also an envelope there?

2    A.    Yes, there is.

3    Q.    Okay.  I know on the copy that I have I'm able to read

4    the name and address on that envelope.  Are you able to do so

5    through that?

6    A.    Not on this screen, no.

7          MR. MCVAY:  Your Honor, if I may, Mr. DeVillers and

8    the United States attorneys have agreed to stipulate that the

9    name on that envelope is one of William Moorman, spelled

10   M-O-O-R-M-A-N, and an address of 1439 North Sixth Street which,

11   as I recall, is the address for the execution of this search

12   warrant; is that correct?

13         THE COURT:  The record will so reflect, Mr. McVay.

14         MR. MCVAY:  Thank you, Your Honor.

15      BY MR. MCVAY:

16   Q.    Now, we saw many items of evidence that you described

17   from the exhibit -- or, I'm sorry, the evidence list, and

18   perhaps it might make sense to pull that up again.  I believe

19   that is Item 28-7, pages 5 and 6.

20         THE CLERK:  Which one are you referring to, Mr. McVay?

21         MR. MCVAY:  28-7, pages 5 and 6.

22         THE CLERK:  Thank you.

23      BY MR. MCVAY:

24   Q.    And, in particular, I wanted to draw your attention to

25   item number 16 which you described as being a ballistic vest, I

1    believe.

2       A.    Yes, sir.

3       Q.    And that was shown in the photograph that we looked at

4    as being on top of the couch in the living room?

5       A.    Yes, sir.

6       Q.    Okay.  Is there more detail about that on your evidence

7    inventory in describing where that body armor, as you described

8    it, was found?

9       A.    Yes.  On here it says it was behind the living room

10   couch.

11      Q.    Behind the living room couch.  So I assume that means

12   that the couch had to be pulled out before that was discovered?

13   That someone had to peer behind that before finding it; it

14   wasn't laying out in plain view, if you will.

15      A.    No.  Not as depicted in the picture, no.

16      Q.    Okay.  Thank you.

17            And I believe you indicated that item number 15 came

18   from the kitchen table, that being a Springfield Armory

19   firearm?

20      A.    Yes, sir.

21      Q.    And then number 10 was also from the kitchen table?

22      A.    Yes, sir.

23      Q.    And then item number 1 was from the living room?

24      A.    Yes, on the mantle.

25      Q.    On the mantle.

1      And then item number 7 being under the cushion of the

2  sofa?

3  A.   Yes, sir.

4  Q.   Okay.  Is it correct for me to understand and say that

5  Mr. Ussury was in the living room and moving towards the

6  kitchen at the time of your entry?

7  A.   I -- I can't answer that at this time.

8  Q.   Do you have anything -- any reports or anything that you

9  reviewed prior to your testimony today which might refresh that

10  recollection?

11  A.   Let me see if he has something in the packet here.

12      If we had an identifier sheet, that may have on it

13  listed where he was found in the structure, but I don't have

14  that in front of me.

15  Q.   Okay.  Well, we'll move on to something else and perhaps

16  come back to that, if necessary.

17      Okay.  You indicated that there were on the evidence

18  inventory three separate locations in which cash was found,

19  each of those being as to number 2, which was evidence item

20  number 28-13 being $375?

21      Again, item number 2 on your evidence inventory.

22  A.   Which number again?

23  Q.   Item number 2.

24  A.   Yes, sir.

25  Q.   And it was $375 cash; is that correct?

TRIAL ONE – VOL. 8 – 966

1    A.    That is correct.

2    Q.    And, again, you said that came from Mr. Ussury.  Where

3   on Mr. Ussury did that come from?

4    A.    His right front pants pocket.

5    Q.    Okay.  And item number 5 was cash which came from

6   Mr. Patterson; is that correct?

7    A.    Yes.

8    Q.    And that came from where on Mr. Patterson?

9    A.    It says L/R pocket so I'm guessing it might have been a

10   lower -- he may have had, like, a pair of cargo pants on, I'm

11   guessing.

12   Q.    Okay.  And item number 12 was $273 cash recovered from a

13   Mr. Howard Boddie, B-O-D-D-I-E, if I can read that correctly?

14   A.    That looks similar, yes.

15   Q.    Does that look correct?

16        All right.  So those three individuals were there.  Was

17   there not also a fourth individual that had been there, a David

18   Allen?

19   A.    Without the identifier sheet, I honestly can't remember.

20        MR. MCVAY:  May I have a moment, Your Honor?

21        THE COURT:  Yes, you may.

22     BY MR. MCVAY:

23   Q.    Do you see that picture before you, Detective?

24   A.    Yes.

25   Q.    And describe what it is that you see to the jury,

1    please.

2    A.   It's a picture of a male black that was handcuffed

3    inside the house.

4    Q.   Okay.  And do you recognize that individual as having

5    been there on that day that you executed the search warrant?

6    A.   Yes, sir.

7    Q.   Would you know the name of that individual or do you

8    have any record that would indicate who that might be?

9    A.   I believe it's number 8, you said, David Allen.

10   Q.   The photograph is number 7.

11   A.   Number 7?  That says it's an east living room window.

12   Q.   Okay.  Well, it was a David Allen, right?  We've already

13   established that a Mr. Boddie was there because cash was taken

14   off him, correct?

15   A.   Yes.

16   Q.   So Mr. Allen would have been a fourth individual there?

17   A.   Yes.

18   Q.   And just to complete the record, 28-2#-008, and describe

19   for the jury what it is that you're looking at there.

20   A.   It's a picture of a female black that was also inside

21   the house.

22   Q.   Okay.  Do you know the name of that individual?

23   A.   That would be a Fontae Young.

24   Q.   Fontae Young, David Allen, and then actually three other

25   individuals, Mr. Ussury, Mr. Patterson and Mr. Boddie; correct?

TRIAL ONE – VOL. 8 –  968

1   A.   Yes.  I don't have a picture of the fifth –– or the last

2   person you said though.

3   Q.   Nor do I.  It's established by the records of people

4   that we discussed and the photographs we looked at and the

5   items of evidence we looked at which establish there were five

6   people there at a minimum, correct?

7   A.   Yes, sir.

8        MR. MCVAY:  Okay.  And, Your Honor, just to complete

9   the record, I would ask that photographs 28-2#-007 and

10  28-2#-008 be admitted into evidence.

11       THE COURT:  28-2#-007 and 28 ––

12       MR. MCVAY:  Oh, that's right, the entire series were

13  put in.

14       THE COURT:  –– and 28-2#-008 were already admitted

15  into the record, Mr. McVay.  But you may publish 007 and 008.

16       MR. MCVAY:  Thank you, Your Honor.

17       THE COURT:  If they haven't been published already.

18       MR. MCVAY:  Thank you.

19     Are they published?

20       THE CLERK:  Yes.

21       MR. MCVAY:  Okay.  Has the jury had an opportunity to

22  see both?

23       THE CLERK:  No.  He needs to go back one.

24       MR. MCVAY:  Go back to 007.

25   BY MR. MCVAY:

TRIAL ONE – VOL. 8 – 969

1    Q.   All right.  007, again, was David Allen from your

2    recollection and your earlier testimony?

3    A.   Yes, sir.

4    Q.   008 was Fontae Young?

5    A.   Fontae Young, yes, sir.

6    Q.   Okay.  Detective Kifer, one of the things you do as a

7    result of collecting evidence, is it not, is to perhaps ask for

8    laboratory testing to be done on particular items of evidence?

9    A.   Yes, sir.

10   Q.   And I assume laboratory testing was done on the items of

11   cocaine?

12   A.   Yes, sir.

13   Q.   And essentially there were two different places in which

14   cocaine was found, crack cocaine; one in the kitchen floor

15   grate.

16   A.   Yes.

17   Q.   And then one on the kitchen countertop.

18   A.   Kitchen table, yes, sir.

19   Q.   Kitchen table.

20        Okay.  And I presume those were tested.

21   A.   Yes, sir.

22   Q.   And one of the other things that you can do is either --

23   as we've had other detectives describe to us -- have firearms

24   tested for either fingerprints or DNA.  One or the other; is

25   that fair to say?

TRIAL ONE – VOL. 8 –   970

1     A.    Yes, sir.

2     Q.    And is it also fair to say that neither approach was

3     taken with regard to the firearms that were recovered from this

4     scene; there was no DNA testing requested, there was no

5     fingerprint testing for latents as to those firearms.  Is that

6     correct?

7     A.    Without the lab request in front of me, I can't answer

8     that.

9          MR. MCVAY:  Okay.  If I may have another moment,

10    Your Honor.

11         THE COURT:  Yes, you may, Mr. McVay.

12         MR. MCVAY:  28-5-004.

13     BY MR. MCVAY:

14    Q.    Okay.  Would you describe for the jury what it is that

15    you're looking at there?

16    A.    This is our request for laboratory examination for the

17    items that were turned in under property number 06-19890.

18    Q.    Okay.  And if you'd take a moment to review that, and

19    then let me know whether that refreshes your recollection as to

20    whether any latents were attempted or whether DNA testing was

21    requested of the firearms.

22    A.    The firearms were checked for operation.  Items 1, 7 and

23    15.  And items number 1, 3 -- I'm sorry, 3, 6, 8 and 14 were

24    checked for prints.

25    Q.    If we could return to the inventory list, 28-7, you said

TRIAL ONE – VOL. 8 –  971

1  3, 6, 8 and 14 for prints?  Pages 5 and 6.

2       We had 3, which was the plate with residue, correct?

3  A.   Correct.

4  Q.   Six, which was a package of crack cocaine from the air

5  vent; is that correct?

6  A.   Correct.

7  Q.   And then we have 8 and 14; 8 being scales?

8  A.   Yes, sir.

9  Q.   And then if we go to the second page, 14 -- I can't read

10  what that is on my copy.

11  A.   I believe it says two glass beakers with residue.

12  Q.   Okay.  Thank you.

13       So, again, in reviewing that lab request, it does not

14  indicate that any DNA testing or latent print testing or

15  examination was requested of the firearms, correct?

16  A.   There were prints -- I think the prints were just for

17  the crack and the items that were -- the beakers and the plate.

18  Q.   And, again, just to be clear, there was no request that

19  latents be attempted to be recovered from firearms.

20  A.   No, sir.

21  Q.   And there was no request for DNA testing to be done as

22  to firearms.

23  A.   No, sir.

24       MR. MCVAY:  Thank you.

25       I have no further questions, Your Honor.

1          Thank you, Detective.

2             THE COURT:  Thank you.

3          Mr. Nolder, any questions?

4             MR. NOLDER:  No.

5             THE COURT:  Mr. Martinez, any redirect?

6             MR. MARTINEZ:  Your Honor, I have no redirect, but I

7     would add that this might be an appropriate time for the

8     stipulation to be read that we discussed earlier.

9             THE COURT:  Could you approach to -- I want to make

10    sure that I'm reading the correct stipulation.

11        (Thereupon, Court and Counsel conferred out of the hearing

12    of open court and off the record.)

13        (The following proceedings were had in open court.)

14            THE COURT:  Ladies and gentlemen, it is hereby

15    stipulated between the parties that on August 26, 2008, Deounte

16    Ussury pleaded guilty to possession of cocaine, an F3, for

17    having possessed cocaine on August 15, 2006.

18            And, ladies and gentlemen, you will recall that I

19    indicated to you that you are to determine from the evidence

20    presented what the facts are, and that's basically the

21    contested facts.  Those matters which have been stipulated to

22    or to which the parties have otherwise agreed are not facts

23    that you need to find.

24            With that being said, I believe that there is nothing

25    further for Officer Kifer; is that correct, Mr. Martinez?

TRIAL ONE – VOL. 8 –  973

1          MR. MARTINEZ:  That's correct, Your Honor.  Thank you.

2          THE COURT:  Detective Kifer, you may be excused.

3     Thank you very much, sir.

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  Mr. Kelley, your next witness.

6          MR. KELLEY:  Thank you, Your Honor.  We call Eric

7     Poliseno.

8          THE CLERK:  Sir, come forward and be sworn, please.

9        (Witness sworn.)

10          THE COURT:  Mr. Kelley, please proceed.

11          MR. KELLEY:  Thank you, Your Honor.

12                        – – –

13                     ERIC POLISENO

14     Called as a witness on behalf of the Plaintiff,

15     being first duly sworn, testified as follows:

16                   DIRECT EXAMINATION

17     BY MR. KELLEY:

18     Q.    Would you please state your name and spell your last

19     name for us?

20     A.    Eric Poliseno, P-O-L-I-S-E-N-O.

21     Q.    And can you tell us who you work for, please?

22     A.    City of Columbus Division of Police.

23     Q.    How long have you been with CPD?

24     A.    Just over 20 years.

25     Q.    And where is your job currently?

TRIAL ONE – VOL. 8 –   974

1    A.    I currently work in our vice unit.

2    Q.    I want to draw your attention back to the fall of 2006.

3  What job did you hold at that time?

4    A.    I was working patrol on the north end of Columbus.

5    Q.    Can you briefly describe for the jury the area that you

6  patrolled?

7    A.    I worked the South Linden area.

8    Q.    And for those who may not be from Central Ohio, can you

9  explain where South Linden is?

10    A.    Basically north of East Fifth Avenue to about Hudson

11  Street.

12    Q.    Are you familiar with an area called the Short North?

13    A.    I am.

14    Q.    Can you tell us in relation to the Short North, where is

15  the South Linden area?

16    A.    It would be just east of the other side of I-71.

17    Q.    And generally what were your responsibilities as a

18  patrol officer in that area?

19    A.    To handle calls for service, traffic, typical.

20    Q.    Drawing your attention to a specific date, November 20

21  of 2006, there was an incident at Joyce Park or in that area.

22  Do you recall that incident?

23    A.    I do.

24    Q.    Can you tell the ladies and gentlemen of the jury what

25  happened that day?

1    A.    On that day I was responding to a burglary alarm at a

2    church at a location just a little bit south of the park.  I

3    was completing some paperwork in my car regarding the alarm,

4    heard initially what I thought was an explosion.  Got out of my

5    car, realized it was just multiple gunshots going off.  Tried

6    to determine where they were coming from.  From the direction

7    it sounded like they were coming from, it was coming from the

8    park which was a little north and west of my location.  Began

9    airing the information with our radio, had what I'm quite sure

10   were at least four to five rounds pass over my head at the

11   time.  Responded up to the park from there.

12   Q.    Can you estimate for us in terms of distance about how

13   far away from the park were you?

14   A.    I would say it's two to three hundred yards at least.  I

15   aired with radio that I felt someone up there probably was

16   using a rifle just the distance I was from the park to have

17   rounds going by me.

18   Q.    Do you know, does the park have a specific name or does

19   it go by several names?  The park itself, if you're familiar.

20   A.    It does have a specific name.  I just can't think of it

21   right now.  I'm sorry.  That was 10 years ago.

22   Q.    Sure.

23         What are you doing on your way to this area?

24   A.    Like I said, I aired what information I had with radio.

25         During my short trip there, they advised that there was

TRIAL ONE – VOL. 8 –  976

1    a gun run.  I responded to see what I could do, whether it was

2    a shooting victim or whether I could stop what was going on.

3    Q.   And what do you see when you get there?

4    A.   As I was pulling on to Joyce Avenue, there were multiple

5    cars pulling out of the park going different directions.  I

6    pulled into the park; there was one gentleman down on the

7    pavement inside the park on the west end as I pulled in.  I got

8    out to check on him.  He had said he had been shot.

9         As I was speaking to him, another gentleman started

10   limping up to me just from west of the location closer to the

11   playground also stating he had been shot.

12   Q.   Did you see other activity going on around you?

13   A.   Yes.  I had several witnesses pointing to another person

14   or two that were going up the wood line between the park and

15   Billiter which is the next road west of the park.

16   Q.   Did you see any signs of gunfire damage around you?

17   A.   Absolutely.  The metal trash canisters within the park

18   itself were riddled with bullet holes.  There was shell casings

19   of all shapes and sizes lying all over the parking lot and

20   surrounding grassy areas.

21   Q.   Had you ever seen a scene like that before?

22   A.   That much, no.

23   Q.   Have you ever seen a scene like that after?

24   A.   No.

25   Q.   Can you tell us streets?  What are the -- what's the

TRIAL ONE – VOL. 8 –   977

1    closest intersection to this park area?

2    A.    It would be East 17th Avenue and Joyce Avenue.

3    Q.    Were you able to identify any of the people at the

4    scene, or was that your responsibility at the time?

5    A.    At that point I called for medics for the two gentlemen

6    that were hurt.  There was what ended up being a coat laying in

7    the grass.  Somebody pointed out that there was another victim,

8    and I was airing the information for the incoming other patrol

9    units for the gentlemen going up the wood line so my basic

10   responsibilities at that point were containing what I had and

11   maintaining whatever scene security I could until I had some

12   help.

13         MR. KELLEY:  If I may have a moment, Your Honor?

14         THE COURT:  Yes.

15         MR. KELLEY:  I have no further questions, Your Honor.

16      Thank you.

17         THE COURT:  Thank you.

18      Mr. Durden?

19         MR. DURDEN:  No questions.

20         THE COURT:  Mr. Gatterdam?

21         MR. GATTERDAM:  No questions.

22         THE COURT:  Ms. Dixon?

23         MS. DIXON:  No questions.

24         THE COURT:  Mr. McVay?

25         MR. MCVAY:  No, Your Honor.

1    THE COURT:  Mr. Nolder?

2    MR. NOLDER:  No questions.

3    THE COURT:  Thank you very much, Officer Poliseno.

4  You may be excused.

5    THE WITNESS:  Thank you, sir.

6    MR. DEVILLERS:  Next witness, Your Honor?

7    THE COURT:  Yes.

8    MR. DEVILLERS:  The United States would call Jason Law

9  to the stand.

10    Your Honor, may we approach briefly?

11    THE COURT:  Yes.

12    (Thereupon, Court and Counsel conferred out of the hearing

13  of open court and off the record.)

14    (The following proceedings were had in open court.)

15    THE COURT:  Ladies and gentlemen, we're going to take

16  a brief briefer recess because we're leaving at 4:00 today, but

17  we all need a bio break and so we're going to stand in -- we're

18  going to try to get everything taken care of by 3:15.  So I'll

19  ask that you be back in the jury room by 3:15 in about 10

20  minutes, and as soon as everything is organized, we'll have you

21  back in.  Remember my admonition not to discuss any aspect of

22  the case.

23    (Recess taken from 3:07 p.m.to 3:19 p.m..)

24    THE COURT:  Mr. DeVillers, your next witness.

25    MR. DEVILLERS:  Thank you, Your Honor.  The United

TRIAL ONE – VOL. 8 – 979

1   States calls Officer Jason Law.

2        THE COURT:  Officer Law, please come forward and be

3   sworn.

4      (Witness sworn.)

5        THE COURT:  Officer Law, would you bend that

6   microphone toward you and speak clearly into it?

7        THE WITNESS:  Yes, sir.

8        THE COURT:  Thank you.

9        Mr. DeVillers, please proceed.

10        MR. DEVILLERS:  Thank you, Your Honor.

11                      – – –

12                      JASON LAW

13    Called as a witness on behalf of the Plaintiff,

14    being first duly sworn, testified as follows:

15                   DIRECT EXAMINATION

16   BY MR. DEVILLERS:

17   Q.   Good afternoon.

18   A.   Good afternoon.

19   Q.   Can you please state your full name and spell your last

20   name?

21   A.   Sure.  It's Jason Law, L-A-W.

22   Q.   Who do you work for?

23   A.   Columbus police department.

24   Q.   What do you currently do for the Columbus police

25   department?

TRIAL ONE – VOL. 8 –  980

1    A.   At the moment I'm a patrol officer for Zone 5 evening

2   midwatch.

3    Q.   Say that slower.

4    A.   I'm sorry.  I'm a patrol officer for Zone 5 evening

5   midwatch.

6    Q.   And where is Zone 5?

7    A.   It's pretty much, like, a quarter or a fifth of the

8   city.  Downtown area out towards Gahanna.

9    Q.   Back in -- I'm going to take you back to 2006.  What

10  were your duties?

11   A.   At that time I was a parole officer then also, but I was

12  for 5 Precinct on second shift.

13   Q.   Okay.  5 Precinct is about where?

14   A.   5 Precinct is Cleveland Avenue from Fifth Avenue up to

15  Hudson, and then from the interstate around 71 out to Sunbury

16  Road.

17   Q.   Is that the Linden area?

18   A.   That's correct.

19   Q.   And you said midwatch.  What's that?

20   A.   Midwatch is what my current assignment is.  It's an

21  overlap shift that we take care of -- the normal shifts are

22  first, second and third, and our duties are to take care of any

23  kind of -- whenever the shifts are changing to make sure that

24  runs are taken care of.

25   Q.   In 2006, you were what?

TRIAL ONE – VOL. 8 – 981

1    A.   2006, I was second shift.  I worked 2 o'clock til 10

2    o'clock.

3              THE COURT REPORTER:  I'm sorry.  2006 you were?

4              THE WITNESS:  I was second shift for 5 Precinct.  I

5    got on at 2:00 p.m, and I was relieved at 10:00 p.m. on my duty

6    hours then.

7      BY MR. DEVILLERS:

8    Q.   Okay.  I want to take you specifically to November 20,

9    2006.  Do you recall that date?

10   A.   I do.

11   Q.   Okay.  Do you recall hearing gunshots or being called to

12   an area?

13   A.   That's correct.  An officer had come across the radio

14   and stated that he had gunshots in his area and needed

15   assistance.

16   Q.   Where were you at the time, do you recall?

17   A.   At that time it was right about shift change when we

18   were just getting on, and we were actually at the substation

19   with roll call with your sergeant.

20   Q.   Where is the substation?

21   A.   The substation is at Eleventh Avenue and Cleveland.

22   Q.   How far away is that from where you got dispatched to?

23   A.   Probably six blocks-ish.  Five blocks, somewhere right

24   around there.  It's fairly close.

25   Q.   And so if you'd get out at 2 o'clock, would this be

TRIAL ONE – VOL. 8 –  982

1    approximately 2 o'clock-ish?

2        A.    That's correct.

3        Q.    Once you got the call, what did you do?

4        A.    At that time, like I stated, we were actually in roll

5    call.  Instead of -- normally you get cruisers assigned to you

6    and partners, if you have a partner, and then you go.

7             When runs like that come in, instead we just have to get

8    there to make sure that we can take care of the officer that

9    needs taken care of and make sure that everybody is safe.  So

10   instead I just went and grabbed a set of keys.  The sergeant

11   didn't have time to issue us what cars or where we were going.

12   And then whatever person got keys obviously was the driver, and

13   then whatever other officers would just jump in whatever vacant

14   seats were in the cruisers to get where we needed to get to

15   cake care of whatever the case may be.

16       Q.    I guess I should ask you, what's a substation?

17       A.    The substation is where we report on a daily basis to

18   begin our tour of duty.  It's where we acquire our -- in 2006,

19   back then we would get walkies, cruisers, shotguns if we

20   carried shotguns.  And then we have a roll call with our

21   sergeant where the sergeant would normally give us what we were

22   going to do that day, if there's any crime patterns that need

23   to be taken care of, anything serious that maybe happened on

24   first shift that needed to be passed on to second shift, things

25   of that nature.

TRIAL ONE – VOL. 8 – 983

1    Q.   Okay.  So the call comes in, you grab the keys, you jump

2    in a cruiser.  Do you remember who gets in with you or how

3    many?

4    A.   I think two other officers got in with me.  I was

5    driving.  Officer O'Connor, and I think Officer Watson was the

6    other officer that jumped in with me.

7    Q.   Okay.  Where did you head to?

8    A.   We headed over to Windsor Terrace, which is a Section 8

9    housing area that there's usually a lot of problems at.  That

10   was where the call come in that there was lots of shots being

11   fired.

12   Q.   Is there a park in that area?

13   A.   There is a park.  There's a couple parks.  St. Stephens

14   rec center is just to the north, and then there's another

15   little park to the -- what is that, the west -- northwest.

16   Q.   Which one did you go to?

17   A.   We went -- initially, we went actually into Rosewind,

18   which is the apartment complex -- or where the housing is.  And

19   then later on we then went to St. Stephens rec center, which is

20   north of which is the bigger one off of 17th.

21   Q.   When you went to the housing complex, what did you see?

22   A.   At that time the chopper was airing that he had an

23   individual who bailed out of a car that he needed us to go over

24   and apprehend.  He was wearing a Carhartt outfit.

25        We were -- we turned from Terrace Lane on to, I think it

TRIAL ONE – VOL. 8 –  984

1    was Rosewind.  And when we turned on Rosewind, myself, Officer

2    O'Connor -- I'm not sure -- I think Officer Watson was actually

3    in the back so she had a hard time seeing, but we both realized

4    that there was an individual wearing a Carhartt outfit just to

5    the south on Rosewind.  And we jumped out, made the

6    apprehension, chopper acknowledged that we had the right guy,

7    and then that was -- on that instance, that was when we made

8    that apprehension.

9    Q.   And a chopper is what?

10   A.   The chopper is the helicopter that is obviously flying

11   through the air and has a very good set of eyes for us to help

12   us find, locate individuals, cars, things of that nature.

13   Q.   And to be clear, this is 2:00 p.m.?

14   A.   That's correct.

15   Q.   So what was the weather like?

16   A.   It's -- it seemed cooler.  It was cold because it was

17   November, but there was not any adverse snow, rain, stuff like

18   that.

19   Q.   By the time you got in your cruiser, was the chopper

20   already in the area?

21   A.   Yes.  The chopper was -- when the initial call come

22   out -- our chopper was always in the air so the chopper was

23   already up.  Where in the city he came from, I can't say.

24        But by the time I made it into Rosewind, yeah, the

25   chopper was overhead and was calling out people and cars for us

TRIAL ONE – VOL. 8 –  985

1  to apprehend or make contact with.

2    Q.    Did you hear any shots while you were at the substation?

3    A.    When we were getting in the car, we could hear a couple.

4  At that -- you could tell there were some shots, but we were

5  far enough away that I couldn't tell you how many or for the

6  length of time.

7    Q.    Where was the person -- as far as did you see this

8  person in the Carhartt outfit, was he walking, was he running?

9  What was he doing?

10   A.    When we come around the corner, he was in the -- he was

11  in the front yard which was on the south side of the road.

12        Once we come -- we come up fairly quickly and jumped

13  out, he -- he was just standing there.  He was not running from

14  us at that time.

15   Q.    Did he try to struggle or anything when you grabbed him?

16   A.    No, he did not.

17   Q.    Who was that person?

18   A.    That was Marcus Peters.

19   Q.    After you secured Marcus Peters, did you put him in your

20  cruiser?

21   A.    No.  I -- we ordered him onto the ground.  I then put

22  handcuffs on him.  By then, of course, we have cars coming from

23  our precinct, and there's cars coming from the southern

24  precinct which was -- it's a later precinct.

25        So when our shift change happens at 2:00, the later one

TRIAL ONE - VOL. 8 - 986

1    to the south happens at 3:00.  So they were sending cars our

2    way also because they knew that 5 Precinct was in the middle of

3    a shift change at that time and they didn't know.  So 6

4    Precinct was sending cars.

5         Once we got handcuffs on, the car that showed up and

6    pulled up closer to where we were was a 6 Precinct car, and

7    that's what car he got put into.

8    Q.   Did you pat down Mr. Peters?

9    A.   Yes, I did.

10   Q.   Did he have any weapons on him?

11   A.   No, he did not.

12   Q.   Do you know subsequently what happened -- strike that.

13        Is Mr. Peters still alive, if you have any knowledge?

14   A.   No.  As I recall, he's not.

15   Q.   He's not alive?

16   A.   He is not.

17   Q.   Okay.  After you put Mr. Peters in the car, what do you

18   do in the cruiser?

19   A.   At that time once he got put into the back of the car,

20   the helicopter once again started airing that there was another

21   individual that they wanted us to go over and apprehend, and he

22   was north of our location in a park, St. Stephens rec center

23   park.

24   Q.   Joyce Avenue, where is that in relation to St. Stephens

25   rec park?

TRIAL ONE – VOL. 8 –  987

1   A.   Joyce Avenue is to the east of where St. Stephens rec

2   is.

3   Q.   To the east?

4   A.   To the east.

5   Q.   Is the park right on Joyce Avenue?

6   A.   No.  It's west of Joyce.

7   Q.   Okay.  All right.  So you go to St. Stephens.  What do

8   you see?  What do you do?

9   A.   He was up in -- the chopper -- I'm sorry.

10       The helicopter was airing that he was against the tree

11  line so we went over and took the cruiser over the parking lot

12  actually through the grass area up to where we made -- where we

13  could see him.  And then the same thing, we went over and

14  ordered him and put him in handcuffs.  And then that individual

15  was actually subsequently put in the back of our car.

16  Q.   Did you pat him down?

17  A.   That's correct, I did.

18  Q.   Did he have any weapons on him?

19  A.   He did not.

20  Q.   All right.  What did you do after you arrested -- who

21  was that individual?

22  A.   That was Deshawnte Crawford.

23  Q.   After you arrested Mr. Crawford, what did you do?

24  A.   At that time we then -- because there was lots of

25  officers with lots of individuals and lots of evidence with

TRIAL ONE – VOL. 8 –  988

1   casings and the like, once the detectives got called, we

2   literally sat there.  We would check him to make sure he

3   doesn't have any warrants, make sure that they have already had

4   mug shots, fingerprints, things of that nature through our

5   department, and we literally held him in the car until

6   detectives arrived and were subsequently ordered to do what we

7   were told to do with the detectives.

8   Q.   Were there a lot of cruisers there at the scene?

9   A.   There was cruisers from multiple precincts and multiple

10   officers, yes, there was lots.

11   Q.   Tell us a little bit about what you observed at the

12   park.

13   A.   In the park there was there was a lot of different

14   individuals around.  There was a lot of cruisers in different

15   areas because each cruiser was at a different place, whether

16   they were subsequently holding evidence as in shell casings,

17   individuals that needed to be talked to by the detectives,

18   things of that nature.  There was a lot of -- a lot of traffic.

19   Q.   Once you got to the scene, right away did you know what

20   happened?

21   A.   We knew that there was -- there were shots fired.

22   Obviously that's the way the call came in.

23       Who the shots were fired at, who -- any of that stuff,

24   no, I had no idea what the reasoning was.

25   Q.   Could you tell me a little bit just kind of generally

1   what's the difference between a patrol officer and a detective?

2    A.   Patrol officers get to wear this nice fancy uniform that

3   I have on.  We actually stay in cruisers.  We take whatever

4   runs might come in from civilians or whoever will call and have

5   us go over and assist them.  We then also, we uphold the Ohio

6   Revised Code, the city code and the traffic code for

7   enforcement.

8        Detectives obviously do not wear the uniform we have.

9   Their job is to be in their specific bureau, wherever it may

10  be, whether it's our headquarters and stuff like that, and

11  investigate different crimes depending what they are, whether

12  it's sex abuse crimes would have that type of detective,

13  assault squad would have some.  Obviously homicide would have

14  another.

15   Q.   Would you as a patrolman in the same situation you just

16  give us once you get to a scene, would you go around

17  interviewing people or would detectives do that?

18   A.   No, detectives would do all the interviews.

19   Q.   How about crime scene collection?

20   A.   Crime scene?  No.  We would hold the scene, we would not

21  collect anything.

22   Q.   Okay.  Let's say you found a particular item, a gun,

23  shell casings, whatever.  Would you flag that down for the

24  detectives?

25   A.   We would -- yes, we would flag it down.  We would

TRIAL ONE – VOL. 8 –  990

1   possibly –– either we could take cones and put cones down for

2   where casings are, put crime scene tape up to hold different

3   areas if there's a large span of evidence around.  Whatever we

4   can do to make sure that all the evidence that's in the area is

5   not disturbed by anyone.

6           MR. DEVILLERS:  May I have a moment, Your Honor?

7           THE COURT:  Yes, you may.

8           MR. DEVILLERS:  Nothing further, Your Honor.

9           THE COURT:  Thank you.

10       Mr. Durden, any cross?

11          MR. DURDEN:  No cross, Your Honor.

12          THE COURT:  Mr. Gatterdam?

13          MR. GATTERDAM:  No, Your Honor.

14          THE COURT:  Ms. Dixon?

15          MS. DIXON:  No, Your Honor.

16          THE COURT:  Mr. McVay?

17          MR. MCVAY:  Yes, Your Honor.

18          THE COURT:  All right.

19                          – – –

20                   CROSS-EXAMINATION

21     BY MR. MCVAY:

22   Q.   Good afternoon, Officer Law.

23   A.   Good afternoon.

24   Q.   My name is Kirk McVay.  Greg Meyers and I represent

25   Deounte Ussury.  I just have a few questions for you.

1      In your testimony you said that at the time that you

2  became aware of this incident, that you were in roll call.

3    A.   That's correct.

4    Q.   And that was at Substation 5, which you indicated was at

5  Eleventh and Cleveland?

6    A.   That's correct.

7    Q.   Being at Eleventh and Cleveland, and the Rosewind

8  apartments -- well, for the jury's sake, can you describe where

9  those are in relation to your substation?

10   A.   Yes.  Pretty much due east of there.

11   Q.   Due east.

12        And when you say due east, how far would it be from

13  Eleventh and Cleveland?

14   A.   The start of the Windsor Terrace and all that area is

15  probably only a couple blocks.  Where we made the apprehension

16  was probably four or five-ish.

17   Q.   And I presume that you're fairly familiar with the

18  layout of the Rosewind apartments; is that fair to say?

19   A.   That's correct.

20   Q.   How many streets are there, maybe four?

21   A.   If you count the little, like, Indigo Way, I mean, there

22  is probably six-ish maybe.

23   Q.   Brooks?

24   A.   Brooks.

25   Q.   St. Clair?

TRIAL ONE – VOL. 8 – 992

1    A.    Correct.

2    Q.    East Chittenden?

3    A.    Correct.

4    Q.    Is there a traffic circle there?

5    A.    No, there was no traffic circle.  There's Terrace Lane,

6    Indigo Way.

7    Q.    As Brooks comes down to Chittenden, there is not a

8    traffic circle at Chittenden and Brooks when it gets to

9    Rosewind itself, the street Rosewind?

10   A.    I don't recall a --

11   Q.    Maybe that's been added in the last 10 years.

12   A.    It very well could have been because I don't remember

13   that at all, no.

14   Q.    They weren't as prevalent 10 years ago as they are

15   today.

16   A.    No.  I have not worked that area for a few years.

17   Q.    All right.  Well, nevertheless, your testimony is that

18   you had arrested an individual in a brown Carhartt outfit, that

19   being Marcus Peters, correct?

20   A.    That's correct.

21   Q.    And is it fair to say that you arrested him in the

22   vicinity or in front of, was it 1079 Rosewind?

23   A.    That's a possibility, yes.

24   Q.    Okay.  And 1079 Rosewind in proximity to, say, 1101 East

25   Chittenden, is it fair to say that would be about a block at

TRIAL ONE - VOL. 8 -  993

1   the most?

2   A.   It would be fairly close.

3   Q.   And if you're an individual running through yards, we're

4   talking about 50 yards at the most and maybe even less than

5   that?

6   A.   It would be a short distance.

7   Q.   Okay.  And when you arrived -- after arresting

8   Mr. Peters, you indicated that you also arrested another

9   individual up near the St. Stephens community center?

10   A.   That's correct.

11   Q.   And that was Mr. Crawford?

12   A.   Correct.

13   Q.   And then from there you then went to -- was it either

14   Joyce or Maloney Park, whatever you know it as?

15   A.   No, not -- at that time once we got to -- we made the

16   apprehensions on both of them, we went over -- actually, not

17   both of them.

18       When we made the apprehension of Crawford, we went over

19   and pulled -- it very well could have been Maloney Park.  We

20   got told to go out of the area because of what was going on and

21   hold for detectives.  I can't recall where we went.

22   Q.   As I recall your testimony, you said you went to assist

23   Officer Poliseno?

24   A.   Initially, yes.  Officer Poliseno was the one that

25   actually aired that the shots were being fired, and that's why

TRIAL ONE - VOL. 8 -  994

1   we came out of the --

2   Q.   And he was over where all the shooting had taken place

3   for all intents and purposes, right?

4   A.   Correct.

5   Q.   And that's where you went after --

6   A.   I was headed that direction until the helicopter stated

7   at this time that this person needed stopped, and that's why we

8   went to Rosewind Drive and made the apprehension of Marcus

9   Peters at that time.  I never -- initially I did not make it

10  over to where Officer Poliseno was.

11  Q.   Did you ever make it over to where Officer Poliseno was?

12  A.   I don't think so.

13       MR. MCVAY:  Okay.  Good enough.  I have no further

14  questions.  Thank you, Officer.

15       MR. NOLDER:  No questions, Your Honor.

16       THE COURT:  Mr. Nolder, no questions?

17       MR. DEVILLERS:  No redirect, Your Honor.

18       THE COURT:  Officer Law, thank you very much, sir.

19  You may be excused.

20       THE WITNESS:  Thank you, Your Honor.

21       THE COURT:  Mr. Martinez, your next witness.

22       MR. MARTINEZ:  Yes, Your Honor.  Thank you.

23       The United States calls Lieutenant David Hughes.

24       THE CLERK:  Sir, come forward and be sworn, please.

25

1                              – – –

2                          DAVID HUGHES

3    Called as a witness on behalf of the Plaintiff, being first

4    duly sworn, testified as follows:

5                      DIRECT EXAMINATION

6    BY MR. MARTINEZ:

7    Q.   Good afternoon, sir.

8    A.   Good afternoon.

9    Q.   Would you please state your name and spell your last

10   name for the record?

11   A.   Lieutenant David L. Hughes, H-U-G-H-E-S.

12   Q.   Lieutenant Hughes, where are you currently employed?

13   A.   Columbus Division of Police.

14   Q.   How long have you been with the Columbus Division of

15   Police?

16   A.   With Columbus, 16-and-a-half years.

17   Q.   What are your current duties?

18   A.   I'm a police lieutenant.  My current duties, I am in

19   charge of the division's fleet, police cars, all of our

20   vehicles.  I'm in an administrative position.

21   Q.   What position did you hold in late 2006?

22   A.   Late 2006 I was a patrol sergeant assigned to the South

23   Linden area.  S5, was my assignment.

24   Q.   Can you tell us a little bit more about sort of that

25   geographic area that you were charged?

TRIAL ONE - VOL. 8 - 996

1    A.    Yeah, it's Cleveland Avenue.  It's considered the South

2    Linden area.  It runs just a little bit north of downtown up to

3    Hudson Avenue.  We patrolled -- we had 15 officers I supervised

4    on second shift, and we were all on the street out of the

5    substation at Cleveland and -- Eleventh and Cleveland was where

6    we reported out of.

7    Q.    You were also on patrol, is that what you said?

8    A.    Yes.  I was a patrol sergeant, yes.

9    Q.    I would like to direct your attention to November 20 of

10   2006, a scene near the park at Joyce Avenue and East

11   Seventeenth Avenue.

12          Do you remember that day, sir?

13   A.    I do.

14   Q.    Please explain to the ladies and gentlemen of the jury

15   how you got involved in that particular incident.

16   A.    I was leaving the substation at Cleveland and Eleventh

17   and an officer had aired on the air that he heard some shots

18   being fired in the area of the park.  Our helicopter units just

19   happened to be in the area at the time and they were overhead,

20   and they aired on our radio that they were following a vehicle

21   that was involved in the shooting and aired the description,

22   and I was the first to get there to make the traffic stop on

23   the car.

24   Q.    Did you ever make it to the park?

25   A.    I did not make it to the park because I was tied up with

TRIAL ONE - VOL. 8 - 997

1    that situation that I -- the car I pulled over.

2    Q.   All right.  So let's continue then with your pursuit of

3    this vehicle.  Was a helicopter involved?

4    A.   Yes, the helicopter was overhead following this vehicle,

5    and it was -- it was a street off of Cleveland Avenue I can't

6    remember off the top of my head, and I lit it up.  It had taken

7    off and then it stopped, and all four doors opened and all the

8    occupants of the vehicle ran out.

9    Q.   Okay.

10   A.   And a foot pursuit continued with all the occupants.

11   Q.   Was there a fifth occupant who stayed in the vehicle?

12   A.   There was -- yes, there was an occupant that had stayed

13   in the vehicle and he had been shot in the foot, and we placed

14   him in custody and under arrest.

15   Q.   All right.  And do you know who that person was?

16   A.   It was Jonathan Ransom.

17        MR. MARTINEZ:  May I have Exhibit 154-1-072, please?

18     BY MR. MARTINEZ:

19   Q.   Sir, do you recognize that photograph?

20   A.   Yes.

21   Q.   And who is depicted in that photograph?

22   A.   That is Jonathan Ransom.

23   Q.   Does Jonathan Ransom have a nickname?

24   A.   Yes, he did.

25   Q.   What was it?

TRIAL ONE – VOL. 8 – 998

1    A.    It was One Tough Creampuff.

2    Q.    Okay.  He actually wanted people to call him that?

3    A.    Allegedly, yes.  This is his calling, yes.

4         MR. MARTINEZ:  Your Honor, at this time we'd move for

5    the admission of Exhibit 154-1-072.

6         THE COURT:  It will be admitted.  154-1-072 will be

7    admitted and may be published.

8         Any objection, Mr. Durden?

9         MR. DURDEN:  No, Your Honor.

10         MR. GATTERDAM:  No, Your Honor.

11         MS. DIXON:  No, Your Honor.

12         MR. MCVAY:  No, Your Honor.

13         MR. NOLDER:  No, sir.

14    BY MR. MARTINEZ:

15    Q.    So, again, now that the ladies and gentlemen of the jury

16    can see the photo, that is One Tough Creampuff in the photo

17    there?

18    A.    Yes.  Very memorable.

19    Q.    You can't make this stuff up.

20         Now, did you say that Mr. Ransom was injured?

21    A.    Yes.  He had a gunshot wound to his ankle, I don't know

22    which one, but he was bleeding.

23    Q.    Was he bleeding?

24    A.    Yes.

25    Q.    Was he placed under arrest?

TRIAL ONE – VOL. 8 –  999

1     A.   Yes.  He couldn't get too far away from me.

2     Q.   Was he searched?

3     A.   Yes.

4     Q.   So you patted him down?

5     A.   Yes.

6     Q.   Did you find anything of interest when you patted him

7   down?

8     A.   There was a bag of marijuana on his person.

9     Q.   Was Mr. Ransom given medical attention?

10     A.   Yes.

11     Q.   Do you know what became of the other four occupants of

12   the vehicle, the four that you said jumped out before you got

13   there?

14     A.   I'm sorry, I don't remember.

15     Q.   That's fine.

16         MR. MARTINEZ:  No further questions, Your Honor.

17         THE COURT:  Thank you.

18         MR. DURDEN:  No questions, Your Honor.

19         THE COURT:  Mr. Gatterdam?

20         MR. GATTERDAM:  No questions.

21         THE COURT:  Ms. Dixon?

22         MS. DIXON:  No questions.

23         THE COURT:  Mr. McVay?

24         MR. MCVAY:  Yes, Your Honor.

25

TRIAL ONE – VOL. 8 – 1000

```
1                            -  -  -

2                        CROSS-EXAMINATION

3        BY MR. MCVAY:

4        Q.   Good afternoon, Lieutenant Hughes.

5        A.   Good afternoon.

6        Q.   I'm sure I'm not going to be the first one to say it,

7    but since my reports say in 2006 you were a sergeant,

8    congratulations on your promotion.

9        A.   Thank you.

10       Q.   I'm assuming that the promotion has been much longer

11   than just a day or two.

12       A.   Yes, 2011.

13       Q.   Congratulations, nevertheless.

14            You indicated that you were informed that the doors

15   opened up and four individuals and occupants fled, correct?

16       A.   Correct.

17       Q.   And that you had detained and arrested Jonathan Holt --

18   not Jonathan Holt, I'm sorry -- Jonathan Ransom.

19       A.   Jonathan Ransom, yes.

20       Q.   And, in fact, you patted him down and searched him?

21       A.   Yes.

22       Q.   Do you remember, did you find any contraband or anything

23   like that?

24       A.   We found a baggie of marijuana.  I don't remember how

25   much, but it was a small amount.
```

TRIAL ONE - VOL. 8 - 1001

1    Q.   Okay.  And then he was taken to the hospital for his

2    injury?

3    A.   Yes, he was taken to the hospital.  And I stayed with

4    him in the hospital, and then I think we were able to -- we

5    took him to headquarters to -- at a later time to process him.

6    Q.   Okay.  And, again, thinking back on 10 years, I

7    understand it may be difficult to remember and you testified on

8    direct that you're not sure what happened to the other four

9    guys, but do you remember ever hearing the names of the other

10   four individuals who had been arrested?

11   A.   I probably did.  I just -- I don't remember now.

12   Q.   If I were to say the names, do you think you might

13   recognize them?

14   A.   Possibly.

15   Q.   Dominic Holt Reed, Nic Nic?

16   A.   I probably need to back up.  Before I was promoted

17   sergeant I worked the Short North area and I worked the Fourth

18   and Eighth area, and so I would recognize that name from my

19   time patrolling the area.  But I -- I do know Nic Nic, but I

20   don't remember if it was that night if he was involved or not.

21   I just -- I'll be honest, I don't remember the four names.

22   Q.   Okay.  How about a Terrel Patterson?

23   A.   T-Patt?  I remember T-Patt.  I don't remember if he was

24   named that night.

25   Q.   Do you remember whether there had been a gun that had

TRIAL ONE – VOL. 8 – 1002

1   been recovered that had been attempted to be tossed up on a

2   roof and had fallen down?

3   A.   I do vaguely remember that, yes.

4   Q.   Does that help your recollection as to whether T-Patt

5   would have been involved in those four people?

6   A.   If it was in the Rosewind subdivision, my memory serves

7   me correctly there was a foot chase involving and a gun was

8   thrown up on a roof, I believe, and I believe it was T-Patt.

9   Q.   Tysin Gordon?

10   A.   I know the name, but I don't know for sure.

11   Q.   You don't have any specific recollection whether those

12   three individuals and Marcus Peters would have constituted the

13   four that fled this --

14   A.   I know the names, but I can't say that they were for

15   sure the four in the car from my traffic stop.  I just don't

16   remember.

17        MR. MCVAY:  Okay.  Thank you for your attempt.

18      No further questions, Your Honor.

19        MR. NOLDER:  No questions, Judge.

20        THE COURT:  All right.  Mr. Martinez, I take it you

21   have no redirect; is that right?

22        MR. MARTINEZ:  That's correct, Your Honor, no

23   redirect.

24        THE COURT:  Officer Hughes, thank you very much, sir.

25   You may be excused.

TRIAL ONE – VOL. 8 – 1003

1      THE WITNESS:  Thank you.

2      THE COURT:  Mr. Martinez, if you have another witness

3  who is going to take a maximum of 10 minutes, you may call him;

4  otherwise, we're done for the day.

5      Which do you have?

6      MR. MARTINEZ:  I think we can do it in 10 minutes,

7  Your Honor.

8      THE COURT:  All right.  Call him.

9      MR. MARTINEZ:  Sergeant Steven Oboczky.

10      THE COURT:  Officer Oboczky, please come forward and

11  be sworn.

12    (Witness sworn.)

13      THE COURT:  Officer, please bend the mic toward you

14  and speak clearly into it.

15      THE WITNESS:  Yes, Your Honor.

16      THE COURT:  Thank you.  Please proceed.

17      MR. MARTINEZ:  Thank you, Your Honor.

18                  - - -

19                STEVEN OBOCZKY

20   Called as a witness on behalf of the Plaintiff,

21   being first duly sworn, testified as follows:

22              DIRECT EXAMINATION

23    BY MR. MARTINEZ:

24  Q.   Good afternoon, Sergeant.

25  A.   Good afternoon.

TRIAL ONE – VOL. 8 – 1004

1   Q.   Will you please state your name for the record and spell

2   your last name?

3   A.   My name is Sergeant Steven Oboczky.  The last name is

4   O-B-O-C-Z-K-Y.

5   Q.   Sergeant Oboczky, where are you currently employed?

6   A.   The Columbus Division of Police.

7   Q.   When did you join the Columbus Division of Police?

8   A.   In 2003.

9   Q.   What are your current duties with the Columbus Division

10  of Police?

11  A.   I'm a sergeant for the Community Response Team.

12  Q.   And what is the Community Response Team?

13  A.   It's a group of 10 officers, and we handle projects in

14  the north area of Columbus.  It can include human trafficking,

15  drug complaints all the way to speeding complaints.

16  Q.   Okay.  A whole variety of things?

17  A.   Whatever the community needs.

18  Q.   All right.  What position did you hold in late 2006?

19  A.   I worked on 5 Precinct as an officer.

20  Q.   What is the 5 Precinct, sir?

21  A.   That's the South Linden area.

22  Q.   And, again, geographically for those who might not know,

23  what is that area?

24  A.   The substation is at East Eleventh Avenue and Cleveland

25  Avenue.  It's -- the south border would be East Fifth Avenue,

TRIAL ONE - VOL. 8 - 1005

1  the north border would be Hudson or Mock Road as you proceed

2  east, and the east border would be Sunbury Road and the west

3  border would be I-71.

4  Q.    Thank you.

5         Sergeant, I would like to direct your attention to

6  November 20, 2006, and an incident that occurred at a park near

7  Joyce Avenue and East Seventeenth Avenue.

8         Do you recall that?

9  A.    Yes.

10  Q.    Please describe for the ladies and gentlemen of the jury

11  how you got involved in that particular incident.

12  A.    It was actually close to shift change.  So when the run

13  went out, I was at the substation and heard the dispatcher air,

14  I believe, a shooting call at Seventeenth and Joyce at Maloney

15  Park.

16  Q.    So there's a park there?

17  A.    Yes, sir.

18  Q.    You said it was near shift change.  What time of day

19  would that be?

20  A.    2 o'clock was shift change so somewhere around

21  2:30-ish --

22  Q.    P.m. or a.m., sir?

23  A.    P.m., I'm sorry.

24  Q.    That's okay.

25         All right.  So when the call went out, what did you do?

1    A.    I proceeded towards the location when I heard the

2    helicopter say that some of the people that were involved in

3    the shooting were running towards Rosewind, or commonly

4    referred to as Windsor Park or Windsor Terrace.

5    Q.    What's Windsor Terrace?

6    A.    It's a housing development that runs east of Cleveland

7    Avenue between Eleventh and Windsor Avenue.

8    Q.    When you heard from the helicopter that some suspects

9    had been in that area, what did you do?

10   A.    I proceeded to the area of Windsor Terrace.  And one of

11   the helicopter pilots said that they had seen one of the people

12   that were running throw an object near some bushes by one of

13   the houses so I went to that area to see what was there.

14   Q.    When you got to that area, did you search the bushes and

15   other places around those houses?

16   A.    Yes.

17   Q.    Did you find anything of interest when you did your

18   search?

19   A.    Yes.  A handgun.

20   Q.    Anything else?

21   A.    I believe there was a cell phone near the handgun.

22   Q.    All right.  So when you're in that situation and you

23   find a piece of evidence like that in a crime scene, as a

24   patrol officer what do you do next?

25   A.    I just stood next to the handgun on guard duty waiting

TRIAL ONE – VOL. 8 – 1007

1   for what would be our crime scene unit to come and collect the

2   evidence.

3     Q.   So you just sort of secure the scene?

4     A.   I just stand and secure.  I'm out of the incident at

5   that point.  I'm just standing there waiting for the evidence

6   to be collected.

7     Q.   But you don't pick up the gun; someone else does that?

8     A.   That's correct.  Our crime scene people would collect

9   the evidence.

10    Q.   Did you ever actually make it to the park on Joyce, or

11  was that sort of the end of your role?

12    A.   No, sir.  That was the end of my role.

13        MR. MARTINEZ:  No further questions, Your Honor.

14        THE COURT:  Thank you.

15     Mr. Durden?

16        MR. DURDEN:  No, Your Honor.

17        THE COURT:  Mr. Gatterdam?

18        MR. GATTERDAM:  No.

19        THE COURT:  Ms. Dixon?

20        MS. DIXON:  No.

21        THE COURT:  Mr. McVay?

22        MR. MCVAY:  No, Your Honor.

23        MR. NOLDER:  No, Your Honor.

24        THE COURT:  Thank you very much.

25        Officer Oboczky, thank you, sir.  You may be excused.

TRIAL ONE – VOL. 8 – 1008

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Ladies and gentlemen, that will conclude

3     our taking of evidence today.  We'll resume Monday morning

4     promptly at 9:00 with a continuation of the government's case.

5     I want to just remind everyone that over this what will for you

6     be a long weekend, you're not to discuss any aspect of the

7     case, including any of the testimony that you may have heard,

8     any of the observations made by any of the counsel or by me.

9     You can blame me for the gag order under which you must labor,

10    as I don't mind that one bit.

11         I do wish, however, that since it's going to be such a

12    beautiful weekend and a long weekend for you to get out and

13    enjoy the spring-like weather and do whatever you do at this

14    time of year.  Enjoy the time off.  We look forward to seeing

15    you on Monday.  Have a safe trip home and a nice safe weekend,

16    and the best of the luck to you.

17        (Jury out at 3:53 p.m.)

18          THE COURT:  Mr. Martinez?

19          MR. MARTINEZ:  Your Honor.

20          THE COURT:  Is there anything further from the --

21    please be seated, everyone.

22          MR. DEVILLERS:  I have something, Your Honor.

23          THE COURT:  Mr. DeVillers?

24          MR. DEVILLERS:  Your Honor, just that we have to add

25    Homicide Detective Jay Fulton to our witness list who was not

TRIAL ONE - VOL. 8 - 1009

1   on the witness list before.  I think because of some things

2   today, we would like to call him as a witness and we would like

3   to make that announcement.

4           THE COURT:  All right.  Do you know when you intend to

5   call him?

6           MR. DEVILLERS:  He doesn't know I'm calling him yet,

7   Your Honor, so we'll try to find that out.  But I think we can

8   wait if we need to, but sometime probably in the next two

9   weeks.

10          THE COURT:  Well, since we don't have court tomorrow,

11  tomorrow by noon I want you to provide to defense counsel

12  the -- your witnesses for Monday and the order in which you

13  will call them.

14          MR. DEVILLERS:  Yes, Your Honor.

15          THE COURT:  Mr. Durden, anything on behalf of

16  Mr. Ledbetter?

17          MR. DURDEN:  Nothing, Your Honor.  Thank you.

18          THE COURT:  Mr. Gatterdam, anything on behalf of

19  Mr. Harris?

20          MR. GATTERDAM:  No, Your Honor.

21          THE COURT:  Ms. Dixon, anything on behalf of

22  Mr. Liston?

23          MS. DIXON:  No, sir.

24          THE COURT:  Mr. Meyers, anything on behalf of

25  Mr. Ussury?

TRIAL ONE – VOL. 8 – 1010

1          MR. MEYERS:  If I may, Your Honor, I just want to log

2     something in for your attention and for the record, a matter I

3     spoke with government's counsel about maybe yesterday evening,

4     and that relates to maybe my pet peeve about Rule 803(8) as it

5     relates to our relative stipulations regarding the law

6     enforcement officials who obtained evidence from a variety of

7     crime scenes.  So we would agree they don't have to parade in

8     all the people who found something somewhere and came to the

9     central location and it got inventoried.  To date in this case

10    there's been no damage done by the documents related to that to

11    our client so we have raised no objection, but I think there's

12    a distinction that could have a difference as we evolve between

13    our agreement to stipulate to the testimony of a law

14    enforcement inventory crime scene type person and documents

15    generated by those people.

16         THE COURT:  You're talking about the police reports?

17         MR. MEYERS:  Not only the police reports, but we saw

18    an example today that didn't touch one of these five men.  And

19    as I learned from government's counsel, sometimes you'll see on

20    evidence admission sheets or submission sheets, inventory

21    sheets, a listing of the named suspects.  Terrel Patterson

22    showed up on two or three of these today.

23         If there comes a time when Deounte Ussury shows up on

24    those, we may object not to distance ourself from our

25    stipulation, but to acknowledge the distinction that the

TRIAL ONE - VOL. 8 - 1011

1    document itself does not -- is not always admissible merely

2    because, as Mr. Martinez has diligently asked, these records

3    are kept in the normal course of business.  Well, sure, they

4    are, but that doesn't make them admissible by the government.

5             THE COURT:  803(6), exhibits.  Right, I understand.

6             MR. MEYERS:  Because they are law enforcement related

7    documents --

8             THE COURT:  They're police reports.

9             MR. MEYERS:  Right.  So I don't think the government

10   has the right to offer them in unless we agree.

11        So I just wanted to flag that we're not asleep at that

12   switch.  Just, it may come up later.

13            THE COURT:  All right.

14        Anything on behalf of Mr. Robinson, Mr. Nolder?

15            MR. NOLDER:  No, sir.  Thank you very much.

16            THE COURT:  All right.  Mr. Kelley?

17            MR. KELLEY:  Your Honor, I will send an e-mail here in

18   the next hour to all counsel regarding a point of contact for

19   the FBI as in regards to relocation and victim witness

20   assistance.

21            THE COURT:  Thank you, Mr. Kelley.

22        That being said, I wish all of you a good and pleasant

23   weekend, and I will see everyone Monday morning at 8:30.

24        (Proceedings concluded at 4:00 p.m..)

25

TRIAL ONE – VOL. 8 – 1012

1                          – – –

2                    WITNESS INDEX

3                          – – –

4    WITNESSES          DIRECT   CROSS   REDIRECT   RECROSS

5    PLAINTIFF'S:

6    Michael Boyd                 782       802       803
     Samantha Murphy      804     858       917       926
7       By Mr. Gatterdam          893                 928
        By Ms. Dixon              908
8    John Kifer                   958       931
     Eric Poliseno       973
9    Jason Law           979      990
     David Hughes        995     1000
10   Steven Oboczky     1003

11                         – – –

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            – – –

2                    INDEX OF EXHIBITS

3                            – – –

4       PLAINTIFF'S:                                    RECEIVED

5       1-2-112                                             814
        28-2                                                938
6       28-2# THROUGH 28-2#-014                             941
        28-7, PAGES 5 AND 6                                 945
7       28-8                                                947
        28-9                                                948
8       28-10                                               950
        28-15                                               951
9       28-16                                               952
        28-13                                               954
10      28-11                                               955
        28-12                                               955
11      28-2#-011                                           956
        28-2#-010                                           957
12      150-20                                              854
        150-92                                              871
13      153-188                                             805
        154-1-033                                           806
14      154-1-089                                           846
        154-1-072                                           998
15      155-1                                               807
        155-5                                               809
16      155-7                                               811
        155-3                                               812
17      155-16                                              813
        161-29.02                                           819

18

19

20

21

22

23

24

25

TRIAL ONE – VOL. 8 – 1014

1                    C E R T I F I C A T E

2

3      We, Shawna J. Evans, Denise N. Errett, Darla J. Coulter, do

4   hereby certify that the foregoing is a true and correct

5   transcript of the proceedings before the Honorable Algenon L.

6   Marbley, Judge, in the United States District Court, Southern

7   District of Ohio, Eastern Division, on the date indicated,

8   reported by me in shorthand and transcribed by me or under my

9   supervision.

10

11

12                              s/Shawna J. Evans
                                Shawna J. Evans, RMR
13                              Official Federal Court Reporter

14

15                              s/Denise N. Errett
                                Denise N. Errett, RMR CRR
16                              Official Federal Court Reporter

17

18                              s/Darla J. Coulter
                                Darla J. Coulter, RMR, CRR
19                              Official Federal Court Reporter

20

21

22                              April 17, 2016

23

24

25