```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
  PLAINTIFF,                     )      CASE NO. 2:14-CR-127
                                 )
        vs.                      )      MAY 9, 2016
                                 )
ROBERT B. LEDBETTER, ET AL.,     )      9:00 A.M.
                                 )
  DEFENDANTS.                    )      VOLUME 17
_____)
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:

BENJAMIN C. GLASSMAN
United States Attorney
By:  DAVID M. DEVILLERS
     KEVIN W. KELLEY
     BRIAN J. MARTINEZ
Assistant United States Attorneys
303 Marconi Boulevard
Columbus, Ohio  43215


FOR THE DEFENDANT ROBERT B. LEDBETTER:

JEFFREY A. BERNDT, ESQ.
575 South High Street
Columbus, Ohio  43215

AARON G. DURDEN, ESQ.
10 West Monument Avenue
Dayton, Ohio  45402
                              - - -


     Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
APPEARANCES CONTINUED:



FOR THE DEFENDANT CHRISTOPHER A. HARRIS:

Carpenter, Lipps & Leland, LLP
By:  KORT W. GATTERDAM, ESQ.
280 North High Street
Columbus, Ohio  43215

KEVIN P. DURKIN, ESQ.
367 East Broad Street
Columbus, Ohio  43215


FOR THE DEFENDANT RASHAD A. LISTON:

ISABELLA DIXON, ESQ.
98 Hamilton Park
Columbus, Ohio  43203

Kegler, Brown, Hill & Ritter
By:  S. MICHAEL MILLER, ESQ.
65 East State Street
Columbus, Ohio  43215


FOR THE DEFENDANT DEOUNTE USSURY:

Office of the Ohio Public Defender
By:  GREGORY W. MEYERS, ESQ.
     KIRK A. MCVAY, ESQ.
250 East Broad Street
Columbus, Ohio  43215



FOR THE DEFENDANT CLIFFORD L. ROBINSON:

Scott & Nolder Law Firm
By:  STEVEN S. NOLDER, ESQ.
35 East Livingston Avenue
Columbus, Ohio  43215


                        - - -
```

TRIAL ONE – VOL. 17 –  2999

1          MONDAY MORNING SESSION

2          MAY 9, 2016

3                              –  –  –

4      (Jury in at 9:05 a.m.)

5          THE COURT:  Ladies and gentlemen, welcome back.  I

6   notice, everyone, that you all filed in and you have that

7   refreshed look.  Happy belated Mother's Day to all of the

8   mothers and any grandmothers or prospective mothers on the

9   jury.  I hope everyone had a really nice week off and a nice

10  day yesterday, and we're ready to return to business in the

11  government's case in chief.

12      Mr. DeVillers, your next witness.

13      MR. DEVILLERS:  Your Honor, the United States calls

14  Troy Patterson to the stand.

15      (Witness sworn.)

16      THE COURT:  Mr. Patterson, please speak clearly into

17  the mic.

18      Mr. DeVillers, please proceed.

19      MR. DEVILLERS:  Thank you, Your Honor.

20

21

22

23

24

25

TRIAL ONE – VOL. 17 –  3000

1                          – – –

2                    TROY PATTERSON

3      Called as a witness on behalf of the Plaintiff,

4      being first duly sworn, testified as follows:

5                    DIRECT EXAMINATION

6        BY MR. DEVILLERS:

7      Q.   Mr. Patterson, please state your full name and spell

8    your last name.

9      A.   Troy Patterson.

10     Q.   And spell your last name for us.

11     A.   P-A-T-T-E-R-S-O-N.

12     Q.   How old are you, Mr. Patterson?

13     A.   25.

14     Q.   Are you currently incarcerated?

15     A.   Yes, sir.

16     Q.   How long have you been incarcerated?

17     A.   Eight years.

18     Q.   How old were you when you first became incarcerated on

19   what you're incarcerated on now?

20     A.   When I was 17.

21     Q.   Have you spent that entire time -- that entire eight

22   years in adult prison?

23     A.   Yes.

24     Q.   Before that, before going to adult prison, had you spent

25   other periods of time in the department of youth services?

TRIAL ONE – VOL. 17 – 3001

1    A.    Yes.

2    Q.    Where did you grow up?

3    A.    I grew up around the Short North area, Weber area.

4    Q.    Do you have family in the Short North?

5    A.    Yes.

6    Q.    Where did you go to school?

7    A.    Middle school or high school?

8    Q.    Start off with middle school.

9    A.    Went to Clinton, Yorktown, Crestview.

10   Q.    Where did you go to high school?

11   A.    I went to Reynoldsburg, Brookhaven.

12   Q.    Did you play any sports in high school?

13   A.    Nah, no, sir.

14   Q.    Did you play any sports in middle school?

15   A.    Little league football.

16   Q.    How far did you get through high school?

17   A.    To about -- to about the ninth grade.

18   Q.    What happened in ninth grade that made you leave high

19   school?

20   A.    I went to the department of youth services.

21   Q.    Do you remember for what?

22   A.    For a gun charge.

23   Q.    Do you remember what year that was?

24   A.    I think it was in 2006.

25   Q.    Tell us about your parents.  Are they still alive?

TRIAL ONE — VOL. 17 —  3002

1    A.    Yeah, both parents still alive.

2    Q.    Where is your father?

3    A.    He in prison right now.

4    Q.    Mr. Patterson, I'm going to take you to around 2005.

5    Where were you living in 2005?

6    A.    2005, I lived with probably my grandma.

7    Q.    Who is your grandmother?

8    A.    Donetta Hill.

9    Q.    And where did she live?

10   A.    Out in Reynoldsburg.

11   Q.    Did you spend time in the Short North area?

12   A.    Yes.

13   Q.    What would you do in the Short North area?

14   A.    I mean, it varied from different things.  Running around

15   just being -- being a kid.

16   Q.    How old were you in 2005?

17   A.    I think I was 14.

18   Q.    Who were you hanging out with while in the Short North?

19   A.    I would hang around with Buck, O-Dog, Franklin.  Just

20   numerous people who would be around.

21   Q.    Let's go over some of those people.  You said Franklin.

22   A.    Yeah.

23   Q.    Do you know his real name?

24   A.    Dawan.

25   Q.    Does he have a nickname?

TRIAL ONE - VOL. 17 - 3003

1    A.    D-Nice.

2    Q.    I want to show you a picture.  I'm going to show you a

3    picture of Government's Exhibit 154-1-19.

4    A.    Yeah.

5    Q.    Who is that?

6    A.    That's D-Nice.

7    Q.    About how old is D-Nice compared to you?

8    A.    Maybe about 28, 29.

9          MR. DEVILLERS:  All right.  Your Honor, may I publish

10   this to the jury?  I believe it's already been admitted into

11   evidence.

12         THE COURT:  Yes, you may.

13     BY MR. DEVILLERS:

14   Q.    You also said someone, O-Dog?

15   A.    Yeah.

16   Q.    Who is O-Dog?

17   A.    Chris.

18   Q.    Do you know Chris' last name?

19   A.    Harris.

20   Q.    You also said someone by the name of Buck?

21   A.    Yeah.

22   Q.    Who is Buck?

23   A.    Rashad Liston.

24   Q.    Let's start off with Chris Harris.  How did you get to

25   know Chris Harris?

TRIAL ONE - VOL. 17 - 3004

1    A.   Him and my cousin, Tone, was best friends and I kinda,

2    you know what I'm saying, met him through Tone just being

3    around.

4    Q.   Who is Tone?

5    A.   Elijah Ledbetter.

6    Q.   Is Elijah Ledbetter your cousin?

7    A.   Yes.

8    Q.   I want to show you another picture, and I would like

9    154-1-85.  Who is that?

10   A.   That's Ledbetter, Elijah Ledbetter.

11   Q.   And he's your cousin, you said?

12   A.   Yes.

13   Q.   And how were you related as far as cousins go?

14   A.   Elijah was adopted through his aunt -- I mean, Aunt

15   Paulette, and him and my cousin, Tiberi Patterson, is brothers.

16   Q.   Okay.  How are you related to Aunt Paulette?

17   A.   I'm not related to Paulette.

18   Q.   How are you related to -- Tiberi Patterson?

19   A.   Yes.

20   Q.   How are you related to him?

21   A.   That's my cousin.  That's my grandmother's sister's son.

22   Q.   Do you know a person by the name of Tyrun Hill?

23   A.   Yes.

24   Q.   And were you related to him?

25   A.   That's my uncle.

TRIAL ONE – VOL. 17 –  3005

1    Q.   Do you know Brandon Ledbetter?

2    A.   Yes.

3    Q.   Are you related to Brandon?

4    A.   Yes.  I'm related to Elijah, but him being his brother,

5    you could say that.

6    Q.   Do you know a person by the name of -- well, in 2005 you

7    said you were hanging out with Chris Harris and Buck.  Were you

8    hanging out with Elijah Ledbetter as well?

9    A.   Yes.

10   Q.   Do you know a person by the name of Allen Wright?

11   A.   Yes.

12   Q.   Did you hang out with him?

13   A.   Yes.

14   Q.   Did you know a person by the name of Deounte Ussury?

15   A.   Yes.

16   Q.   Did you hang out with him?

17   A.   Not in 2005.

18   Q.   When did you start hanging out with him?

19   A.   Probably around about 2006.  2006.

20   Q.   Let's stick to kind of 2005 then.  Were you committing

21   crimes in 2005?

22   A.   Yes.

23   Q.   What sort of crimes were you committing?

24   A.   Robberies, like my gun charge I had, RSP.

25   Q.   What's RSP mean?

TRIAL ONE - VOL. 17 - 3006

1    A.    Receiving stolen property.

2    Q.    Can you be more specific?  Like, what were you doing as

3  far as the robberies go?  What kind of robberies back in 2005?

4    A.    Like, petty robberies, like, knocking people out,

5  punching people, you know what I'm saying, taking their money.

6  They come buy drugs, act like we got some drugs, you know what

7  I'm saying, just take the money from them.  Little petty stuff

8  like that.

9    Q.    Would you use a firearm back then?

10   A.    Not too often.

11   Q.    Were you doing this with anybody?

12   A.    Yes.

13   Q.    Who were you doing it with?

14   A.    Liston, Nuts, Ledbetter, Elijah, Harris, Franklin.

15         That was pretty much who I was running with every day

16  back then.

17   Q.    Okay.  You said Nuts.  Who is that?

18   A.    Allen Wright.

19   Q.    Explain this knockout.  How would you knock somebody

20  out?  How old are you during this time period?

21   A.    Probably about -- about 14.

22   Q.    All right.

23   A.    About 14, 15.

24   Q.    Where would you do these knockouts?

25   A.    Around the Short North area.

TRIAL ONE – VOL. 17 –  3007

1   Q.   Where in the Short North area?

2   A.   Like, Fourth Street, Summit, Fifth Street.  Just all

3   throughout the Short North.  Eleventh.

4   Q.   How bad would you knock somebody out?

5   A.   I mean, I don't know how -- I don't know how much worse

6   it can get from a knockout.  I mean --

7   Q.   Were they unconscious?

8   A.   Yes.

9   Q.   You ever hear of the term Cut Throat?

10  A.   Yes.

11  Q.   What's Cut Throat?

12  A.   It's another -- a gang.  Another subset gang from the

13  Short North.

14  Q.   A subset of the Short North?

15  A.   Yes.

16  Q.   Who -- do you know who was in Cut Throat?

17  A.   Nuts, which is Allen.  Le Le.

18  Q.   Do you know Le Le's real name?

19  A.   Richard; Richard Willis.

20  Q.   Did he end up -- what happened to him?

21  A.   He dead.

22  Q.   How did he die?

23  A.   Got killed.

24  Q.   Do you know who killed him?

25  A.   I think some dude named Day Day or somebody.

1    Q.   All right.  Go on.  Who else was in Cut Throat?

2    A.   Freddie.

3    Q.   Do you know Freddie's real name?

4    A.   Freddie Johnson.

5    Q.   Do you know a street name?

6    A.   Freeze.

7    Q.   All right.

8    A.   Tysin, Tommy.

9    Q.   Tommy who?

10    A.   Coates.

11    Q.   Tysin who?

12    A.   Gordon.

13    Q.   All right.

14    A.   Evil.

15    Q.   Do you know Evil's real name?

16    A.   DeShawn Smith.  That's pretty much it.

17    Q.   Do you know a person by the name of Lance Green?

18    A.   Oh, yeah, Lance.  Yeah.

19    Q.   Did he have a street name?

20    A.   Jiggs.

21    Q.   Was he in Cut Throat?

22    A.   Yeah.

23    Q.   Were you in Cut Throat?

24    A.   Never.

25    Q.   Did you associate with guys in Cut Throat?

TRIAL ONE - VOL. 17 -  3009

1    A.   Yes.

2    Q.   What's Homo or Homicide Squad?

3    A.   Another subset gang from the Short North.

4    Q.   Did they specialize in anything in particular?

5    A.   Robberies, murders, extortion.

6    Q.   Were you in Homo?

7    A.   Yes.

8    Q.   About when did that start?

9    A.   Probably around, like, 2006.

10   Q.   Is there any event that took place that got that

11   rolling?

12   A.   Just mainly robbery -- yeah.  One particular, yeah.

13   Robberies, the murder that took place up north.

14   Q.   Okay.

15   A.   Probably around, like, 2006, 2007.

16   Q.   All right.  Who is in Homo?

17   A.   Me, Liston, Harris, Franklin, Deounte.

18   Q.   Deounte?

19   A.   Ussury.

20   Q.   Does he have a street name?

21   A.   D Frog.

22   Q.   Okay.

23   A.   B; Brandon Ledbetter.  Yeah, that's it.

24   Q.   Mr. Liston, he has a street name?

25   A.   Yes.

1    Q.   What's his street name?

2    A.   Buck.

3    Q.   Does he have any relatives?

4    A.   Yes.

5    Q.   Who are his relatives?

6    A.   He had a brother named Robert Liston.

7    Q.   Does he have a street name?

8    A.   RJ.

9    Q.   Is there another RJ?

10   A.   Yeah.

11   Q.   What's his name?

12   A.   Robert Wilson.

13   Q.   Do you know where Buck and his brother came from?

14   A.   Michigan; Detroit.

15   Q.   Do you know how long they lived here in Columbus?

16   A.   Over about 15 years at least.

17   Q.   Do you know where they lived?

18   A.   In the Short North.

19   Q.   Was there anyone in particular that Buck was associated

20   with or close to?

21   A.   O-Dog, RJ.

22   Q.   Which RJ?

23   A.   Robert Wilson.

24   Q.   Robert Wilson?

25   A.   Yeah.

TRIAL ONE – VOL. 17 –  3011

1    Q.    Does Robert Wilson have any sisters?

2    A.    Yes.

3    Q.    Who are his sisters?

4    A.    Terikia and Turquoise Patterson.

5    Q.    Was Robert Wilson in Homicide?

6    A.    Yes.

7    Q.    Do you have any tattoos?

8    A.    Yes.

9    Q.    Do you have any tattoos that relate to Homicide?

10   A.    Yes.

11   Q.    Tell us what they are.

12   A.    Just HM.  HM tattoos, or Homicide for the Cash.

13   Q.    Why Homicide for the Cash?

14   A.    Because, like, it was, like, our thing.  Like, Homicide

15   for the Cash kind of speaks for itself, you know what I'm

16   saying.  Homicide, murder for money.

17   Q.    You said HM.  Where is it tattooed on you?

18   A.    My neck, my hands, my arms.

19   Q.    Okay.

20   A.    My stomach.

21   Q.    Do you have any Short North related tattoos on you?

22   A.    No.

23   Q.    You said on your neck there's an HM?

24   A.    Yes.

25   Q.    Within that tattoo is there anything else?

1    A.    Yes.  Some names.

2    Q.    Whose names?

3    A.    Buck, O-Dog, Tone.

4    Q.    Who is Tone?

5    A.    Anthony Jones.

6    Q.    Was he a member of Homo?

7    A.    Yeah.

8    Q.    When did he become considered Homo?

9    A.    Around about 2007; 2007.

10   Q.    I interrupted you.  Anyone else on your neck?

11   A.    RJ.

12   Q.    Is there any hand sign or anything that's related to

13   Homo?

14   A.    Yeah.  It's like an H.

15   Q.    How would you make the H?

16   A.    Like this (indicating).

17   Q.    Can you kind of lift your hands up the best you can?  I

18   know it's tough.

19   A.    (Indicating).

20   Q.    So you're talking about your index finger and your

21   pinkie in the air with the other fingers down?

22   A.    Yes.

23   Q.    Is there anything individuals in Homo would say or any

24   phrase they would use?

25   A.    Not in particular besides HM or Homo.

TRIAL ONE – VOL. 17 –  3013

1    Q.    Okay.  I want to play for you a couple of phone calls

2   and see if you recognize the people on them.  I'm going to

3   start off with 150-1335 and start at 4:42.

4         Hold for a second.  I want to ask -- I believe you said

5   you were incarcerated in 2008?

6    A.    Only in March.  I'm out in March of 2008.

7    Q.    In March of 2008?

8    A.    Yeah.

9    Q.    Since then you've been incarcerated?

10   A.    No.  I got incarcerated again in July.  I got out in

11  March and went back in July of 2008.

12   Q.    Okay.  And since that time where were you in prison?

13   A.    Ross Correctional.

14   Q.    Were there other people in Homo eventually in Ross

15  corrections with you?

16   A.    Yes.

17   Q.    Who were those people?

18   A.    Me, O-Dog, Buck, RJ.

19   Q.    You said Tony Jones or Anthony Jones?

20   A.    Yeah, Tony, was down there, too.  He was only down there

21  for, like, a split second, maybe about a couple months.  A year

22  at the most.

23   Q.    Were you able to associate with those guys while you

24  were incarcerated?

25   A.    Yes.

TRIAL ONE – VOL. 17 – 3014

1    Q.   I'm going to play you a tape and see if you can

2    recognize the voices.

3       (Audiotape played in open court.)

4       BY MR. DEVILLERS:

5    Q.   Do you recognize those voices?

6    A.   Yes.

7    Q.   Who are those voices?

8    A.   Harris, and I think it was Hurt, his brother.

9    Q.   Chris Harris had some brothers?

10   A.   Yes.

11   Q.   Who were his brothers?

12   A.   Mechie, Hurt, Lanny, an older brother named Kevin.

13   Q.   Do you know Mechie's real name?

14   A.   I think it might be Demetrius or something.

15   Q.   All right.  You said Lanny?

16   A.   Lanny.

17   Q.   Do you know Lanny's real name?

18   A.   Orlando.

19   Q.   Orlando?

20       Do you know what they're talking about there in that

21   conversation?

22   A.   Talking about -- I think they talking about a Homicide

23   song, talking about Keko made a Homicide song or something.

24          MR. DEVILLERS:  Let's play a little more.  Go to 720.

25       (Audiotape played in open court.)

TRIAL ONE – VOL. 17 – 3015

1      BY MR. DEVILLERS:

2      Q.    You mentioned the name Keko.  Who is Keko?

3      A.    Keko Russell.

4      Q.    All right.  Was he part of Homo?

5      A.    No.

6      Q.    Do you know what they were talking about in regards to

7  Keko or whoever was rapping Homicide?

8      A.    They talking about -- I think something about a song or

9  something.

10     Q.    Are you familiar with the song at all.

11     A.    No.

12          MR. MCVAY:  Excuse me, your Honor?  Can we know when

13  the tapes are ending, at what point?

14          MR. DEVILLERS:  This ended at 7:48.  The first one

15  ended approximately 4:58.

16          MR. MCVAY:  Thank you.

17     BY MR. DEVILLERS:

18     Q.    You indicated -- I think I asked you if Buck was close

19  to somebody and you said O-Dog; is that right?

20     A.    Yeah.  Yes.

21     Q.    Is there such a thing about someone being someone's

22  street son or something like that?  A mentor thing of sort?

23     A.    I don't understand that.

24     Q.    Have you ever heard anyone referring to themselves as

25  someone's son even though they're not related at all?

TRIAL ONE - VOL. 17 - 3016

1    A.   Yes.

2    Q.   What's that?  Explain that to us.

3    A.   Basically, like, somebody who look up to you, like,

4    somebody who -- basically somebody that look up to you.

5    Q.   Okay.  I want to play you 150-1424 at 15:60.  I'm sorry,

6    5:16.  At 5:16.

7        (Audiotape played in open court.)

8       BY MR. DEVILLERS:

9    Q.   Do you know who's talking there?

10   A.   That's Harris and his mom.

11         MR. DEVILLERS:  Okay.  Continue.

12       (Audiotape played in open court.)

13         MR. DEVILLERS:  Stop there.

14       BY MR. DEVILLERS:

15   Q.   Do you know what he's talking about there?

16   A.   He's talking about -- he talking about Buck was up under

17   him and his cousin Little Shawn stealing cars and stuff.

18   Q.   Who is Little Shawn?

19   A.   Lovelady Waddell.

20   Q.   Do you know a person by the name of Jermonte Fletcher?

21   A.   Yes.

22   Q.   Did he have a street name?

23   A.   Yes.

24   Q.   What?

25   A.   Chin.

TRIAL ONE - VOL. 17 -  3017

1    Q.   Chin?

2    A.   Yes.

3    Q.   And where was he from?

4    A.   He from the Short North.

5    Q.   Do you know what happened to him?

6    A.   He got killed by the police.

7    Q.   When was that?

8    A.   I want to say last year sometime.  I don't know what

9    month.

10   Q.   Clear something up.  Have you been indicted on the case

11   that you're here on now, the case that you've pled to?

12   A.   Yes.

13   Q.   And do you know how many people you're indicted with?

14   A.   I think about 20.

15   Q.   20?

16   A.   20 now.

17   Q.   What did Chin do for a living?

18   A.   Sold drugs, gambled.

19   Q.   In 2005 to 2007, in that area, was Chin around?

20   A.   No.  I think he was incarcerated.

21   Q.   And do you know about when he got out of prison?

22   A.   I want to say around 2012, '13.  Somewhere around there.

23   It might have been '11.

24   Q.   All right.  I want to play for you Government's

25   Exhibit -- I'm sorry, we stopped there at 5:52.

TRIAL ONE - VOL. 17 -  3018

1    I want to play for you Government's Exhibit 150-1425 at

2  1 minute.

3    (Audiotape played in open court.)

4    BY MR. DEVILLERS:

5  Q.   Do you know what he's talking about here?

6  A.   He was talking about -- was basically saying that --

7  that Chin was telling people that Buck was his son.

8  Q.   Buck was Chin's son?

9  A.   Yeah.  That Buck was his son, and I guess India and

10  Ebony was -- when he talking about the Homo -- when he said the

11  Homo stuff, talking about India and Ebony trying to set him up.

12  Q.   Okay.

13  A.   To rob him.

14  Q.   Okay.  When he says -- how long have you known Chris

15  Harris for?

16  A.   I know him for a while, probably about -- about 2013,

17  '14.  I mean, 2003 or '04.

18  Q.   When he refers to somebody is up to some Homo shit,

19  what's that mean?

20  A.   Probably some robbery, a setup.  Some robbery.

21  Q.   And who is -- you said these two individuals that were

22  up to it, who are these two individuals he's talking about?

23  A.   India and Ebony.

24  Q.   And who is India?

25  A.   His baby mom.

TRIAL ONE - VOL. 17 -  3019

1    Q.    And who is Ebony?

2    A.    Just somebody from the neighborhood he used to mess with

3    too.

4    Q.    At times when you were out, would you use -- how would

5    you find out about robberies, people to rob, targets?

6    A.    I mean, different people, like, Ledbetter or seeing

7    somebody with flashy stuff, nice cars, follow them.  Hearing

8    about them in the streets, find out where they live.

9    Q.    How about females, would you ever listen to females in

10   the neighborhood who would tell you about --

11             MR. GATTERDAM:  Objection; leading.

12             THE COURT:  Sustained.

13             MR. DEVILLERS:  Keep going.  Keep playing, please.

14             THE COURT:  Well, no.  You have to pose another

15   question.

16             MR. DEVILLERS:  I think if I play some more, I can

17   pose another question, Your Honor.

18             THE COURT:  All right.

19      (Audiotape played in open court.)

20             THE COURT:  Before your next question, I misunderstood

21   you, Mr. DeVillers.  I thought you were telling the witness to

22   keep going.  You were telling the agent to keep playing the --

23             MR. DEVILLERS:  Yes, sir.

24             THE COURT:  All right.  I stand corrected.  All right.

25   You may continue.  I'm sorry.

TRIAL ONE – VOL. 17 –  3020

1      Go ahead, Mr. DeVillers.

2    (Audiotape played in open court.)

3    BY MR. DEVILLERS:

4    Q.   In 2012 when Chin got out of prison, do you know what he

5    was doing then?

6    A.   Selling drugs.

7    Q.   And from this conversation could you tell what

8    Mr. Harris was talking to this person about in regards at least

9    to India and Ebony?

10   A.   Trying to find out where his money at.

11   Q.   Whose money?

12   A.   Chin's.  Money, jewelry, or whatever type accessories he

13   might got.

14   Q.   Okay.  Now, I would like to bring you to Government's

15   Exhibit 150 --

16       MR. DEVILLERS:  I'm sorry, where did we stop there?

17   3:01.

18    BY MR. DEVILLERS:

19   Q.   Government's Exhibit 150-1269.  And start at

20   approximately 9:15.  And, again, just listen and see if you can

21   identify the voices first, Mr. Patterson.

22    (Audiotape played in open court.)

23    BY MR. DEVILLERS:

24   Q.   Who was he talking about there?  Or whose voice is this,

25   first of all?

TRIAL ONE - VOL. 17 - 3021

1    A.    That's Harris.

2    Q.    Could you tell who the other voice was?

3    A.    His baby mom.

4    Q.    And her name is?

5    A.    Lynn.

6    Q.    Who?

7    A.    Lynn.

8    Q.    Lynn?  All right.

9          Can you tell who they were talking about there?

10   A.    They was talking about Keko.

11   Q.    Was there another name mentioned?

12   A.    You gotta play it again for me.

13         MR. DEVILLERS:  Can you play it again at 9:18-ish?

14      (Audiotape played in open court.)

15         MR. GATTERDAM:  Your Honor, I'm going to object.  Can

16   we have a sidebar?

17         THE COURT:  Yes, you may.

18                       -  -  -

19      Thereupon, the following proceeding was held at sidebar out

20   of hearing of open court:

21         THE COURT:  Go ahead, Mr. Gatterdam.

22         MR. GATTERDAM:  Your Honor, my objection is to playing

23   calls to this witness that don't involve him and just basically

24   randomly asking him to interpret a call that he's not part of.

25   I mean, we don't have any foundation for where he would have

TRIAL ONE - VOL. 17 - 3022

1   this knowledge.  I mean, the jury can listen to it and draw

2   their own conclusions.  Why do we need this witness to sort of

3   interpret things?

4          THE COURT:  First of all, before Mr. DeVillers

5   answers, that -- I'm -- well, I'm not going to assume anything.

6   The calls by and large are coconspirator statements.

7          MR. DEVILLERS:  This is Chris Harris', yeah.

8          THE COURT:  So -- but, go ahead, Mr. DeVillers.

9          MR. DEVILLERS:  I think he's -- I'm asking him to

10  identify the people he's mentioning.  One was Keko Russell and

11  one was D-Nice, who is Dawan Franklin, who he already testified

12  is part of Homicide Squad.  He knows basically the slang, he

13  knows the code talk, he knows what is talked about when

14  somebody is throwing up Homo, as he's already testified about.

15  I think I laid a foundation for that with him.

16         MR. GATTERDAM:  I mean, my objection still is this is

17  just a random call that he was not a part of and he doesn't

18  have any knowledge of.  The jury can hear it just as much as

19  anybody else, and now he's being asked to interpret something

20  he's not even a part of.

21         THE COURT:  It's a fine line, I think.  They are --

22  these are -- Mr. Harris is an indicted coconspirator so his

23  statements appear to be statements made as a part of or in

24  furtherance of the conspiracy.

25         Now, I think that the problem that you identify takes us

TRIAL ONE - VOL. 17 -  3023

1    up to the line but not over the line.

2        Mr. Patterson can't tell us what Mr. Harris was

3    thinking, but I think that Mr. DeVillers is correct,

4    Mr. Patterson can interpret the code in which Mr. Harris spoke.

5    This witness has identified himself as a part of the Homicide

6    Squad.  He's identified Mr. Harris as a part of the Homicide

7    Squad.  And to the extent that they have their own language,

8    then I think that he can permissibly construe that language

9    without being in a position to tell us what Mr. Harris was

10   thinking.

11       So I think that the best thing for me to do, I'm going

12   to overrule your objection, but I'm going to instruct the jury

13   that Mr. Patterson can interpret the language to the extent

14   that it represents code or whatever, or the code of what he

15   purports to be the Homicide Squad, but he's not in a position

16   to tell us what Mr. Harris was thinking.

17       MR. MCVAY:  Your Honor, Mr. Ussury would join in the

18   objection, for the record.

19       THE COURT:  Everybody joins in.  The objection is

20   overruled.

21       MR. GATTERDAM:  Thank you, Your Honor.

22     (The following proceedings were had in open court.)

23       THE COURT:  Ladies and gentlemen, the Court overrules

24   the objection on legal grounds.  I will indicate, however, that

25   Mr. Patterson -- while Mr. Patterson is allowed to construe for

TRIAL ONE - VOL. 17 - 3024

1    you some of the terms that may -- in Mr. Harris' --

2    Mr. Patterson's mind may represent language or terms he says

3    the Homicide Squad used, he's allowed to testify to that

4    because he testified he was a member of the Homicide Squad and

5    that others were members and some of the others who were on

6    these phone calls.

7         He cannot, however, represent what an individual might

8    have been thinking at the time he made the remark. So he can't

9    tell you what Mr. Harris was thinking, but he can construe

10   Mr. Harris' terms, as those terms are consistent with language

11   used by the -- what he testified to as the Homicide Squad.

12        Please continue, Mr. DeVillers.

13         MR. DEVILLERS: Could you continue with the tape?

14      (Audiotape played in open court.)

15      BY MR. DEVILLERS:

16   Q.   From your time with Mr. Harris and other people in the

17   Homicide Squad, when someone is throwing up Homicide Squad,

18   what does that mean?

19   A.   Just repping, representing.

20   Q.   What's representing mean?

21   A.   Just basically letting somebody know what you are.

22   Letting somebody know what Homicide is.

23   Q.   Was D-Nice a part of Homicide?

24   A.   Yes.

25   Q.   Did something happen -- well, let me ask you this:

TRIAL ONE - VOL. 17 -  3025

1          Was there some sort of falling out between D-Nice and

2    other people?

3      A.   When he come to jail, yeah.

4      Q.   Why?  What happened?

5      A.   D-Nice didn't hold up to his standards, what he was

6    supposed to be doing while we was in jail.

7      Q.   Who was in jail?

8      A.   Me, Harris, Liston, Wilson.

9      Q.   And what time period are we talking about?

10     A.   It was around about 2008, '09 and up.

11     Q.   What was D-Nice supposed to be doing by holding up his

12   end?

13     A.   Just making sure we was all right as far as money, not

14   letting people come to court on us when we was going through

15   our first case.

16     Q.   What do you mean not letting people come to court on

17   you?

18     A.   No witnesses.

19     Q.   How do you make sure there are no witnesses?

20     A.   Either -- there's two options, either dead or pay them

21   not to come to court.

22     Q.   Okay.  I think we mentioned your cousin Tyrun Hill?

23     A.   My uncle.

24     Q.   Your uncle.  Sorry.

25          What happened to Mr. Hill?

TRIAL ONE – VOL. 17 – 3026

1    A.   He was killed.

2    Q.   Do you remember where you were when he was killed?

3    A.   No.

4    Q.   Have you ever heard the term D-Block?

5    A.   Yes.

6    Q.   What's D-Block?

7    A.   It's another neighborhood up north, another gang.

8    Q.   Was there any sort of problem between D-Block and the

9  guys from the Short North?

10   A.   Yes.

11   Q.   Do you know what that was about?

12   A.   It first started over because they was saying that the

13 D-Block dudes killed my uncle, and from then on it was -- it

14 was problems every time they seen each other.

15   Q.   What would happen when you would see people from

16 D-Block?

17   A.   A shoot-out.

18   Q.   Are you aware of a situation at a park where there was a

19 shoot-out?

20   A.   Yes.

21   Q.   Okay.  How did you become aware of that situation?

22   A.   I mean, numerous people told me.  Harris told me,

23 Franklin told me.  Just numerous people told me after the

24 incident had tooken place.

25   Q.   Do you remember where you were at the time?

TRIAL ONE - VOL. 17 -  3027

1    A.   No.  I think I was incarcerated.

2    Q.   And at that time where would you have been incarcerated?

3    A.   At a DH.

4    Q.   What's DH mean?

5    A.   Detention home, juvenile center.

6    Q.   Juvenile center?

7    A.   Yeah.

8    Q.   What did Chris Harris tell you about what happened at

9   the park?

10    A.   He just told me what happened basically.

11    Q.   What did he say happened?

12    A.   He said Freddie and another guy was fighting -- I mean,

13   Tyrell and another guy was fighting.

14    Q.   Tyrell who?

15    A.   Tyrell Davis and another guy was fighting.  I think the

16   guy was beating up Tyrell, and Freddie pull out a gun, shot the

17   guy, end up shooting Tyrell, and then it was just a gun fight

18   after that.

19    Q.   Mr. Harris say who else was there?

20    A.   It was him, Freddie, Tyrell, Hov.

21    Q.   Hov?

22    A.   Yeah.

23    Q.   I want to show you a picture, see if you -- I want to

24   show you Government's Exhibit 154-1-72.

25         Who is that?

TRIAL ONE – VOL. 17 –  3028

1    A.   That's Hov.

2    Q.   All right.  Mr. Harris say who else was there, if you

3  can remember?

4    A.   I'm trying to think, man.  D-Nice was there, Tyrell was

5  there.  That's it.  That's all I can remember so far.

6    Q.   Okay.  I want to show you a photograph, 31-2#-025.

7         Can you see that?

8    A.   Yes.

9    Q.   Do you recognize that?

10    A.   Yes.

11    Q.   What is that?

12    A.   A white van.

13    Q.   Do you know whose white van that is?

14    A.   That's Harris' van.

15        MR. DEVILLERS:  Your Honor, may I publish this to the

16  jury?

17         THE COURT:  Yes, you may.

18        MR. DEVILLERS:  I believe it's already in.

19     BY MR. DEVILLERS:

20    Q.   Have you ever been in that van?

21    A.   Yes.

22    Q.   Do you know how Mr. Harris got the van?

23    A.   Yeah.  He bought it from the auction.

24    Q.   What's the auction?

25    A.   The car auction.  Police auction where they auction cars

TRIAL ONE – VOL. 17 –  3029

1   off, I guess.

2       Q.   Do you know if he got any other vehicles from that, from

3   an auction?

4       A.   Yeah.  He got that one -- a white Caprice.  It was white

5   at the time, a cop car.

6       Q.   A Caprice?

7       A.   Yes.

8       Q.   Was it later painted?

9       A.   Yes.

10      Q.   Do you remember what color it was painted?

11      A.   It was painted twice.  It was painted blue the first

12   time and black the second time.

13      Q.   Do you know if Mr. Harris had a driver's license back in

14   this time period?

15      A.   Yes.

16      Q.   How about Mr. Franklin, D-Nice?

17      A.   Yes.

18      Q.   The people you've mentioned so far, the people you

19   talked about in Homicide, did they have jobs?

20      A.   No.

21      Q.   I want to show you what's been marked as Government's

22   Exhibit 31-4#-034.

23           MR. DEVILLERS:  May I publish this the jury, too,

24   Your Honor?

25           THE COURT:  Yes, you may.

1      BY MR. DEVILLERS:

2      Q.    And what is this?

3      A.    A white van.

4      Q.    The same van I showed you earlier?

5      A.    Yes.

6      Q.    Okay.  Mr. Ledbetter, Elijah Ledbetter, what happened to

7    him?

8      A.    Elijah Ledbetter?

9      Q.    Yes.

10      A.    He was killed.

11      Q.    And do you know who killed him?

12      A.    AV; Alan Johnson.

13      Q.    Do you know what happened to Alan Johnson?

14      A.    He was killed.

15      Q.    About how long after Elijah Ledbetter was killed was

16    Alan Johnson killed, if you know?

17      A.    It ain't but a week or two.

18      Q.    Were you out at that time or were you locked up, or do

19    you recall, when Elijah was killed?

20      A.    No, I was in jail when he was killed.

21      Q.    Do you remember what you were locked up for then?

22      A.    I think a probation violation.

23      Q.    And you indicated that Mr. Johnson was then killed.

24      A.    Yes.

25      Q.    How did you learn about that?

TRIAL ONE - VOL. 17 -  3031

1    A.   Harris told me.  We used to talk about it all the time.

2  It came up from a few different people, but Harris had told me

3  what happened.

4    Q.   What did Harris tell you had happened?

5    A.   The first time he just told me that basically it was

6  handled the first time probably about '06.

7    Q.   Do you remember where you were when he told you?

8    A.   At my aunt's house.

9    Q.   Aunt who?

10   A.   My Aunt Cheryl.

11   Q.   Was something going on at the house?

12   A.   It was a cookout going on.

13   Q.   And you had a conversation with who?

14   A.   Harris.

15   Q.   What did he tell you?

16   A.   He just -- then he just told me that, you know what I'm

17  saying, that they had killed AV for killing my cousin Tone.

18   Q.   Did he indicate who was involved?

19   A.   Then, no.  Later on, yes.

20   Q.   Okay.  Who did he indicate later on?

21   A.   Him and Marcus.

22   Q.   Do you know who Marcus is?

23   A.   Peterson (sic).

24   Q.   Does he have a street name?

25   A.   Black Marc.

TRIAL ONE – VOL. 17 –   3032

1    Q.   I want to show you what's been marked as Government's

2    Exhibit 154-1-39.

3    A.   Yes.

4    Q.   And who is that?

5    A.   Marcus Peterson.

6         MR. DEVILLERS:  Your Honor, may I publish this to the

7    jury?

8         THE COURT:  Yes.  I believe that's already been

9    admitted.

10     BY MR. DEVILLERS:

11    Q.   Did Mr. Harris tell you why they killed Alan Johnson?

12    A.   Because he had killed Elijah Ledbetter.

13    Q.   Did he indicate whether he got anything for it?

14    A.   Some money.

15    Q.   Do you know how much money?

16    A.   I think it was, like, ten, fifteen thousand.

17    Q.   Where did he get that money from?

18    A.   Elijah Ledbetter.

19    Q.   From Elijah Ledbetter?

20    A.   I mean, Brandon Ledbetter.

21    Q.   Did he tell you more specifics about what happened that

22    night?

23    A.   Yes.

24    Q.   What did he tell you?

25    A.   He just said they got a call from -- I forgot who he

TRIAL ONE - VOL. 17 -  3033

1   said he got a call from.  I think it was -- I think it was

2   Tommy.

3          Somebody gave him a call, let him know that AV was with

4   China.  And they went out there, kicked the door in, and AV was

5   in the bed and Harris and Peterson -- Peterson shot him, like,

6   maybe about five, six times, four or five.

7   Q.    Okay.  Did he indicate who all went out to the scene?

8   A.    It was Ledbetter, Peterson and Harris.

9   Q.    Okay.  Do you know what Mr. Harris did with that money?

10  A.    No.

11  Q.    You mentioned Tony Jones before.

12  A.    Yeah.

13  Q.    Did Tony Jones have anything to do with what happened

14  that night?

15  A.    I'm not sure.

16  Q.    Do you know how Mr. Coates learned that AV was at

17  China's?

18  A.    I'm not sure how he knew.  I just knew he gave Ledbetter

19  the call.  Between him and -- him and Jones gave Ledbetter the

20  call.

21  Q.    Who, which Jones?

22  A.    Anthony.

23  Q.    Okay.  Did you know China?

24  A.    Yes.

25  Q.    How did you know China?

TRIAL ONE - VOL. 17 -  3034

1   A.   Just knew her from being around the neighborhood.

2   Q.   Sometime in 2006 do you remember talking to the police?

3   A.   Yes.

4   Q.   Do you remember why you talked to the police?

5   A.   No.

6   Q.   Do you remember telling them about -- anything about

7   this incident?

8   A.   Yes.

9   Q.   After that did they ever come back to you again?

10  A.   No.  Not about that, no.

11  Q.   How about drugs, were there any drugs being sold in the

12  Short North?

13  A.   Yes.

14  Q.   Back between kind of '05 and '08?

15  A.   Yes.

16  Q.   What kind of drugs?

17  A.   Crack, weed.

18  Q.   Where would the crack and weed come from?

19  A.   It would come from Rashawn.

20  Q.   Rashawn who?

21  A.   I don't know his last name.  Slaughter, I think.

22  Slaughty or something.  I don't know his last name.

23  Q.   Does he have a street name?

24  A.   Schizel.

25  Q.   Schizel?

TRIAL ONE – VOL. 17 –   3035

1    A.    Yes.

2          Ledbetter.

3    Q.    Which Ledbetter?

4    A.    Brandon.

5    Q.    All right.

6    A.    That's pretty much it.

7    Q.    And where would these drugs be sold?

8    A.    They would be sold in the Short North, all throughout

9    the Short North; Fifth Street, Sixth Street, Fourth Street,

10   Eleventh.  Just anywhere through up in there if you wanted

11   drugs, you could get it.

12   Q.    Were there any locations like houses or apartments where

13   people would sell drugs?

14   A.    Yes.  On Fifth Street and Sixth Street.

15   Q.    Start off with Fifth Street.  Is that location called

16   anything?  Do you refer to it as anything?

17   A.    The trap, the spot.

18   Q.    What would be in these traps and these spots?

19   A.    Just drugs, guns.

20   Q.    The one on Fifth Street, do you remember where it was on

21   Fifth?

22   A.    No.

23   Q.    Do you remember whose it was?

24   A.    Yes.

25         MR. BERNDT:  Your Honor, may we approach?

1                              - - -

2        Thereupon, the following proceeding was held at sidebar out

3   of hearing of open court:

4              THE COURT:  Go ahead, Mr. Berndt.

5              MR. BERNDT:  Thank you, Your Honor.

6        Your Honor, I would object to this line of questioning

7   unless Mr. DeVillers lays a foundation that this gentleman was

8   actually in these spots or these places of which he speaks.  I

9   also didn't want to object to the prior questioning where he's

10  saying that he knows certain things, but I'm going to have to

11  start objecting if he doesn't say he was told by other people

12  about certain things.  Because he -- he testified previously

13  about what he was told by Mr. Harris, and then he says that he

14  knows these things.  So the question is what did Mr. Harris

15  tell you, and he says, well, I know; and really what he's doing

16  is he's just recounting Harris' information.  He doesn't know

17  what he's saying.  He knows what Harris told him, not what he

18  knows.

19        In terms of these two spots that he just mentioned on

20  Fifth Street and Sixth street, he testified that there were

21  guns and drugs in these houses, but then he said he didn't know

22  where the house was.

23        So he's really not testifying from any personal

24  knowledge, he's not testifying from anything he heard from

25  somebody, and his answers aren't couched in terms of his degree

TRIAL ONE - VOL. 17 - 3037

1    of knowledge.

2         I don't want to object continuously, but I'm going to

3    start.

4              THE COURT:  Mr. DeVillers, any response?

5              MR. DEVILLERS:  Just because he doesn't know the

6    address of a place doesn't mean he doesn't know where the house

7    is.  I don't know the address of many places that I've been to

8    as well.  He says he knows the place.  He's been there.  I will

9    basically get into that now.

10             THE COURT:  Okay.  I think that if you establish that

11   he's been there or how he knows where they are, he doesn't have

12   to know the address, I agree.  But if you can establish that

13   he's been -- he's been there and that's how he knows where they

14   are, then I will allow that testimony to stand.

15        At this point I'm going to overrule your objection.

16             MR. BERNDT:  Yes, sir.

17             THE COURT:  Pending Mr. DeVillers' questioning to

18   establish a foundation.  If he doesn't, then you may renew your

19   objection.

20             MR. GATTERDAM:  Judge, in case there are more phone

21   calls played, can I have a continuing objection to the same

22   thing I objected to previously?

23             THE COURT:  Yes, you may.  And you all join in that,

24   even Mr. Nolder.

25             MR. NOLDER:  Solidarity.

TRIAL ONE – VOL. 17 –  3038

1      (The following proceedings were had in open court.)

2           THE COURT:  Mr. DeVillers, please continue.

3      BY MR. DEVILLERS:

4      Q.   You were talking about the trap house or a spot.  The

5  one on Fifth Street, have you ever been to this place?

6      A.   Yes.

7      Q.   Have you seen who was in it?

8      A.   Yes.

9      Q.   Were there people -- how often would you go there?

10     A.   Probably every day, every other day.

11     Q.   Who would be in this trap house?

12     A.   Different people.

13          THE COURT:  Give us a time period, Mr. DeVillers.

14     BY MR. DEVILLERS:

15     Q.   What years are we talking about here, what year?

16     A.   2006.

17     Q.   In 2006 --

18     A.   '05.

19     Q.   -- do you know whose house or whose spot that was from

20  being in there?

21     A.   Tommy's and Trav's.

22     Q.   Tommy who?

23     A.   Coats.

24     Q.   And Trav who?

25     A.   McGinnis.

TRIAL ONE – VOL. 17 –  3039

1    Q.    I believe you said there was also a trap house on Sixth

2    Street; is that right?

3    A.    Yes.

4    Q.    Have you ever been to that place?

5    A.    Yes.

6    Q.    From being in that place, do you know whose house that

7    was?

8    A.    Schizel's.

9    Q.    Would anyone in particular be selling drugs out of that

10   house besides Schizel?

11   A.    Yeah.  Deounte, Anthony Jones, Terrel.

12   Q.    Terrel who?

13   A.    Patterson.

14   Q.    Are you related to Terrel Patterson?

15   A.    Yes.

16   Q.    How so?

17   A.    My cousin.

18   Q.    Did you ever sell crack?

19   A.    Yes.

20   Q.    Where did you get your crack from?

21   A.    Schizel.

22   Q.    How did you pay for that crack?

23   A.    Money from the robberies or -- robbery.  I only bought

24   it one time.

25   Q.    How much did you buy?

TRIAL ONE - VOL. 17 - 3040

1   A.   Like, a half ounce.

2   Q.   Where did you get most of your money?

3   A.   Probably from a robbery.

4   Q.   Before Elijah died, did you commit robberies, more than

5   just street robberies with him?

6   A.   Yes.

7   Q.   Are you familiar with somebody named Q?

8   A.   Yes.

9   Q.   A female?

10  A.   Yes.

11  Q.   Tell the ladies and gentlemen of the jury what happened

12  there.

13  A.   Me, Ledbetter, Elijah and Franklin, a girl Q was selling

14  weed on Ninth Street, and we went in there, act like we was

15  buying some weed, punched her, just took her weed, took the

16  money she had in her pocket, and we left out.

17  Q.   Do you remember how much weed you got?

18  A.   It wasn't nothing, probably couple ounces of weed.

19  Q.   Do you remember how much money you got?

20  A.   Maybe about $2000.

21  Q.   You talked earlier about Lance Green and Tommy Coates.

22  Did you ever commit any robberies with them?

23  A.   Yes.

24  Q.   Do you recall an incident near Canal Winchester?

25  A.   Yes.

TRIAL ONE - VOL. 17 -  3041

1    Q.   Tell us about that.

2    A.   The guy had did something to Jiggs, owed him some money

3  or something.

4    Q.   And Jiggs is?

5    A.   Lance Green.

6    Q.   Okay.

7    A.   And he came out to the Short North and he got a -- he

8  got me, Tommy, Harris, Franklin.  Jiggs had somebody in the car

9  with him, I forgot who, who he had in the car with him, though.

10 He came and got us, we went out there.

11   Q.   Went out where?

12   A.   To Canal Winchester?

13   Q.   Do you remember how you got out there?

14   A.   We drove out there.  We drove out there.  I was in the

15 car with Harris.

16   Q.   Do you remember how many different cars?

17   A.   It was two.

18   Q.   All right.  You go out there.  What happens?

19   A.   We go out there, we get to the apartment building.  He

20 had, like, a sliding screen door, glass door.  We busted it

21 with a gun.  We went in there and ransacked the house.  Wasn't

22 nothing in there.  But then we found, like, some brick

23 wrappers.

24   Q.   What are brick wrappers?

25   A.   Like, drug wrappers.  Drug wrappers.  And we didn't find

TRIAL ONE – VOL. 17 –  3042

1    no money or nothing.  And after we didn't find nothing, we

2    left.  We left from out there and went back to the Short North.

3        Q.   What's the most you've ever gotten in a robbery?

4        A.   Maybe about seventy-eight, eighty thousand, somewhere

5    around there.

6        Q.   Do you remember where that was?

7        A.   Southfield.

8        Q.   Do you remember who you were robbing?

9        A.   No, I don't know his name.  I know his -- I know what he

10   look like.  I don't know his name.

11       Q.   How did you find out about this person?

12       A.   From Mark.

13       Q.   Mark who?

14       A.   I think -- I don't know his last name.

15       Q.   Okay.

16       A.   I can't tell you.

17       Q.   Is he alive?

18       A.   No, he's dead.

19       Q.   Who all went?

20       A.   Me, Harris, Franklin and Mark.

21       Q.   Okay.

22       A.   I think his real name Taron or something.

23       Q.   Taron Colvin?

24       A.   I think, yeah.

25       Q.   Do you know what this person did for a living that you

TRIAL ONE – VOL. 17 –  3043

1    were robbing?

2    A.    He sold drugs.

3    Q.    Do you remember how you got there?

4    A.    Yeah.  We -- Harris drove; me, Harris, Franklin.

5    Q.    Do you remember what you drove?

6    A.    A van.

7    Q.    You saw -- I showed you a picture of a white van

8    earlier.  Was that the van you drove?

9    A.    No.

10    Q.    Did he have more than one van?

11    A.    Yes.

12    Q.    Okay.  Describe --

13    A.    His mom had a van.

14    Q.    Describe that van.

15    A.    She had several different vans, for real.  I think the

16    one we was in was, like, blue, like a bluish, grayish van.

17    Q.    Dark blue or light blue?

18    A.    Like, light blue, grayish.

19    Q.    Okay.  So you go out there.  What do you do?

20    A.    We go out there.  I knock on the door, me and -- me and

21    Franklin knock on the door.  Some girl answers.  Asked her for

22    some water or something and she, like, turned her back a little

23    bit.  We just pulled the guns out, went in there, laid her

24    down.  Harris and Colvin came in there, ransacked the house,

25    find the money, some jewelry, a gun, and we left.

TRIAL ONE - VOL. 17 -   3044

1    Q.    How much did you find?

2    A.    Oh, like, seventy-eight, eighty thousand.

3    Q.    Do you remember where it was found?

4    A.    In a drawer.

5    Q.    You said you went up and you knocked on the door.  Is

6    that a typical thing you would do when you do a robbery?

7    A.    Sometimes.  It all depends.

8    Q.    Okay.  Did you have a particular role when you did these

9    robberies?

10   A.    Yes.

11   Q.    What was your role?

12   A.    Sometimes.  It all depends.

13   Q.    Typically, what would your role be?

14   A.    Knock on the door.

15   Q.    Why you?

16   A.    I don't know.  Probably because I was up for it.

17   Q.    What's that?

18   A.    I said probably because I was up for it.

19   Q.    When you do these -- these robberies, what would you

20   wear?

21   A.    All black.

22   Q.    Anything else?

23   A.    Gloves and masks.

24   Q.    Do you know a person by the name of Quincy White?

25   A.    Yes.

TRIAL ONE - VOL. 17 -  3045

1    Q.   Does he have a street name?

2    A.   I think it was Q.

3    Q.   I'm going to show you what's been marked as Government's

4    Exhibit 153-310.  Do you recognize that person?

5    A.   Yes.

6    Q.   Who is that?

7    A.   Q.

8    Q.   Are you aware of a situation where he was shot?

9    A.   Yes.

10   Q.   How did you become aware of that situation?

11   A.   Liston, Harris, Franklin, we would sit and talk about it

12   openly.

13   Q.   What did they tell you about it?

14   A.   I guess he had did something to another guy from the

15   Short North, got over on him on some drugs, tried rob him.

16   Liston caught up with him, seen him in the Short North, he shot

17   him.

18   Q.   Did Liston tell you this?

19   A.   Yes.

20   Q.   Did he tell you where he was?

21   A.   Where who was?

22   Q.   Where this took place, where this shooting took place?

23   A.   In the Short North between, like, Fourth and Fifth.

24   Q.   Was there any particular establishment in that area

25   that's common to the Short North?

TRIAL ONE – VOL. 17 –  3046

1     A.   D&J's.

2     Q.   What's D&J's?

3     A.   It's a carryout.  It's a store.

4     Q.   Do you know a person by the name of Tony Cumberland?

5     A.   Yes.

6     Q.   Does he have a street name?

7     A.   Shitty Tone.

8     Q.   Shitty Tone?

9     A.   Yeah.

10    Q.   All right.  Do you know where he's from?

11    A.   He's from out south like Twenty-Second area.

12    Q.   Is there a particular gang that's out in that area?

13    A.   Twenty-Second Bloods.

14    Q.   Are you aware of a situation between Mr. Harris and

15   Mr. Cumberland, or Shitty Tone?

16    A.   Yes.

17    Q.   What happened?

18         Wait a minute.  First of all, how did you become aware

19   of if?

20    A.   Harris told me.

21    Q.   What did he tell you?

22    A.   He just told me that they was out riding one day.

23    Q.   Who is that?

24    A.   Harris, Tone, Franklin.  Somebody else I'm not sure.  I

25   want to say it was Liston.

TRIAL ONE – VOL. 17 –  3047

1          THE COURT:  Mr. Patterson, which Tone was this that

2    you're referencing now?

3          THE WITNESS:  Antonio Harris.

4      BY MR. DEVILLERS:

5      Q.    Okay.  Does he have a street name?

6      A.    Tone, Fat Tone.

7      Q.    This isn't Tony Jones?

8      A.    No.

9      Q.    I'm going to show you what's been marked as Government

10   Exhibit 154-1-20.  Can you tell me who that is?

11     A.    That's Tone, Fat Tone.

12     Q.    Is he related to Mr. Harris?

13     A.    Yes.

14     Q.    How so?

15     A.    His cousin.

16     Q.    Okay.  So I believe you said Mr. Harris, Fat Tone and

17   Franklin and someone else you're not sure were driving around.

18     A.    Yes.

19     Q.    What happened?

20     A.    They was riding up Twenty-Second, the one way, which is

21   a gang neighborhood.  And I guess dude Shitty Tone was out

22   there while they was riding up the one way, and he shot Harris'

23   car up.

24     Q.    Do you know what car?

25     A.    It was a blue Caprice.

TRIAL ONE - VOL. 17 - 3048

1    Q.    And what happened next?

2    A.    He shot his car up, and they leave from out south.  They

3    switch cars.

4    Q.    And who is they?

5    A.    Harris.  Ussury was with them, but I don't think he was

6    with them that time, though, on the way back.  But going back

7    out there, he was with them.

8    Q.    Okay.  When the shooting of Harris' car took place,

9    Ussury wasn't with them?

10   A.    No.

11   Q.    All right.

12   A.    I don't believe, no.

13   Q.    All right.  When they go back, you said they switched

14   cars?

15   A.    Yes.

16   Q.    Do you know what cars they switched to?

17   A.    A van, that white van.

18   Q.    All right.  So now who is in this white van?

19   A.    It's Harris, Ussury, Franklin, and I believe Liston.

20   Q.    Okay.  Where do they go?

21   A.    They went back out south off of Whittier riding around

22   out there looking for dude Shitty Tone.

23   Q.    Did they find him?

24   A.    Yeah, they found him.

25   Q.    What happened?

TRIAL ONE – VOL. 17 –   3049

1    A.    They —— they pull up off of Whittier, and I guess he was

2   standing out there and Harris shot him.  He shot him, like, in

3   the leg or pelvis area somewhere.

4    Q.    Do you know if Shitty Tone lived?

5    A.    Yeah, he did.

6    Q.    I want to show you a photograph, 1-3.  Do you recognize

7   this photograph?

8    A.    Yes.

9    Q.    What is that?

10    A.    That's Miss Harris' Caprice.

11         MR. DEVILLERS:  May I publish this to the jury,

12   Your Honor?

13         THE COURT:  Yes, you may.

14     BY MR. DEVILLERS:

15    Q.    I believe you earlier indicated this was purchased at an

16   auction?

17    A.    Yes.

18    Q.    And what was the original color?

19    A.    It was an all white police car.

20    Q.    Police car.  What do you mean a police car?

21    A.    It was a cop car.

22    Q.    How do you know it was a cop car?

23    A.    It had the cop stickers on there, the red/white, cop

24   badge.  It was a police auction.

25    Q.    And when it was white, you indicated it was painted what

TRIAL ONE – VOL. 17 –   3050

1   color after that, after white?

2   A.   This blue right here (indicating).

3   Q.   Was it later painted a different color?

4   A.   Yeah.  Black.

5   Q.   I want to show you what's been marked as Government's

6   Exhibit –– strike that.

7        You indicated he had another car as well?

8   A.   Yes.

9   Q.   What kind of car?

10  A.   A Monte Carlo.

11  Q.   What color was that?

12  A.   Black.  All black with a blue stripe.

13  Q.   I show you what's been marked as Government's Exhibit

14  1-2-127.  Do you see that?

15  A.   Yes.

16  Q.   Do you recognize that?

17  A.   Yes.

18  Q.   What is that?

19  A.   It's a Monte Carlo.

20  Q.   Whose Monte Carlo?

21  A.   Harris.

22       MR. DEVILLERS:  May I publish this to the jury,

23  Your Honor?

24       THE COURT:  Yes, you may.

25   BY MR. DEVILLERS:

TRIAL ONE – VOL. 17 – 3051

1   Q.   It appears that there's something on the hood there.  Do
2   you know what that is?
3   A.   That's Elijah Ledbetter's face.
4   Q.   I'm now going to show you what's been marked as
5   Government's Exhibit 1-2-125.  Could you tell me who that is?
6   A.   That's Harris.
7   Q.   And what's he driving?
8   A.   A black Monte Carlo.
9   Q.   I want to show you what's been marked as Government's
10  Exhibit 1-2-080.  Can you tell me what that is?
11  A.   That's a painting of Elijah Ledbetter.
12  Q.   And what's it painted on?  What's it on, describe --
13  A.   Oh, it's on the hood of the car.
14  Q.   Whose car?
15  A.   Harris' car.
16       MR. DEVILLERS:  Your Honor, may I publish this to the
17  jury?
18       THE COURT:  Yes, you may.
19    BY MR. DEVILLERS:
20  Q.   Do you know a person by the name of Rastaman Wilson?
21  A.   Yes.
22  Q.   How do you know Rastaman Wilson?
23  A.   From being in prison with him.
24  Q.   And where was that?
25  A.   Ross Correctional.

TRIAL ONE – VOL. 17 – 3052

1    Q.   Who else was in prison with you at Ross correction?

2         Let me ask you this:

3         I think you testified earlier that at one point Tony

4    Jones, Buck, Mr. Liston, Chris Harris and RJ were locked up

5    with you; is that accurate?

6    A.   Yes.

7    Q.   All right.  Was Rastaman Wilson locked up with you also

8    during that same time period?

9    A.   No.

10   Q.   Okay.  When did he come?

11   A.   I ain't sure exactly when he came, but it had to be,

12   like, maybe around 2013, maybe.

13   Q.   Okay.

14   A.   Somewhere in there.

15   Q.   Did he know anybody that you knew?

16        THE COURT:  He who?

17     BY MR. DEVILLERS:

18   Q.   I'm sorry.

19        Did Rastaman Wilson know anybody that you knew?

20   A.   Yes.

21   Q.   Who?

22   A.   My uncle.

23   Q.   And who was your uncle?

24   A.   Tyrell.

25   Q.   Do you know a person that goes by Tink?

TRIAL ONE - VOL. 17 -  3053

1    A.   Yes.

2    Q.   And how do you know Tink?

3    A.   Just from being around the neighborhood.  I was in

4  prison with him.

5    Q.   Okay.  So you've seen him in the neighborhood?

6    A.   Yes.

7    Q.   All right.  Are you aware of an event involving some of

8  the Homicide guys and Tink and Rastaman?

9    A.   Yes.

10   Q.   How did you become aware of it?

11        MR. NOLDER:  Your Honor, objection.  May we approach?

12        THE COURT:  Yes.

13                      - - -

14   Thereupon, the following proceeding was held at sidebar out

15  of hearing of open court:

16        THE COURT:  Go ahead, Mr. Nolder.

17        MR. NOLDER:  Your Honor, from the discovery and the

18  summaries that I received, I fully expect that this witness is

19  going to state that while he was in custody with RJ Wilson, and

20  I believe the other guys that Mr. DeVillers is asking about,

21  that there was a discussion between RJ and this witness, Troy

22  Patterson, as to what happened there in Pataskala.  I believe

23  that based on the summary, that he's going to say that RJ

24  Wilson told him about the event in Pataskala and implicated my

25  client Clifford Robinson.

TRIAL ONE – VOL. 17 –    3054

1      So, first of all, I don't see how this is a

2   coconspirator statement because it does nothing to further the

3   conspiracy.  And, secondly, the declarant there, RJ Wilson, is

4   not unavailable and so he could come in and testify about those

5   events if he is so inclined.

6          MR. DEVILLERS:  I believe, actually, it says Chris

7   Harris and RJ Wilson told him about this while they were in

8   prison.  And Chris Harris is clearly unavailable, I believe,

9   and I'm not certain it's even arguable that RJ is unavailable

10  because he's not been sentenced yet.

11         THE COURT:  Is this witness going to say that Chris

12  Harris told him about it?

13         MR. DEVILLERS:  Yes.

14         THE COURT:  As opposed to one of the RJs?

15         MR. DEVILLERS:  Yes.

16         THE COURT:  Counsel, mostly for the jury, and also for

17  the Court, I don't -- it's not problematic if you refer to some

18  of these witnesses or other coconspirators by their street

19  names, but when you come to the RJs, that can be confusing.  So

20  to the extent that you can refer to them by their names, I

21  believe it would be helpful for the jury because, you know, you

22  guys have lived with it for so long so you know the different

23  RJs because of context.  The jurors who are hearing some of

24  this for the first time may not.

25         So, go ahead.  You were going to say something,

TRIAL ONE - VOL. 17 -  3055

1    Mr. Nolder?

2          MR. NOLDER:  Well, I'm going to recount what's in the

3    summary.  It says Patterson advised that Robert Wilson, aka RJ,

4    shot a man with a .45 caliber Hi-Point and that Tink, Clifford

5    Robinson, also shot him.  So, again, the declarant there is

6    Robert Wilson.

7          MR. DEVILLERS:  I don't think it -- may I see it?

8          MR. NOLDER:  Sure.

9          MR. DEVILLERS:  In the next sentence it says advised

10   that while Harris and Wilson were all in Ross Correctional,

11   Harris told him about the shooting.  Harris told him,

12   Patterson, in Wilson's presence and that Wilson did not have to

13   go and shoot the moon.

14         MR. NOLDER:  And he doesn't implicate Clifford

15   Robinson, is the point there.  The implication there is that RJ

16   Wilson, who did plead guilty to that event and who hasn't been

17   sentenced, like Mr. DeVillers has said, is the declarant and

18   that he's not unavailable and he can come in and testify about

19   that.  I have no way of -- this is about the fourth time I've

20   been unable to cross-examine the declarant in a very important

21   component of this trial that implicates my client.  So I hereby

22   object.

23         THE COURT:  Is Wilson coming in to testify,

24   Mr. DeVillers?

25         MR. DEVILLERS:  No, Your Honor.

TRIAL ONE - VOL. 17 -   3056

1          THE COURT:  He's not?  Well, and your representation

2   is that you're going to elicit testimony from this witness that

3   Harris told him?

4          MR. DEVILLERS:  Yes.  I can be very specific about

5   that.

6          THE COURT:  Then your objection is overruled,

7   Mr. Nolder.

8          MR. GATTERDAM:  Your Honor, can we also address the --

9   or have a continuing objection to this line of questioning

10  where people are just shooting the breeze and talking about

11  things that happened?  I don't see where that's in furtherance

12  of the conspiracy.  And I think it's coming -- it's been coming

13  in, it's going to continue to come in.  I just want to note my

14  objection to statements -- you know, the AV Johnson thing,

15  Harris is telling him this and there's really no context that

16  he's telling him for some reason that's in furtherance of the

17  conspiracy.  I think one time it's even a cookout so it's

18  obviously not in furtherance of the conspiracy.

19         THE COURT:  You may have a continuing objection, but I

20  would urge you to object to the discrete statements.  If you

21  don't think that there's a context, then perhaps you should

22  make an objection to that because I think that the statements

23  thus far have been in the context of the furtherance of the

24  conspiracy.  There was no objection made to the statement made

25  at the cookout.  The Court didn't have to decide that issue.

TRIAL ONE - VOL. 17 - 3057

1   But with respect to the other statements, I believe that they

2   were made in the context of the furtherance of the conspiracy,

3   which is why they have been allowed in.

4        But you may -- the short answer to your question is --

5   your request is, yes, you may have a continuing objection.  But

6   since all of the statements aren't of the same category; that

7   is, all of the statements weren't like cookout statements, some

8   of them were you're going to do this to achieve this objective

9   then, you know, you may want to just bring them to the Court's

10  attention.  That's all I'm saying.

11       MR. GATTERDAM:  Are you okay with me -- so that we

12  don't do a sidebar for each -- just standing up and objecting

13  and saying it's not in furtherance of?  Is that enough?

14       THE COURT:  That's fine.

15       MR. BERNDT:  Your Honor, on behalf of Mr. Ledbetter,

16  we'll join in Mr. Gatterdam's request.

17       MS. DIXON:  We'll join as well.

18       THE COURT:  Absolutely.  Okay.

19     (The following proceedings were had in open court.)

20       THE COURT:  Ladies and gentlemen, we'll take our

21  morning recess now.  Mr. DeVillers just advised this is a good

22  breaking point.  We'll stand in recess until 10:45.

23     (Recess taken from 10:33 a.m. to 10:45 a.m.)

24       THE COURT:  Mr. DeVillers, please continue.

25

TRIAL ONE - VOL. 17 -  3058

1   BY MR. DEVILLERS:

2   Q.   Mr. Patterson, I want to clear up a few things.  I want

3   to show you again what's been marked as Government's

4   Exhibit 153-310.  And who is this?

5   A.   This is Q.  Quincy.

6        MR. DEVILLERS:  May I publish it for the jury, Your

7   Honor, and enter it into evidence?

8        THE COURT:  Yes, you may.

9   BY MR. DEVILLERS:

10  Q.   I'd like to show you Government Exhibit 1-2-125.  Who is

11  this, Mr. Patterson?

12  A.   Chris Harris.

13  Q.   What's he in?

14  A.   A black Monte Carlo.

15       MR. DEVILLERS:  Your Honor, may I publish this to the

16  jury?

17       THE COURT:  Yes, you may.

18  BY MR. DEVILLERS:

19  Q.   I think before we broke, Mr. Patterson, we talked about

20  an incident involving some of the homicide guys and Rastaman

21  Wilson.

22  A.   Correct.

23  Q.   Specifically, as far as Chris Harris, did Chris Harris

24  tell you anything about that event?

25  A.   Yes.

TRIAL ONE - VOL. 17 -  3059

1    Q.   What did he tell you?

2    A.   He told me they had went out to -- I forgot where he

3    said it was at.  I think it was -- I want to say Pataskala to a

4    robbery.  And it was him, Tink, Rastaman Wilson, some other

5    guy, Dave.  I don't know his last name.  They went there for

6    the robbery.  I don't know what all they got out of there.  I

7    know there was a guy end up getting killed in there.

8    Q.   Did he tell you anything about firearms?

9    A.   Like who had guns?

10   Q.   Yes.

11   A.   Yeah.  All of them had guns.  Yes.

12   Q.   Do you know what type of guns, from Chris Harris?

13   A.   They said Wilson had a Hi-Point .45.

14   Q.   Why wouldn't you talk about a Hi-Point .45?

15   A.   He said Wilson shot him with a Hi-Point .45.

16   Q.   Why would he say that?  What's the big deal about a

17   Hi-Point .45?

18   A.   It's a low-profile gun.  It's probably one of the

19   wickedest guns.  It jams.  It's not a good gun.

20   Q.   Any other guns talked about?

21   A.   AK-47.

22   Q.   Did Chris tell you who fired?

23   A.   Yes.

24   Q.   What did he say?

25   A.   He just said Wilson had shot the guy with a -- with a

TRIAL ONE – VOL. 17 –  3060

1    big dumb-ass Hi-Point .45.

2      Q.   I want to show you what's been marked as Government's

3    Exhibit 1-2-067.

4           What are we looking at here, Mr. Patterson?

5      A.   That's a picture where when we was in Ross Correctional

6    Institution.

7           MR. DEVILLERS:  I believe this has been admitted.  May

8    I publish to the jury?

9           THE COURT:  Yes, you may.

10    BY MR. DEVILLERS:

11     Q.   Who is in this photograph?

12     A.   Me.

13     Q.   You can actually touch the screen.  Can you circle which

14    one is you?  Touch the screen.  It will make a circle.

15     A.   (Witness complies.)

16     Q.   Who else?

17     A.   Allen Wright.

18     Q.   Make a mark where he is.

19     A.   (Witness complies.)

20     Q.   Who else?

21     A.   Harris.

22     Q.   Make a mark where he is.

23     A.   (Witness complies.)

24     Q.   Who else?

25     A.   Tees. (Spelled phonetically.)

TRIAL ONE – VOL. 17 – 3061

1    Q.   Who is that?

2    A.   The guy in the middle.

3    Q.   Is he from the Short?

4    A.   Yes.

5    Q.   Who else?

6    A.   I don't know who the other guy is in the middle.  This

7  is Wilson right here.

8    Q.   Which one is Wilson?

9    A.   (Witness complies.)

10   Q.   What's his street name?

11   A.   RJ.

12   Q.   This time period when this photograph was taken, was

13  Rastaman Wilson locked up with you?

14   A.   I don't think so.

15   Q.   Do you know if it was before or after this?

16   A.   It was after.  He was locked up after this photograph

17  right here.

18   Q.   I want to show you what's been marked as Government's

19  Exhibit 1-2-065.  Who is this?

20   A.   That's Chris Harris.

21        MR. DEVILLERS:  Your Honor, may I publish to the jury?

22  I believe it's already been admitted.

23        THE COURT:  Yes, you may.

24   BY MR. DEVILLERS:

25   Q.   What's he doing with his hand?

TRIAL ONE - VOL. 17 -  3062

1    A.   Throwing up homicide.

2    Q.   I want to play for you -- strike that.

3         How often would you talk to Rastaman Wilson while you

4  were locked up with him?

5    A.   Me and Rastaman didn't start talking -- not often.  We

6  probably didn't start talking till about 2014, '13.

7    Q.   I want to play Government's Exhibit 150-1431 starting at

8  7:20.  1431.  7:20.

9    (Audiotape played in open court.)

10        MR. DEVILLERS:  Stop there.

11  BY MR. DEVILLERS:

12   Q.   Do you recognize the voice?

13   A.   That's Rastaman.

14   Q.   Do you know who Parkay is?

15   A.   Yes.

16   Q.   Did you do something to Parkay?

17   A.   Yes.

18   Q.   What did you do?

19   A.   We robbed him.  It was a robbery one day: me, Harris,

20  another guy that was incarcerated with us.

21   Q.   We'll get to that.  Let's keep listening to this.  Can

22  you tell who he's talking about from -- from talking about

23  Parkay?

24   A.   Yes.

25   Q.   Who is he talking about?

TRIAL ONE – VOL. 17 – 3063

1    A.   His girlfriend.  Parkay's girlfriend.

2    Q.   Keep listening.

3       (Audiotape played in open court.)

4          MR. DEVILLERS:  Stop there.  We stopped at 8:39, Your

5    Honor?

6          THE COURT:  Yes.

7          MR. DEVILLERS:  I'd like to start up again at 9:30.

8       (Audiotape played in open court.)

9          MR. DEVILLERS:  Stop there.

10   BY MR. DEVILLERS:

11   Q.   Did you hear that part?

12   A.   Yes.

13   Q.   Who is he talking about there?

14   A.   I think he was talking about the other Wilson.

15   Q.   Who is the other Wilson?

16   A.   RJ.  Talking about his cousin.  That's the only one I

17   could think of.  I'm not related to them.

18          MR. GATTERDAM:  Objection, Your Honor.  Speculation.

19   Move to strike.

20          THE COURT:  Sustained.  Ladies and gentlemen, you're

21   instructed to disregard Mr. Patterson's prior testimony

22   inasmuch as it's speculative.

23          Please continue, Mr. DeVillers.

24          MR. DEVILLERS:  Keep playing.

25       (Audiotape played in open court.)

TRIAL ONE – VOL. 17 – 3064

1          MR. DEVILLERS:  Stop there.

2          And I believe we stopped, Your Honor, at 10:37.

3          THE COURT:  All right.

4     BY MR. DEVILLERS:

5     Q.    Whose voice is this?

6     A.    It was Rastaman.

7     Q.    Do you know who the other voice is?

8     A.    No.

9     Q.    Do you know a person by the name of Mook?

10    A.    Yes.

11    Q.    Who is Mook?

12    A.    He's a drug dealer -- street dealer, drug dealer.

13    Q.    Did you ever rob him?

14    A.    I didn't rob him personally, but Harris and a few other

15    guys had robbed him.

16    Q.    And how do you know this?

17    A.    Because they told me.  I mean, I was there right before

18    they went.

19    Q.    Tell us what happened right before you went -- they

20    went.

21    A.    Me and Anthony Jones was over a girl Melissa's house in

22    the Short north.  And Tone had got a call from I think it might

23    have been Liston.

24    Q.    Don't speculate.  Do you know who it was from, or are

25    you just thinking?

TRIAL ONE - VOL. 17 - 3065

1    A.   I'm not for sure.  It was one of them.  I'm not for

2   sure.  He got a call telling him to come on, they was ready.

3   And he knew that I had knew about it --

4    Q.   Who is "he"?

5    A.   Anthony Jones.

6    Q.   Okay.

7    A.   He knew I knew about it because I was supposed to go.

8    Q.   Knew about what?

9    A.   The robbery.

10   Q.   Was there a plan before this?

11   A.   Yes.

12   Q.   Tell us about that.

13   A.   The plan was we was supposed to go out there and go to

14  Mook's house.

15   Q.   Who is "we"?

16   A.   Me, Liston, Harris, Franklin, and that was it

17  originally.

18   Q.   Do you know how you knew about this house?

19   A.   Brandon Ledbetter.

20   Q.   So the plan was to do what?

21   A.   To rob him.

22   Q.   All right.  So then you're at a house, Melissa's house,

23  with Tony Jones?

24   A.   Yes.

25   Q.   Tell us what happened.

TRIAL ONE – VOL. 17 –  3066

1    A.   Me and Tony Jones over there.  He got a call telling him

2    to come on.  He knew I was going to follow him out the house

3    because I was waiting on the call too.  When he get the call to

4    come on, he spin me off like it was a shooting just happen

5    somewhere.

6    Q.   What do you mean spin you off?

7    A.   Spin me off like play me, lied, indicating there was a

8    shooting somewhere so me and him would break off and split up.

9    So we go out the house.  He told me somebody was on Ninth

10   shooting and they just drove up Fifth Street.

11   Q.   Where were you when he drove up Fifth Street?

12   A.   No, that's where he said the car -- he told me that's

13   what call he got, that there was a shooting.  So we go outside.

14   He's like, You go this way, I'm going to go that way.

15        I go towards Ninth.  He goes towards Fifth Street and

16   cut back towards Eleventh where Harris, Liston, Franklin,

17   India, was all waiting for him to go out to do Mook's house.

18   But I didn't later find this out until they came back.

19   Q.   About when did they come back?

20   A.   The same night probably about two hours later, an hour

21   later.

22   Q.   Where did they come back to?

23   A.   The Short North.

24   Q.   Where in the Short North?

25   A.   Back at Melissa's house on Fourth and Eleventh.

TRIAL ONE - VOL. 17 -  3067

1    Q.   Who came into Melissa's house?

2    A.   They didn't come in.  They was in the van.

3    Q.   Whose van?

4    A.   Harris's mom's van.  It was Harris, India, Liston,

5  Franklin, Tony Jones, and that was it at the time.

6    Q.   Did they tell you what happened?

7    A.   Yeah.  He just told me that --

8    Q.   Who is "he"?

9    A.   They told me that Mook --

10        MR. GATTERDAM:  Objection.

11  BY MR. DEVILLERS:

12   Q.   Who is "they"?

13        THE COURT:  Sustained.  Go ahead.

14  BY MR. DEVILLERS:

15   Q.   Who is "they"?  Who told you about this?

16   A.   Harris, Liston, Franklin, Tony Jones.  They the ones --

17  when they came back, they had told me about it.

18   Q.   Tell me what they said.

19   A.   They had on like some minks.

20   Q.   What do you mean minks?

21   A.   Mink coats, expensive coats, fur coats.

22        When they come back, I see them with all this flashy

23  stuff on.  So they just told me that they just came back from

24  robbing Mook.  They said they hit one house for 40,000 and hit

25  the other house for like 50 -- 50,000.

TRIAL ONE - VOL. 17 -  3068

1    Q.   Two houses?

2    A.   Yes.

3    Q.   Were they both Mook's house?

4    A.   Yes.  Both his.  That's when I later found out that Tony

5    Jones had spun me off, lied to me, because he ain't want me to

6    go.  He ain't want me to get, you know what I'm saying, a cut

7    of the money because he probably wasn't going to get none,

8    because he wasn't supposed to go originally.

9    Q.   Did you ever get any money?

10   A.   Yes.

11   Q.   What did you get?

12   A.   I think they gave me like 500 apiece.

13   Q.   Do you know if Mr. Ledbetter ever got paid?

14   A.   Yes.

15   Q.   Do you know how much he would get?

16   A.   In that particular one, no, I don't know exactly how

17   much he got.

18   Q.   I'm going to take you back to April of 2007.  Do you

19   remember the first time you were involved in something where

20   someone was killed?

21   A.   Yes.

22   Q.   Tell the ladies and gentlemen of the jury about it.

23   A.   About April 2007, me, Harris, Liston, Franklin, Ussury,

24   and Ledbetter had went to a robbery up north off of Schrock.

25   Q.   Let me ask you this.  Let's go back a day.

TRIAL ONE - VOL. 17 -  3069

1    I believe you testified before that you did some time in

2  DH?

3   A.   Yes.

4   Q.   And what is DH?

5   A.   Detention home for juveniles.

6   Q.   Have you ever picked up anybody up at a DH?

7   A.   Yes.

8   Q.   Who?

9   A.   Liston.

10   Q.   Do you remember when -- did you do that -- do you

11  remember when in relation to this event that happened?

12   A.   I believe it was the same night, same day.

13   Q.   What happened?

14   A.   We had went and picked Liston up from the DH, me --

15   Q.   Who?

16   A.   -- and Harris.

17   Q.   Where is the DH?

18   A.   South Front Street.  We had went and picked him up from

19  the DH.  And when we leave picking him up, we go to the -- we

20  end up in the Short North.  And I guess Ledbetter had called.

21        MR. BERNDT:  Objection, Your Honor.

22        THE COURT:  Sustained.

23   BY MR. DEVILLERS:

24   Q.   You said you guessed.  Did you talk to Ledbetter after a

25  phone call came?

TRIAL ONE - VOL. 17 - 3070

1    A.    Not after the phone call, no.

2          THE COURT:  Would you have him identify -- we had two

3    Mr. Ledbetters identified variously.

4          MR. DEVILLERS:  I understand.

5    BY MR. DEVILLERS:

6    Q.    Let's start over a little bit.  Was there anything

7    special about this day when this happened?

8    A.    Somebody got killed.

9    Q.    Anything more friendly or happy about that day?

10   A.    Liston was released from the juvenile that night on his

11   birthday.

12   Q.    It was his birthday?

13   A.    Yes.

14   Q.    Do you know how old he was?

15   A.    I think he just turned 18.

16   Q.    How old were you?

17   A.    I think I was 15 or 16.

18   Q.    Okay.  So I believe now we're in the Short and you're

19   with some people.  Who are you with in the Short?

20   A.    Harris, Ussury, Franklin, Liston and Brandon later

21   appeared -- Ledbetter.

22   Q.    Where did Brandon later appear?

23   A.    In the Short North, Fourth Street.

24   Q.    Do you know how he got there?

25   A.    He drove his van.

TRIAL ONE - VOL. 17 -  3071

1   Q.   Do you know what kind of van it was?

2   A.   Maroon, like a maroon, big van.

3   Q.   I want to show you what's been marked as Government's

4   Exhibit 48-11.  Can you see that?

5   A.   Yes.

6           MR. DEVILLERS:  Can you make it bigger so he can see

7   it?

8           May I have a moment, Your Honor?

9           THE COURT:  Yes, you may.

10   BY MR. DEVILLERS:

11   Q.   What are we looking at here, Mr. Patterson?

12   A.   That's Ledbetter's van.

13           MR. DEVILLERS:  Your Honor, may I publish this to the

14   jury?

15           THE COURT:  Yes, you may.

16   BY MR. DEVILLERS:

17   Q.   Have you ever been in that van?

18   A.   Yes.

19   Q.   What's it like inside?

20   A.   It's like -- Ohio State seats inside.  Ohio State

21   material.

22   Q.   So Mr. Ledbetter shows up.  Is he with anybody?

23   A.   No.  He's by himself.

24   Q.   When he shows up, what happens?

25   A.   He shows up.  Him and Harris walk off to the side

TRIAL ONE - VOL. 17 -  3072

1   talking about I don't know want.

2           MR. BERNDT:  Objection, Your Honor.

3           THE COURT:  Overruled.

4     BY MR. DEVILLERS:

5     Q.   Go ahead.

6     A.   Talking about I don't know what.  So when he comes

7   back --

8     Q.   Who comes back?

9     A.   Harris and Ledbetter.  They just walk off to the side a

10  little bit.  They didn't go too far.  They come back.  We sat

11  on the porch, right on the stoop at Fourth and Ninth.  He come

12  back and like, You all ready?

13          Me, Harris, Ussury, Franklin and Liston, we get in the

14  van.

15    Q.   Whose van?

16    A.   Harris's mom's van.

17    Q.   Do you remember which one it was?

18    A.   It was like grayish, bluish, light gray, bluish-type

19  van.

20    Q.   Go ahead.

21    A.   We get in the van.  We head out to the robbery.  We was

22  supposed to be going stakeout, just check it out.  We was going

23  to see what was going on over there.  So basically him coming

24  to show us where the dude live, seeing if anybody there.

25    Q.   How do you know to get there?

1    A.    Ledbetter.

2    Q.    Okay.  Did Harris tell you what Ledbetter told him?

3    A.    Yes.

4    Q.    What did he say?

5    A.    Later on, not then, but later on after the situation had

6    took place, then, you know what I'm saying, we was sitting

7    talking about it.  Then he told me what had happened.

8    Q.    Let's go over the situation and then we'll talk about

9    what Mr. Harris told you.  Where do you go?

10   A.    We get to off of Schrock, to some apartments off of

11   Schrock.  He told us it was supposed to be like the second or

12   third door from the end.  So me and Harris get out the van, go

13   up to the apartment door.  And we knocking on the door just to

14   see if anybody in there.  If there ain't nobody in there, more

15   than likely we was going to go in there if there wasn't nobody

16   in there.

17        So as we're knocking on the door, we get a two-way from

18   Franklin.

19   Q.    Let me ask you this.  When you're knocking on the door,

20   are you saying anything or just knocking?

21   A.    No.  We're just knocking on the door.

22   Q.    Who was with you that the time?

23   A.    Me and Harris.

24   Q.    Just you two?

25   A.    Yes.

TRIAL ONE - VOL. 17 -  3074

1    Q.   Were you carrying a gun?

2    A.   No.

3    Q.   Why weren't you carrying a gun?

4    A.   Because previously a situation had tooken place where I

5    had knocked on the door and a guy had opened the door with a

6    M16 and pointed it at me --

7    Q.   Why were you knocking on that door?

8    A.   Trying to rob him, seeing if anybody was home.  Just

9    knocking on the door seeing if anybody was home before we go in

10   there.  That's usually the thing we do, knock on the door and

11   see if anybody in there.

12   Q.   Do you remember who that was, who you were trying to rob

13   that time?

14   A.   I forgot his name.  An older guy.  I forgot his name.

15   Q.   What happened that time?

16   A.   I knocked on the door and he opened the door.  He said,

17   Who is it?  I asked for a girl named Kiesha.  And he said,

18   Don't no Kiesha live here.

19        As he was saying it, he opened the door with a gun in

20   his hand.  I just put my hands up like -- he told me to get

21   away from here.  I'm like all right, basically indicating that

22   I had the wrong house.  And ever since then, that situation

23   right there, I -- if he had seen my gun, he probably would have

24   shot me.  I had my hands up, you know what I'm saying.

25   Q.   Let's go back to April 2007.  You're knocking on a door?

TRIAL ONE - VOL. 17 -  3075

1    A.    Yes.

2    Q.    What happened?

3    A.    As we knock on the door, Franklin had two-wayed

4    Harris --

5    Q.    What's a two-way?  What do you mean by two-way?

6    A.    That's when Nextels was the phones then, the two-way

7    chirp.

8    Q.    Okay.

9    A.    Like a two-way chirp.  I don't know how more to explain

10   that.

11         He got a two-way chirp indicating that the guy we was

12   coming to rob was just pulling up.  You know what I'm saying?

13   So when he two-wayed that, me and Harris walk away from the

14   door.  We walk to another door like to play it off.  He told us

15   the dude just pulled up.  By this time we walk to another door.

16   The guy was coming from the side of the apartment.

17   Q.    Where is Brandon Ledbetter at this point?

18   A.    He was in his van the whole time.  He was -- he played

19   behind the scenes, don't want to be seen or nothing.  He was

20   just showing, you know what I'm saying, where the dude lived

21   at.

22   Q.    Where was that van parked in relation to the doors you

23   were at?

24   A.    It was parked maybe -- it was in the back.  He parked in

25   the back of the apartments.

1    Q.   Go on.

2    A.   And so as we walking away from that door going to

3    another door to play it off, the guy was coming up the side,

4    from the side of the building.  And Harris -- I mean, Franklin,

5    Ussury, and Liston was running up on the dude with their guns

6    out.  You know what I'm saying?  So we seeing them running up

7    on the dude with the guns out.  Me and Harris go over there, we

8    pat the dude down, snatch his earrings out, just seeing what he

9    got on him.

10        When we did that, we told the dude to walk us into the

11   house, to his apartment.  But we found out that we was knocking

12   on the wrong apartment.  I think it was the third door from the

13   end instead of the second one --

14   Q.   All right.

15   A.   -- that we was knocking on.  So we walk the guy to the

16   door.  Me, Harris, Franklin, Ussury, walk the guy to the door.

17   They had guns to him.  So we told him to walk us in the house.

18   So he put his key in the door, act like it didn't work.  So

19   when he act like it didn't work, we told him to knock on the

20   door.  So we knock on the door.  Some lady from the inside, she

21   say -- she asked who it is.  And I guess the guy told her like

22   it's dirty, which indicating like it's dirty, don't open the

23   door.

24        Once we catch on to that, we pull him away from the

25   door.  Liston smack him upside the head with the gun and told

TRIAL ONE - VOL. 17 -  3077

1   him to strip.  So the dude he started striping, pulled his

2   pants down a little bit.  Then he just said out of nowhere, If

3   you all going to kill me, kill me.  So he took a swing -- he

4   swung at Liston.  And Liston came up under his punch and shot

5   him like three times in the stomach.  And then as he was

6   falling, Ussury shot him.  Ussury shot him maybe about three or

7   four times.  And then Franklin stood over him and shot him

8   maybe about -- numerous times.

9       Q.   Do you remember what kind of guns they had?

10      A.   I know there was revolvers, 9 millimeters and .40s.

11      Q.   Where were you and Chris standing during that whole

12  period?

13      A.   We was like behind the dude, behind them, behind the

14  other guy.  We don't have no guns on us so we wasn't trying to

15  get in the middle of no crossfire, you know what I'm saying, of

16  what's going on, other than us searching the dude.  Once it

17  started getting kind of hectic, we kind of backed off a little

18  bit.

19      Q.   Do you remember what you guys were wearing at the time?

20      A.   All black.

21      Q.   What happened next after the shooting?

22      A.   So after the shooting, we hopped back in the van, speed

23  off.  We pulling off.  As we leaving, we hear the police -- see

24  the police coming towards the scene.  As we going, they coming.

25  And we go to Ussury's girlfriend's house.

TRIAL ONE - VOL. 17 -   3078

1      Q.    Do you know her name?

2      A.    Bam.

3      Q.    Bam?

4      A.    Yeah.  We go to her house.  And that's where we -- me

5   and Liston and Ussury stayed at that night.

6           And Harris, Franklin -- and I don't know where Ledbetter

7   had went after we had left the scene.  We had -- they had met

8   up the next morning.

9      Q.    Okay.  Do you know what happened to those weapons?

10     A.    Yes.

11     Q.    What?

12     A.    Broke them down -- broke them down, burned them, and

13  threw them different parts like in the water, trash cans.

14     Q.    What do you mean broke them down?

15     A.    Took them apart.

16     Q.    What do you mean burnt?

17     A.    Set them on fire.

18     Q.    How would you do that?

19     A.    Put them in a bag.  Put them in like a shopping store

20  bag and set the bag on fire with the guns in there.  And it

21  will melt -- the bag will melt onto the guns and it will melt.

22     Q.    Okay.  Would the whole gun melt?

23     A.    Yeah, the majority of the gun.

24     Q.    What did melt?

25     A.    What didn't melt?

TRIAL ONE – VOL. 17 – 3079

1    Q.   Yes.

2    A.   I don't think nothing.  Everything melted.

3    Q.   What did you do with the melted gun?

4    A.   We would take it, and piece by piece we would throw them

5    in trash cans, throw them in the water, in the river water.

6    Q.   Okay.  You indicated that later you talked to Chris

7    about his conversation with Brandon?

8    A.   Yes.

9    Q.   Did you have that conversation with Chris?

10   A.   Yes.

11   Q.   What did he tell you?

12   A.   That he just told me how he had found out about the

13   robbery.

14   Q.   How who found out about the robbery?

15   A.   How Chris found out.

16   Q.   How did Chris find out?

17   A.   Through Ledbetter.  Ledbetter told Harris that he was

18   over one of his guy's house buying some drugs.  I guess the

19   other dude had came in there and bought like two or three

20   bricks.  And Ledbetter didn't know the dude.  His dude didn't

21   care for the dude too much.  So Ledbetter ended up following

22   him to the apartment that he showed us, where we had later went

23   to.

24   Q.   I want to show you a picture of what's marked 153-137.

25   Do you recognize that person?

TRIAL ONE – VOL. 17 –  3080

1     A.   Yes.

2     Q.   Do you know that person's name?

3     A.   No.

4     Q.   How do you know him?

5     A.   He used to have a food mart, a gyro spot on Fourth

6  Street, Fourth and Eleventh; had like a little food restaurant.

7     Q.   Did you see him in any place besides the Short North?

8     A.   Yes.  I seen him in prison.  He was in prison with us.

9     Q.   Where?

10    A.   In Ross Correctional.

11         MR. DEVILLERS:  Your Honor, may I publish this to the

12  jury?

13         THE COURT:  Yes.  Any objection?

14         MR. BERNDT:  No, Your Honor.

15         MR. GATTERDAM:  No, Your Honor.

16         MS. DIXON:  No, Your Honor.

17         MR. MCVAY:  No, Your Honor.

18         MR. NOLDER:  No, sir.

19   BY MR. DEVILLERS:

20    Q.   Did you ever have a conversation with Chris Harris about

21  this individual?

22    A.   Yes.

23    Q.   Where was that conversation?

24    A.   We was in Ross Correctional.

25    Q.   What did he tell you but this individual?

TRIAL ONE – VOL. 17 –  3081

1      A.    He just told me that was dude that used to have the food

2   spot on Fourth.  They had got into it with him over -- I think

3   somebody was sitting on his car or something out front.  And he

4   came out with a gun one day, then the next day I guess they had

5   came back and shot at him for pulling a gun out on them.

6      Q.    Who is "they"?

7      A.    Harris and Liston.

8      Q.    Did they say if they hit him or not?

9      A.    No, I don't think so.

10      Q.    You don't think they hit him?

11      A.    No.

12      Q.    Do you know a person by the name of Aaron Hughes?

13      A.    Yes.

14      Q.    How do you know Aaron Hughes?

15      A.    We robbed him before.  He sell drugs.

16      Q.    Okay.  I want to show you a picture 153-127.  Do you

17   recognize that individual?

18      A.    Yes.

19      Q.    Who is that?

20      A.    Aaron Hughes.

21         MR. DEVILLERS:  Your Honor, may I enter this into

22   evidence and publish it to the jury?

23         THE COURT:  You may.  Any objection, Mr. Berndt?

24         MR. BERNDT:  No, Your Honor.

25         THE COURT:  Mr. Gatterdam?

1          MR. GATTERDAM:  No, Your Honor.

2          THE COURT:  Ms. Dixon?

3          MS. DIXON:  No, Your Honor.

4          THE COURT:  Mr. McVay?

5          MR. MCVAY:  No, Your Honor.

6          THE COURT:  Mr. Nolder?

7          MR. NOLDER:  No.

8          THE COURT:  You may publish it.

9     BY MR. DEVILLERS:

10    Q.    I believe you indicated you robbed this individual?

11    A.    Yes.

12    Q.    Tell us about that.

13    A.    Me, Hov, Harris, Liston, Franklin, Wilson --

14    Q.    What Wilson?

15    A.    Robert.

16    Q.    And his street name is?

17    A.    RJ.

18          Hov set the robbery up.  He told us where the guy lived

19    at.

20    Q.    Where did he live at?

21    A.    Out east off like Refugee.  We go out there to the guy's

22    house.  We knew he wasn't home.  Hov knew he wasn't home

23    because who told Hov about the robbery I guess had the guy at

24    the bar with him.

25          We go out there.  Harris kicked the door in.  We go in

TRIAL ONE - VOL. 17 -  3083

1   the house, ransack the house.  We found some marijuana, some

2   jewelry, some guns, and that was it.  We didn't find no cash in

3   there.

4       Q.   Was anyone at the house at all?

5       A.   No, there wasn't nobody in there.

6       Q.   You said you found some jewelry?

7       A.   Yes.

8       Q.   What kind of jewelry did you find?

9       A.   A chain, a bracelet, like two rings.

10      Q.   Do you know what happened -- what happened to that

11  jewelry?

12      A.   Eventually it was sold.  Eventually it was sold.

13      Q.   Who -- have you robbed places where jewelry was

14  recovered before?

15      A.   Yes.

16      Q.   Who would you sell this jewelry to?

17      A.   I wouldn't particularly sell it.  But they would sell it

18  to like random people on the streets, people they know.  You

19  know what I'm saying?  I might not know them, but people that

20  somebody knew.

21      Q.   I want to show you Government's Exhibit 1-2-079.

22           MR. DEVILLERS:  Your Honor, may I publish this?  I

23  believe it's been admitted.

24           THE COURT:  It's been admitted.  You may publish it.

25

1   BY MR. DEVILLERS:

2   Q.   Who are we looking at here?

3   A.   Harris, Liston, and Antonio Harris.

4   Q.   Is that the person -- you said Fat Tone before?

5   A.   Yes.

6   Q.   Is that him?

7   A.   Yes.

8   Q.   Do you know whose car that is behind there?

9   A.   That's Fat Tone's car.

10  Q.   It looks at this point -- can you circle who Mr. Liston

11  is?  Which one is Mr. Liston?

12  A.   (Witness complies.)

13  Q.   What's he doing with his hands?

14  A.   Holding money and throwing up Fourth Street.

15  Q.   What's around his neck?

16  A.   A chain.  Aaron Hughes' chain.

17  Q.   That's the chain that was stolen from Aaron Hughes?

18  A.   Yes.

19  Q.   Do you remember this picture being taken?  Were you part

20  of this picture?

21  A.   No, I wasn't there.

22  Q.   Did you have another contact with Mr. Hughes?

23  A.   Yes.

24  Q.   What was that about?

25  A.   It was supposed to be a -- it was supposed to be a hit.

TRIAL ONE - VOL. 17 -  3085

1   Somebody had 15,000 on his head because he --

2       Q.   On whose head?

3       A.   Aaron Hughes.

4       Q.   Why would someone have $15,000 on Aaron Hughes's head?

5       A.   He had told on -- he had told on Deez.

6       Q.   Who is Deez?

7       A.   Street name Deez.  I don't know his real name.  Told on

8   him back in the day.

9       Q.   How did you find out about this contract?

10      A.   Me and Ussury.

11      Q.   How did you and Ussury find out about this contract?

12      A.   I guess --

13      Q.   Don't guess.  Do you remember anyone telling you about

14  it?

15      A.   Yes.

16      Q.   Who told you about it?

17      A.   Ussury.

18      Q.   What did he tell you?

19      A.   He told me that Little Bro and Deez had some money on

20  Aaron Hughes' head because he told about a murder back in the

21  '90s or something.

22      Q.   What did you do?

23      A.   So me and Ussury and -- me, Ussury, Lance Green had went

24  out back to the same house that we had just robbed --

25      Q.   How -- you said -- did you rob the house before the

TRIAL ONE - VOL. 17 -  3086

1    contract?

2    A.    Yes.

3    Q.    Okay.  And about how long before you decided to take up

4    this contract did you rob this house, like in relation to time?

5    A.    Maybe a month, maybe.

6    Q.    Okay.

7    A.    Somewhere in between there.

8    Q.    So you go back to the house.  What happens?

9    A.    So we go back to the house.  Prior us to going to the

10   house, we had went to a nightclub where we knew Aaron Hughes

11   was at downtown.  So, as the club was over with, we knew it was

12   about time for him to be heading home.  So me, Lance Green,

13   Ussury, we already beat him to his house.  By the time we get

14   there, we waiting for him to get there.

15   Q.    How did you get there?

16   A.    Lance Green.

17   Q.    Okay.

18   A.    So when we get there, me and Ussury get out the car.  We

19   was waiting in the back of his house.  He had like these pipes

20   on his cars real loud so you can hear him when he coming.  We

21   sat back there.  We was waiting, waiting for him.  We hear the

22   pipes coming so we know he's on his way.

23         So when the truck pull up, he pull in the driveway.

24   Q.    Whose truck?

25   A.    Aaron Hughes.  Aaron Hughes pull up in the driveway.

1    And the original plan was we was going to try to wait as he's

2    walking in the house before we run up on him.  So we hear the

3    truck stop.  He get out the car.  We hear the door shut.  So we

4    trying to time it.  So when we hear the door shut, we running

5    from the back of his house, from Aaron Hughes' House.  And as

6    we running up, something made him come around the other side of

7    his car.  He had a gun in his hand.  When he seen us running

8    up, he start shooting.  We started shooting at him.  The cover

9    was kind of blown then.  It was a gunfight after that.

10       Q.   Did you fire at him?

11       A.   Yes.

12       Q.   Did Mr. Ussury fire at him?

13       A.   Yes.

14       Q.   Do you know if you hit him?

15       A.   No.

16       Q.   Where did you go after that?

17       A.   After that, we went back to Lance Green's baby mom's

18   house where we stayed at for the night.

19       Q.   Did you ever try to go back?

20       A.   No, not after that, no.

21       Q.   Do you know a person by the name of Andre Brown?

22       A.   Yes.

23       Q.   Does he have a street name?

24       A.   Yeah.  Paco.

25       Q.   I want to show you what's been marked as Government's

TRIAL ONE - VOL. 17 -   3088

1    Exhibit 155-18.

2              MR. DEVILLERS:  Your Honor, may I publish this?  I

3    believe it's already in evidence.

4              THE COURT:  Yes.

5       BY MR. DEVILLERS:

6       Q.   Who is this?

7       A.   That's Paco.

8       Q.   Did you ever do anything with Paco?

9       A.   Yes.

10      Q.   I believe before you testified about someone named

11   Turner; is that right?

12      A.   Yes.

13      Q.   And do you know where Mr. Turner is today?

14      A.   He in prison.

15      Q.   Do you remember the first time you did anything with

16   Paco?

17      A.   Yeah.

18      Q.   What was that?

19      A.   It was a -- it was a robbery up north off of Manchester

20   and Minnesota.  Me, him, Harris, Turner, and Mark which is

21   Taron Colvin.

22      Q.   Okay.

23      A.   We go to the house and the guy wasn't home.  He was at

24   the club.

25      Q.   How did you know to hit -- to go to this house?

TRIAL ONE - VOL. 17 - 3089

1    A.    Paco.

2    Q.    You said Taron Colvin.  I want to show you a photograph

3  to see if you can identify somebody for me.  154-1-23.

4          Do you recognize that person?

5    A.    Yes.

6    Q.    Who is that?

7    A.    Mark, Taron Colvin.

8    Q.    He goes by a different name than Taron?

9    A.    Mark.

10   Q.    Does he have a street name?

11   A.    Mark.  That's what we call him.

12         MR. DEVILLERS:  May I publish this to the jury, Your

13  Honor?

14         THE COURT:  Yes, you may.

15       Any objection, Mr. Berndt?

16         MR. BERNDT:  No, Your Honor.

17         THE COURT:  Mr. Gatterdam?

18         MR. GATTERDAM:  No.

19         THE COURT:  Ms. Dixon?

20         MS. DIXON:  No, Your Honor.

21         THE COURT:  Mr. McVay?

22         MR. MCVAY:  No.

23         THE COURT:  Mr. Nolder?

24         MR. NOLDER:  No.

25

TRIAL ONE – VOL. 17 – 3090

1    BY MR. DEVILLERS:

2    Q.    Do you know where Mr. Colvin is today?

3    A.    He's dead.

4    Q.    Paco: did he specialize in anything?

5    A.    Burglary, getting inside of whatever.

6    Q.    What do you mean by getting inside of whatever?

7    A.    Like opening up a door, anything.  You name it,

8    anything, he can get in.

9    Q.    So you go to this house off -- I believe you said off of

10   Manchester.  What do you do?

11   A.    The guy wasn't home so we kind of walking around the

12   house.  We see us a window open on the side.  So they lift me

13   up to see if -- see if I can see inside the window because I

14   was the smallest.  So they lift me up to see if I could see in

15   there.  And the blind -- the window was open.  There was a girl

16   and her daughter in the bed.  And the guy wasn't there.  When I

17   see that, I tell them, The dude ain't here, just a girl.

18   Q.    Tell who that?

19   A.    Paco, Harris, Turner, and Mark.

20   Q.    Okay.

21   A.    So now our plan was we probably just going kick the door

22   in.  As we walking around the back of the house, Paco flashes

23   the light on his gun up to a window up top.

24   Q.    What do you mean a light on his gun?

25   A.    He had a flashlight on his gun.  And the window up top

TRIAL ONE - VOL. 17 - 3091

1    was open above the garage.  So we climb on top of the garage

2    and climb in the window which is an attic window.

3         So that's how we entered the house.  All of us went in

4    through the same way.  And when we get in there, by the time we

5    get downstairs -- we had to walk down the stairs.  By the time

6    we get downstairs, the girl was getting out of bed and coming

7    around the corner.

8         When we see her, we pull the gun on her, tell her to lay

9    down, threw her some clothes to put on, ransacked the house,

10   ask her where the money and jewelry at.  She tell us there was

11   a little bit of weed in the kitchen.

12   Q.   What do you mean by a little bit?

13   A.   Like a -- like a pound or two of weed --

14   Q.   All right.

15   A.   -- in the kitchen.  So we asked her where her boyfriend

16   at.  And she told us he wasn't there.  He should be on his way

17   home in a minute.  So we had her call him on the phone and she

18   called him.  We told her to play it off like, you know what I'm

19   saying, make like everything is all right, like ain't nothing

20   wrong.

21   Q.   Let me stop you there.  Did you have any weapons?

22   A.   Yes.

23   Q.   Who had --

24   A.   Well, we all had guns.  Me, Harris, Paco, Colvin and

25   Turner, we all had guns on us.

TRIAL ONE – VOL. 17 –  3092

1    Q.    When you were telling this girl to make the phone call,

2    what were you doing with the guns?

3    A.    We had the guns pointed at her.  As she was making the

4    call, she called him and told him to get home, she wanted to

5    have sex with him.  So when she hang up the phone, he told her

6    prior to that like he on his way.  So she hangs up, tell us

7    what he said, and we sat there and waited for him to come home.

8    Q.    About how long do you think you waited?

9    A.    Maybe about 15 minutes, 10 minutes, if that.

10   Q.    I want to stop you there for a second.

11         I want to play what's been marked as Government's

12   Exhibit 150-1349 and start at 3:30.

13             THE COURT:  3:30?

14             MR. DEVILLERS:  3:30.  Yes, Your Honor.

15       (Audiotape played in open court.)

16             MR. DEVILLERS:  We're going to move on, Your Honor.

17             MR. GATTERDAM:  I'd ask the jury be instructed to

18   disregard that last --

19             MR. DEVILLERS:  May I ask some questions based on

20   that?

21             THE COURT:  Yes.

22    BY MR. DEVILLERS:

23   Q.    Who was that?  Whose voice was that?

24   A.    That was Harris and his mom.

25   Q.    Did the individual eventually come home?  We're back to

TRIAL ONE – VOL. 17 –  3093

1  the --

2   A.   Yeah, he end up coming home.  So I guess he called her,

3  tell her he outside, open the door, unlock the door.  So we

4  unlock the door, turn the lights off in the house but the

5  bedroom and the TV.  And when he opened the door, he instantly

6  hit the light to the living room.  By that time, Paco, Colvin,

7  Harris, and Turner had pulled the gun out on dude as soon as he

8  walk in, laid him down, took his jewelry off his neck.  He had

9  a bracelet on, a ring, went in his pockets, took everything out

10  of his pockets, ask him was there anything in the house, any

11  more money.  There wasn't nothing else in there.

12      After that we didn't find nothing.  After that we told

13  him and his girl and their daughter to get in the basement.  So

14  we took them in the basement, shut the door, put the couch up

15  against the door and we left.

16   Q.   Okay.  Where did you go afterwards?

17   A.   I can't recall where we went after that.

18   Q.   What happened with all the stuff that was taken?

19   A.   We split it up.  It wasn't too much to split up.  It was

20  like a pound of weed, the jewelry, and I think it was a gun.

21   Q.   You testified before about a Marcus Peters?

22   A.   Yes.

23   Q.   Do you recall what happened to Marcus Peters?

24   A.   He was shot.  He was shot during a robbery.

25   Q.   How do you know that?

TRIAL ONE - VOL. 17 -  3094

1    A.   Harris, Ussury had told me about it.

2    Q.   What did they tell you about it?

3    A.   They told me that they was going to a robbery.  And I

4    think something was going on inside the house where they heard

5    some noise in the house and Ussury accidentally shot Peterson

6    [sic].

7    Q.   Do you know a person by the name of Latasha Barrett?

8    A.   Yes.

9    Q.   Who is Latasha Barrett?

10   A.   That's Peters' girlfriend at the time.

11   Q.   Did you ever do anything with Peters before he died?

12   A.   No.

13   Q.   Do you know what he drove?

14   A.   He had a white truck.  He had an Acura, and he had a

15   Cutlass.

16   Q.   Do you know what Latasha Barrett drove?

17   A.   She drove a Pontiac, some type of like Grand Am or

18   something.

19   Q.   Do you know where you were when Marcus Peters was

20   killed?

21   A.   I was incarcerated in juvenile.

22   Q.   In juvenile?

23   A.   Yeah.

24   Q.   When did Mr. Ussury tell you about this?

25   A.   After I had got out.  He told me about it shortly after

TRIAL ONE - VOL. 17 - 3095

1   I got out.  And I was -- I know I came back to the

2   neighborhood, you know what I'm saying, wondering what happened

3   and, you know what I'm saying, you know how people sitting

4   around talking.

5   Q.   Were there rumors about what happened?

6   A.   Yeah.  There was a lot of different speculations about

7   what happened.

8   Q.   What did Mr. Ussury tell you?

9   A.   He accidentally did it.  He accidentally shot him.

10  Q.   Mr. Harris, did he -- did they tell you where they went

11  afterwards?

12  A.   No.

13  Q.   Does Mr. Ussury have any relatives that you know?

14  A.   He had a brother.

15  Q.   What is his brother's name?

16  A.   Two brothers.  One of them Antwan.  The other one I

17  don't know his real name.  I just know him by Red.

18  Q.   By Red?

19  A.   Yeah.

20  Q.   I want to play for you something to see if you can

21  recognize the voices in this audio.  Government's

22  Exhibit 150-354.  And you can start at about 1:25.

23      (Audiotape played in open court.)

24  BY MR. DEVILLERS:

25  Q.   Do you recognize those voices?

TRIAL ONE – VOL. 17 – 3096

1    A.   Ussury, and Antwan his brother.

2    Q.   Someone just said those N's aren't stupid.  Did you hear

3  that?

4    A.   Say what?

5    Q.   Someone just said they're not stupid.  Did you hear

6  that?

7    A.   Yeah.

8    Q.   Who was saying that?

9    A.   That's Ussury.

10       THE COURT:  Hold on one second.

11       Thank you, Mr. DeVillers.  Please continue.

12     (Audiotape played in open court.)

13  BY MR. DEVILLERS:

14   Q.   Who is Frog Man?

15   A.   Dounte.

16   Q.   Continue.

17     (Audiotape played in open court.)

18       MR. DEVILLERS:  We stopped at 2:27, Your Honor.

19       THE COURT:  All right.

20       MR. DEVILLERS:  Go to 4:50 of the same exhibit.

21     (Audiotape played in open court.)

22  BY MR. DEVILLERS:

23   Q.   Did you hear a term they used?

24   A.   No.

25   Q.   Can you go back just a little bit? – about something

TRIAL ONE – VOL. 17 –  3097

1   costing money.  Can you listen to that and see if you know what

2   that term is?

3       (Audiotape played in open court.)

4     BY MR. DEVILLERS:

5     Q.   Did you hear that?

6     A.   Yes.

7     Q.   What did he say?

8     A.   A gun, talking about a gun.

9     Q.   What's the term that was used, do you know?

10    A.   Strap.

11    Q.   Continue.

12      (Audiotape played in open court.)

13          MR. DEVILLERS:  We stopped at 6:11, Your Honor.

14    BY MR. DEVILLERS:

15    Q.   The voices in that part, do you recognize those voices?

16    A.   Yes.

17    Q.   Who are those two people?

18    A.   Dounte and his brother Antwan.

19    Q.   Do you know a person by the name of Edub?

20    A.   Yes.

21    Q.   Who is Edub?

22    A.   Earl Williams.

23    Q.   I'm going to show you what's been marked as Government's

24    Exhibit 154-1-32.  Can you tell me who that is?

25    A.   Edub, Earl Williams.

TRIAL ONE – VOL. 17 –  3098

1        MR. DEVILLERS:  Your Honor, may I enter this into

2   evidence and publish to the jury?  I'm not sure that it's been

3   entered yet.

4        THE COURT:  Yes, you may.

5        Any objection, Mr. Berndt?

6        MR. BERNDT:  No objection.

7        MR. GATTERDAM:  No, Your Honor.

8        MS. DIXON:  No, Your Honor.

9        MR. MCVAY:  No, Your Honor.

10        MR. NOLDER:  None, Your Honor.

11   BY MR. DEVILLERS:

12   Q.   How do you know Earl Williams?

13   A.   I know him from -- I was incarcerated with him.

14   Q.   Okay.

15   A.   Before.

16   Q.   Have you met him outside incarceration?

17   A.   Yes.  But we didn't like -- we didn't talk or nothing,

18   but I knew him outside of that.  I knew of him, seen him.

19   Q.   Do you know if he ever did anything with people from

20   Homo?

21   A.   Yes.

22   Q.   Who do you know this from?

23   A.   Harris, Liston, Ledbetter.

24   Q.   Okay.  Let's talk about from those individuals, are you

25   aware of an incident that took place out in Pickerington?

TRIAL ONE – VOL. 17 – 3099

1    A.    Yes.

2    Q.    Who told you about that?

3    A.    Harris, Ledbetter.

4    Q.    What did Harris tell you about it?

5    A.    He just told me they went out there for a robbery.

6    Q.    Who is "they"?

7    A.    Harris, Ledbetter.

8          MR. GATTERDAM:  Objection, not in furtherance of.

9          THE COURT:  Side-bar.

10                           - - -

11    (The following proceeding was held at side-bar.)

12          THE COURT:  This is going to be a great place to take

13   our lunch break because I want to look at the -- this question

14   about what parameters, if any, are placed on these statements.

15   Because I thought about it over the break, and I think that

16   statements made in furtherance of a conspiracy, to wit, Dave,

17   let's you and I go and rob Jeff, easily comes in.  Or Nolder

18   telling Ms. Dixon that I told you that we were going to rob

19   Berndt, that also comes in.

20          But if Gatterdam and I are having a beer, and I said,

21   Boy, some good times when Dave and I went and robbed Berndt,

22   then that's your issue.

23          MR. GATTERDAM:  Yes.

24          THE COURT:  It's kind of a random thought or

25   reflection.  I know where I think this comes down at, but I'm

TRIAL ONE – VOL. 17 –  3100

1    going to look at it to confirm.  So I want to take a -- we're

2    going to break for our lunch recess now.  We'll reconvene a few

3    minutes before the jury comes back in.  Because this is going

4    to be just like the 801 issue.  It's going to be a recurring

5    issue with other cooperators, and I want to make sure that I'm

6    consistent.

7            MR. DEVILLERS:  Can I jump in?

8            THE COURT:  Absolutely.

9            MR. DEVILLERS:  The one thing you're going to hear is

10   that the reason they do talk about it is they want to make sure

11   no one is testifying, cooperating.  We've already heard from

12   Allen Wright.  He told us about it too because they want to off

13   Edub.  You're going to hear that throughout the rest of this

14   trial about them trying to kill Edub in numerous ways.

15           THE COURT:  Edub is --

16           MR. DEVILLERS:  Earl Williams.  Forget conspiracy,

17   furtherance of the conspiracy, for a second.  I believe it also

18   comes in as a clearly -- Mr. Ledbetter, Mr. Harris, Mr. Liston

19   are unavailable.  These are statements against interest.  And

20   that's I think even a stronger argument than --

21           THE COURT:  And you may be correct, but I want to just

22   reflect on it.

23           MR. BERNDT:  In that regard, the alternative method of

24   admissibility being a statement against interest, it's going to

25   be very important for us to determine who made the statement to

TRIAL ONE - VOL. 17 - 3101

1    the witness.  I don't think that cover the umbrella.

2          THE COURT:  Thank you.  And let's see.  It's -- why

3    don't we take our lunch break.  It's about five minutes to

4    noon.  Let's stand in lunch recess until 1:15.  And we'll come

5    back at one o'clock.

6       (The following proceeding was held in open court.)

7          THE COURT:  Ladies and gentlemen, we're going to take

8    our lunch recess now.  Because we have some business to which

9    to attend, we're going to take lunch recess until 1:15.  It's

10   about noon right now.  So enjoy your lunch, ladies and

11   gentlemen.  Stay dry.  It looks like it might be raining,

12   something it never does in Columbus.

13      (Lunch recess taken from 12:00 p.m. to 1:00 p.m..)

14                          - - -

15                             MONDAY AFTERNOON SESSION

16                             MAY 9, 2016

17                          - - -

18      (Thereupon, the following proceeding was held in open court

19   with all defendants and counsel present.)

20          THE COURT:  All right.  I looked at the statements

21   that were tendered by the government.  I think that the

22   statements come in under 804(b)(3).  And you all know that

23   under the statement -- I'm sorry -- under the exception for

24   statements against the declarant's interest, these statements,

25   which are hearsay statements, are admissible if three

TRIAL ONE – VOL. 17 – 3102

1    conditions are satisfied:

2          First, the declarant is unavailable.  And in the

3    instant, at least, that is pending before the Court, the

4    declarant is unavailable.

5          Secondly, from the perspective of the average reasonable

6    person, the statements are truly adverse to the declarant's

7    penal interest.  And they are.

8          And, third, corroborating circumstances truly establish

9    the trustworthiness of the statements.  And, based on the

10   record before the Court at this time, there are circumstantial

11   guarantees of trustworthiness that would satisfy Criterion 3.

12         And as the Sixth Circuit has explained and as I set

13   forth in Document 1014 that was filed on the 31st of March,

14   Rule 804(b)(3) permits the introduction of statements that

15   incriminate not only the declarant but also other individuals

16   provided that those three conditions are met.  And those three

17   conditions have been met.

18         I did, also, look at this whole notion of co-conspirator

19   statements, and I may do to them what I did under 801.  But I

20   want all counsel to be clear that a statement is made in

21   furtherance of the conspiracy if it is intended to promote the

22   objectives of the conspiracy.  That's under *Warman*, in the

23   Sixth Circuit, 2009.  The statements need not actually further

24   the conspiracy.  The inquiry turns on whether the declarant

25   intended the statements to do so.

1          Although a statement may be found in furtherance of a

2    conspiracy, even if not exclusively or even primarily made to

3    further the conspiracy, the Sixth Circuit is in lockstep with

4    other courts in strictly interpreting the, quote, in

5    furtherance requirement to limit evidence admitted under

6    801(d)(2)(E).  And a number of courts have found that it was

7    prejudicial error to admit statements made during a

8    conversation that were idle remarks, as you pointed out, Mr.

9    Gatterdam.

10         So, you know, I'm going to look at those statements to

11   determine whether the government has established a proper

12   context for the statements to show that they were actually in

13   furtherance of and not, as the *Warman* court put it, for

14   instance, they were not mere idle chatter or bragging in the

15   context of a casual conversation.  And that was your point, Mr.

16   Gatterdam.

17         And, so, as we discussed at side-bar, it's incumbent

18   upon the government to establish the context and to establish

19   that it was in furtherance of the conspiracy.

20         Mr. Devillers is correct, in this instance, that it was

21   a statement made against the declarant's penal interest and it

22   was against the declarant's penal interest at the time that it

23   was made.

24         So, the three criteria have been satisfied in this

25   instance, and we'll proceed.

TRIAL ONE – VOL. 17 – 3104

1          Linda, would you please bring in the jury.

2       (Jury in at 1:17 p.m.)

3          THE COURT:  Mr. Devillers, please resume your

4    questioning.

5     BY MR. DEVILLERS:

6     Q.   Mr. Patterson, I believe we were talking, before the

7    break, about conversations you had with certain individuals

8    about an incident that took place in Pickerington.  Do you

9    recall that?

10    A.   Yes.

11    Q.   Do you recall who you talked to about it?

12    A.   Yes.

13    Q.   Who did you talk to about it?

14    A.   Chris Harris.

15    Q.   What did Chris Harris tell you about what happened?

16    A.   Basically just told me they went out to a robbery that

17    Ledbetter had set up for them.  And they went there, ransacked

18    the house for money.  There was some people in there.  And one

19    of the guys tried to end up running out of the house, and Chris

20    shot him.

21    Q.   Okay.  Did Chris say who he was there with?

22    A.   Edub.  Wilson.  He was there with Liston.  B -- B wasn't

23    in there.

24    Q.   Where was B?

25    A.   B was outside, around the corner somewhere.

TRIAL ONE – VOL. 17 – 3105

1    Q.    Okay.  And who is B?

2    A.    Brandon Ledbetter.

3    Q.    Did Chris Harris ever tell you why this place was

4    selected, this particular individual or house?

5    A.    Ledbetter was messing with --

6              THE COURT:  Complete your answer, Mr. Patterson.

7    BY MR. DEVILLERS:

8    Q.    Go ahead.

9              THE COURT:  Go ahead and complete your answer.

10             THE WITNESS:  Ledbetter was messing with the guy's

11   girlfriend, or whatever.  And he knew he had money.  So, he was

12   talking to her the whole time, trying to see where he was at,

13   what was going on.

14   Q.    All right.

15             THE COURT:  Just a second.  Excuse me.

16     (Whereupon, there was a brief interruption.)

17             THE COURT:  Mr. Devillers, please continue.

18   BY MR. DEVILLERS:

19   Q.    You indicated that the information that you've talked

20   about so far you'd gotten from Chris Harris?

21   A.    Yes.

22   Q.    Did you -- Have you ever talked to Brandon Ledbetter

23   about this incident?

24   A.    I think we did when we was locked up in Delaware, but it

25   wasn't -- it wasn't too much or nothin'.

TRIAL ONE – VOL. 17 – 3106

1    Q.   Did anybody express any concerns about Edub, or

2    Williams, to you?

3    A.   Yes.

4    Q.   Who did?

5    A.   Earl.  I mean Ledbetter, concerned that he was telling.

6    Q.   Telling what?

7    A.   Telling about what happened that night.

8    Q.   Do you know a person by the name of Crystal Fyffe?

9    A.   Yes.

10   Q.   Have you ever met her before?

11   A.   Never.

12   Q.   Have you ever talked to Brandon Ledbetter about her?

13   A.   Brief.

14   Q.   What did he say about her?

15   A.   He just said that she had to go.

16   Q.   When was this you had this conversation with him about

17   it?

18   A.   In Delaware.  Delaware County Jail.

19   Q.   Do you know what brought up this conversation?  Why did

20   this conversation come to be?

21   A.   Because we was all indicted.  He was charged with it,

22   and he was just talking about stuff that we was all charged

23   with and, basically, why it took -- why she had to go.

24   Q.   Did he say why she had to go?

25   A.   Because she was cooperating; she was talking to the

TRIAL ONE - VOL. 17 -  3107

1   federal agents about whatever he had goin' on.

2      Q.   Do you know a person by the name of Tabby Broomfield?

3      A.   Yes.

4      Q.   Can you describe him for us?

5      A.   A fat guy.  Accent, New York.  Dark skin.

6      Q.   I'm going to show you a picture marked Government's

7   Exhibit 153-35.  Can you tell me who that is?

8      A.   Yes.  It's Tabby.

9      Q.   Do you know what Tabby did for a living?

10     A.   Sold drugs and was a gambler.

11     Q.   Do you know where he lived?

12     A.   Last I know, he stayed on the Twenty-sixth, Twenty-sixth

13  and Joyce.

14     Q.   Have you ever been out there to his house?

15     A.   Yes.

16     Q.   What were you doing out at his house?

17     A.   Over there gambling.  Watching him gamble.  Selling me

18  weed, marijuana.

19     Q.   What kind of gambling would they do out there?

20     A.   Shoot dice.  Play the video game.  Play cards.

21     Q.   Are you aware of an incident that took place outside of

22  his house sometime in 2007?

23     A.   Yes.

24     Q.   How did you become aware of that incident?

25     A.   Ussury told what happened.  Harris.

TRIAL ONE – VOL. 17 –  3108

1    Q.   What did Ussury tell you?

2    A.   Just told me that he was supposed to be buying weed from

3    the dude, ended up robbing him, shooting him, killing him.

4    Q.   When did he tell you that?

5    A.   On the streets.  We was locked up in Delaware.  Came up

6    a few different times.

7    Q.   I believe you testified before about a Tyrell Davis.

8    A.   Yes.

9    Q.   What happened to Mr. Davis?

10   A.   He was killed.  Me, Liston, Anthony Jones, Wilson,

11   Little Shawn –– Shawn Waddell –– went out there to buy some

12   weed from him.  And in the midst of us buying some weed from

13   him, we ended up robbing him.  We ended up robbing and killing

14   him.

15   Q.   Let's start out –– Let's back up a little bit.  You

16   mentioned a person by the name of Le Le before.

17   A.   Yes.

18   Q.   Who was Le Le?

19   A.   Le Le from Poindexter.

20   Q.   Do you know his real name?

21   A.   Richard Willis.

22   Q.   I believe you testified earlier somebody named Day Day

23   killed him?

24   A.   Yeah.

25   Q.   Do you know where that took place?

TRIAL ONE - VOL. 17 -  3109

1    A.    In Nelson Park.

2    Q.    Did people at one point want to do harm to Tyrell Davis?

3    A.    Yes.

4    Q.    Why?

5    A.    People had their different reasons why they wanted to --

6    why they wanted to do something to him.  One of them was for

7    they thought he had set up Le Le and had him killed.

8    Q.    Why would people think that?

9    A.    Because I guess he --

10         MS. DIXON:  Objection, Your Honor.

11         THE COURT:  Sustained.

12         Rephrase your question.  Your question was, why would

13   people think.  And I don't know who the people are or how he

14   would know what these people were thinking.

15         MR. DEVILLERS:  Understood, Your Honor.

16   BY MR. DEVILLERS:

17   Q.    Tony Jones?

18   A.    Yeah.

19   Q.    You talked about Tony Jones before.  Did he tell you

20   whether he felt a certain way about Tyrell Davis?

21   A.    Yes.

22   Q.    What did he tell you?

23   A.    He just told me that he thought Tyrell had set Le Le up

24   by calling Day Day out there while Le Le was out there.  Day

25   Day got out there, and Le Le was out there, and that they

TRIAL ONE - VOL. 17 -  3110

1   killed him.

2   Q.   Okay.  So, Tony Jones felt that Tyrell Davis made a

3   phone call of some sort?  Explain that to me.

4   A.   He thought that --

5   Q.   Who is "he"?

6   A.   Tony Jones.  Anthony Jones.  Anthony Jones thought that

7   Le Le -- I mean Tyrell -- had called Day Day out there to kill

8   Le Le.

9   Q.   Okay.  How about you?  Did you have any ill will,

10  necessarily, against Mr. Davis?

11  A.   No, sir.

12  Q.   I'm going to take you to the day before Tyrell was

13  killed.  Do you remember what you did the day before he was

14  killed?

15  A.   No, I can't recall.

16  Q.   Have you been to his house before?

17  A.   Yeah.

18  Q.   Where is his house?

19  A.   Off of -- off of Long.  Out east, off of Long Street.

20  Q.   Have you bought marijuana from him before?

21  A.   Yes.

22  Q.   Had you ever robbed him before?

23  A.   No.

24  Q.   Was there a plan to rob him?  Was there a discussion

25  about what you were going to do?

TRIAL ONE - VOL. 17 - 3111

1    A.   Yes.

2    Q.   Okay.  In relation to when the murder took place, when

3  did that discussion take place?

4    A.   The morning of.

5    Q.   Who was part of that discussion?

6    A.   It was me, Liston, Jones, Wilson.  That was it.

7    Q.   Where was this discussion?

8    A.   Over at Keisha's, which is Le Le's baby's mom.

9    Q.   Kiesha who?

10    A.   I don't know.  I'm not sure of her last name.

11    Q.   And whose baby's mom?

12    A.   Le Le.  Richard.

13    Q.   Okay.  Tell me the discussion.  What did you guys talk

14  about?

15    A.   Basically, we were just going to go rob him -- you know

16  what I'm saying -- rob him for his weed or money, whatever he

17  had on him, jewelry, whatever.  And we went out there.

18    Q.   How did you get out there?

19    A.   Little Shawn.  Shawn Waddell was driving.

20    Q.   What was he driving?

21    A.   A white Kia.

22    Q.   Do you know whose white Kia that was?

23    A.   It belonged to -- belonged to Wilson.

24    Q.   Which Wilson?

25    A.   Robert Wilson.

TRIAL ONE – VOL. 17 – 3112

1    Q.   Did he own this white Kia?

2    A.   No.  I think his mom rented it.

3    Q.   Was it a rental vehicle?

4    A.   Yes.

5    Q.   All right.  And does Robert Wilson, who goes by -- does

6    he go by "R.J."?

7    A.   Yes.

8    Q.   Does he have any sisters?

9    A.   Yes.

10   Q.   Who are his sisters?

11   A.   Terika and Turquoise.

12   Q.   Do you know their last name?

13   A.   Patterson.

14   Q.   Are you related to them?

15   A.   Yes.

16   Q.   How so?

17   A.   Cousins.

18   Q.   Okay.  Bucc, Mr. Liston, do you know where he was living

19   at this time?

20   A.   Living with Wilson, with Terika and Turquoise.

21   Q.   They were living together?

22   A.   Yes.

23   Q.   All right.  Do you know Robert Liston?

24   A.   Yes.

25   Q.   And who is that?

TRIAL ONE – VOL. 17 –   3113

1    A.   That's Bucc's brother.

2    Q.   Do you know where he lived at the time?

3    A.   No.

4    Q.   Okay.  So, you're in this white Kia?

5    A.   Yes.

6    Q.   Where do you go?

7    A.   We head out to Long Street, to Tyrell's house.  We was

8    supposed to meet him out there so he could sell us some weed.

9    Q.   How do you -- How were you supposed to meet him out

10   there?  How did he know you were going to be out there?

11   A.   Wilson had called him and told him we wanted to buy some

12   weed and --

13   Q.   Again, we're talking about who?

14   A.   Wilson.  Robert Wilson.

15   Q.   And what's his street name?

16   A.   R.J.

17   Q.   Does he have another street name besides R.J.?

18   A.   Jizzle.

19   Q.   Jizzle?

20   A.   Yeah.

21   Q.   Okay.  Go on.  He calls him?

22   A.   Yeah.  Yeah, he called him.  And we told him we'd meet

23   him out there.  So, we go out there, waiting for him to come.

24   He ain't there yet.  We beat him there.  In the midst of us

25   sitting out there waiting for him, somebody else was waiting

TRIAL ONE – VOL. 17 –  3114

1    for him, too.

2      Q.   Sitting out where?

3      A.   Out in front of the Long Street apartment.

4      Q.   I'm going to show you what's been marked as Government's

5    Exhibit 55-2#-002.

6           MR. DEVILLERS:  I believe this is already into

7    evidence, Your Honor.  So I'd ask to publish it.

8           THE COURT:  You may.

9      BY MR. DEVILLERS:

10     Q.   Okay.  Mr. Patterson, does this look familiar to you at

11   all?

12     A.   Yes.

13     Q.   Okay.  What is this?

14     A.   It's outside of the Long Street apartment.

15     Q.   I believe you indicated -- okay.  Where are you in

16   relation to this picture when you first got there?

17     A.   I think I was sitting in that white car, right there.

18     Q.   Okay.  Where was the white Kia?

19     A.   The white Kia was parked, like, over in the corner, to

20   the left.

21     Q.   Over in the corner?

22     A.   Yes, to the left.

23     Q.   All right.  And who all was out there in the parking

24   lot?

25     A.   Me, Liston, Wilson, Jones, and Shawn Lovelady.

TRIAL ONE – VOL. 17 – 3115

1    Q.   Shawn who?

2    A.   Lovelady.

3    Q.   Lovelady?

4    A.   Yes.

5    Q.   Was Shawn Lovelady part of the conversation about

6    robbing Tyrell Davis?

7    A.   No.

8    Q.   When did he kinda get into the picture?

9    A.   We -- we needed somebody to drive that has a license.

10   He had a license.  So that's the only reason that he was

11   driving.

12        So, we had went and got him just to drive us around.

13   All he knew is we was going to buy some weed.

14   Q.   Did you see anybody else out there?

15   A.   Yeah.

16   Q.   Who's that?

17   A.   There was two people out there waiting for him.

18   Q.   Waiting for who?

19   A.   Waiting for Tyrell Davis.

20   Q.   Who are those people?

21   A.   Rio, by the name of Summerville, and his dad.

22   Q.   Rio?

23   A.   Yeah.

24   Q.   Is that his street name?

25   A.   Yes.

TRIAL ONE – VOL. 17 –  3116

1    Q.   Do you know his real name?

2    A.   No.  Last name is Summerville.

3    Q.   Okay.  Bear with me a second.

4         Describe Mr. Summerville to us.

5    A.   Brown skin.  At the time, he had a low haircut.

6    Q.   What do you mean, little haircut?

7    A.   I said a low haircut.

8    Q.   A low haircut?

9    A.   Yes.

10   Q.   Okay.

11   A.   Maybe about 5'8", 5'9".

12   Q.   What did Mr. Summerville do for a living, if you know?

13   A.   I ain't sure what he did for a living.  I know he was in

14   the streets.  I don't know what he did, though.

15   Q.   And you said he was there with somebody?

16   A.   Yeah.  I think it was his –– his dad was in the car.

17   Q.   Does Mr. Davis eventually arrive?

18   A.   Yes.

19   Q.   And do you remember what he was driving?

20   A.   No.  He had parked in the back.  He came from the back,

21   where the apartments are.  I don't know what kind of car he had

22   pulled up in.

23   Q.   How do you know he was there, then?

24   A.   Because he walked through the back of the apartments, up

25   toward the front where we all was at.

TRIAL ONE - VOL. 17 -  3117

1    Q.    Okay.  Where did you go?

2    A.    So, when he arrived, we went to the apartment, all of

3    us:  Me, Liston, Wilson, Jones, Lovelady, and Summerville.

4    Summerville was there to buy some weed, too.

5          So, when we get in there, he sells Summerville what he

6    came to get.  I don't know exactly what it was, but it was some

7    marijuana.  Summerville leave.  And when Summerville leave,

8    shut the door, maybe about a minute or two later, Wilson put

9    the gun to him, told him to give him everything.  But Davis had

10   a gun on him.

11   Q.    Tyrell had a gun on him?

12   A.    Yeah, he had a gun on him.  So, as he was -- had his

13   hand in his pocket, I was standing behind him.

14   Q.    Do you have a gun?

15   A.    Yes.

16   Q.    Okay.

17   A.    Liston was on the other side of him.  And we could see

18   him pulling his gun out at the same time as he tried to turn

19   around a little bit.  And as he was pulling it out, Liston hit

20   him, shot him.

21   Q.    Where did he shoot him?

22   A.    Like in the back side of his head.  And as he was

23   falling, he was shoot -- he started shooting, too.

24   Q.    Who is he?

25   A.    Tyrell Davis was shooting, falling towards me.  I shot

TRIAL ONE - VOL. 17 -  3118

1  him.  Jones shot him.  Me and Lovelady had -- Lovelady had

2  jumped out the window, and I jumped out the window after him.

3     Q.   I'll stop you there.  Do you remember how many times you

4  shot him?

5     A.   Maybe about three or four.

6     Q.   How about Mr. Jones?

7     A.   I don't know exactly how many times he shot him, but the

8  gunfire was going off pretty --

9     Q.   How about Mr. Liston?

10    A.   Maybe about -- one time is what I seen.

11    Q.   And where was that?

12    A.   In the head.

13    Q.   I believe you said Mr. Wilson was there, R.J.?

14    A.   Yeah.

15    Q.   Was he there?

16    A.   He didn't shoot.

17    Q.   When Mr. Davis was shooting, do you know -- what

18  direction was he shooting?

19    A.   His gun was still, like, in his pocket.  So, he was,

20  like, shooting toward the ground, maybe.

21    Q.   All right.  Do you know how many times he shot?

22    A.   No, I don't know exactly.

23    Q.   Okay.  Did you take anything?

24    A.   Yeah.  They had took some weed, just some weed and a

25  couple -- he had some money in his pocket, but it wasn't too

TRIAL ONE - VOL. 17 -  3119

1   much.  And that was it.

2      Q.   What did you do?

3      A.   I jumped out the window.  I had fled the scene and ran

4   back to the car, back to the white Kia.

5      Q.   I'm going to show you what's been marked as Government's

6   Exhibit 55-2#-004.  Do you see that, Mr. Patterson?

7      A.   Yes.

8      Q.   Does that look familiar to you?

9      A.   Yes.

10     Q.   What's that?

11     A.   That's the window to the apartment.

12     Q.   Did anyone else go out that window that you know of?

13     A.   Shawn Lovelady.

14     Q.   Once you went out the window, where did you go?

15     A.   Back to the car, to the white Kia.

16     Q.   Was anyone there?

17     A.   By the time I got in the car, Lovelady was in the car

18   already, and -- and everybody else just started coming out,

19   after that, at that point.

20     Q.   Did everyone that went there with you get back in the

21   car?

22     A.   Yes.

23     Q.   Where did you go?

24     A.   We went back to -- back to Terika's house.

25     Q.   Where was that?

TRIAL ONE – VOL. 17 –  3120

1    A.   Off of –– off of Cleveland and Agler.

2    Q.   What time of day was this?

3    A.   This was mid –– this was maybe about –– I'm going to say

4    about 11, 11, 12'ish.

5    Q.   A.m. or p.m.?

6    A.   A.m.

7    Q.   Okay.

8    A.   Eleven a.m., turning twelve p.m.

9    Q.   When you got back to Ms. Patterson's place, what did you

10   do?

11   A.   We –– We had to clean the van out.  I mean

12   clean –– clean the rental car out, because I cut myself.  I had

13   blood all in the car.

14   Q.   Where did you cut yourself?

15   A.   On my chin.

16   Q.   Do you know how you cut yourself?

17   A.   I think it was from, when I came out the window, I hit

18   my ground –– my chin on the ground.

19   Q.   All right.

20   A.   I cut myself that a way.

21   Q.   And you said you bled.  Where did you bleed?

22   A.   I bled in the car.

23   Q.   Okay.

24   A.   I bled in the car, on the seats and my clothes.

25   Q.   Do you know who rented that vehicle?

TRIAL ONE – VOL. 17 –  3121

1    A.   I think it was my aunt.

2    Q.   Who is your aunt?

3    A.   Renee Wilson.

4    Q.   And whose mother is that?

5    A.   Robert Wilson.

6    Q.   You said you had to clean up the car?

7    A.   Yeah.  We had -- Well, they'd cleaned the car up.

8    Q.   Who is they?

9    A.   Terika, Turquoise, Wilson, Liston, Jones.

10   Q.   Did you tell them -- When you got to the Pattersons'

11   house, did you tell Terika and Turquoise what happened?

12   A.   No, we didn't tell them what happened.  We had just told

13   them we had a food fight in the car.  They thought it was like

14   some barbecue sauce or ketchup or something on the seat.

15   Q.   Okay.  What did you do with the weed?

16   A.   We split it up.  It wasn't too much of nothin'.  We just

17   split it up.  And that was it after that.

18   Q.   What did you do with the weapons?

19   A.   We broke the guns down.  We put them in a Deveroes bag.

20   Q.   What?

21   A.   A Deveroes bag.  A clothing store bag.

22   Q.   Okay.

23   A.   We burned it and set it on fire.  Took the gun apart

24   first and set it on fire in the bag.  Unloaded all the pieces

25   and took the pieces and just put them everywhere, like, in the

TRIAL ONE – VOL. 17 –  3122

1   ocean -- in a river, trash cans, just spread them out.

2   Q.   Chris Harris, O-Dog, did you see him that day?

3   A.   Yes.

4   Q.   When did you see him?

5   A.   Right after.  After we got back to Terika and

6   Turquoise's house.

7   Q.   Did you tell him what happened?

8   A.   Yeah, he knew.  He knew what happened.

9   Q.   Okay.  Mr. Patterson, do you know a person by the name

10  of Markey Moore?

11  A.   Yes.

12  Q.   What does he go by?  Does he have a street name?

13  A.   Parkay.

14  Q.   Okay.  Did you rob Parkay's house?

15  A.   Yes.

16  Q.   Tell us what happened.

17  A.   This is back in 2008, in July.  Me, Harris, Turner,

18  Paco, Mark --

19  Q.   Mark?

20  A.   -- Taron Colvin.

21  Q.   Okay.

22  A.   -- we had -- we all went to his house to rob him.  So we

23  get out there.

24  Q.   Where is "out there"?

25  A.   In Canal Winchester.  He stayed out there in Canal

TRIAL ONE - VOL. 17 -  3123

1  Winchester.

2    Q.   How did you get there?

3    A.   Mark drove a van, a black -- a black, big van.

4    Q.   I'm going to show you what's been marked as Government's

5  Exhibit 58-12#-024.

6         MR. DEVILLERS:  And, Your Honor, I believe this has

7  been admitted into evidence, as well.  I'd like to publish it.

8         THE COURT:  You may.

9  BY MR. DEVILLERS:

10   Q.   What is this, Mr. Patterson?

11   A.   That's the black van we was in.

12   Q.   Do you know whose van that was?

13   A.   I know it was Mark and Paco's van.  I don't know whose

14  name it was in or none of that.

15   Q.   Why did you go to Parkay's house?  Why was he chosen?

16   A.   We went to rob him.  He was known for having a lot of

17  money, drugs.  And we had -- we had went out there late night,

18  maybe about 2:00, 3:00, in the morning.

19        Me, Harris, Paco, Turner, we get out there.  We know he

20  ain't there.  We know he had a bar somewhere.  And so we get to

21  the house.  We go to the back of the house.  Paco got -- We all

22  got guns on us.  Paco got his crowbar.  The crowbar was used

23  to, like, open doors.

24        So, we go through the back of the house to the back

25  door.  He pried the door off, opened it up real quiet.  And

TRIAL ONE - VOL. 17 - 3124

1    we -- we get in there. Got our guns out. We run upstairs to

2    where -- his girlfriend was in a room. She didn't hear nothin'

3    or nothin'. So, by the time we got up there, she was still in

4    bed. And we pulled our guns out, told her to get on the

5    ground, ransacked the house, found some money, a little bit of

6    marijuana. And, in the midst of all that, we had her. And

7    Mark had cut her hair off.

8        Q.   Why did he cut her hair off?

9        A.   I don't know; just like a torture tactic, because she

10   wasn't telling us where all the money was at. She wasn't

11   telling us where anything was at, and we knew she was lying.

12   So, it was kind of like a scare tactic.

13       Q.   How was she -- I mean, was she just laying there? Was

14   she tied up at all?

15       A.   At first, she was just -- we just had her laying --

16   laying down, face down. And then, eventually, Turner had

17   brought over a belt and tied her hands behind her back. And

18   that's when Mark started cutting her hair because he was asking

19   her where the money was at. She wasn't telling him. And I had

20   her, like -- she was in front of me, on the side. And Mark was

21   on the side of her. Probably about three of us around. I

22   think Turner was around her, too. And Harris and Paco was

23   ransacking the house. And we used another scare tactic by

24   pointing the gun at her vagina, telling her, once again:

25   Where's the money at? And she wasn't telling us.

TRIAL ONE - VOL. 17 -  3125

1    Q.   Who did that?

2    A.   I pointed the gun at her vagina.

3    Q.   Did you put the gun on her vagina?

4    A.   Yes.

5    Q.   Did she talk?

6    A.   No.  She just continued to say she didn't know.

7    Q.   I'll show you what's been marked as Government's Exhibit

8    48-12# -- I'm sorry -- 58-12#.  Who is that, Mr. Patterson?

9    A.   That's -- that's her.  I don't know her name, but that's

10   Parkay's girlfriend, who was in the house.

11             MR. DEVILLERS:  May I publish this to the jury, Your

12   Honor?

13             THE COURT:  Yes.

14   BY MR. DEVILLERS:

15   Q.   Okay.  She's not talking at all?  She is not telling you

16   anything?

17   A.   No.

18   Q.   What do you do next?

19   A.   So, we take her downstairs to the -- to the kitchen area

20   while we're still ransacking the house -- it's a pretty big

21   house -- and give her a drink of water.

22             So, we know there is more money in there.  So we tell

23   her we're going to wait until her boyfriend comes home, which

24   is Parkay.  She tells us he should be on his way home from the

25   club.  So, we sit there.  We're waiting until he come home.

TRIAL ONE - VOL. 17 -  3126

1       Turner was looking outside the front window, seeing when

2   his truck pulled up.  So, maybe about 15 minutes later, he

3   coming down the street.  Turner let us know that he's coming

4   down the street.  So, we went in the kitchen, in the dark, like

5   with the light off, waiting for him to walk in.  But we hear

6   his garage door.  We hear the garage door open up.  It never

7   shut.

8       So, then he started knocking on the door, and we knew

9   something wasn't right with that.  So, as he was knocking on

10  the door, me and Harris were about to pull him in the house,

11  but there was a change of plan.  We just said:  Everybody just

12  leave.

13      So me, Harris, Paco, and Mark leave out the back door

14  the same way we came in.

15  Q.   Let me stop you there.  Did you end up finding anything

16  in the house?

17  A.   Yes.

18  Q.   What did you find?

19  A.   We found some money, a little bit of marijuana.

20  Q.   Do you know how much money?

21  A.   Not exactly how much, but I kind of know how much we got

22  caught with when we had came to jail.  But some people got

23  away.  So I don't know what they had.

24  Q.   Okay.  Okay.  So you go out the door?

25  A.   Yeah, we go out the back door, walking up the side of

TRIAL ONE - VOL. 17 -   3127

1    the garage.

2         So, I guess Parkay ended up seeing us, and Turner ended

3    up firing a couple of shots at him.  Didn't hit him.  Didn't

4    hit him or nothin'.  And we fled the scene.  After we heard the

5    shots fired, we fled the scene.

6    Q.    How did you flee the scene?

7    A.    Well, me and Harris, we had took off and run a separate

8    way from Turner, Paco and Mark.  We had run to --

9    Q.    What happened to the van?

10   A.    The van was where it was parked at, waiting for them to

11   get in it.  But me and Harris had run a separate way first.

12   Q.    Okay.

13   A.    We had run in some cornfields, because we didn't want to

14   run out in front of the street and let them see us and see what

15   kind of car we was getting in.

16   Q.    Okay.

17   A.    So, me and Harris had run a separate way.  We ran in

18   these cornfields.  And we see the van coming down the street.

19   So we come out of the cornfield and flag the van down, hop in

20   the van with Mark, Paco and Turner.  And we leave.  And we --

21   Q.    Do you know what time of day it is at this point?

22   A.    Maybe about four.  Maybe about four, going on five at

23   this time.

24   Q.    Was it light, or dark, at that point?

25   A.    It was still dark.

TRIAL ONE – VOL. 17 –  3128

1    Q.   Okay.  Where did you go?

2    A.   We leave down the freeway.  And maybe about five, ten,

3  minutes later, a cruiser gets behind us.  Didn't have a

4  license.  Got guns on us, masks.  So we know we can't pull

5  over.  So, we take them on a high-speed chase.

6    Q.   Who's driving?

7    A.   Mark Colvin.

8    Q.   Okay.

9    A.   And we take them on a chase, throw some guns out, some

10  masks.  We throw that out and just, again, chase.  And then we

11  ended up pulling up on -- I don't know what street.  I don't

12  know where I'm at at this time.  We were just far out by Canal

13  Winchester.  So, we get rid of all that.  We stop the van.  We

14  hop out and took off running.  And we later got caught.

15    Q.   How far away from the van were you when you got caught?

16    A.   Not too, too far.  I mean, maybe about -- about 20

17  yards.

18    Q.   Did you -- What did you do with your gun?

19    A.   I threw it out the window.

20    Q.   Did you have a phone?

21    A.   Yes.

22    Q.   What did you do with the phone?

23    A.   I think my phone was in my pocket.

24    Q.   Would you recognize that phone if I showed it to you

25  again?

TRIAL ONE - VOL. 17 - 3129

1    A.    Yes.

2            MR. DEVILLERS:  May I approach the witness, Your

3    Honor?

4            THE COURT:  Yes, you may.

5    BY MR. DEVILLERS:

6    Q.    I'm going to hand you -- I'm going to hand you what's

7    been marked as Government's Exhibit 58-14.  I'm going to pull

8    out something.  Do you recognize that?

9    A.    Yes.

10   Q.    What is that?

11   A.    Nextel.

12   Q.    What color is it?

13   A.    Maroon and black.

14   Q.    Is this your phone, Mr. Patterson?

15   A.    Yes.  Yes.

16   Q.    Do you know what happened to Mr. Harris?

17   A.    We later got caught together.

18   Q.    How about Mr. Colvin?

19   A.    He got away.  Him, Paco, had got away.  And me, Harris

20   and Turner had got caught.

21   Q.    Did you ever tell the police that Paco was with you?

22   A.    No.

23   Q.    How about that Colvin was with you?

24   A.    No.

25   Q.    I'm going to show you what's been marked as Government's

TRIAL ONE – VOL. 17 –  3130

1    Exhibit 58-12#-004.  Can you tell me who that is?

2     A.   Anthony Turner.

3     Q.   I want to show you --

4          MR. DEVILLERS:  May I publish this to the jury, Your

5    Honor --

6          THE COURT:  Yes.

7          MR. DEVILLERS:  -- and admit it in evidence?

8    Actually, I think it's in evidence.

9          THE COURT:  It is in evidence.

10    BY MR. DEVILLERS:

11    Q.   I'm going to show you what's been marked as Government's

12   Exhibit 58-12#-006.  Who is this?

13    A.   Chris Harris.

14         MR. DEVILLERS:  May I publish this to the jury, Your

15   Honor?

16         THE COURT:  It's admitted into evidence, but you may

17   publish it, yes.

18    BY MR. DEVILLERS:

19    Q.   I'm now going to show you what's been marked as

20   58-12#-008.  Can you tell me who that is?

21    A.   It's me.

22    Q.   How old are you at this time?

23    A.   Seventeen.

24    Q.   Are you arrested during this picture?

25    A.   Yes.

TRIAL ONE – VOL. 17 –  3131

1    Q.   Where do you go?

2    A.   I went to the juvenile, to the D.H.

3    Q.   Eventually, you're transferred to somewhere else?

4    A.   I later got bounded over.

5    Q.   What's "bound over" mean?

6    A.   Where they try you as an adult.  On my 18th birthday,

7    they bounded me over to the adult system.

8    Q.   Okay.  Did you end up pleading guilty to something?

9    A.   Yes.

10   Q.   What did you plead guilty to?

11   A.   Aggravated burglary, rape, discharging a firearm,

12   felonious assault.

13   Q.   How long were you in jail before -- Eventually, were you

14   sentenced -- were you sentenced to prison?

15   A.   Yes.

16   Q.   For how long?

17   A.   Twenty years.

18   Q.   How long were you in jail, if you recall, before you

19   went to prison, like in a local jail?

20   A.   Maybe about 16, 17, months.

21   Q.   Was Mr. Harris in jail with you?

22   A.   Yes.

23   Q.   The phone that I showed you, Government's Exhibit 58-14,

24   did you have a contact list in there?

25   A.   I believe so.

TRIAL ONE - VOL. 17 -  3132

1    Q.   I'm going to show you what's been marked as Government's

2    Exhibit 58-6 -- 158-6, and I want to go to page 4 of that.

3         MR. DEVILLERS:  Agent, if you could highlight just

4    that number there (indicating).

5    BY MR. DEVILLERS:

6    Q.   Do you see the bottom of that exhibit?  There is, like,

7    a highlighted area?

8    A.   Yes.

9    Q.   Do you see that phone number?

10   A.   Yes.

11   Q.   Whose phone number is that?

12   A.   That's my old number.

13   Q.   All right.  I now want to show you what's been marked as

14   Government's Exhibit 58 -- 158-6, page 5.  Can you see the very

15   bottom of that exhibit?

16   A.   Yes.

17   Q.   All right.  Is there a "Bro" in there?

18   A.   Yes.

19   Q.   Okay.  Is that someone's phone number?

20   A.   Yes.

21   Q.   Whose phone number is that?

22   A.   It's Chris Harris'.

23   Q.   You refer to him as Bro?

24   A.   Yes.

25   Q.   Does this appear to be your contact list from your

TRIAL ONE – VOL. 17 –  3133

1    phone, Mr. Patterson?

2     A.   Yes.

3          MR. DEVILLERS:  May I publish this to the jury, Your

4    Honor?

5          THE COURT:  Yes, you may.

6     BY MR. DEVILLERS:

7     Q.   I'd now like to go to page 6 of that exhibit.  And if

8    you look at the very top, do you see a name up there?

9     A.   Yes.

10    Q.   What's the name?

11    A.   Bucc.

12    Q.   And who is that?

13    A.   Rashad Liston.

14    Q.   I'd now like to go to the bottom part, number 29 of that

15   exhibit.  Do you see a name there?

16    A.   Hov.

17    Q.   And who is Hov?

18    A.   Jonathan.

19    Q.   Jonathan who?

20    A.   I'm not sure of his last name.

21    Q.   Is it -- Did you pick him out before in a photograph

22   earlier this morning?

23    A.   Yes.

24    Q.   I'd now like to go to page 7 of that exhibit.  And if

25   you look at the very top, do you see a name there?

TRIAL ONE - VOL. 17 -  3134

1    A.    Yes.

2    Q.    Whose name is that?

3    A.    Jizzle.

4    Q.    Do you see the phone number associated with that name?

5    A.    Yes.

6    Q.    Could you read that phone number to us?

7    A.    446-1344.

8    Q.    Who is Jizzle?

9    A.    It's R.J.

10    Q.    And what's R.J.'s real name?

11    A.    Robert Wilson.

12    Q.    Now I'm going to -- If you go to page 9 of that exhibit,

13    do you see Line 72?

14    A.    Yes.

15          MR. DEVILLERS:  Can you highlight that?

16    BY MR. DEVILLERS:

17    Q.    Do you see a name there?

18    A.    Yes.

19    Q.    What name is that?

20    A.    Tone.

21    Q.    Who is Tone?

22    A.    I'm not sure if that's Fat Tone or Anthony Jones.

23    Q.    Okay.  I'd now like to go down two, to #75 of that

24    exhibit, that same page.  Do you see a name there?

25    A.    Yes, Turquoise.

TRIAL ONE - VOL. 17 - 3135

1    Q.    Turquoise who?

2    A.    Patterson.

3    Q.    All right.  While you were locked up waiting for the

4  trial of this case, do you recall an incident involving a

5  person by the name of Anthony Hackney?

6    A.    Yes.

7    Q.    Who was Anthony Hackney?

8    A.    Anthony Hackney was the person that Wilson and Liston

9  was in jail for.

10   Q.    Okay.  Did you know him at all?

11   A.    No, not really.

12   Q.    Have you ever talked to Mr. Liston about what happened

13  to Mr. Hackney?

14   A.    Nah.  No.

15   Q.    Have you ever talked to R.J. about -- Mr. Wilson about

16  what happened to Mr. Hackney?

17   A.    I can't recall.

18   Q.    Do you know a person by the name of Stephan Austin?

19   A.    Yes.

20   Q.    Who is Stephan Austin?

21   A.    That's -- I don't know his real name.  He goes by the

22  name of Nutty.

23   Q.    Okay.

24   A.    Supposedly, he had testified and told on R.J.

25   Q.    Hold on a second.

TRIAL ONE - VOL. 17 -  3136

1      I'm going to show you what's been marked as Government's

2  Exhibit 154-1-26.  Do you know who that is?

3  A.   Yes.

4  Q.   Who is that?

5  A.   Nutty.

6  Q.   While you are in prison, was there talk on Nutty?

7  A.   I mean, not too much, other than he had -- he had --

8  Q.   I'm actually going to stop you there.

9      Who talked to you, if anybody, about Nutty?

10  A.   Well, it came up from Harris that he had told

11  on -- there was buzz on the streets that he had told on R.J.

12  and them --

13  Q.   Okay.  Did Mr. Harris --

14  A.   -- during their trial.

15  Q.   How did Mr. Harris feel about that?

16  A.   I mean, he was upset.  Everybody was upset.

17  Q.   Were you upset?

18  A.   Yeah.

19  Q.   Why were you upset?

20  A.   Because he had told on -- on Wilson and Liston.

21  Q.   I want to play for you Government's Exhibit 150-1243.

22  And I'd like to start at 126.  See if you can identify some

23  voices here.

24      (Audiotape played in open court.)

25        MR. DEVILLERS:  Stop there.

1     BY MR. DEVILLERS:

2     Q.    Whose voices are those?

3     A.    That's Harris and his mom.

4     Q.    Eventually, did something happen to Nutty?

5     A.    Yeah.  He was -- he got killed.

6     Q.    How did you find out that he was killed?

7     A.    Everybody was just talking in prison about him getting

8     killed.  Harris had told me he got killed.

9     Q.    I'm sorry.  What?

10    A.    Harris had told me he got killed.

11    Q.    Do you know if -- You talked about Mr. Harris' baby's

12    momma.  Who is that?

13    A.    Which one?

14    Q.    Name -- how many does he have?

15    A.    He has two of them.

16    Q.    Okay.  Is India one of them?

17    A.    Yes.

18    Q.    Who is the other one?

19    A.    Lynne.

20    Q.    Okay.  Was Nutty somehow related to one of them?

21    A.    Yes.

22    Q.    How so?

23    A.    Through her mom, her mom's boyfriend.

24    Q.    Whose mom?

25    A.    Lynne's mom's boyfriend.

TRIAL ONE – VOL. 17 –  3138

1    Q.   Okay.  I want to play for you 150-1282, at 108.

2       (Audiotape played in open court.)

3          MR. DEVILLERS:  Stop there.

4    BY MR. DEVILLERS:

5    Q.   Did you hear those voices?

6    A.   Yes.

7    Q.   Who are those voices?

8    A.   Harris and his baby's momma, Lynne.

9    Q.   Did you hear the term "Homo" being thrown out there?

10   A.   Yes.

11   Q.   What did you hear?

12   A.   Just said he's lucky Homo wasn't out there.

13          MR. DEVILLERS:  Continue.

14       (Audiotape played in open court.)

15          MR. DEVILLERS:  Stop there.

16       We stopped at 149, Your Honor.

17          THE COURT:  All right.

18          MR. DEVILLERS:  I'd like to now move to 412.

19       (Audiotape played in open court.)

20          MR. DEVILLERS:  Stop there.

21       Stopped at 429, Your Honor.

22          THE COURT:  The record will so reflect.

23   BY MR. DEVILLERS:

24   Q.   I believe you testified earlier about D-Nice.  Who is

25   D-Nice?

TRIAL ONE – VOL. 17 –   3139

1    A.   Dawan Franklin.

2    Q.   And while you were locked up pending the case with

3  Parkay and Ms. Ramirez, was Mr. Liston locked up with you?

4    A.   Yes.

5    Q.   How about Mr. Wilson, R.J.?

6    A.   Yes.

7    Q.   How about Mr. Harris?

8    A.   Yes.

9    Q.   I want to play for you some audio and see if you can

10  recognize some voices.  I'm going to start it at 150-1440 and

11  start it at 11:50.

12        (Audiotape played in open court.)

13  BY MR. DEVILLERS:

14   Q.   Do you recognize that voice?

15   A.   Yes.

16   Q.   Who is that?

17   A.   Liston.

18        MR. DEVILLERS:  Keep going.

19        (Audiotape playing continued in open court.)

20        MR. DEVILLERS:  Stop it there.

21  BY MR. DEVILLERS:

22   Q.   Who is Freddie?

23   A.   Freddie Johnson.

24   Q.   And what's his street name?

25   A.   Freeze.

TRIAL ONE – VOL. 17 – 3140

1    Q.    And who is Tone?

2    A.    Anthony Jones.

3    Q.    Who is Woo Woo?

4    A.    That's his baby momma's brother.

5    Q.    Do you know his name?

6    A.    No, I don't know his real name.

7         MR. DEVILLERS:  Okay.  Continue.

8         (Audiotape continued to be played in open court.)

9         MR. DEVILLERS:  Stop there.

10        And we stopped at 1238, Your Honor.

11         THE COURT:  Yes.

12         MR. DEVILLERS:  Could you please move to 3:15?

13         AGENT:  3:50?

14         MR. DEVILLERS:  Yeah.  The time 13:13.  I'm sorry.

15        (Audiotape continued to be played in open court.)

16         MR. DEVILLERS:  Stop there.

17   BY MR. DEVILLERS:

18   Q.    Again, whose voices were those?

19   A.    That's Liston.  I don't know who that girl is.

20         MR. DEVILLERS:  Okay.  I'd now like to play 150-1446.

21         AGENT:  What time?

22         MR. DEVILLERS:  3:14.

23        (Audiotape played in open court.)

24         MR. DEVILLERS:  Stop there.

25   BY MR. DEVILLERS:

TRIAL ONE – VOL. 17 –  3141

1    Q.   Can you tell who is talking there?

2    A.   No.  Liston, but I don't know who the girl is talking.

3    Q.   You don't know who the girl is?

4    A.   Hu-uh.

5    Q.   They said something's dead.  Did you hear that?

6    A.   They're talking about the Short North.

7    Q.   Why would the Short North be dead?

8    A.   Because there ain't anybody out there, for real.  Like

9    everybody who pretty much had a name or had something going on

10   out there was in jail or dead.

11   Q.   Now, I want to play you 150-1449.

12        MR. DEVILLERS:  Fourteen.  Fourteen minutes.

13        (Audiotape played in open court.)

14        MR. DEVILLERS:  Stop there.

15   BY MR. DEVILLERS:

16   Q.   Can you tell us whose voices those are?

17   A.   That's Liston.  I don't know who the girl is.

18   Q.   All right.  I now want to play for you Exhibit 150-1452.

19        MR. DEVILLERS:  And start at 11:20.

20        (Audio played in open court.)

21   BY MR. DEVILLERS:

22   Q.   Do you recognize those voices?

23   A.   Yes.

24   Q.   Who are those voices?

25   A.   Liston and Turquoise.

TRIAL ONE – VOL. 17 –  3142

1    Q.   Okay.  And did you hear them talk about D-Nice?

2    A.   Yes.

3    Q.   At this time, what's going on with D-Nice?

4    A.   I think he was trying to take the gun, or take something

5    from somebody.

6    Q.   All right.

7         MR. DEVILLERS:  Keep listening.  Keep going.

8         (Audiotape played in open court.)

9         MR. DEVILLERS:  Stop there.

10   BY MR. DEVILLERS:

11   Q.   Again, whose voices are those?

12   A.   Liston and Turquoise.

13   Q.   Do you know a person by the name of Chad Harris?

14   A.   I don't think I know anyone by that name.

15   Q.   I'm going to show you a picture, I think.

16     (Whereupon, there was a brief interruption.)

17        THE COURT:  Mr. Devillers, please continue.

18   BY MR. DEVILLERS:

19   Q.   I'm going to show you what's been marked as Government's

20   Exhibit 61.  I believe there's two photographs there.  Do you

21   recognize those individuals?

22   A.   Yes.

23   Q.   Okay.  The man on top, who is that?

24   A.   Mark.

25   Q.   Okay.  The man on the bottom, who's that?

TRIAL ONE – VOL. 17 – 3143

1    A.    That's Chad.

2    Q.    Do you know Chad's last name?

3    A.    I mean, now, I do.  Ayers.

4    Q.    Okay.  But you didn't before --

5    A.    Yes.

6    Q.    -- five minutes ago?

7    A.    Yeah.

8         MR. DEVILLERS:  May I publish this to the jury, Your

9    Honor?

10        THE COURT:  Yes, you may.

11   BY MR. DEVILLERS:

12   Q.    Do you know what happened to these two individuals?

13   A.    They was killed.

14   Q.    Do you know how you learned about them being killed?

15   A.    I mean, I learned about it.  It was on the news.  I seen

16   the news.  And, at first, I seen them in there.  And then,

17   later on, Paco had told me.

18   Q.    Hold on.  You talked to Paco about this?

19   A.    Yes.

20   Q.    All right.

21        THE COURT:  You say that the gentleman at the bottom

22   is Chad Ayers?  Is that his name?

23        THE WITNESS:  Yes.

24        THE COURT:  What's the gentleman on top?  What's his

25   name?

TRIAL ONE - VOL. 17 - 3144

1      THE WITNESS:  Mark Taron Colvin.

2      THE COURT:  Okay.

3   BY MR. DEVILLERS:

4   Q.   Have you ever talked to Mr. Ledbetter about what

5   happened to these two individuals?

6   A.   No.

7      MR. DEVILLERS:  You can take that down.

8   BY MR. DEVILLERS:

9   Q.   Mr. Patterson, when did you first learn -- about when

10  did you first learn that your -- about this investigation, the

11  subject of this current indictment?

12  A.   About the Short North Posse investigation?

13  Q.   Yes.

14  A.   Probably around about 2012, '13.

15  Q.   Okay.  And how did you learn about it?

16  A.   Anthony Jones, he had caught a case, a double homicide.

17  And we heard that the feds was coming and talking to him.

18  Q.   Who told you that?

19  A.   I forgot who told Harris.  Harris had told me.  And I

20  think Tone had told Harris.

21      MR. GATTERDAM:  Objection.

22      THE COURT:  Sustained.  Rephrase, Mr. Devillers.

23      MR. DEVILLERS:  Yes, Your Honor.

24  BY MR. DEVILLERS:

25  Q.   When you were locked up, did you receive phone calls

TRIAL ONE – VOL. 17 –  3145

1    from people?

2     A.    Yes.

3     Q.    And from those phone calls, did you learn there was an

4    investigation?

5     A.    Yes.

6     Q.    Were you concerned about it?

7     A.    Yes.

8     Q.    I'll play a couple other calls and see if you recognize

9    some voices for me.

10          I'm going to play Government's Exhibit 150-96.

11          MR. DEVILLERS:  And start at 11:25.

12          (Audiotape played in open court.)

13          MR. DEVILLERS:  Stop there.

14    BY MR. DEVILLERS:

15     Q.    Do you recognize those voices?

16     A.    Brandon Ledbetter.  I don't know who the girl is.

17     Q.    Do you know who Terika is?

18     A.    Do I know Terika?

19     Q.    Yes.

20     A.    Yes.

21     Q.    Who is that?

22     A.    That's my cousin.

23     Q.    All right.

24          MR. DEVILLERS:  Keep playing.

25          (Audiotape continued to be played in open court.)

TRIAL ONE – VOL. 17 – 3146

1        MR. DEVILLERS:  We stopped at 12:55, Your Honor.

2        THE COURT:  The record will reflect that.

3    BY MR. DEVILLERS:

4    Q.   Do you know -- Do you know who Mr. Ledbetter referred to

5    as Little Bro?

6    A.   R.J., Robert Wilson.

7    Q.   Now I want to play for you 150-106.

8        MR. DEVILLERS:  And start at 8:20.

9        (Audiotape played in open court.)

10   BY MR. DEVILLERS:

11   Q.   Did you hear those voices?

12   A.   Yes.

13   Q.   Do you recognize any of those voices?

14   A.   Brandon Ledbetter.

15   Q.   Do you recognize the other voice?

16   A.   No.

17   Q.   Did you hear them talk about anyone in particular?

18   A.   O-Dog.

19   Q.   At this time -- Well, in 2013, where are you?

20   A.   I was in Ross Correctional Institution.

21   Q.   Do you know where Mr. Harris was?

22   A.   He was in Ross with me.

23       MR. DEVILLERS:  Keep going.

24       (Audiotape played in open court.)

25       MR. DEVILLERS:  Stop.

TRIAL ONE – VOL. 17 –  3147

```
 1          Judge, we stopped at 8:59.
 2            THE COURT:  All right.  The record will reflect that.
 3       BY MR. DEVILLERS:
 4       Q.   Mr. Patterson, did you plead guilty to something in
 5    front of Judge Marbley?
 6       A.   Yes.
 7       Q.   When were you indicted?  Do you remember when, for this
 8    case?
 9       A.   July 1st, 2014.
10       Q.   Do you remember what you were indicted for?
11       A.   Murder and aiding racketeering.
12       Q.   Do you know what that murder was in relation to?
13       A.   Tyrell Davis.
14       Q.   Did you plead guilty to that?
15       A.   Yes.
16       Q.   Do you remember when you first talked to the government?
17       A.   Yes.
18       Q.   When was that?
19       A.   I don't know, exactly, the date.
20       Q.   Do you remember what year it was?
21       A.   On this case?
22       Q.   Yes.
23       A.   Maybe about, I want to say, like November, September.
24       Q.   Of what year?
25       A.   2014.
```

TRIAL ONE – VOL. 17 –  3148

1    Q.    2014?

2    A.    Yes.

3    Q.    Okay.  Do you have an attorney?

4    A.    Yes.

5    Q.    Who is your attorney?

6    A.    Robert Krapenc.

7    Q.    Was he with you when you talked to the government?

8    A.    Yes.

9    Q.    To the best of your ability, did you tell us the truth?

10   A.    Yes.

11   Q.    Did we make you any promises, that is, myself or the

12   people sitting at this table?

13   A.    No.

14   Q.    Did we tell you that we'd file a motion for you?

15   A.    Yes.

16   Q.    Do you know what that motion is called?

17   A.    It's a 5K1.

18   Q.    What would that do?

19   A.    Something they do when I get sentenced, my sentencing.

20   Q.    Right now, if you were -- when you pled guilty in front

21   of the Judge, what was your sentence?

22   A.    Life.

23   Q.    Could you do less than life?

24   A.    No.

25   Q.    If I filed -- If we filed this motion, could you do less

TRIAL ONE – VOL. 17 –  3149

1   than life?

2    A.   Yes.

3    Q.   Does the government get to make a recommendation as to

4   what sentence you get?

5    A.   Yes.

6    Q.   Who decides, in the end, what your sentence is?

7    A.   Judge Marbley.

8    Q.   Who decides whether or not to grant the motion, this 5K

9   motion?

10    A.   Judge Marbley.

11    Q.   Does your attorney get to make a recommendation as to

12   your sentence?

13    A.   Yes.

14    Q.   How about the victim's family?  Do they get to make a

15   recommendation?

16         MR. GATTERDAM:  Objection to leading.

17         THE WITNESS:  Yes.

18         THE COURT:  I'm going to -- Side-bar.

19                        – – –

20      (Thereupon, the following proceeding was held at side-bar.)

21         THE COURT:  Normally, I would sustain your objection.

22   But on these matters dealing with issues of law that he may or

23   may not understand, I'm going to overrule your objection.  So

24   long as Mr. Devillers doesn't ask a question like, I'm going to

25   recommend 18 years, isn't that correct, he can ask him, did I

TRIAL ONE - VOL. 17 - 3150

1   make -- did I make a representation to you as to how long a

2   sentence I'm going to recommend.  I'm going to allow that

3   because, having observed Mr. Patterson, I don't believe that he

4   needs to be lead with respect to any of the facts of matters in

5   which he was engaged.  And I think that, with just a handful of

6   exceptions, Mr. Devillers abided by the Court's directive.  But

7   on something like this where it's more technical and more

8   legal, I'm going to allow the type of leading that I would

9   allow to establish a foundation.

10          MR. GATTERDAM:  My other concern, I guess, or my

11  request, would be that the questions, whether leading or not,

12  be directed at what his knowledge is, versus the government

13  tells you or the government does this or the Judge does this.

14          THE COURT:  You mean what his understanding is?

15          MR. GATTERDAM:  Yeah, because now he's made it sound

16  like it's a fact, as opposed to what his understanding is.

17          THE COURT:  I don't know that I agree with that.  But

18  I will allow you, Mr. Gatterdam, to make an objection if he

19  asks a question that's leading in a way that's inconsistent

20  with what I said here.  That's why I requested this side-bar on

21  something as simple as a leading objection.

22          MR. GATTERDAM:  I understand.

23          MR. BERNDT:  When he's done, are we going to break?

24          THE COURT:  We'll probably go until about 3:30, 3:35,

25  and then we'll take a break, unless somebody needs a break.

TRIAL ONE – VOL. 17 – 3151

1      MR. BERNDT:  I'm good.

2      MS. DIXON:  I'm okay.

3   (The following proceedings were had in open court.)

4      MR. DEVILLERS:  May I have a moment, Your Honor?

5      THE COURT:  Yes.

6   (Whereupon, there was a brief interruption.)

7   BY MR. DEVILLERS:

8   Q.   I just want to show you a couple more pictures, Mr.

9   Patterson.  I want to show you 153-177.  Do you recognize that

10  person?

11  A.   Yes.

12  Q.   Who is that?

13  A.   Shawn Lovelady.

14  Q.   Does he have -- Does he go by two different names?

15  A.   Shawn Waddell.

16      MR. DEVILLERS:  May I publish this, Your Honor?

17      THE COURT:  Yes, you may.

18      Any objection, Mr. Berndt?

19      MR. BERNDT:  No, Your Honor.  Thank you.

20      THE COURT:  Mr. Gatterdam?

21      MR. GATTERDAM:  No, Your Honor.

22      THE COURT:  Ms. Dixon?

23      MS. DIXON:  No, Your Honor.

24      THE COURT:  Mr. McVay?

25      MR. McVAY:  No.

TRIAL ONE - VOL. 17 - 3152

1          THE COURT:  Mr. Nolder?

2          MR. NOLDER:  No.

3          MR. DEVILLERS:  May I enter it into evidence?  I don't

4     think it's in.

5          THE COURT:  Yes, you may.

6     BY MR. DEVILLERS:

7     Q.   Mr. Patterson, I want you to look around the courtroom

8     to see if you see the individual you know as Deounte Ussury?

9     A.   Yes.

10    Q.   Could you please point to him and describe what he's

11    wearing?

12    A.   A blue shirt.  That's all I can see.

13    Q.   Does he have a jacket on?

14    A.   No.

15         MR. DEVILLERS:  Your Honor, may the record reflect the

16    witness has identified Deounte Ussury?

17         THE COURT:  The record will so reflect.

18    BY MR. DEVILLERS:

19    Q.   I ask you to look around and see if you see Brandon

20    Ledbetter.

21    A.   Yes.

22    Q.   Can you describe what he's wearing?

23    A.   A gray suit, black shirt.

24         MR. DEVILLERS:  Your Honor, may the record reflect the

25    witness has identified the defendant, Robert Brandon Ledbetter?

TRIAL ONE – VOL. 17 –  3153

1          THE COURT:  The record will so reflect.

2     BY MR. DEVILLERS:

3     Q.   The person you know as Bucc, as Rashad Liston, do you

4     see him in the courtroom?

5     A.   Yes.

6     Q.   Please point to him and describe what he's wearing.

7     A.   A gray suit, black shirt.

8     Q.   The person you know as Chris Harris --

9          MR. DEVILLERS:  Your Honor, may the record reflect the

10    witness has identified the defendant, Rashad Liston?

11         THE COURT:  The record will so reflect.

12    BY MR. DEVILLERS:

13    Q.   The person you know as Chris Harris, is he in the

14    courtroom today?

15    A.   Yes.

16    Q.   Would you point to him and describe what he's wearing?

17    A.   A yellow blazer, black shirt.

18         MR. DEVILLERS:  May the record reflect the witness has

19    identified the defendant, Chris Harris?

20         THE COURT:  Mr. Patterson, are you sure it's a yellow

21    blazer?

22         THE WITNESS:  Or gold, or whatever that color is.

23    BY MR. DEVILLERS:

24    Q.   Can you tell if he's wearing a shirt or a blazer?

25    A.   A yellow -- yellow shirt, or black, whatever you call

TRIAL ONE – VOL. 17 –  3154

1    it, blazer or whatever it is.

2            THE COURT:  I understand.

3         The record will so reflect.

4         MR. DEVILLERS:  Thank you, Your Honor.

5         No further questions, Your Honor.

6          THE COURT:  Mr. Berndt?

7          MR. BERNDT:  Thank you, Your Honor.

8                        - - -

9                    CROSS-EXAMINATION

10   BY MR. BERNDT:

11   Q.   Mr. Patterson, good afternoon.

12   A.   Good afternoon.

13   Q.   Can you hear me okay?

14   A.   Yes, sir.

15   Q.   My name is Jeff Berndt.  I'm a lawyer.  I represent

16   Robert Ledbetter.  Okay?

17   A.   Yes.

18   Q.   I only represent Robert Ledbetter.  So I am going to

19   confine my inquiries into the allegations you've made against

20   him during your direct testimony, okay?

21   A.   Yes.

22   Q.   Okay.  I want to start with your plea agreement, and

23   your plea agreement that you entered into in regard to this

24   case.  Okay?

25   A.   Yes.

TRIAL ONE – VOL. 17 –  3155

1    Q.    Now, you pled guilty to the murder of Tyrell Davis,

2    correct?

3    A.    Yes.

4    Q.    And in doing so, you were informed by Judge Marbley,

5    when you entered that plea, that your sentence would be life

6    imprisonment or death, correct?

7    A.    Yes.

8    Q.    Okay.  And you were, also, told by Judge Marbley that

9    your plea agreement took into account the potential that that

10   sentence could be reduced based upon -- please look at me --

11   thank you -- based upon your cooperation in this case, correct?

12   A.    Yes.

13   Q.    And in order to get that reduction, the government, and

14   only the government, can file a motion requesting that,

15   correct?

16   A.    Yes.

17   Q.    Okay.  So, you've placed yourself entirely in the hands

18   of the government in regards to whether or not you spend the

19   rest of your life in prison, correct?

20   A.    Yes.

21   Q.    So, if they don't file that 5K motion on your behalf,

22   you're still going to be satisfied with what happened in this

23   courtroom, correct?

24   A.    Yes.

25   Q.    So, you're prepared to spend the rest of your life in

TRIAL ONE - VOL. 17 -  3156

1   prison because of your plea, correct?

2   A.   I know the consequences of my actions, yes.

3   Q.   That's not my question.  If the government does not file

4   a request to reduce your sentence, you're going to be satisfied

5   and you're not going to complain, correct?

6   A.   Yes.

7   Q.   And you're going to go to federal prison for the rest of

8   your life, no parole, correct?

9   A.   Yes.

10  Q.   Okay.  Now, when you pled guilty in state court -- do

11  you remember that?

12  A.   Yes.

13  Q.   In regard to the Parkay, the Markey Moore, the rape, the

14  kidnapping, the robbery, do you remember that?

15  A.   Yes.

16  Q.   Okay.  You agreed to a 20-year sentence in that case,

17  did you not?

18  A.   Yes.

19  Q.   That was a jointly recommended sentence; was it not?

20  A.   Yes.

21  Q.   Okay.  And by "jointly recommended," that means that you

22  knew that's what the prosecutor and your lawyers were going to

23  ask the Judge to give to you, correct?

24  A.   Yes.

25  Q.   Okay.  And that is the sentence that you were given,

TRIAL ONE – VOL. 17 –  3157

1  correct?

2   A.   Yes.

3   Q.   And that sentence was given on January 4th of 2009,

4  correct?

5   A.   Yes.

6   Q.   And on June 22nd, 2010, you asked for that sentence to

7  be changed, did you not?

8   A.   Yes.

9   Q.   You asked for it to be --

10       MR. DEVILLERS:  Objection to relevance, Your Honor.

11       THE COURT:  Side-bar for a moment.

12                          - - -

13    (Thereupon, the following proceeding was held at side-bar.)

14       THE COURT:  Go ahead, Mr. Devillers.

15       MR. DEVILLERS:  I'm not sure how the sentence on

16  something that took place before the indictment is relevant.

17  In this case, I would imagine it would be somehow relevant if

18  it was to this particular crime, but it's not.

19       THE COURT:  That's what I was trying to put together,

20  Mr. Berndt.  Where are you going with this?

21       MR. BERNDT:  Your Honor, he stated he would have

22  absolutely no problem with the sentence that Mr. Devillers

23  recommended, even if it was life imprisonment.  I think that

24  his conduct in regard to how he handled his sentence during the

25  state case is impeachment material as to whether or not he's

TRIAL ONE - VOL. 17 - 3158

1    satisfied with the statement -- with the -- with placing

2    himself completely in the hands of the government, which is

3    exactly what he did in the state case, placed himself in the

4    hands of the government on a joint recommendation, and four

5    months after his sentence --

6          THE COURT:  He placed himself in the hands of the

7    United States Attorney's Office, the government, or are you

8    talking about the state prosecutors?

9          MR. BERNDT:  I'm talking about state prosecutors.

10   That's still a prosecutor.

11         THE COURT:  Your objection is sustained.  Here is the

12   thing.  Here is the concern I had, and apparently, I share it

13   with the government, but when you were cross-examining him

14   about what if the government doesn't file its 5K, and maybe I

15   misunderstood, my understanding, though, is that -- the

16   government, obviously, has the right to file it or not file it.

17   There is no question about that.  But I thought you're -- I

18   thought that you represented to the Court that you were filing

19   the 5K in exchange for his testimony against these defendants.

20         MR. DEVILLERS:  Yes, sir.

21         THE COURT:  Once he gives the testimony, irrespective

22   of the outcome of the case, you file the 5K?  Is that right?

23         MR. DEVILLERS:  Yes, Your Honor.

24         THE COURT:  Wait, Mr. Berndt.

25         MR. BERNDT:  I'm with you.

TRIAL ONE - VOL. 17 -  3159

1          THE COURT:  Your question was almost like, when did

2     you stop beating your spouse, because, you know, they presume

3     facts that were not in evidence because he's testified now.

4     Once he's testified, they're on the hook to file the 5K.  So

5     it's not like it's optional now.  It might have been optional

6     up to the point where he testified.  And my concern, as the

7     gatekeeper, is whether that question was misleading to the

8     jury.  I don't know the answer to that.  But the government

9     didn't object.  So, I want that to be a warning to everybody.

10    I don't like those kinds of questions.

11          Now, it's one thing if they have the option at this

12    point and everything is done.  It's one thing if they have the

13    option, you know, to withdraw it.  And I imagine that there are

14    some circumstances, if they find out that he later lied about

15    some stuff, which all goes to your defense, Mr. Berndt, because

16    then you can make your argument there were circumstances where

17    they could withdraw it, but if the only condition was that he

18    comes in and testifies or tells the truth, then I would -- I

19    would think that that question in the future would be improper.

20    And it's just like I told you, told the government, with

21    respect to some of these other questions; you've got a lot of

22    ammunition.

23          MR. BERNDT:  I understand.

24          THE COURT:  And I understand your cross-examination.

25    So, there is no need to have extraordinary questions that are

TRIAL ONE - VOL. 17 -  3160

1    otherwise misleading, and I'm not just addressing it to you.

2    You're just --

3              MR. BERNDT:  That would be fine.

4              THE COURT:  You just happen to be the exemplar at this

5    time.  You're the one who is doing the examining.

6              MR. BERNDT:  Exactly.

7              THE COURT:  But I want all of the other equally

8    qualified cross-examiners to know -- Dixon, Gatterdam and

9    McVay -- to understand that, too.  All right.

10             MR. BERNDT:  Your Honor, may I say something?

11             THE COURT:  Absolutely.

12             MR. BERNDT:  The plea agreement doesn't reflect what

13   the Court's understanding was as to the obligation to file the

14   5K.  The plea agreement states that it's entirely up to the

15   government.  And, frankly --

16             THE COURT:  Right.

17             MR. BERNDT:  -- my understanding is that it is

18   entirely up to the government and that if he didn't file the

19   5K, the case law would not allow Mr. Patterson to force a 5K,

20   and I don't think the Court can force a 5K.

21             MR. DEVILLERS:  He does have other trials, too, that

22   he's required to testify in.  And I guess, in effect, he isn't

23   quite done with what he could do.

24             THE COURT:  I understand.  And, then, I stand

25   corrected because my understanding was that, once he

TRIAL ONE – VOL. 17 –  3161

1    testified -- but you're right.  He has to testify at all three,

2    and he hasn't testified.  If he backs out -- but I'm not so

3    certain that if the case came before me and given the testimony

4    that he's given -- I treat this from an analytical vantage

5    point the same way I would treat a contract case.  It's, you

6    know, he's performed --

7              MR. DEVILLERS:  Uh-huh.

8              THE COURT:  -- to his detriment.  So, there has been

9    consideration; and, as far as I'm concerned, Mr. Devillers, you

10   are now on the hook.

11             MR. DEVILLERS:  Understood, Your Honor.

12             THE COURT:  Yeah.  You have no option, I think --

13             MR. BERNDT:  Your Honor, maybe --

14             THE COURT:  -- unless you find out that he's lied.

15             MR. BERNDT:  Maybe we could make that clear to the

16   jury, because, see, that's not -- that's not how it was

17   presented.

18             THE COURT:  Under that circumstance, I don't have any

19   problem with that.  Okay?

20             MR. GATTERDAM:  Your Honor, for the record, not

21   necessarily to change your decision, but I, also, think these

22   documents in state court go more generally to his character for

23   truthfulness, because I think he really is --

24             THE COURT:  What lie did he tell to the people at

25   state court?

TRIAL ONE - VOL. 17 - 3162

1        MR. GATTERDAM:  He agreed to a 20-year sentence; and,

2    within a month later, he says that I want -- I'm supposed to

3    get a ten-year sentence, the law says I should have a ten-year

4    sentence.

5        THE COURT:  But, see, that doesn't go to truthfulness,

6    Mr. Gatterdam.  He's saying it would go to truthfulness if he

7    got on the stand and testified:  Wasn't it your understanding

8    that you were going to get 20 years, yes, when his

9    understanding really was that he was going to get 30 years and

10   he lied.

11       He didn't lie about this.  There is nothing that

12   prohibits him from saying:  I agreed to, you know, to a 20-year

13   sentence, but I saw an opportunity availed itself for me to ask

14   for another sentence.

15       That's not a lie.

16       MR. GATTERDAM:  But when you go into court and say, I

17   agree to a 20-year sentence, and then you backtrack and say,

18   no, I didn't agree to that, I want a ten-year sentence now, I

19   mean, he could answer, I saw an opportunity, but I don't

20   think --

21       THE COURT:  No.  No.  No.  No.  I think -- and I think

22   that sets bad precedent, going forward, in so many different

23   ways.  So I disagree.  I understand your analysis.  And, Mr.

24   Gatterdam, I applaud you for such creativity, but --

25       MR. BERNDT:  To further creativity, in state court, a

1  jointly-recommended sentence is not appealable.  There is no

2  breaks on judicial release.

3      THE COURT:  There was no appeal.  That's tantamount to

4  saying you can never file -- now, personally, I would like it,

5  because what that would do is prohibit any of you all from ever

6  filing for a motion for reconsiderations and all of that.  And

7  all of you know how I feel about motions for reconsideration.

8  So, I know that, you know, but I think that that would be

9  misleading to the jury.

10      MR. BERNDT:  Okay.

11      THE COURT:  And with all of the ammunition you have,

12  Mr. Berndt, and the rest of you assembled here, I can't imagine

13  that we're going to get hung up on this point, although that is

14  not a criticism for you pursuing your client's interest and

15  trying to get a ruling, but I agree with Mr. Devillers.  I

16  think that it is not relevant.  All right.

17     (The following proceedings were had in open court.)

18      THE COURT:  Please continue, Mr. Berndt.

19      MR. BERNDT:  Thank you, Your Honor.

20  BY MR. BERNDT:

21  Q.  Mr. Patterson, I want to digress for a minute with you.

22  Okay?  You were born January 13th, 1991, correct?

23  A.  Yes.

24  Q.  And where did you grow up?

25  A.  I lived in the Short North area, the Weber area.

TRIAL ONE – VOL. 17 –  3164

1    Q.   And the Weber area is actually Weber Road, correct?

2    A.   Yes.

3    Q.   And that's not in the Short North, correct?

4    A.   Yes.

5    Q.   Okay.  Correct?  It's not in the Short North, right?

6    A.   Correct.

7    Q.   Okay.  And you said you went to the ninth grade in

8    school, correct?

9    A.   Yes.

10   Q.   Okay.  And you, also, said that, by 2005, you were

11   hanging around in the Short North, correct?

12   A.   Yes.  Every day, yes.

13   Q.   Every day.  All right.  You were 14, correct?

14   A.   Yes.

15   Q.   So you really weren't going to school, right?

16   A.   Not really.

17   Q.   Okay.  And you were 14, and you were running the

18   streets, correct, in the Short North?

19   A.   Yes.

20   Q.   Okay.  I want you to explain to the ladies and gentlemen

21   of the jury what the knockout game is.

22   A.   Knockout is when you randomly knock people out in the

23   streets.  They don't have to be nobody in particular.  Just

24   whoever you might see walking up and down the street, knock

25   them out.

TRIAL ONE - VOL. 17 -   3165

1    Q.   Take their stuff?

2    A.   Punch them, yeah.

3    Q.   So -- so I understand this, you're on the street,

4    correct?

5    A.   Yes.

6    Q.   You see an unsuspecting victim, correct?

7    A.   Yes.

8    Q.   You ambush that victim, correct?

9    A.   Yes.

10   Q.   You physically assault that victim, correct?

11   A.   Yes.

12   Q.   You take what that victim has, correct?

13   A.   Yes.

14   Q.   And you leave them there to live or to die, correct?

15   A.   Yes.

16   Q.   And you're 14 years old when you're doing this, correct?

17   A.   Yes.

18   Q.   You, also, stated that you committed a lot of robberies

19   with Elijah Ledbetter, correct?

20   A.   Yes.

21   Q.   Okay.  And that was when you were 13, 14, 15 years old,

22   correct?

23   A.   Yes.

24   Q.   Okay.  And these were residential robberies, burglaries?

25   A.   One of them was a burglary.  The rest of them was, like,

TRIAL ONE – VOL. 17 – 3166

1  on the streets.

2  Q.  Okay.  The rest of them were more akin to the knockout

3  game?

4  A.  Yes.

5  Q.  Do you remember when somebody died as a result of you're

6  playing the knockout game?

7  A.  No.

8  Q.  You don't?

9  A.  No, sir.

10  Q.  So, if there is prior testimony in this case about you

11  playing the knockout game with Allen Wright and somebody died

12  as a result of that, you would dispute that, or you just don't

13  know?

14  A.  I would dispute that.

15  Q.  Okay.  You committed various felonies, receiving stolen

16  property, correct?

17  A.  Yes.

18  Q.  Carrying a concealed weapon at the age of 15, correct?

19  A.  Yes.

20  Q.  Is that a gun?

21  A.  Yes.

22  Q.  Were you with Tony Jones when that happened?

23  A.  Yes.

24  Q.  And then a robbery at the age of 16, right?

25  A.  Yes.

TRIAL ONE – VOL. 17 –  3167

1    Q.    Okay.  You then get involved, at the age of 17, with

2    this crime against Marilyn Ramirez and Parkay, correct?

3    A.    Yes.

4    Q.    The home invasion in Canal Winchester, correct?

5    A.    Yes.

6    Q.    Okay.  Now, you did that with Paco, Harris, Liston?

7         MS. DIXON:  Objection.

8    BY MR. BERNDT:

9    Q.    I'm sorry.  Who did you do that with?

10        THE COURT:  I'm sorry?

11        MS. DIXON:  Mischaracterization.

12        MR. BERNDT:  I apologize.

13        THE COURT:  Your objection is sustained.

14   BY MR. BERNDT:

15   Q.    Who was involved in that?

16   A.    Me, Harris, Paco, Colvin and Turner.

17   Q.    Okay.  And not Robert Ledbetter, correct?

18   A.    No.

19   Q.    Okay.  So, you committed a home invasion, correct?

20   A.    Yes.

21   Q.    You were given information to go do that home invasion,

22   correct?

23   A.    Yes.

24   Q.    You did that with people other than Robert Ledbetter,

25   correct?

TRIAL ONE – VOL. 17 –  3168

1    A.   Yes.

2    Q.   You went in, broke in, terrorized the people, cut the

3  hair off of the woman, correct?

4    A.   I didn't cut the hair off, but her hair was cut,

5  correct.

6    Q.   No.  You were reserved for placing the gun on her

7  vagina, correct?

8    A.   Yes.

9    Q.   Did you, also, insert your fingers into her vagina?

10    A.   No, sir.

11    Q.   Did you try to insert your fingers into her anus?

12    A.   No, sir.

13    Q.   And you've never stated that previously?

14    A.   No, sir.

15    Q.   And you then left, correct?

16    A.   Yes.

17    Q.   Now, at this point, you're 17 years old, correct?

18    A.   Yes, sir.

19    Q.   So, at this point, at the age of 17, you're a career

20  criminal, correct?

21    A.   I don't know what the criteria for career criminal is.

22    Q.   Well, how about that you started playing the knockout

23  game when you were 13; and by the time you were 17, you were in

24  jail for rape, robbery and kidnapping?  Would you consider that

25  to be a career criminal at that point?

1    A.    I just call it having a few bad years.

2    Q.    A few bad years?

3    A.    Yes.

4    Q.    Okay.

5    A.    Career criminal –– I haven't even really lived to be a

6    career criminal.

7    Q.    Okay.  When you were locked up for the Canal Winchester

8    robbery, rape, kidnapping, you were placed in the custody of

9    the Juvenile Detention Center, correct?

10   A.    Yes.

11   Q.    Okay.  And while you were in pretrial custody, you

12   committed another crime within the detention center, did you

13   not ––

14   A.    Yes.

15   Q.    –– where you viciously assaulted somebody in the

16   lunchroom, correct?

17   A.    Yes.

18   Q.    While you were in jail for the other crime, you did

19   that, correct?

20   A.    Yes.

21   Q.    You went to prison, right?

22   A.    Yes.

23   Q.    Eighteen tickets for disciplinary actions; would you

24   agree?

25   A.    Yes.  For being late to school, yes, the majority of

TRIAL ONE - VOL. 17 -  3170

1   them.

2      Q.   Would you agree that, on March 30th of 2010, that you

3   were in a fight that sent somebody to the hospital?

4      A.   No, never.

5           THE COURT:  Mr. Berndt, is this -- I'm sorry.  Could

6   you give the jury a time frame so that -- you've asked about

7   the -- his time in the detention center and the time in the

8   prison.  And I don't know that it's clear which period of

9   incarceration you're talking about.

10  BY MR. BERNDT:

11     Q.   Do you remember being sentenced, in January of 2009, on

12  the robbery, rape, kidnap, Parkay, Canal Winchester?

13     A.   Yes.

14     Q.   The 20-year sentence, correct?

15     A.   Yes.

16     Q.   And when you got sentenced on that, you were sent to a

17  penitentiary, correct?

18     A.   Yes.

19     Q.   And that was sometime in 2009, correct?

20     A.   Yes.

21     Q.   And on March 30th of 2010, you received disciplinary

22  action at the prison, correct?

23     A.   I can't recall.

24     Q.   You can't recall?  Can you recall beating somebody up

25  that month?

TRIAL ONE – VOL. 17 –  3171

1   A.   No.  I talked to my lawyer about that.  I think that was

2   a misprint somewhere, because I never -- I don't know nothing

3   about that one.

4   Q.   Where is it misprinted?

5   A.   The accusation that you said about the incident that

6   supposedly happened.

7   Q.   Where was it misprinted?

8   A.   Somewhere on what you're reading, I believe.

9   Q.   So you are aware of that allegation, correct?

10  A.   Yes.

11  Q.   You told me, two minutes ago, you weren't, correct?

12  A.   Yes.

13  Q.   So, now, you're telling me you are, correct?

14  A.   Yes, prior to my lawyer telling me, but prior to it

15  happening, I don't have no recognition of that happening.

16  Q.   But you knew what I was talking about when I asked you

17  to begin with, correct?

18  A.   Yes.

19  Q.   And yet you denied it, correct?

20  A.   Yes.

21  Q.   Okay.  And you're under oath, correct?

22  A.   Yes.

23  Q.   And that was a lie, correct?

24  A.   Yes.

25  Q.   Thank you.

1        So, if it states in your presentence report that you

2   were involved in a physical altercation with another inmate,

3   the injured inmate requiring hospital treatment, on March 30th

4   of 2010, and you received 15 days in disciplinary, that's

5   something that you would dispute, correct?

6   A.   I -- I can't recall that -- that incident.

7   Q.   So, now you can't recall it at all?

8   A.   No.

9   Q.   So, it's not a misprint anymore?

10  A.   What -- what -- what is he asking me?

11       MS. DIXON:  We can't hear.

12       MR. BERNDT:  You can read it back to him.

13     (Question read back by the court reporter.)

14       THE WITNESS:  I don't know if it's a misprint.  I

15  don't recall the incident that you're reading, I can't recall

16  that incident.  I don't know why it's typed in that paperwork

17  or whatever you're reading from, but I can't recall that

18  incident taking place.

19  BY MR. BERNDT:

20  Q.   Okay.  And you had a chance to review your presentence

21  report?

22  A.   Yes.

23  Q.   And you know that there is an objection process to the

24  presentence report?

25  A.   Yes.

TRIAL ONE - VOL. 17 - 3173

1    Q.   And the presentence report that I have in front of me is

2   noted as final, and it contains that information.  Did you go

3   through the objection process in the presentence report?

4         MR. DEVILLERS:  I'm going to object, Your Honor.

5         MR. BERNDT:  If he knows.

6         THE COURT:  I'm going to sustain it; and I'm going to

7   sustain it, Mr. Berndt, on the basis of the fact that the

8   objections are handled by the lawyers, and they're legal in

9   nature.  And in my 19 years, I've not, I don't believe, had a

10  defendant who argued an objection before me, because they're

11  legal in nature.

12        MR. BERNDT:  Okay.

13        THE COURT:  So, I understand your question, but I'm

14  going to sustain the objection, as it would be beyond this

15  witness' knowledge.  The other answers, however, that you have

16  elicited about his knowledge of the incident will stand.

17        MR. BERNDT:  Thank you.

18   BY MR. BERNDT:

19   Q.   Sir, do you remember being caught with a cell phone

20  while you were in prison?

21   A.   Yes.

22   Q.   Okay.  And you're not allowed to have a cell phone while

23  you're in prison, are you?

24   A.   No.

25   Q.   So, you had that smuggled into the prison, correct?

TRIAL ONE – VOL. 17 –  3174

1    A.    I didn't have it smuggled.  I bought it from within the

2    prison.

3    Q.    You bought it within the prison, correct?

4    A.    Yes, sir.

5    Q.    Against all the prison rules, correct?

6    A.    Yes.

7    Q.    And you were caught with that cell phone, correct?

8    A.    Yes.

9    Q.    And you received disciplinary action against you for

10   that cell phone, correct?

11   A.    Yes.

12   Q.    Okay.  And do you remember around the time that you were

13   indicted?  Do you remember when that happened?

14   A.    Yes.

15   Q.    Were you at Ross then?

16   A.    Yes.

17   Q.    Okay.  Do you remember what they found in your property

18   when they asked you to roll it up because you were coming up

19   here to face this case?

20   A.    A cell phone and some crack cocaine.

21   Q.    So within the prison, you had another cell phone,

22   correct?

23   A.    Yes.

24   Q.    And you had crack cocaine, correct?

25   A.    Yes.

TRIAL ONE – VOL. 17 –  3175

1    Q.   So, you're somebody who went to prison, right?

2    A.   Yes.

3    Q.   Got caught with two cell phones, correct?

4    A.   Yes.

5    Q.   Accessed crack cocaine, correct?

6    A.   Yes.

7    Q.   Okay.  And, of course, this is all illegal, correct?

8    A.   Yes.

9    Q.   This is all against prison policy, correct?

10   A.   Yes.

11   Q.   And these are rules that you specifically disregarded,

12   correct?

13   A.   Yes.

14   Q.   You continued to commit crimes while you were locked up,

15   correct?

16   A.   Violations, yes.

17   Q.   That's who you are, correct?

18   A.   Is who?

19   Q.   Went to prison, continued to break the rules?

20   A.   Correct.

21   Q.   And this is in 2014 when you got caught with the crack

22   cocaine, correct?

23   A.   Correct.

24   Q.   And the second cell phone, correct?

25   A.   Yes.

TRIAL ONE – VOL. 17 – 3176

1    Q.    Okay.  Now, you have a nickname on the street, do you

2    not?

3    A.    Yes.

4    Q.    What's your nickname?

5    A.    Forty.

6    Q.    Stands for .40 caliber, does it not?

7    A.    Yes.

8    Q.    So, you're 15 years old, on the street, and your

9    nickname is the caliber of a firearm; is that correct?

10   A.    Correct.

11   Q.    And I assume you earned that nickname, correct --

12   A.    Correct.

13   Q.    -- because you carried a .40 caliber gun, correct?

14   A.    Correct.

15   Q.    At the age of 13, 14, 15, right?

16   A.    I'd say about the age of 15.

17   Q.    Now, do you know A.V. Johnson?

18   A.    Yes.

19   Q.    Alan Johnson?  I think he goes by A.V.?

20   A.    Yes.

21   Q.    You knew him?  What was your relationship with him?  Was

22   it good, bad, in between?

23   A.    In between.

24   Q.    In between?  Do you have a tattoo about A.V. on your

25   body?

TRIAL ONE – VOL. 17 –  3177

1     A.   Yes.

2     Q.   Okay.  What's the tattoo show?

3     A.   It's a tattoo of somebody peeing on his grave, on his

4   gravestone.

5     Q.   And who would that somebody be?

6     A.   Nobody in particular, just a drawing.

7     Q.   So you decided to get a tattoo of somebody who's died

8   that you got along with, showing somebody urinating on their

9   grave?

10    A.   Because he killed my cousin, yes.

11    Q.   Okay.  And you want the jury to believe that that isn't

12   you peeing on his grave?

13    A.   It's not.

14    Q.   It's not?  Okay.  It's just some --

15    A.   There is no face.  There is no face or nothing on there.

16   It's just a person from behind.

17    Q.   And you had that permanently affixed on your body,

18   correct?

19    A.   Yes.

20    Q.   Okay.  All right.  Remember talking to the police in May

21   of 2006, May 15th, specifically?

22    A.   Yes.

23    Q.   You do?

24    A.   Yes.

25    Q.   And do you remember that you were in the Juvenile

TRIAL ONE – VOL. 17 –  3178

1    Detention Center at that time, correct?

2     A.    Yes.

3     Q.    And you were looking to help yourself on some type of

4    probation revocation issue, correct?

5     A.    Yes.

6     Q.    All right.  And you talked to the police, right?

7     A.    Yes.

8     Q.    And, again, this is May 15th of 2006, correct?

9     A.    I believe so.

10     Q.    And you had been in jail since about March 24th of 2006,

11    correct?

12     A.    I believe so.  I don't know exact dates.

13     Q.    All right.  If the records would reflect that, would you

14    have any reason to doubt that?

15     A.    No, sir.

16     Q.    Okay.  And you talked to the police, right?

17     A.    Yeah.

18     Q.    And you talked to them about making a fresh start and

19    turning your life around, right?

20     A.    I can't recall if that was part of the conversation.

21     Q.    Living with your mom in an attempt to stay away from

22    further trouble, correct?

23     A.    I can't recall if that was part of the conversation.

24     Q.    And did you recall talking to them about a group of

25    people called the Web Boys Gang?

1    A.   Yes.

2    Q.   Okay.  And naming people that aren't in this case,

3    correct?

4    A.   Yes.

5    Q.   Okay.  And do you remember not talking to them about

6    Alan Johnson's homicide?

7    A.   Do I remember not talking to them?

8    Q.   Uh-huh.  That that was not mentioned at all during your

9    discussion on May 15th, 2006, with law enforcement?

10   A.   I don't know if it was that interview or another one,

11   but I do remember talking to them about it at some point in

12   time.

13   Q.   Because you talked to them a second time, correct?

14   A.   Yes.

15   Q.   I believe in December of 2006; do you remember that?

16   A.   Correct.

17   Q.   Okay.  Now, going back to May of 2006, May 15th,

18   specifically, Elijah Ledbetter had been murdered, correct?

19   A.   Correct.

20   Q.   When he was murdered, you were in the Juvenile Detention

21   Center, correct?

22   A.   Correct.

23   Q.   So, anything that you know about Elijah Ledbetter's

24   murder you got from other people, correct?

25   A.   Correct.

TRIAL ONE – VOL. 17 – 3180

1    Q.   Okay.  Ten days later, Alan Johnson was killed, correct?

2    A.   Correct.

3    Q.   April 16th, 2006, correct?

4    A.   Correct.

5    Q.   And you were in the Juvenile Detention Center on April

6    16th, 2006, correct?

7    A.   Correct.

8    Q.   The interview occurred on March 15th, 2006.  You know

9    nothing, personal knowledge, about Alan Johnson's murder

10   because you were in the Juvenile Detention Center, correct?

11   A.   Yes.

12   Q.   And everything that you know about that you got from

13   other people, correct?

14   A.   Yes.

15   Q.   Now, so you wouldn't know anything about what happened

16   leading up to that, correct, I mean, outside of what people

17   were telling you?

18   A.   Correct.

19   Q.   While you were locked up, correct?

20   A.   Correct.

21   Q.   I want you to listen to a phone call, or not a phone

22   call, but your statement that you made to the police in

23   December of 2006 in regard to Alan Johnson.  Okay?

24        MR. BERNDT:  Eric, could you have 165-18.03?  If you

25   could start at 1535, 1535.

TRIAL ONE – VOL. 17 –  3181

1          (Audiotape played in open court.)

2     BY MR. BERNDT:

3     Q.   Did you hear that?

4     A.   Yes.

5     Q.   It says that you were standing right next to somebody

6     when they took the phone call, correct?

7     A.   I believe that's what the recording says.  You didn't

8     finish playing it, so I couldn't really hear it.

9     Q.   I understand.  Do you remember what this conversation

10    was about?

11    A.   On this recording?

12    Q.   Uh-huh.

13    A.   No, sir.

14    Q.   Let's –– let's see if we can remind you.

15         MR. BERNDT:  Could we go back to the beginning.

16         (Audiotape played in open court.)

17    BY MR. BERNDT:

18    Q.   Did you hear that?

19    A.   Yes.

20    Q.   Did you hear "December 20th, 2006"?

21    A.   Yes.

22    Q.   Did you hear "Troy Patterson"?

23    A.   Yes.

24    Q.   Did you hear "9:24," or sometime in the morning,

25    correct?

TRIAL ONE – VOL. 17 –  3182

1    A.    Yes.

2    Q.    Okay.

3          MR. BERNDT:  We're going to go to 15, even, on the

4    tape.

5          (Audiotape played in open court.)

6    BY MR. BERNDT:

7    Q.    Is that your voice?

8    A.    Yes.

9    Q.    Okay.

10         MR. BERNDT:  Go ahead, please.

11         (Audiotape continued to be played in open court.)

12   BY MR. BERNDT:

13   Q.    Do you remember this conversation?

14   A.    Yes.

15   Q.    You're telling the police that you were at a residence

16   with China Hester, Tommy Coates and Anthony Jones shortly

17   before Alan Johnson was murdered; are you not?

18   A.    No.

19   Q.    What are you telling them?

20   A.    I'm telling them that Anthony Jones and Tommy Coates

21   was -- had got -- received a phone call saying that A.V. was

22   with China.

23   Q.    And you're telling the police that you heard this while

24   you were in the Juvenile Detention Center?

25   A.    I don't know if I'm -- I don't know if I'm telling them

TRIAL ONE - VOL. 17 -   3183

1   that right then and there.  I didn't finish listening to it.

2          MR. BERNDT:  Can we continue, please?

3          (Audiotape continued to be played in open court.)

4    BY MR. BERNDT:

5    Q.   Where did you hear that?

6    A.   Anthony Jones.

7    Q.   Okay.  He told you that while you were in the Juvenile

8    Detention Center?

9    A.   When I had got out.

10   Q.   Okay.

11          MR. BERNDT:  Keep going, please.

12          (Audiotape continued to be played in open court.)

13   BY MR. BERNDT:

14   Q.   China was right there.  It was me, Anthony, China.  Who

15   told you that?

16   A.   What are you -- I'm not understanding your question.

17          MR. BERNDT:  Let's back that up ten or fifteen

18   seconds.

19          (Audiotape played in open court.)

20   BY MR. BERNDT:

21   Q.   You, China, Anthony Jones all in the same house

22   together.  That's you saying that, correct?

23   A.   Correct.

24   Q.   That's you saying that when you know that's false,

25   correct?

TRIAL ONE – VOL. 17 – 3184

1    A.    No.

2    Q.    You were there to make a proffered interview, yes or no,

3    sir?

4    A.    Yes.

5    Q.    You were in the Franklin County Juvenile Detention

6    Center when Alan Johnson was murdered, yes or no?

7    A.    Correct.

8    Q.    You are telling the police that you were not there, that

9    you were in a house with China, Tommy Coates and Tony Jones,

10   correct?

11   A.    When I got the information.

12   Q.    You are lying to the police about what you knew and

13   where you were on that day, correct?

14   A.    No.

15         I'm not sure.

16   Q.    You're not telling them -- when you say, It was me,

17   China, Tommy Coates, and Tony Jones in a house together, you're

18   saying that you were in the Juvenile Detention Center?

19   A.    No.  I don't know if I'm referring to -- if we were just

20   in the house together, period -- or -- I know I'm not referring

21   to the incident that took place that same night.

22         MR. BERNDT:  Can we continue with the tape, please?

23         (Audiotape continued to be played in open court.)

24   BY MR. BERNDT:

25   Q.    You were laying on the couch.  Was that in the Juvenile

TRIAL ONE - VOL. 17 -  3185

1    Detention Center?

2    A.    No, sir.

3    Q.    That isn't something somebody told you you were doing

4    while you were in the Juvenile Detention Center, correct?

5    A.    Correct.

6    Q.    You're telling these police that you were at that house

7    on that date, when you were actually somewhere else in jail,

8    correct?

9    A.    Correct.

10   Q.    So, you went to this interview December 20th, 2006, and

11   you made that up, correct?

12   A.    No.  I can't recall.

13   Q.    Sir, you gave the police facts about a murder, facts

14   that you didn't know, correct?

15   A.    I can't recall.

16   Q.    You told them that you were somewhere that you weren't,

17   correct?

18   A.    I can't recall.

19        MR. BERNDT:  Excuse me, Your Honor.

20        THE COURT:  Yes.

21     (Whereupon, there was a brief interruption.)

22        MR. BERNDT:  Could we continue with the tape?

23        (Audiotape played in open court.)

24   BY MR. BERNDT:

25   Q.    We all was right there in the living room.  That's your

TRIAL ONE – VOL. 17 –  3186

1    voice, right?

2    A.   Correct.

3    Q.   That's you talking to the police about what you claim to

4    know about Alan Johnson's murder, correct?

5    A.   I mean, if I continued to keep listening to the tape, I

6    would probably have a better idea on what's being really talked

7    about.

8         MR. BERNDT:  Please.

9         (Audiotape continued to be played in open court.)

10   BY MR. BERNDT:

11   Q.   Remember that?

12   A.   I can't recall.

13   Q.   When she got the -- well, that's your voice, isn't it?

14   A.   Correct.

15   Q.   Do you recognize your voice?

16   A.   Correct.

17   Q.   Do you understand those words?

18   A.   Correct.

19   Q.   You said, When China got the call, we was all at

20   Terika's house, correct?

21   A.   I can't recall saying that, but --

22   Q.   You weren't at Terika's house, were you?

23   A.   During that time, I don't know -- during that time that

24   was being talked about, I don't know where I was at.

25   Q.   You agree with me that you were locked up in the

TRIAL ONE - VOL. 17 -  3187

1   Juvenile Detention Center from March 24th through May 19th,

2   2006, correct?

3   A.   Correct.

4   Q.   You agree with me that that's your voice on this tape

5   recording from December 20th of 2006, correct?

6   A.   Correct.

7   Q.   You agree with me that you made that statement in

8   December of 2006, just like you made the statement in March of

9   2006, to get yourself some type of deal to get around some of

10  your trouble, correct?

11  A.   I can't recall the last interview, but I do recall

12  sitting down with them, correct.

13  Q.   And you've never sat down with the police and told them

14  anything unless you expected to get something from them,

15  correct?

16  A.   Correct.

17  Q.   And that statement that you made in December of 2006 was

18  expected to be the truth, correct?

19  A.   Correct.

20  Q.   And you lied to them, correct?  You told them that you

21  were somewhere that you weren't, correct?

22  A.   No, not to my knowledge.

23  Q.   You told them that you were with China, Jones, Coates at

24  Terika's waiting, hearing the phone call that China supposedly

25  got saying that Alan Johnson was going to be with her, correct?

TRIAL ONE – VOL. 17 –  3188

1    A.   I can't recall.

2    Q.   You lied to them square to their face to try and get a

3    deal, correct?

4    A.   No, I can't recall that.

5    Q.   You're expected to tell the truth here today, aren't

6    you?

7    A.   Correct.

8    Q.   Same circumstances as that tape, correct?

9    A.   Correct.

10   Q.   Now, you talked about -- strike that.

11        Let's move on to Broomfield.

12        THE COURT:  Mr. Berndt, if we're going to move on to

13   another area, it's 3:30 now.  So this would be a good time for

14   us to take our afternoon recess.  We'll stand in recess until

15   3:45.

16     (Recess taken from 3:32 p.m. to 3:56 p.m.)

17        THE COURT:  Mr. Berndt.

18        MR. BERNDT:  Thank you, Your Honor.

19   BY MR. BERNDT:

20   Q.   Mr. Patterson, I want to -- I said I was going to talk

21   about Mr. Brumfield and that incident.  I want to back up just

22   a little bit and talk to you a little bit more about Parkay and

23   the home invasion there.

24   A.   Okay.

25   Q.   You know where I'm going?

TRIAL ONE – VOL. 17 – 3189

1      A.    Yeah.

2      Q.    You were in the room with Marlyn Ramirez, the girl who

3    was there, Parkay's girlfriend, correct?

4      A.    Correct.

5      Q.    You were in there with other people, correct?

6      A.    Correct.

7      Q.    And you say that somebody else cut her hair, correct?

8      A.    Correct.

9      Q.    Now, but you're the person that threatened her vagina

10   with a firearm, correct?

11     A.    Correct.

12     Q.    You actually placed it in contact with her vagina,

13   correct?

14     A.    Correct.

15     Q.    That's how you picked up the rape charge, correct?

16     A.    Correct.

17     Q.    And you also threatened to kill her, did you not?

18     A.    Correct.

19     Q.    You threatened to roll her up in a rug and burn her,

20   correct?

21     A.    Correct.

22     Q.    That's the response that you gave to Ms. Ramirez when

23   you didn't think she was being truthful with you about where

24   the money was, correct?

25     A.    Correct.

TRIAL ONE – VOL. 17 –  3190

1    Q.    Now, when you testified about the circumstances

2    surrounding Marschell Brumfield, I believe that you said that

3    Mr. Harris, Mr. Liston, Mr. Franklin and Mr. Ussury were in the

4    Short North, Fourth Street in the Short North, correct?

5    A.    Correct.

6    Q.    Yourself also, right?

7    A.    Correct.

8    Q.    And you then said that my client, Robert Ledbetter,

9    showed up later, correct?

10   A.    Correct.

11   Q.    You said that Mr. Ledbetter drove this maroon van,

12   correct?

13   A.    Correct.

14   Q.    And you said that he took Mr. Harris aside by himself

15   and had a conversation, correct?

16   A.    Correct.

17   Q.    Now, you didn't hear that conversation, right?

18   A.    No.

19   Q.    And then you and the other gentlemen, Mr. Harris,

20   Mr. Liston, Mr. Franklin, Mr. Ussury, get into a vehicle

21   together, correct?

22   A.    Correct.

23   Q.    And you guys drive somewhere, correct?

24   A.    Correct.

25   Q.    Mr. Ledbetter didn't get into that vehicle, did he?

TRIAL ONE – VOL. 17 –  3191

1    A.    He was in a separate car.

2    Q.    I understand that.  He got into a different car,

3    correct?

4    A.    Correct.

5    Q.    And what time of day is it?

6    A.    It's about -- it's late night.  It was after about --

7    it's late night.  I don't know exactly what time it was.

8    Q.    So it's your testimony that you guys were driving to

9    this place to do this robbery.  Is that about right?

10   A.    Correct.

11   Q.    And when you got there, you were one of the people that

12   was going to knock on the door, correct?

13   A.    Correct.

14   Q.    Now when you got there, I assume you park the van

15   somewhere that you thought was an appropriate place to park it?

16   A.    Correct.

17   Q.    And that wasn't next to Mr. Ledbetter, was it?

18   A.    It was about a couple cars down.

19   Q.    A couple cars down.  So what did you mean when you said

20   that Mr. Ledbetter was parked in the back of the apartments

21   when you testified on direct?

22   A.    Because it's one way in.  There's two parking lots.  You

23   can park on the side or you can park in the back of the

24   apartments.

25   Q.    And then you went to a door, correct?

TRIAL ONE – VOL. 17 – 3192

1    A.    Correct.

2    Q.    And then you got a NEXTEL contact, like a walkie-talkie

3    contact, from Franklin, correct?

4    A.    Harris did, correct.

5    Q.    So that wasn't even to you, correct?

6    A.    Correct.

7    Q.    But you know that was from Franklin, correct?

8    A.    Correct.

9    Q.    And then the person that was the supposed target showed

10   up, correct?

11   A.    Correct.

12   Q.    And it was actually he went to a different door,

13   correct?

14   A.    Once we later walked him to the door, correct.

15   Q.    It wasn't the door that you knocked on, correct?

16   A.    Correct.

17   Q.    It wasn't the door that you claim Ledbetter told you was

18   the door where this person lived, correct?

19   A.    Correct.

20   Q.    So for all this information is worth, according to you

21   from Mr. Ledbetter, what your testimony is, is that he gave you

22   the wrong door, correct?

23   A.    He gave Harris the wrong door.

24   Q.    He gave you guys as a group the wrong door is what your

25   testimony is, correct?

TRIAL ONE – VOL. 17 – 3193

1   A.   We later found out, correct.

2   Q.   And then this kid gets shot, correct?

3   A.   Correct.

4   Q.   And he gets shot a lot, does he not?

5   A.   Correct.

6   Q.   And he gets shot with a .40 caliber firearm, correct?

7   A.   Correct.

8   Q.   Your firearm, correct?

9   A.   No.

10  Q.   So out of all the people out there, you were the one

11  that didn't have a gun, correct?

12  A.   Correct.

13  Q.   Just like that, no gun, right?

14  A.   Correct.

15  Q.   When it was over, you didn't see Mr. Ledbetter, correct?

16  A.   He went a different way.

17  Q.   You didn't see him when it was over, right?

18  A.   No.

19  Q.   Right.  You didn't see where he went, if he went, right?

20  A.   No.

21  Q.   So you didn't see him leave, correct?

22  A.   Correct.

23  Q.   You didn't see him go a different way, correct?

24  A.   Correct.

25  Q.   You're under oath, sir.  This is very important.  So

TRIAL ONE - VOL. 17 -  3194

1   please keep that in mind.

2          And then you guys went to somebody else's house,

3   correct?

4    A.   Correct.

5    Q.   And you split up, correct?

6    A.   Yes.

7    Q.   Never saw Ledbetter again, right?

8    A.   Not that night.

9    Q.   Right.  You remember speaking to the police on

10  February 24th of 2015?

11   A.   I believe so.

12   Q.   Do you remember Mr. DeVillers and Mr. Kelley and your

13  lawyer, Mr. Krapenc, being present during that interview?

14   A.   Yes.

15   Q.   Do you remember telling those people -- And that was a

16  circumstance when you were supposed to be telling the truth,

17  agreed?

18   A.   Correct.

19   Q.   And do you remember telling those folks on that day that

20  you were riding with Harris, Franklin, Ussury and Liston

21  looking for somebody to rob?

22   A.   Looking for Brumfield, correct.

23   Q.   That's not what this says.  Looking for somebody to rob.

24  It then says, goes on to say, that you met Ledbetter at a

25  run-down hotel on route 161 and 71.  Do you remember telling

TRIAL ONE – VOL. 17 –   3195

1    them that?

2    A.    No.

3    Q.    You don't remember telling them that?  If I showed you

4    the statement, would it potentially refresh your recollection?

5    A.    Maybe.

6    Q.    Do you have any reason to believe that the person that

7    wrote this report could get something so wrong as to confuse

8    routes 71 and 161 with being in the Short North?

9    A.    No.

10              MR. BERNDT:  Your Honor, may I approach the witness?

11              THE COURT:  Yes, you may.

12              MR. BERNDT:  Dave, do you want to see it?

13              MR. DEVILLERS:  Yes.

14    BY MR. BERNDT:

15    Q.    Here you go, sir.  Why don't you go ahead and take a

16    look at that.  Do you read okay?

17    A.    Yeah.

18    Q.    Does that jog your memory a little bit?

19    A.    Yes.

20              MR. BERNDT:  Your Honor, may I approach and retrieve

21    the document?

22              THE COURT:  Yes, you may.

23              MR. BERNDT:  Thank you.

24    BY MR. BERNDT:

25    Q.    So did you or did you not tell the government in a

TRIAL ONE – VOL. 17 – 3196

1    proffer session when you were expected to tell the truth that

2    you met, at route 161 and 71, Mr. Ledbetter on the night that

3    Mr. Brumfield was killed?

4    A.    Correct.  What I said was we met Mr. Ledbetter in the

5    Short North.  As we got to the destination we was supposed to

6    go, which I forget -- I forgot to mention, we needed further

7    directions on where to go.  So we met at the hotel for a split

8    second.

9    Q.    So let me make sure I understand this.  In February of

10   2015, you forgot to mention the meeting in the Short North,

11   right?

12   A.    No.  That was the -- that was initially.  That's where

13   we first met at.

14   Q.    And was that in here?

15   A.    No.  I don't believe.

16   Q.    You want to see it again?

17        MR. BERNDT:  May I approach the witness, Your Honor?

18        THE COURT:  Yes, you may.

19        THE WITNESS:  Read this whole thing?

20   BY MR. BERNDT:

21   Q.    You can read as much of it as you want.  I think the

22   incident we're covering is on the first two pages.

23   A.    Okay.

24        MR. BERNDT:  I'm just going to retrieve the document,

25   Your Honor.

TRIAL ONE – VOL. 17 – 3197

1        THE COURT:  You may.

2    BY MR. BERNDT:

3    Q.    So in your statement given on February 24th, 2015, did

4    you mention this meeting in the Short North in this statement?

5    A.    It's not on there, no.

6    Q.    So that's a no.  So in the February statement you failed

7    to mention the Short North meeting, correct?

8    A.    Possibly, correct.

9    Q.    And in today's testimony to this jury you failed to

10   mention the 161 and 71 meeting, correct?

11   A.    Correct.

12   Q.    You seem to have a pretty good grasp of the facts today,

13   correct?  You've talked about a lot of people.  Would you

14   agree?

15   A.    Correct.

16   Q.    But you forgot those items, correct?

17   A.    Correct.

18   Q.    In terms of Marschell Brumfield and Robert Ledbetter,

19   you didn't see Robert Ledbetter do a thing in regard to hurting

20   Marschell Brumfield on April 22nd, 2007, correct?

21   A.    Correct.

22   Q.    And you hear this story that somehow this was somebody

23   who he had sold drugs to or somebody he knew sold drugs to and

24   that, therefore, he was going to be robbed, correct?

25   A.    Correct.

TRIAL ONE - VOL. 17 -  3198

1    Q.    And you didn't see any of that, correct?

2    A.    Correct.

3    Q.    You didn't see Robert Ledbetter do a thing with this

4    person ever, correct?

5    A.    Correct.

6    Q.    So that, again, is stuff that you've heard from somebody

7    else, correct?

8    A.    Correct.

9    Q.    Some other criminal, correct?

10   A.    Correct.

11   Q.    Some other person that has no credibility, correct?

12   A.    He does have credibility.

13   Q.    You talked about burning the guns.  How do you burn a

14   gun?

15   A.    Basically you take it apart, break it all the way down,

16   put it in a bag and set the bag on fire and eventually it will

17   melt.  The plastic from the bag will melt onto the gun and it

18   will be destroyed.

19   Q.    The gun will be destroyed?

20   A.    Yes.

21   Q.    So the gun actually melts when you light it with a

22   match?

23   A.    As far as I'm concerned, yes.

24   Q.    I'm asking you.  You said you've done this.

25   A.    Yes.

TRIAL ONE - VOL. 17 -  3199

1   Q.   And so it like becomes molten, it becomes liquid?

2   A.   No.  It's not liquid, no.  It just burned real bad like

3   it melts a little.  It didn't turn a liquid though.  Just the

4   bag melts onto the gun.

5   Q.   And you testified that you helped get rid of those guns,

6   correct?

7   A.   Correct.

8   Q.   Yet you didn't have a firearm on you during this

9   incident, correct?

10  A.   My firearm was in the car.

11  Q.   You didn't have one on your person during this incident,

12  correct?

13  A.   Correct.

14  Q.   According to you, you didn't shoot Marschell Brumfield,

15  correct?

16  A.   Correct.

17  Q.   In spite of the fact that there's a .40 caliber gun,

18  correct?

19  A.   Correct.

20  Q.   Was that what the kind of gun was that you had in the

21  van, a .40 caliber?

22  A.   .380.

23  Q.   .380.  You remember from nine years ago.  And you,

24  though, who had no gun, who didn't shoot Marschell Brumfield,

25  you're responsible for melting down the gun.  Is that your

TRIAL ONE – VOL. 17 –  3200

1  testimony?

2  A.   Correct.

3  Q.   You talked about talking to Robert Ledbetter while you

4  were in Delaware.  Remember that?

5  A.   Correct.

6  Q.   And you claim that you spoke to Mr. Ledbetter in

7  Delaware about Earl Williams.  Remember that?

8  A.   Keep going.  Maybe I'll remember.

9  Q.   Do you remember that?

10  A.   Yes.

11  Q.   You do?

12  A.   I remember talking.

13  Q.   It's okay to say you don't.

14  A.   I remember talking to him.

15  Q.   And Crystal Fyffe, correct?

16  A.   Briefly about her.

17  Q.   I'm sorry?

18  A.   Briefly about her.

19  Q.   Understood.  And also about this situation that happened

20  out in Pickerington, correct?

21  A.   Correct.

22  Q.   And I assume that you did that as you guys were whiling

23  away the time in the Delaware County jail, correct?

24  A.   Correct.

25  Q.   Seeing that you were housed in the same situation?

TRIAL ONE – VOL. 17 –  3201

1    A.    Correct.

2    Q.    I have records here from the Delaware County jail in

3  regard to where you were held since August 1st or actually

4  July 7th of 2014 through February 24th of 2015, the day that

5  you made the statement that we just got done talking about,

6  correct?

7    A.    Correct.

8    Q.    And you were transferred to Franklin County after you

9  made the statement on February 24th, correct?

10   A.    Correct.

11   Q.    Would it surprise you if I told you that these records

12  only reflect one time when you and Mr. Ledbetter were housed

13  together in the Delaware County jail from July 7th, 2014

14  through February 24th, 2015?  Would that surprise you?

15   A.    No.

16   Q.    Wouldn't surprise you?

17   A.    (Shaking head.)

18   Q.    Would it surprise you that that one time that you guys

19  were held together was for six minutes?  Would that surprise

20  you, sir?

21   A.    No.  It was more than that sometimes.

22   Q.    So if these records are correct, you were with

23  Mr. Ledbetter, housed together for a total of six minutes in

24  the Delaware County jail, correct?

25   A.    We were across from each other.  When we go to court,

TRIAL ONE - VOL. 17 -  3202

1   we'd be around each other for maybe the whole time.

2   Q.   Okay.

3   A.   Delaware County, from down here to Delaware County.

4   Q.   Well, I thought you told me that you had these

5   discussions with Mr. Ledbetter when you were whiling away the

6   time waiting to come to court as you were housed together.

7   That was my memory of what you said about 90 seconds ago.  Is

8   my memory correct?

9   A.   Correct.

10  Q.   If that was a total of six minutes over, I don't know,

11  nine months, you would dispute that, correct?

12  A.   No.

13  Q.   You were very good friends with Elijah Ledbetter,

14  correct?

15  A.   My cousin.

16  Q.   Cousin.  But you were also good friends with him.  I

17  have cousins that I don't even know.  You were good friends

18  with Elijah Ledbetter, cousin or not, correct?

19  A.   Correct.

20  Q.   And you didn't do much with Robert Ledbetter, correct?

21  A.   Correct.

22  Q.   Substantially older than you, correct?

23  A.   Correct.

24  Q.   Not one of your contemporaries, correct?  His younger

25  brother was one of your friends, correct?

TRIAL ONE – VOL. 17 –  3203

1    A.    Correct.

2    Q.    And you're telling this jury that during this

3  microscopic time frame, Mr. Ledbetter decided to talk to you

4  about how he was involved in a murder in Pickerington, about

5  how he was going to go ahead and take care of Earl Williams

6  because he thought Earl Williams was telling, and that he had

7  Crystal Fyffe murdered.  That's what you're telling this jury?

8    A.    Correct.

9    Q.    And what we have to rely on for that is your word,

10  right?

11   A.    Correct.

12   Q.    That's it, correct?

13   A.    Correct.

14   Q.    You mentioned in one of these statements that you made

15  that you were given a note by Robert Ledbetter threatening you,

16  correct?

17   A.    Correct.

18   Q.    Where's the note?

19   A.    Flushed it.

20   Q.    Oh, so you tell the police that Robert Ledbetter is

21  threatening you, correct?

22   A.    Correct.

23   Q.    You tell the police that Robert Ledbetter put that in

24  writing, correct?

25   A.    Correct.

TRIAL ONE – VOL. 17 – 3204

1   Q.   And what you do with that piece of evidence is you

2   destroy it.  That's what you want this jury to believe?

3   A.   Correct.  It's the truth.

4   Q.   Now, you also didn't mention that letter until

5   March 26th of 2015, about five, six weeks after you were

6   transferred out of the Delaware County jail, correct?

7   A.   I don't know the time frame on it.

8   Q.   Well, you were transferred the day that you made your

9   statement, February 24th, 2015, and your second statement was

10  on March 26th, 2015.  About five weeks, correct?

11  A.   Correct.

12  Q.   Now, I would have assumed that you had that note or were

13  given that note that you claim you destroyed before you were

14  transferred to Franklin County since Mr. Ledbetter has always

15  been in Delaware County, correct?

16  A.   Correct.

17  Q.   Yet you didn't tell law enforcement in February of 2015

18  anything at all about this note, correct?

19  A.   Is that the day of that I left out?

20  Q.   That was the day that you left out.  And I can show you

21  your statement again on February 24th if you'd like to review

22  it to see if I've read it correctly.

23  A.   No.

24  Q.   And then you tell them this five weeks later, correct?

25  A.   Correct.

TRIAL ONE – VOL. 17 –  3205

1   Q.   And you tell them that you destroyed the note, correct?

2   A.   Correct.

3   Q.   So once again, we're left with your word?

4   A.   Correct.

5   Q.   You talked about Pickerington and what you know about

6   Pickerington, correct?

7   A.   Yes.

8   Q.   And by the way, you testified on direct examination that

9   you were locked up with Earl Williams, were you not?

10   A.   Correct.

11   Q.   And when was that?

12   A.   That was in 2009 we was in a county jail fighting my

13   first case together with him.

14   Q.   Got you.  So well before you made these statements,

15   correct?

16   A.   Correct.

17   Q.   Had plenty of time to talk to Earl Williams, correct?

18   A.   Correct.

19   Q.   Had plenty of time to talk to him about whatever you

20   guys thought you guys should talk about, correct?

21   A.   Correct.

22   Q.   And in your March 26th statement, you talk about the

23   murder of Rodriccos Williams, remember that?

24   A.   You said when?

25   Q.   The second statement, March 26th, 2015.

TRIAL ONE – VOL. 17 – 3206

1    A.    Correct.

2    Q.    And in that statement, do you remember telling law

3  enforcement that Robert Ledbetter was sleeping with Rodriccos

4  Williams' girlfriend or wife?

5    A.    Correct.

6    Q.    And do you remember telling them that she gave Robert

7  Ledbetter a key to her house?

8    A.    Correct.

9    Q.    So Robert Ledbetter, according to you, is in a sexual

10  relationship with Rodriccos Williams' wife, right?

11    A.    Correct.

12    Q.    He's given a key to that house, according to you, by

13  that person, correct?

14    A.    Correct.

15    Q.    And what Mr. Ledbetter, according to you, decides to do

16  is to conduct a strong-arm robbery involving a murder as

17  opposed to just showing up one day in the afternoon when no one

18  was home and using the key, correct?

19    A.    I don't know what his purpose or reason.  I don't -- I

20  can't tell you why he did it, how he did it.

21    Q.    But that's what he did, according to you, correct?

22    A.    Correct.

23    Q.    He had a soft target, according to you, correct?

24    A.    Correct.

25    Q.    He had a key to the house, according to you, correct?

TRIAL ONE – VOL. 17 –  3207

1    A.   Correct.

2    Q.   And his decision, according to you, was to take, I don't

3  know, handful of guys out there, load up guns, dress down in

4  black, kill somebody and go inside, correct?

5    A.   Correct.

6    Q.   But of course, he didn't go inside, correct, even

7  according to you?

8    A.   Correct.

9    Q.   But Mr. Williams did, did he not?

10    A.   Yes.

11    Q.   And you know from talking to Mr. Williams that

12  Mr. Williams knew Rodriccos Williams, correct?

13    A.   Correct.

14    Q.   Knew Mario Gibbs, correct?

15    A.   Correct.

16    Q.   Knew Luke Estes, correct?

17    A.   Correct.

18    Q.   That Earl Williams had all of the information that he

19  needed to conduct that robbery without any help, correct?

20    A.   I don't know.

21    Q.   Knew Rodriccos, correct?

22    A.   He said he did, yes.

23    Q.   Sure he did.  And he knew Rodriccos dealt drugs,

24  correct?

25    A.   Said he did.

TRIAL ONE – VOL. 17 –  3208

1   Q.   And when you and him were incarcerated together, you

2   talked about this, correct?

3   A.   I don't believe so.

4   Q.   You don't believe so?  Didn't you testify previously

5   that you did talk to him when you were incarcerated?

6   A.   We talked but we didn't talk about this specific

7   incident.  What we talked about was how Ledbetter had played

8   him by messing with his girlfriend, how he left him for dead.

9   Q.   Right.  Earl was mad because he believed that Robert

10  Ledbetter was carrying on a relationship with his girlfriend

11  while Earl was locked up, right?

12  A.   That, and he had left him for dead which means he wasn't

13  looking out for him, paying for his lawyer after the incident

14  that Earl had got in.

15  Q.   Okay.  So he made up stories to try to get himself out

16  of trouble?

17  A.   I don't know what he was doing.

18  Q.   Because whatever Earl Williams told you is, again, based

19  upon his word, correct?

20  A.   Correct.

21  Q.   Now, you also talked about Crystal Fyffe.  Remember

22  that, in March of 2015?

23  A.   Correct.

24  Q.   And my information is that you stated you never met

25  Crystal Fyffe.  Is that accurate?

TRIAL ONE – VOL. 17 –  3209

1   A.   Correct.

2   Q.   But that Mr. Ledbetter told you that he had her killed,

3   correct?

4   A.   Correct.

5   Q.   And you said, and I'll quote this, Patterson stated that

6   Brandon Ledbetter was worried because Fyffe's cousin tried to

7   set him up.  Remember saying that?

8   A.   Correct.

9   Q.   That Fyffe's cousins were drug dealers and she drove for

10  them.  Remember saying that?

11  A.   Correct.

12  Q.   And that Fyffe told Ledbetter that someone had paid her

13  to snitch on him.  Remember saying that?

14  A.   Correct.

15  Q.   And that's why Fyffe had to go?

16  A.   Fyffe had to go because she, later on from

17  Mr. Ledbetter, had started cooperating with the government as

18  well.

19  Q.   Sir, you made this statement in March of 2015.  Crystal

20  died on October 19th of 2011.  That was all over, way over by

21  then.

22  A.   Correct.

23  Q.   It's your testimony that this is what you were told by

24  Robert Ledbetter?

25  A.   Correct.

TRIAL ONE – VOL. 17 –  3210

1    Q.   And do you know where Robert Ledbetter was when Crystal

2    Fyffe died?

3    A.   I believe he was in prison.

4    Q.   He was locked up.  Now, when you talked about Brumfield,

5    you talked about Mr. Franklin, correct?

6    A.   Correct.

7    Q.   His name is Dawan Franklin?

8    A.   Correct.

9    Q.   And you told the government that he was involved in the

10   murder of Marschell Brumfield, correct?

11   A.   Correct.

12   Q.   You told the government that he was with you and these

13   other gentlemen when that murder occurred, correct?

14   A.   Correct.

15   Q.   And did you, I don't want to misstate the evidence, but

16   did you -- You told the government that Mr. Franklin stood over

17   the body of Marschell Brumfield and filled it full of bullets,

18   right?

19   A.   Correct.

20   Q.   Just mercilessly, correct?

21   A.   Correct.

22   Q.   After he had been shot seven times and was on the ground

23   already, correct?

24   A.   I believe so.  It was more than five, six.  Somewhere

25   around there.

TRIAL ONE - VOL. 17 -  3211

1    Q.   So what did Dawan Franklin get out of his case?

2    A.   Get out of what?  I don't understand that question.

3    Q.   Dawan Franklin was charged with his murder, was he not?

4    A.   No.

5    Q.   He wasn't?

6    A.   No.

7    Q.   Wait a second.  You told the government that he stood

8    over this gentleman's body and emptied his gun into his

9    carcass, correct?

10   A.   Correct.

11   Q.   And that brought no charges at all, to your knowledge?

12   A.   To my knowledge, yeah.

13   Q.   You told it to them, right?

14   A.   Correct.

15   Q.   Your word, right?

16   A.   Correct.

17   Q.   No charges, right?

18   A.   To my knowledge.

19   Q.   You talked about Tyrell Davis, correct?

20   A.   Correct.

21   Q.   And I believe that you talked about how you had, on

22   direct examination, no ill will towards Tyrell Davis, correct?

23   A.   Correct.

24   Q.   But after Mr. Jones shot him in the head, you shot him

25   three times, according to you?

TRIAL ONE – VOL. 17 –  3212

1    A.   Mr. Jones?

2    Q.   I'm sorry.  Mr. Liston.

3    A.   Correct.

4    Q.   No ill will, correct?

5    A.   He had a gun.

6    Q.   He was shooting into the floor by your testimony,

7    correct?

8    A.   Correct.

9    Q.   He had just been shot in the back of the head, correct?

10   A.   Correct.

11   Q.   You didn't have any ill will towards him, correct?

12   A.   No.

13   Q.   You pulled out your .40 caliber and shot him three

14   times, correct?

15   A.   Correct.

16   Q.   Without any ill will at all?

17   A.   He had a gun.

18        MR. BERNDT:  Erick, could you bring up 158-6?

19   BY MR. BERNDT:

20   Q.   Can you see that exhibit, Government's Exhibit 158-6?

21   A.   Yes.

22   Q.   And do you remember on direct examination that this was

23   one of your phones, I believe, correct?

24   A.   Correct.

25   Q.   And you went through a contact list, correct?

TRIAL ONE – VOL. 17 –  3213

1    A.    Correct.

2    Q.    Do you need to see that contact list if I ask you a

3    couple of questions about it?  Do you want me to have that

4    brought up on the screen for you?

5    A.    Sure.

6          MR. BERNDT:  Could you do that, Erick, just start with

7    the A's?

8    BY MR. BERNDT:

9    Q.    Do you see page one there, the SIM contacts?

10   A.    Yes.

11         MR. BERNDT:  Your Honor, could we publish this for the

12   jury?  I think this was admitted.

13         THE COURT:  Yes, you may.

14   BY MR. BERNDT:

15   Q.    And you have the basically A through B there, correct?

16   A.    Correct.

17   Q.    Nothing in there for Brandon Ledbetter, correct?

18   A.    No.

19   Q.    Could we go to the L's?  Let's just go to the next page.

20   Anything on page 2 indicating that Mr. Ledbetter was on your

21   contact list?

22   A.    No.  He wasn't in there at all.

23   Q.    You know that for a fact?

24   A.    Yes.

25   Q.    You talked about Avery Johnson.  We're going to go back

TRIAL ONE – VOL. 17 – 3214

1   to Mr. Johnson.  And you gave a story that talked about Marcus

2   Peters and Chris Harris shooting Alan Johnson, correct?

3   A.   Correct.

4   Q.   And you were very specific about how they both shot this

5   gentleman, correct?

6   A.   Correct.

7   Q.   So if the casings that were left at the scene indicate

8   that they all came from a single gun, that would be kind of

9   swimming upstream there in terms of your allegation that they

10  both shot this gentleman, correct?

11  A.   Correct.

12  Q.   You've never gone to a robbery where you took a gun from

13  somebody else after they had shot it and shot it yourself,

14  right?

15  A.   No.

16  Q.   So if all of the casings came from the same gun and you

17  heard, according to you, that two guns were used and two guns

18  were fired, correct?

19  A.   Correct.

20  Q.   Your information would be wrong, right?

21  A.   No.  Revolvers don't leave shell casings.

22  Q.   And your information about a revolver?

23  A.   Correct.

24  Q.   It's the first I've heard of that.  I mean, so that's

25  your explanation as to why the casings would be the same,

TRIAL ONE – VOL. 17 –  3215

1    correct?

2    A.    Why the .45s would be the same, correct.  No revolver

3    casings.

4    Q.    But you don't know whether there was a revolver used in

5    that shooting, correct?

6    A.    I know from what Harris told me, correct.

7    Q.    You talked about D-Block probably earlier this morning.

8    Remember that?

9    A.    Correct.

10    Q.    You talked about how D-Block and people from the Short

11    North don't get along, correct?

12    A.    Correct.

13    Q.    You talked about how there was riffs between the two,

14    correct?

15    A.    Yes.

16    Q.    You even talked about how there was this shooting in

17    Joyce Park over D-Block/Short North issues, correct?

18    A.    Correct.

19    Q.    So nobody, no self-respecting Short North person would

20    do any type of business with D-Block, correct?

21    A.    I mean, nobody that I knew of.

22    Q.    It would be inconsistent with being in the Short North

23    whatever, right?

24    A.    Some people may go around with, you know, whoever they

25    feel but the right people or the right place, right time know

TRIAL ONE - VOL. 17 -   3216

1   there's liable be problems.

2     Q.    And it would be problems if somebody did significant

3   business with D-Block if they were part of the Short North,

4   correct?

5     A.    You could say that at the time.

6     Q.    I'm sorry?

7     A.    You could say that at the time.

8     Q.    I mean, that's what we're talking about.  At the time,

9   right?

10         What does rocking somebody to sleep mean?

11    A.    It mean like tricking them.

12    Q.    Give me an example.

13    A.    You playing them close to get something, playing them

14   close for a specific reason, you acting like it's one way when

15   it's really another way.

16    Q.    Right.  You're being deceitful with that person,

17   correct?

18    A.    Correct.

19    Q.    You're being deceitful with that person so that they let

20   their guard down, correct?

21    A.    Correct.

22    Q.    While at the same time, you have this plan in the back

23   of your mind that is totally inconsistent with being nice to

24   this person, correct?

25    A.    Correct.

TRIAL ONE – VOL. 17 –  3217

1   Q.   You're basically acting one way when your intentions are

2   really the exact opposite, correct?

3   A.   Correct.

4   Q.   And could that be what's going on today?

5   A.   No.

6   Q.   Well, now you're a person who has engaged in this type

7   of conduct, correct?

8   A.   Correct.

9   Q.   You're a person that is deceptive enough that you can

10  make somebody feel very comfortable with you, correct?

11  A.   Correct.

12  Q.   While at the same time you have murderous thoughts about

13  that person, correct?

14  A.   I don't really understand that question.

15  Q.   You're somebody who is schooled and skilled in the art

16  of deceit, correct?

17  A.   I wouldn't say all that.  I wouldn't say I'm schooled

18  and skilled.

19  Q.   Have you rocked somebody to sleep before?

20  A.   No.

21  Q.   Have you tried to do that before?

22  A.   No.

23  Q.   Yet you know what the term means?

24  A.   Other than committing a robbery and something goes bad.

25  But me just blatantly rocking somebody to sleep for being cool

TRIAL ONE – VOL. 17 –  3218

1  with them, being friends with them but then doing something to

2  them, no, I never did that.

3    Q.  Never did that?

4    A.  Never.

5    Q.  But you knew about the phrase, correct?

6    A.  Correct.

7    Q.  You knew what the phrase meant, correct?

8    A.  Correct.

9    Q.  And you certainly have had the opportunity to engage in

10  that conduct, have you not?

11    A.  Could you break that down for me, please?

12    Q.  Let me ask you this.  When you went over to Tyrell

13  Davis' house, okay?

14    A.  Correct.

15    Q.  He thought you were there to buy marijuana, correct?

16    A.  Correct.

17    Q.  He had no idea that he was going to die, correct?

18    A.  Correct.

19    Q.  So you walked into that apartment under the pretense of

20  buying probably a small amount of marijuana, correct?

21    A.  Correct.

22    Q.  And your intention was to rob him, correct?

23    A.  Correct.

24    Q.  You rocked him to sleep, didn't you?

25    A.  In that robbery, correct.

TRIAL ONE - VOL. 17 -  3219

1   Q.   And you were successful at it, were you not?

2   A.   Correct.

3   Q.   And it cost a man his life, correct?

4   A.   Correct.

5   Q.   And your deceit lent to that, correct?

6   A.   In that situation, correct.

7   Q.   So you are skilled at deceiving people, correct?

8   A.   Correct.

9   Q.   Now, do you remember when D-Nice stole $20 from you when

10  you were sleeping?

11  A.   Yes.

12  Q.   What was your response?

13  A.   Shot his car up.

14  Q.   Over $20?

15  A.   It wasn't over $20.  It was the principle, to go in my

16  pockets while I'm asleep.

17  Q.   Somebody stole $20 from you, correct?

18  A.   Correct.

19  Q.   When you found out, you pulled out a firearm, correct?

20  A.   Correct.

21  Q.   Shot the man's car up, correct?

22  A.   Correct.

23       MR. BERNDT:  May I have just a moment, Your Honor?

24       THE COURT:  Yes, you may, Mr. Berndt.

25

TRIAL ONE – VOL. 17 –  3220

1    BY MR. BERNDT:

2    Q.   I've got a couple more questions for you, Mr. Patterson.

3    Mr. Patterson, were you involved in the murder of Rodriccos

4    Williams in Pickerington on November 3rd, 2007?

5    A.   No.

6    Q.   Do you know that you were picked out of a photo array as

7    somebody who was involved in that case?

8    A.   I was incarcerated.

9    Q.   Okay.  So those people were wrong, were they not?

10   A.   Yes.

11   Q.   You had nothing to do with that, correct?

12   A.   Correct.

13   Q.   Now, do you know if Earl Williams, have you ever talked

14   to Earl Williams about rocking somebody to sleep?

15   A.   No.

16   Q.   No?

17        MR. BERNDT:  Your Honor, thank you very much.  I have

18   no further questions.

19        THE COURT:  Thank you, Mr. Berndt.

20        MR. GATTERDAM:  Your Honor, may we approach?

21        THE COURT:  Yes, you may.

22        MR. GATTERDAM:  We don't need a court reporter.

23     (Thereupon, the Court and counsel conferred out of the

24   hearing of the court reporter.)

25        THE COURT:  Ladies and gentlemen, I'm going to give

TRIAL ONE – VOL. 17 –  3221

1   you a choice; whatever you decide as a group is fine.  We can

2   begin with Mr. Gatterdam's examination.  Obviously it's going

3   to be a longer examination.  He's willing to begin now and we

4   can go for about 20 minutes or so, 15 minutes.  He tells me,

5   however, that overnight he could excise some material.

6          One of the Court's missions in any trial is never to

7   waste the time of the jury because you're the only parties who

8   didn't ask to be here.  So we can get started or if you want to

9   get a head start on the afternoon rush, you may do so.

10  Whatever is your pleasure.

11               A JUROR:  Start.

12               THE COURT:  Please proceed.

13          Thank you, ladies and gentlemen.

14            MR. GATTERDAM:  May I proceed?

15            THE COURT:  Yes.  You may proceed, Mr. Gatterdam.

16                         –  –  –

17                   CROSS-EXAMINATION

18   BY MR. GATTERDAM:

19   Q.   Mr. Patterson, before I get into my other questions I

20   had, I think when Mr. Berndt was asking you questions, if I

21   wrote this down correct, you said, when he was asking you

22   questions, that you had a few bad years; is that correct?  Did

23   I write that down correct?

24   A.   Correct.

25   Q.   How do you define a few bad years?

TRIAL ONE – VOL. 17 –  3222

1    A.   Which means I only probably had about three years in the

2    streets.  On those three years, maybe four at the most, I done

3    some things that I ain't very proud of.

4    Q.   Well let's talk about that.  You talked about the

5    knockout game.  Is that one of the things that you're not very

6    proud of?

7    A.   Correct.

8    Q.   How many people did you knock out cold?

9    A.   I don't know.

10   Q.   Dozens?

11   A.   It wasn't that many.  Maybe about anywhere between four,

12   five.  No specific number.  I know it wasn't a dozen.

13   Q.   Four or five.  And give us a time frame when you started

14   knocking people out, from when to when?

15   A.   Maybe when I was around about 14, 15.

16   Q.   14 or 15.  So that would have been 2005, 2006?

17   A.   About 2005.  '4 or '5.

18   Q.   2004 or '5.  So Mr. Berndt, I think, referred to this.

19   There's been previous testimony from Allen Wright.  You know

20   Allen Wright, right?

21   A.   Correct.

22   Q.   Al-Nuts, right?

23   A.   Correct.

24   Q.   You ever go on these knockouts with him?

25   A.   Yes.  He was in the neighborhood probably when somebody

TRIAL ONE – VOL. 17 –  3223

1   got knocked out but never went to, like, a specific place.

2     Q.    Okay.  So if he's testified that you did one in 2003 and

3   you killed a person, is that false?

4     A.    Yes.

5     Q.    Now, is it false that you did it in 2003?

6     A.    Yes, that's false.

7     Q.    Because you would have been twelve then, right?

8     A.    Correct.

9     Q.    It's false you did it in 2003 and it's false that you

10   killed someone?

11     A.    Correct.

12     Q.    Now, tell me, when you knock somebody out, you take all

13   their stuff.  You knock them out, you take all their stuff,

14   right?

15     A.    Not all the time.

16     Q.    Not all the time.  What do you do some of the time?

17     A.    All the time they don't even get knocked out.  They

18   might just drop, be hurt or something.  They don't always go

19   unconscious.  Sometimes they go to sleep, we go in they

20   pockets.

21     Q.    Now, do you do these knockouts during the daytime,

22   during the nighttime or does it vary?

23     A.    It varied.

24     Q.    And correct me if I'm wrong, you don't stick around

25   until the police come or until an ambulance comes, do you?

TRIAL ONE - VOL. 17 -  3224

1    A.   No.  Not all the time.

2    Q.   Not all the time.  Any of the time?  Did you ever stay

3  around until somebody came?

4    A.   I just stayed around until they woke up before.  Or I

5  stayed up until they got up off the ground before.

6    Q.   Okay.  Where did you watch?

7    A.   I might go across the street.

8    Q.   Okay.

9    A.   Down the street.

10   Q.   It was sort of fun, wasn't it, just to watch to see if

11  they could get up, right?

12   A.   Correct.

13   Q.   But you wouldn't be right next to them where somebody

14  could actually take you to jail for what you did, right?

15   A.   I don't understand that question.

16   Q.   Well, in other words, when you knock somebody out, you

17  go -- you walk away, far enough away so that if help comes for

18  that person, they can't figure out who did it, right?

19   A.   Correct.

20   Q.   So these knockouts that you did, you've never been

21  prosecuted for any of them, have you?

22   A.   No.

23   Q.   And when you talked, in 2015, about these knockouts to

24  the government, are you going to be prosecuted for any of those

25  things you talked about?

TRIAL ONE - VOL. 17 -  3225

1      A.    No.

2      Q.    And did you stay around at all the knockouts enough to

3    know that the person didn't die?

4      A.    Not all of them.

5      Q.    Okay.  So you don't really know.

6      A.    One of them I didn't, but I knew who it was so I knew

7    that they had got up.

8      Q.    You knew who it was.  Somebody from the neighborhood,

9    somebody you were friends with?

10     A.    Just somebody we used to see in the neighborhood often.

11   Come buy drugs.

12     Q.    Somebody used to buy drugs from?

13     A.    No.  Somebody who used to buy drugs just in the

14   neighborhood, period.  I would see them.

15     Q.    And what was the reason for knocking that person out?

16     A.    They were just part of a game that we used to play as

17   kids.  Part of being a kid.

18     Q.    Part of being a kid.

19     A.    Doing dumb stuff, correct.

20     Q.    Mr. Berndt asked you about statements that you made.

21   And let's make sure that I have it correct.  You made a

22   statement initially in May of 2006.  You were asked about the

23   Web Boys.  You remember that?

24     A.    Correct.

25     Q.    And then later in 2006 you made a statement to the

TRIAL ONE – VOL. 17 –  3226

1   police and you talked about the Alan Johnson murder?

2   A.   Correct.

3   Q.   And then we have this big gap, correct?  You don't talk

4   to the police at all until 2015, correct?

5   A.   Correct.

6   Q.   And then you give two statements about six weeks apart,

7   correct?

8   A.   I believe that's correct.

9   Q.   So that's four statements.  Two in 2006 and two in 2015,

10  correct?

11  A.   Correct.

12  Q.   Now, those statements, have you had a chance to review

13  those summaries of those statements before coming in here

14  today?

15  A.   No.

16  Q.   And you didn't have a chance to listen to the

17  tape-recorded interview of your December, 2006 statement that

18  Mr. Berndt was playing for you, right?  You hadn't listened to

19  that before today?

20  A.   I believe -- no.  Not that one in particular, no.  I

21  don't believe.  I can't recall.

22  Q.   Because if you had, you would have remembered that you

23  told them you were there in the home when the call came in from

24  Avery Johnson, right?  You would have remembered that if you

25  just listened to it?

1    A.    Maybe.

2    Q.    So before coming in here today, if you didn't review the

3    tape-recorded statements, what did you do to get yourself ready

4    to testify here?

5    A.    Just being honest, being truthful.

6    Q.    How did you do that?  Did you have to go practice in

7    front of a mirror to do that?

8    A.    No.  Just remembering everything that I was involved in

9    or everything that was told to me.

10    Q.    And did the people preparing you, were there people

11    helping you get ready?  Did your lawyer help you get ready?

12    A.    No.

13    Q.    Did the government help you get ready?

14    A.    No.

15    Q.    They didn't ask you or didn't help you prepare for

16    questions that we might ask and how to respond to them?

17    A.    No.

18    Q.    Mr. Berndt asked you and Mr. DeVillers asked you some

19    questions about the charges.  And you were charged in this

20    Indictment, two counts for the Tyrell Davis murder, correct?

21    A.    Correct.

22    Q.    And you pled to one of those two counts, pled guilty,

23    right?

24    A.    Correct.

25    Q.    And you testified about, both on direct and Mr. Berndt's

TRIAL ONE - VOL. 17 - 3228

1    questions, to the Short North Posse and Cut Throat and Homicide

2    Squad, correct?

3      A.    Correct.

4      Q.    And you testified to being in that gang, correct?

5      A.    Correct.

6      Q.    And you're familiar with this case because you were in

7    it.  When I say familiar with this case, you're familiar with

8    the Indictment, correct?

9      A.    Correct.

10     Q.    And you probably reviewed the Indictment at some point

11   in time, didn't you?

12     A.    Yes.

13     Q.    And the first count of the Indictment involves being in

14   a criminal gang, correct?

15     A.    Correct.

16     Q.    And you were never charged with being in a gang, were

17   you?

18     A.    No.

19     Q.    And when you got charged, you hadn't given any

20   statements to the government agreeing to cooperate back in

21   2014, correct?

22     A.    Correct.

23     Q.    So with all of that, when you got indicted in 2014, they

24   did not accuse you of being in a criminal gang, correct?

25     A.    Correct.  I wasn't hit with the racketeering.  I was a

TRIAL ONE - VOL. 17 -  3229

1   juvenile at the time.

2     Q.    So you couldn't face any charges?

3     A.    Not for racketeering, correct.

4     Q.    That's how you understand it?

5     A.    Correct.

6     Q.    You face charges for a murder but not for being in a

7   gang?

8     A.    Correct.

9     Q.    Now, in the time period 2005 until 2008, can you tell

10  me -- well, first of all, let me back up.

11        Your date of birth is January 13th, 1991, correct?

12    A.    Correct.

13    Q.    So starting in 2005, when were you incarcerated?  During

14  what periods of time, do you recall?

15    A.    No.

16    Q.    Do you recall being incarcerated, we've talked about

17  this, Mr. Berndt's asked you questions and you agree, now you

18  agree you were incarcerated March of 2006 through some period

19  in May of 2006, correct?

20    A.    I believe so.

21    Q.    And then didn't you also get arrested in November of

22  2006, you and Tony Jones?

23    A.    Correct.

24    Q.    And how long were you in jail for that period of time?

25    A.    Six months.

TRIAL ONE – VOL. 17 –  3230

1    Q.   All right.  So that would be 11/06 to maybe 5/07, is

2    that fair?

3    A.   I'd say March.

4    Q.   To March of '07?

5    A.   Somewhere around there.

6    Q.   And then you got arrested again, correct?

7    A.   Correct.

8    Q.   And that would be probably the end of June or beginning

9    of July of '07, correct?

10   A.   Correct.

11   Q.   And that was until approximately March of 2008, correct?

12   A.   Correct.

13   Q.   And then you got out in March of 2008 and then you've

14   talked about Parkay.  That was July 19th, 2008.  You were

15   arrested on that date, right?

16   A.   Correct.

17   Q.   And you've been in ever since, right?

18   A.   Yes.

19   Q.   So during these several years you've been testifying

20   about, you've been in jail all those times that you've just

21   testified to, more than a year?

22   A.   Correct.

23   Q.   You have about three months, you have about four months,

24   you have about eight months and then you have from July 19,

25   2008, correct?

TRIAL ONE – VOL. 17 –  3231

1    A.    Of what?  Being incarcerated or on the street?

2    Q.    Being incarcerated.

3    A.    It sounds correct.

4    Q.    Now, when you gave your second statement in 2015, they

5    asked you some questions about when you started to get involved

6    in this.  Do you recall?  Do you recall that?

7    A.    Involved in what?

8    Q.    Involved in being in the Short North?

9    A.    I don't recall but I could probably tell you.

10   Q.    Well do you recall telling them that you met some of the

11   members of the Short North Posse in approximately 2003 when

12   they came to your football games?

13   A.    Correct.

14   Q.    And you would have been about twelve then, right?

15   A.    Correct.

16   Q.    And you indicated to the agents when you were being

17   interviewed that you didn't start hanging out in the Short

18   North until after 2005 because you were busy playing sports.

19   Do you remember that?

20   A.    Every day, yes.  Correct.  I wasn't going to school and

21   stuff like that, correct.

22   Q.    You weren't going to school but you were playing sports?

23   A.    2003 I was playing sports and about 2005 when I stopped

24   playing sports, I was hanging out in the Short North every day.

25   But prior to that, I would come out there on occasion.

TRIAL ONE – VOL. 17 –   3232

1    Q.   So it's correct then if it says that you didn't start

2    hanging out there until after 2005.  That would be 2006 at the

3    earliest, right, because that's after 2005?

4    A.   About 2005, 2006.

5    Q.   I'm just asking if the agent wrote it down that you said

6    you didn't start hanging out in the Short North until after

7    2005, did the agent write it down correctly?

8    A.   I'm sure he did.

9    Q.   And are you saying that when you started hanging out in

10   the Short North, say, in 2006, you weren't doing school or

11   sports anymore?

12   A.   No.  I wasn't doing sports no more.  Wasn't doing

13   sports.  If I did do school it would maybe be like once, twice

14   a week because I was on probation and my PO would come to

15   school to see if I was at school.  But I really wasn't in

16   school.

17   Q.   So you just come -- you just go to school if you knew

18   your PO was going to be there so you didn't get in any trouble,

19   right?

20   A.   Correct.

21   Q.   Now, if you didn't start hanging out until after 2005 --

22   you indicated that you participated in robberies in

23   approximately 2005 with Elijah Ledbetter, is that just on those

24   occasions you would come to the Short North?

25   A.   Probably.

TRIAL ONE - VOL. 17 - 3233

1    Q.   And you indicated you did some with Elijah Ledbetter.

2    How long did you -- how many robberies did you do with them?

3    A.   We only did one burglary, robbery.  But the rest of them

4    was like knockouts.

5    Q.   How many is the rest of them?

6    A.   I can't give you a specific number.  It was quite a few.

7    Maybe about, I don't know, three, four.  Somewhere in there.

8    Q.   And did that also include the time in 2005 when you and

9    Dawan Franklin robbed what you termed a lesbian couple?

10   A.   Correct.

11   Q.   And this is at a time in 2005 when you were not hanging

12   out in the Short North, correct?

13   A.   I don't think I was out there every day, correct.  But I

14   would come be with my cousin for a minute, maybe a couple days

15   and go back home.

16   Q.   Were you still staying off of Weber which is not in the

17   Short North?

18   A.   Correct.  Or in Reynoldsburg with my grandma.  Back and

19   forth.

20   Q.   And you knew an individual -- Did you know an individual

21   by the name of Lance Green?

22   A.   Yes.

23   Q.   He went by the name Jiggs, right?

24   A.   Yes.

25   Q.   And he didn't live in the Short North either, did he?

1    A.    No.

2    Q.    He lived out east?

3    A.    I believe so.

4    Q.    Now, when you talked to the police in 2015 at your

5  second interview you talked about vehicles that he had.  Do you

6  remember that in 2005?  Vehicles, you were describing what

7  vehicles Lance Green had?  Do you remember that?

8    A.    Correct.

9    Q.    And then you went on to say that you didn't even hang

10  out with Lance Green until 2007.  You remember that?

11    A.    Correct.

12    Q.    So you knew about his vehicles but you didn't hang out

13  with him?

14    A.    Correct.  I would see his vehicles all the time like

15  around the city, the Short North.  Might even see him riding

16  down the street.

17    Q.    But you weren't hanging out with him?

18    A.    Correct.

19    Q.    Then you go on a little bit later and you say that you

20  did a robbery with him in 2006.  So my question is, if you

21  weren't hanging out with him, you're doing robberies with him

22  though?

23    A.    It wasn't specifically him.  It was more so he came and

24  he told Coates and Coates -- we went with Coates.

25    Q.    We went with Coates.

TRIAL ONE – VOL. 17 – 3235

1   A.   Yes.  Me, Harris, Franklin, Terrel, Liston.  We went out

2   there with Coates, with Jiggs.

3   Q.   So you were hanging around then?

4   A.   In 2006, yes.

5   Q.   So even though you said that you didn't hang out with

6   Lance Green until 2007, now you're saying you were?

7   A.   That was a one-time thing.  2007 we hung around on more

8   occasions riding around together, being with each other a

9   little more because of the relationship grew in 2006.  Prior to

10  2007 we didn't hang around as much.  Just that one time.  So,

11  no, we didn't hang around.

12  Q.   And you also indicated that you did a robbery with Lance

13  in 2008, right?

14  A.   It wasn't a robbery.  He was just driving.

15  Q.   All right.  Do you remember when in 2008 that supposedly

16  happened?

17  A.   No.  I can't recall what month exactly it was.

18  Q.   Do you know whether it was early or later in the year?

19  A.   When I got out of jail in March, went back in July.  So

20  it had to be somewhere in between there.

21  Q.   Now, when you're talking about these things that you

22  were supposedly doing in the Short North, you were -- when you

23  were doing these robberies, how did it work?  Did you just

24  whoever went along, you guys split up the proceeds?

25  A.   Yeah.

TRIAL ONE – VOL. 17 –  3236

1    Q.   There was nobody leading you.  You guys just decided on

2    any given day who would do whatever, right?  You were on your

3    own?

4    A.   Kind of sort of.  I was young.  Trying to fit in, trying

5    to do whatever.

6    Q.   Well, I guess what I'm wondering about then is you

7    talked to the police for the first time in May 15, 2006 and

8    they asked you and you said you were a documented or you said

9    you were a member of the Web Boys gang, right?

10   A.   That's what they documented me as, correct.

11   Q.   So where did the Web Boys gang work out of?

12   A.   Off of Weber.  Weber Road.

13   Q.   So as of May 15, 2006, you were a Web Boys gang member?

14   A.   That's what I was documented as, correct.

15   Q.   That's what you were, correct?

16   A.   On black and white, yes.  Correct.

17   Q.   On black and white.  You mean on paper?

18   A.   Yes.  On paper.

19   Q.   So you didn't say to them, hey, I'm in the Short North

20   Posse?

21   A.   I can't recall that I said that to them.

22   Q.   Well, do you have any reason to doubt that they didn't

23   note anywhere in here that you were a member of the Short North

24   Posse at that time?

25   A.   No.  They just asked me questions about Short North.  It

TRIAL ONE - VOL. 17 -  3237

1    never came up that I was a member of the Short North.  I had

2    family out there.  I been out there since I was a kid.

3      Q.    It never came up because you didn't bring it up, right?

4      A.    Possibly, correct.

5      Q.    In fact, when they did -- they did ask you about the

6    Short North and you gave a couple of names.  You gave Ricco

7    Maye, you gave T-Patt which is Terrel Patterson, right?

8      A.    Correct.

9      Q.    You gave Tommy Coates, right?

10     A.    Correct.

11     Q.    And you gave Troy Locke?

12     A.    Correct.

13     Q.    You never gave Chris Harris, did you?

14     A.    Not at that time.  At that time specifically I don't

15   think so.

16     Q.    Well, if it's not in their notes do you have any reason

17   to doubt that you never told police that Chris Harris was in

18   the Short North Posse or Homicide Squad or anything?

19     A.    No.

20     Q.    And your whole purpose in talking to them was to get a

21   lighter sentence, correct?

22     A.    Correct.

23     Q.    And that worked, didn't it?  Because three or four days

24   after you talked to them, you got released, didn't you?

25     A.    I believe so.

TRIAL ONE - VOL. 17 -  3238

1   Q.   To be part of this Web Boys gang, what kind of crimes

2   did you have to commit with them?

3   A.   Web Boys really wasn't a gang to me.  It wasn't a gang

4   to me.  We didn't do nothing.  It was just maybe about ten

5   people that lived in the neighborhood that just smoked weed

6   together, for real.  Didn't really commit no crimes or nothing

7   crazy.

8   Q.   Just a bunch of guys hanging out getting high?

9   A.   You can say that.

10  Q.   And you made up a name?

11  A.   The police made the name up.

12  Q.   Okay.  So when did you start being in this Web Boys

13  gang?

14  A.   I guess I was documented in there in about 2000 -- I

15  want to say '5 or '4, I believe.

16  Q.   I'm sorry?

17  A.   I said I believe.

18  Q.   2005 or 2004 and you listed a number of people that you

19  say were in the gang, correct, when you talked to the police?

20  A.   Correct.

21  Q.   Did you ever say to them that, hey, we really aren't a

22  gang, we don't do anything illegal?

23  A.   No.

24  Q.   And by that time, you were already doing knockout -- the

25  knockout game.  Did you ever do that with any of the Web Boys?

1    A.    No.

2           MR. GATTERDAM:  Your Honor, I may have a different

3    line to pursue.

4           THE COURT:  All right.  Thank you, Mr. Gatterdam.

5    We'll resume with your cross-examination tomorrow morning

6    at 9:00.

7           Ladies and gentlemen, thank you very much.  Thank you

8    for your collaboration and guidance.  As always, I want you to

9    have a safe journey home, pleasant evening with family and

10   friends and I look forward to seeing everyone tomorrow morning.

11   Thank you for your patience.

12      (Jury out at 5:10 p.m.)

13           THE COURT:  Mr. DeVillers, is there anything further

14   from the government?

15           MR. DEVILLERS:  There is, Your Honor.

16           We talked over the weekend with defense counsel and I

17   talked to the marshals.  Our endeavor was to try to somehow get

18   either the tattoos of the defendants shown to the jury.  It's

19   clear the marshals would rather have that done by photographs

20   and that's what we intend to do.  We would ask the Court to --

21   we don't believe it's testimonial.  We would ask the Court to

22   order the defendants made available for photographs through one

23   of our agents with the marshals.  The defense attorneys can be

24   there as well.

25           THE COURT:  All right.  Mr. Berndt.

TRIAL ONE – VOL. 17 –  3240

1          MR. BERNDT:  Your Honor, we would resist the

2    photographing.  We would have a different position on it.  We

3    believe that it's testimonial.  There's also going to be the

4    question as to whether --

5          THE COURT:  Let me ask you this.  And I'm not going to

6    rule on it right now but I want us all to think about it

7    collectively as we have dealt with some of the other legal

8    issues.

9          The first thing that came to my mind was, is it

10   different from blood samples, for instance?

11         MR. BERNDT:  Understood.

12         THE COURT:  And let's start there.  I don't want any

13   response, necessarily, right now because it's probably an issue

14   that we need to noodle on a little bit and I'll, of course,

15   research it.  But let's think about it in a smart way.

16         MR. BERNDT:  Suffice it to say, we're going to resist

17   that.  I will do some research on it myself and come up with

18   what I can.

19         THE COURT:  Before you sit down.  Mr. DeVillers, what

20   kind of -- at what point --

21         MR. DEVILLERS:  I think we have plenty of time, Judge.

22   At least three more weeks of testimony, evidence, I think.  I

23   don't think we need it from Mr. Robinson.

24         THE COURT:  Just the defendants who were listed in the

25   conspiracy?

TRIAL ONE - VOL. 17 - 3241

1            MR. DEVILLERS:  Yes.

2            THE COURT:  Do you have anything further, Mr. Berndt?

3            MR. BERNDT:  No, Your Honor.  And thank you, Dave, for

4     bringing that up over the weekend.

5            THE COURT:  Mr. Gatterdam, on behalf of Mr. Harris.

6            MR. GATTERDAM:  I guess the two cents that I'll add to

7     that is I'm more than happy to have a motion filed.  We have

8     actually been e-mailing back and forth since over the break on

9     this subject.  I'm more than happy to provide something.

10           THE COURT:  Would you rather submit some briefing on

11    it?  I should ask you and Mr. Martinez if you would rather

12    submit some briefing on it, give you guys maybe about -- guys

13    and women about a week, woman, about a week?  Would that be

14    sufficient, Mr. Martinez, for you.

15           MR. MARTINEZ:  Thank you, Your Honor.

16           THE COURT:  How about next Monday simultaneous briefs

17    on it whether it's testimonial.  Does that work for you,

18    Mr. Gatterdam?

19           MR. GATTERDAM:  Absolutely.

20           THE COURT:  Ms. --

21           MS. DIXON:  It does, Your Honor.  I have another issue

22    besides the issue of whether it's testimonial.  I think I asked

23    in my e-mail what the basis of it was or where was it coming

24    from because obviously we've been in this case for almost two

25    years before getting to this point and that has not been an

TRIAL ONE – VOL. 17 –  3242

1    issue and I know why it hasn't been an issue.  Because my

2    client, for one, has been in state custody since 2008, late

3    2007, and he obviously did not have these tattoos that they

4    want to take a picture of.  And so I was asking what the basis

5    of it was.

6            THE COURT:  Are you challenging the government's

7    request on relevancy grounds?

8            MS. DIXON:  Correct, Your Honor.

9            THE COURT:  That can be a part of your simultaneous

10   briefing.  You can write the section of the brief that deals

11   with relevancy as Mr. Gatterdam does the other portion.  Who

12   writes it, of course, is irrelevant to me.  But you should

13   include that in your argument.  What I'll do is have

14   simultaneous briefing and if the parties want, I can give you

15   maybe by the end of that same week to file any replies.

16           MS. DIXON:  Okay.

17           THE COURT:  Mr. Martinez, does that work for you?

18           MR. MARTINEZ:  Yes, Your Honor.

19           THE COURT:  Mr. McVay?

20           MR. MCVAY:  We have nothing further on behalf of

21   Mr. Ussury at this time.

22           THE COURT:  Mr. Nolder, anything --

23           MR. NOLDER:  Nothing.

24           THE COURT:  -- on behalf of Mr. Robinson?

25           MR. NOLDER:  Thank you.

TRIAL ONE – VOL. 17 –  3243

1          THE COURT:  So we'll have simultaneous briefing on the

2    16th and then any replies by close of business on the 20th and

3    the Court will have a decision at least a week after that.

4    Thank you very much everyone.  Have a good evening.

5          (The proceedings were adjourned at 5:15 p.m.)

6                            –  –  –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                    TRIAL ONE - VOL. 17 -  3244
 1                          - - -

 2                      WITNESS INDEX

 3                          - - -

 4   WITNESSES            DIRECT   CROSS   REDIRECT   RECROSS

 5   PLAINTIFF'S:

 6   Troy Patterson        3000    3154
        By Mr. Gatterdam           3221
 7                          - - -

 8                    INDEX OF EXHIBITS

 9                          - - -

10   PLAINTIFF'S:                              RECEIVED

11   153-310                                     3058
     153-177                                     3152
12   154-1-23                                    3089
     154-1-32                                    3098
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3          We, Shawna J. Evans, Denise N. Errett, Darla J.

4    Coulter, and Lahana Dufour, do hereby certify that the

5    foregoing is a true and correct transcript of the proceedings

6    before the Honorable Algenon L. Marbley, Judge, in the United

7    States District Court, Southern District of Ohio, Eastern

8    Division, on the date indicated, reported by us in shorthand

9    and transcribed by us or under our supervision.

10

11

12                         s/Shawna J. Evans
                           Shawna J. Evans, RMR
13                         Official Federal Court Reporter

14

15                         s/Denise N. Errett
                           Denise N. Errett, RPR FCRR
16                         Official Federal Court Reporter

17

18                         s/Darla J. Coulter
                           Darla J. Coulter, RMR, CRR
19                         Former Official Federal Court Reporter

20

21                         s/Lahana Dufour
                           Lahana Dufour, RMR, CRR
22                         Official Federal Court Reporter

23

24                         May 9, 2016

25